1  SCOTT C. CLARKSON, ESQ. SBN 143271
   EVE A. MARSELLA, ESQ. SBN 165797
2  CLARKSON, GORE & MARSELLA
   A PROFESSIONAL LAW CORPORATION
3  3424 Carson Street, Suite 350
   Torrance, California 90503
4  (310) 542-0111 Telephone
   (310) 214-7254 Facsimile

5  [Proposed] Attorneys for MTI Technology Corporation

6

7              UNITED STATES BANKRUPTCY COURT

8      CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

9  In re                          | Case No.  SA 07-13347-ES

10 MTI TECHNOLOGY CORPORATION, a   | In a Chapter 11 Bankruptcy Case
   Delaware corporation,
11                                 | MOTION FOR: I) APPROVAL OF SECURED
              Debtor in Possession.| POST-PETITION FINANCING;
12                                 | II) AUTHORITY TO USE CASH
                                   | COLLATERAL AND PROVIDE ADEQUATE
13                                 | PROTECTION OF PRE-PETITION
                                   | SECURITY INTERESTS; AND (III) ORDER
14                                 | FIXING A FINAL HEARING FOR
15 Federal Tax I.D. # 95-3601802   | APPROVAL OF THE MOTION

16                                 | DECLARATION OF THOMAS P. RAIMONDI,
17                                 | JR. IN SUPPORT

18
                                   | Date:   October 16, 2007
19                                 | Time:   2:00 p.m.
                                   | Ctrm:   5A
20

21

22        Pursuant to General Order 02-02 and Local Bankruptcy Rule 9075-1, MTI Technology

23 Corporation, debtor in possession in the above-captioned chapter 11 case ("Debtor" and "Case"

24 respectively), hereby moves this Court for an interim order (i) approving secured post-petition

25 financing; (ii) authorizing the use of cash collateral and adequate protection of pre-petition

26 security interests; and (ii) fixing a final hearing on financing and cash use (the "Motion").

27

28

## A. SUMMARY.

The Motion is brought pursuant to Bankruptcy Code sections 105(a), 361, 362, 363, and 364, Fed. R. Bankr. P. Rules 4001(b), (c) and (d) and 9014. The Motion seeks an interim order: (1) approving post-petition financing from Zinc Holdings, LLC ("Zinc" or "DIP Lender") pending a final hearing in conformity with applicable procedural requirements. The Motion also requests authority to use cash collateral which is subject to pre-petition security interests in favor of The Canopy Group, Inc. ("Canopy") and Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division ("Wells Fargo") (together the "Secured Lenders"); and, finally, the Motion requests authority to provide adequate protection to the Secured Lenders by granting replacement liens (on the same species of collateral), and administrative priority with respect to all "Collateral," and "Obligations" as those terms are defined in the "Post-Petition Loan and Security Agreement " executed by Debtor and Zinc dated as of October 15, 2007 (the "DIP Financing Agreement"). The relief catalogued above is intended to be "interim" in nature. The Motion asks that the Court set a final hearing with respect to the DIP Financing Agreement; and prescribe the form and manner of notice with respect to that hearing.

The Motion is brought on an "emergency" basis, pursuant to General Order 02-02 because if the relief requested in the Motion is not granted immediately, the Case may be stillborn, and the going concern value of Debtor's assets may be lost.

## B.    DISCUSSION

### 1.    Commencement of the Case.

The Case was commenced by the filing of a voluntary petition under chapter 11 of title

Motion for Order Approving Interim DIP Financing and Use of Cash
Collateral.

2

11, United States Code[1] on October 15, 2007 (the "Petition Date"), in the Central District of California, Santa Ana Division ("Court").

## 2.    Background of the Debtor.

The Debtor is a global provider of end-to-end information infrastructure solutions for mid to large size companies. With more than 20 years experience in delivering innovative technology solutions and more than 5 million hours of providing professional services, the Debtor is a leader in end-to-end information infrastructure solutions that span analysis, design, implementation and has strategic technology and services relationships with industry leaders including, EMC, Microsoft, VMWARE, Symantec and Cisco.

The Debtor has three primary groups of assets at this time:

1.    European Subsidiaries – the Debtor owns all of the issued and outstanding capital stock of each of all of the issued and outstanding share capital of each of MTI Technology GmbH, incorporated in Germany ("MTI Germany"), MTI Technology Limited, incorporated in Scotland with company number SC112019 ("MTI UK"), and MTI France S.A.S., incorporated in France ("MTI France", and together with MTI Germany and MTI UK, the "European Companies," and each a "Company").

2.    Collective – Debtor owns a U.S. based service division know as "Collective", which was purchased approximately 18 months ago, and

3.    A U.S. based service division other than Collective.

The Debtor has aggressively attempted to sell each of these asset groups as going concerns over the past year.  Debtor has entered into a purchase agreement to sell the European

---

[1] All section references are to the "Bankruptcy Code, title 11, United States Code, § 101 et seq.

Motion for Order Approving Interim DIP Financing and Use of Cash Collateral.

3

1   Companies to Zinc,[2] and is working with prospective buyers for the U.S.-based assets over the

2   next sixty (60) days.

3        Debtor has remained in possession of all of its assets and continues to operate and

4   manage its business as a debtor in possession pursuant to sections 1107 and 1108 of the

5   Bankruptcy Code.

6

7        3.    **Summary of Secured Indebtedness.**

8        As indicated above, Canopy and Wells Fargo are the Debtor's primary secured creditors,

9   holding security interests in all or substantially all assets of Debtor's chapter 11 estate ("Estate").

10  Debtor believes and represents that all of the Debtor's cash, including the cash in its deposit

11  accounts, wherever located, whether as original collateral or proceeds of other Pre-petition

12  Collateral, constitutes Cash Collateral of the Pre-petition Lenders within the meaning of section

13  363(a) of the Bankruptcy Code.

14

15       (a)    <u>The Wells Fargo Facility</u>:  Pursuant to that certain Account Purchase Agreement,

16  dated as of November 27, 2006 (as amended, supplemented, restated or otherwise modified prior

17  to the Petition Date, the "Wells Fargo Prepetition Agreement" and together with all other loan

18  and security documents executed in connection therewith, the "Wells Fargo Facility"), between

19  the Debtor and Wells Fargo Bank, National Association, acting through its Wells Fargo Business

20  Credit operating division ("Wells Fargo"), the Debtor sold and assigned to Wells Fargo certain

21  of its accounts receivable.  Accounts sold to Wells Fargo under the Wells Fargo Facility become

22  the sole property of Wells Fargo upon payment of the initial payment for the account.  However,

23

24  under certain circumstances, the Debtor is required to repurchase accounts sold to Wells Fargo.

25

26  _____

27  [2] The sale is the subject of a contemporaneous motion relating to bidding procedures in contemplation
of a sale to Zinc, or a higher qualified bidder under section 363(f).

28

1  To secure obligations of the Debtor under the Wells Fargo Facility, and pursuant to the terms of

2  the Wells Fargo Facility, the Debtor granted Wells Fargo a first priority security interest and lien

3  (the "Wells Fargo Lien") on the Debtor's then existing or thereafter arising accounts, the reserve

4  account established in connection with the Wells Fargo Facility, and, to the extent that they

5
   pertain to such accounts, any contract rights, inventory, general intangibles, chattel paper,
6
7  documents, books and records, and the proceeds and products of the foregoing property (the

8  "Wells Fargo Collateral"). The Debtor is currently in default under the terms of the Wells Fargo

9  Facility. As of October 10, 2007, $1,711,670.04 remains outstanding in connection with the

10  Wells Fargo Facility (the "Wells Fargo Obligations").

11
           (b)    The Canopy Facility.    Pursuant to that certain Loan Agreement, dated as of June
12
13  27, 2002 (as amended, supplemented, restated or otherwise modified prior to the Petition Date,

14  the "Canopy Prepetition Agreement" and, together with all other loan and security documents

15  executed in connection therewith, the "Canopy Facility"), between the Debtor and The Canopy

16  Group, Inc. ("Canopy", and, together with Wells Fargo, the "Prepetition Lenders"), Canopy

17  guaranteed the Debtor's performance and prompt payment when due of all of the Debtor's

18  obligations under that certain Loan and Security Agreement between the Borrower and Comerica

19
   Bank-California (the "Comerica Line of Credit"), and secured its guarantee of the Comerica Line
20
21  of Credit through a Seven Million Dollar ($7,000,000) letter of credit issued by Bank of

22  America, which letter of credit was called by Comerica Bank-California prior to the Petition

23  Date and used to satisfy in full the Comerica Line of Credit. To secure the Canopy Facility, and

24  pursuant to the terms of the Canopy Prepetition Agreement, the Borrower granted Canopy a first

25  priority security interest and lien (the "Canopy Lien", and, together with the Wells Fargo Lien,

26  the "Prepetition Liens") on all of Borrower's presently existing and after-acquired general

27  intangibles, accounts (including but not limited to accounts receivable), inventory, equipment,
28

1  goods, fixtures, chattel paper, documents (including but not limited to investment property),

2  instruments and records (except for the Released Accounts, the Released Inventory and certain

3  other items of collateral as more fully set forth in the Canopy Prepetition Agreement) and the

4  proceeds and products thereof, and the products and proceeds of the foregoing property (all as

5

6  more particularly described in the Canopy Prepetition Agreement, the description of which is

7  incorporated herein by reference) (hereinafter the "Canopy Collateral", and, together with the

8  Wells Fargo Collateral, the "Prepetition Collateral").  As of October 9, 2007, $5,190,546.60 plus

9  interest and attorneys' fees and costs remained outstanding in connection with the Canopy

10  Facility (the "Canopy Obligations", and together with the Wells Fargo Obligations, the

11  "Prepetition Obligations").

12      **4.      Proposed European Companies Stock Sale.**

13

14      Due to the Debtor's financial condition and lack of available capital, the Debtor has

15  determined that it is in the best interests of the Debtor's creditors and shareholders to

16  immediately sell the Debtor's European Companies, with valid liens and encumbrances to attach

17  to the proceeds.  Crucial to Debtor's success was finding a buyer who would be willing to fund

18  operating expenses during the interim period between negotiating and closing the sale.  Not only

19  has the Debtor identified Zinc as the best candidate to acquire the Debtor's interest in the

20  European Companies; but Zinc is willing to provide the required financing subject to it being

21

22  approved as the stalking horse bidder.  After negotiations, the Debtor and Zinc prepared a Term

23  Sheet and entered into a Purchase Agreement dated as of October 15, 2007 (the "Purchase

24  Agreement").

25      Pursuant and subject to the terms of the Purchase Agreement, Zinc offered to purchase all

26  of the Debtor's interest in the European Companies for $5.5 million cash and the assumption of

27  certain limited obligations (the "Purchase Price"), and to provide financing to allow the Debtor's

28

1   business to continue in operation through the closing of the sale under the Purchase Agreement.

2   Zinc has offered to provide post-petition financing on a secured basis pursuant to Bankruptcy

3   Code Section 364(d) in the maximum amount of $5,000,000 (the "DIP Financing"), subject to

4   the terms and conditions as more specifically set forth in the DIP Financing Agreement and

5   Budget as more fully described below.  The DIP Financing will bridge the period through the

6   close of the sale of the European Companies, which will allow the company to continue

7   marketing the remaining United States-based assets to various buyers, and repayment of all DIP

8   Financing Facility is intended to occur by the use of a credit bid procedure during the auction of

9   the European Companies, or in the case of a successful overbid by another purchaser, a

10   superpriority administrative lien of the proceeds of the sale.

11           The Debtor believes that this outcome is far superior to the treatment creditors would

12   receive if Debtor simply filed a Chapter 7 bankruptcy petition, as was otherwise imminent in this

13   case.  Due to the amounts owed to Canopy and Wells Fargo, the Debtor's assets are likely fully

14   encumbered.  As a consequence, in a Chapter 7 case, under-secured, priority and unsecured

15   creditors likely would recover little or nothing.  However, under the proposed transactions with

16   Zinc, coupled with other possible sales of remaining MTI assets, fund may be available for

17   payment of administrative, priority unsecured claims and unsecured claims.

## II.    LEGAL ANALYSIS

### A.    Post-Petition Financing, Use of Cash Collateral and Adequate Protection.

         Pending the conclusion of Bankruptcy Court approval of the sale of the Debtor's assets to

Zinc and others, it is imperative that the Debtor receives funding in order to retain the key

employees and to continue a level of operations so there is, in fact, a going concern at the time of

the closing of the sale to Zinc (or another successful bidder).

         The Debtor seeks post-petition financing to fund working capital and to maintain

1    business operations until the Debtor's assets are sold.  As a first day motion, the Debtor shall also

2    file a motion seeking to establish bidding procedures and for approval of a sale of the Debtor's

3    interest in the European Companies under section 363 of the Bankruptcy Code, with liens and

4    encumbrances to attach to the proceeds of the sale.  The Debtor also seeks an order approving its

5    use of cash collateral and granting to Zinc as adequate protection for its post-petition DIP

6   

7    financing a super priority administrative expense claim under Section 507(b), which is senior to

8    certain interests granted to Canopy and junior to certain interests granted to Wells Fargo. Finally,

9    the Debtor seeks an order granting the Prepetition Lenders adequate protection for their consent

10    to the use of cash collateral, and for Canopy's voluntary agreement to subordinate its security

11    interest in the Canopy Collateral to the DIP Lender.

12        Pending the sale to Zinc or a higher bidder, the Debtor has negotiated in good faith and

13    entered into an agreement with Zinc whereby (subject to the approval of this Court) the Debtor

14    may borrow and obtain letters of credit up to $5,000,000 as debtor-in-possession financing ("DIP

15    Financing") from Zinc.  A copy of the agreement evidencing this agreement regarding DIP

16   

17    Financing is attached hereto as <u>Exhibit A</u> (the "DIP Financing Agreement").[1]  Pursuant to the

18    DIP Financing Agreement, Zinc has agreed to provide a total commitment, in the maximum

19    amount of $5,000,000 ($1,000,000 on an interim basis) pursuant to a budget that has been

20    approved by Zinc, Canopy and Wells Fargo.  A true and correct copy of the Budget is attached

21    hereto as Exhibit "C". As shown on the Budget, the Debtor does not believe it will borrow the

22   

23    maximum amount authorized under the DIP Financing Agreement in order to complete an

24    orderly liquidations.

25    ///

26

27          [1] All capitalized terms herein and not otherwise defined shall have the meanings ascribed to

28    such terms in the DIP Financing Agreement.

1.   **Summary of Key Terms of the DIP Financing Agreement.**

**Borrower:**    MTI Technology Corporation as a debtor and debtor in possession in a case filed under Chapter 11 of the Bankruptcy Code (the "*Case*") in the United States Bankruptcy Court for the Central District of California (the "*Bankruptcy Court*").

Borrower may also be referred to as Debtor.

**Lender:**    Zinc Holdings, LLC or its affiliate ("*DIP Lender*").

**Credit Facility:**    A senior secured revolving credit facility (the "*Revolver*") in the amount of up to $5,000,000 (the "*Revolver Commitment*"). Availability under the Revolver will be limited to 20% of the committed amount prior to entry of a final order of the Bankruptcy Court authorizing the financing arrangements contemplated by this Term Sheet and in scope and substance satisfactory to the DIP Lender (the "*Final Financing Order*").

**Use of Proceeds:**    To finance working capital needs and capital expenditures and for other general corporate purposes.

**Closing Date:**    The date the conditions precedent to the initial extension of credit under the Revolver shall have been satisfied and the initial extension of credit under the Revolver is made.

**Maturity:**    The earliest of (a) December 21, 2007, (b) the effective date of the Borrower's plan of reorganization and (c) the date a sale of one or more European Entities or material assets of any of them, or the receivable due to Borrower from MTI Technology GmbH, is consummated under Section 363 of the Bankruptcy Code (any such date, the "*Stated Maturity Date*"). All amounts outstanding under the Revolver shall be due and payable in full at the Stated Maturity Date.

**Security:**    All loans and all other obligations under the Revolver will be entitled to (a) super priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code, senior to any and all administrative expenses (with agreed upon exceptions) specified or ordered pursuant to any provision of the Bankruptcy Code, prepetition obligations and any other claims of any entity, including, without limitation, any claims under Sections 503, 507, 1113, and 1114 of the Bankruptcy Code, and (b) secured by (i) a perfected security interest junior only to the Wells Fargo Lien pursuant to Sections 364(c)(2) and (3) and 364(d) of the Bankruptcy Code in on all presently owned and hereafter acquired assets of the Borrower including without limitation accounts, deposit accounts, certain investments, instruments, documents, inventory, fixed assets, machinery and equipment, general intangibles, intellectual property, and all interests (whether owned or leased) in all real estate and all proceeds and products of all of the foregoing (including insurance proceeds) (ii) the proceeds of avoidance actions under section 549 (but not 547 or 548) of the Bankruptcy Code, to the extent that the Carve Out funded the estate's expenses in investigating such actions, commencing such actions, and conducting the litigation and/or settlement discussions that resulted in the receipt of such proceeds, (iii) proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-

petition transfer of Collateral, (iv) the Borrower's rights under section 506(c) of the Bankruptcy Code and the proceeds thereof, (v) any unencumbered assets of the Borrowers, and (vi) all capital stock and other equity interests in the Borrower and its subsidiaries (in the aggregate, the "*Collateral*"), senior in priority to all other security interests and liens. The security interest will not be subject to section 551 of the Bankruptcy Code nor shall the Collateral be charged pursuant to section 506(c) of the Bankruptcy Code, nor shall it be subject to the "equities of the case" cutoff under Section 552(b) of the Bankruptcy Code.

The term "<u>Carve Out</u>" shall mean (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930 (a)(6), and (b) allowed fees and expenses incurred by the debtors and any official committee(s) of creditors pursuant to Sections 327 and 1103 of the Bankruptcy Code. For purposes of clause (b), (i) if, at the time of reference, the Termination Declaration Date (as hereinafter defined) has not occurred, the amount of the Carve Out shall not be limited, except that no payment may be made to any professional absent an order allowing such payment, and (ii) if, at the time of reference, the Termination Declaration Date has occurred, the amount of the Carve Out (the "*Carve Out Amount*") shall be limited to the sum of $25,000 in the aggregate, whether the fees and expenses are allowed and unpaid at the time of the Termination Declaration Date or are incurred before or after the Termination Declaration Date.

**<u>Cash Management</u>:**    All collections and proceeds of Collateral will be deposited directly into and maintained in deposit accounts at institutions for which the DIP Lender has in place an account control agreement satisfactory to the DIP Lender (the "*Account Control Agreement*"). Such deposit accounts will be swept daily (the "*Daily Sweep*") into the Borrower's main operating accounts (the "*Concentration Account*") at each of its banking institutions (each a "*Depository Bank*") which Depository Bank shall have executed an Account Control Agreement and shall remain throughout the term of the Revolver the Depositary Bank for the Borrower's cash collateral. All amounts deposited into the Concentration Account will be swept on a daily basis into a collection account to be established by the DIP Lender (the "*Collection Account*"), net of amounts owed to Wells Fargo until the Wells Fargo Obligations are paid in full.

After the Wells Fargo Obligations are paid in full, collections and proceeds of Collateral deposited into the Collection Account will be applied on a daily basis, after a Daily Sweep, to reduce outstanding amounts under the Revolver. Any excess cash amounts remaining following application thereof to reduce outstanding amounts under the Revolver shall be redeposited into accounts subject to Account Control Agreements at the direction of the Borrower and subject to Canopy's security interests.

In connection with the foregoing, the Borrower shall seek the entry of appropriate first day orders, satisfactory to the DIP Lender, relating to the cash management system and deposit and disbursement accounts of the Borrower.

**Interest Rate:**

Interest shall be at the Prime Rate as reported in the Wall Street Journal (the "*Base Rate*") plus the Applicable Margin (referred to below). Base Rate loans shall require one business day's advance notice.

Interest on Base Rate loans will be due and payable monthly in arrears. All interest on Base Rate loans and Commitment Fee and other fee calculations shall be based on a 360 day year and actual days elapsed.

**Applicable Margin:**     3% above the Base Rate.

**Default Pricing:**     2.00% above the otherwise applicable rate.

**Letter of Credit Fees:**

Letter of credit fees shall be 4.0% per annum, payable monthly in arrears on the average daily face amount of all letters of credit outstanding during each calendar month.

An additional 0.25% per annum of the face amount of all letters of credit shall be paid to the Issuing Bank on the issuance of each letter of credit as a fronting fee, in addition to customary fees for issuance, amendments and processing of letters of credit specified from time to time by the Issuing Bank.

**Commitment Fee:**

A.     1% on the total Revolver commitment amount due and payable at the Closing; and

B.     0.25% per annum on the unused portion of the Revolver, payable monthly in arrears to the DIP Lender.

**Revolver Administration Fee:**     All actual expenses incurred by DIP Lender in connection with the administration of the Revolver

## C.     The Motion for the DIP Financing Should Be Granted under Bankruptcy Code Section 364(d).

Bankruptcy Code section 364(c) provides that if a debtor in bankruptcy is unable to obtain unsecured financing allowable under Bankruptcy Code section 503(b)(1) as an administrative expense, then the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:

(c)(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

1

2     Further, if a debtor is unable to obtain credit under the provisions of Bankruptcy Code

3     section 364(c), the debtor may obtain credit secured by a senior or equal lien on property of the

4     estate that is already subject to a lien (*i.e.*, a "priming lien"). 11 U.S.C. § 364(d). As set forth in

5     the Interim DIP Order, certain of the liens granted to secure the obligations under the DIP

6     Facility will prime the existing prepetition liens of Canopy (although will be junior to the liens of

7     Wells Fargo). This "priming" is proposed to be effected with the agreement of Canopy,

8     provided Canopy is granted a post-petition replacement lien on the Canopy Collateral as

9
      adequate protection for its agreement to subordinate its liens, and all borrowings under the DIP
10
      Facility are authorized by and set forth in the Budget approved by the Debtor, Canopy and the
11
12    DIP Lender.

13    The Debtor has been unable to obtain unsecured financing strictly based on 364(c). New

14    borrowing facilities are unavailable to the Debtor without the Debtor or this Court granting a

15    super-priority administrative expense, and security for such obligations through the granting of a

16    junior security interest and liens. The Debtor believes it to be impossible to obtain unsecured
17
      financing in any amount (or financing that is merely accorded administrative loan status), much
18
19    less the amount necessary to keep the Debtor afloat pending the sale of the "Assets" described in

20    the proposed asset purchase agreement with Zinc. Thus, the relief available under Section

21    364(d) is available in this instance because there is no other financing option more favorable.

22         **D.    The DIP Financing is Necessary and in the Best Interests of Creditors.**

23    The Debtor will not have sufficient funds to meet its payroll or to pay other continuing

24
      expenses necessary for the operation of its business during the pendency of this case. The
25
      Debtor believes that the interests of creditors and other parties in interest will be served under the
26
27    DIP Financing. Any credit incurred will be used to fund continued operations and to maintain

28

1   business operations to enable a maximization of proceeds from the sale of the Debtor's assets.

2   The DIP Financing will also be used to retain key employees, the loss of which employees would

3   undermine the ability to consummate a sale of the Debtor's assets to Zinc and any other person or

4   entity.  Notwithstanding the severe cost-cutting measures taken and described herein, the

5
6   Debtor's financial condition has become critical and without the Zinc DIP Financing, the Debtor

7   will be unable to operate and faces immediate shutdown of its business operations.

8         It is clear under the facts of this case that the ability of the Debtor to continue its

9   business, to remain a viable entity, and to reorganize under Chapter 11 of the Bankruptcy Code,

10  depends upon obtaining financing, and Zinc is the only available source of such crucial

11  financing.  The relief requested in the Motion is necessary, essential, and appropriate for the

12  continued operation of the Debtor's business and the management and preservation of its

13
14  property.  The Debtor believes that the interim relief requested herein is necessary to avoid

15  immediate and irreparable harm to the Debtor's estate.

16        **E.    The DIP Financing Agreement - Good Faith.**

17        The financing under the DIP Facility provides new liquidity to the Debtor and will enable

18  the Debtor, *inter alia*, to (a) minimize disruption to its business and on-going operations through

19  the date of a sale of its European operations, (b) preserve and maximize the value of the Debtor's

20  estate for the benefit of all the Debtor's stakeholders, (c) avoid immediate and irreparable harm to

21  the Debtor, its creditors, its businesses, its employees, and its assets, and (d)  continue to pursue

22
23  the sale process that has already been underway prepetition.

24        Such financing is the sole means of preserving and enhancing the Debtor's going concern

25  value.  Indeed, without the financing provided by the DIP Facility, the Debtor will not be able to

26  pay its employees or meet its direct operating expenses and the Debtor will suffer irreparable

27  harm.

28

In addition, the Debtor and the Prepetition Lenders have conferred regarding the relief requested herein and the terms of the Interim Order. The Prepetition Lenders do not object to the relief requested herein, provided the Court enters an Interim and Final Order that is in form and substance acceptable to the Prepetition Lenders and grants the Prepetition Lenders the adequate protection they have negotiated in return for their consents as set forth herein. Further, the rights of parties in interest are not prejudiced because there will be an adequate opportunity for review of the terms and conditions (including any waivers and grant of security interests and liens) of the DIP Facility prior to the Final Hearing.

The terms and conditions of the DIP Agreement, including the fees and expenses, are fair and reasonable and were negotiated by the parties in good faith and at arms' length. Accordingly, the DIP Lender should be accorded the benefits of Bankruptcy Code section 364(e) in respect of the DIP Facility.

**F.      The Motion for Use of Cash Collateral and the Granting of Adequate Protection Should Be Granted under Bankruptcy Code Section 363(e).**

Bankruptcy Code Section 363(c)(2) provides that in order to use cash collateral a debtor must obtain the consent of each creditor that has an interest in cash collateral and Bankruptcy Code Section 363(e) provides that the Bankruptcy Court may condition the use of property in which a creditor has a security interest to provide adequate protection of such interest. The Debtor, Zinc, Canopy and Wells Fargo have agreed upon the terms and conditions of Debtor's use of cash collateral, the priority of pre- and post-petition liens, and adequate protection to the Lenders, as follows:

(1)      The DIP Lender has a superpriority administrative claim pursuant to section 364(c)(1) subject to the Carve Out;

(2)      The Wells Fargo Lien in pre-petition collateral and the Wells Fargo adequate protection collateral is senior to all other liens and the Carve Out; and

1  (3)  The DIP Lender's Lien under section 364(d)(1) is junior to the Wells Fargo Lien

2  and the Carve Out, and senior to the Canopy Lien and all other liens; and

3  (4)  The Canopy Lien is junior to the DIP Lender's Lien, the Wells Fargo Lien and the

4  Carve Out, and senior to all other liens.

5  **G.   This Court Should Set This Emergency Interim Motion for Final Hearing.**

6  Upon this Court's approval of the financing, use of cash collateral and adequate

7  protection on an interim basis (as requested herein), Debtor respectfully requests that this Court

8

9  set this Motion for final hearing as soon as the Court's calendar permits.

10  **III.   RELIEF REQUESTED**

11  The Debtor seeks entry of an interim order (the "Interim Order"), *inter alia*:

12

13  (i)  authorizing the Debtor to obtain secured postpetition financing on a superpriority

14  basis (the "DIP Facility"), pursuant to the terms and conditions of that certain

15  Post-Petition Loan and Security Agreement (as the same may be amended,

16  supplemented, restated or otherwise modified from time to time, the "DIP Credit

17  Agreement") between the Borrower and Zinc Holdings, LLC, substantially in the

18  form of Exhibit A annexed to the Motion;

19  (ii)  authorizing the Debtor to execute and deliver the DIP Credit Agreement and the

20  other related loan documents (collectively with the DIP Credit Agreement, the

21  "DIP Facility Documents"), and to perform such other acts as may be necessary

22

23  or desirable in connection with the DIP Facility Documents;

24  (iii)  granting the DIP Facility and all obligations owing thereunder and under the DIP

25  Facility Documents to the DIP Lender (collectively, the "DIP Obligations")

26  allowed superpriority administrative expense claims in the Debtor's chapter 11

27  case, which superpriority claims shall be subject only to the Carve-Out Amount

28

and the Wells Fargo Obligations (as defined) and will otherwise be accorded

superpriority status in the Debtor's chapter 11 case, having priority over any and

all other administrative expenses in the Debtor's chapter 11 case;

(iv)    granting to the DIP Lender automatically perfected security interests and liens in

and on all of the Collateral (as defined), including, without limitation all property

constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy

Code, senior in priority to the Prepetition Liens (as defined) and also senior in

priority to all other security interests and liens, other than the Wells Fargo Liens

on the Wells Fargo Collateral, and granting Canopy (as defined) automatically

perfected junior security interests and liens in and on all of the Collateral as

adequate protection for its consent to the use of cash collateral and also for its

consent to the priming lien granted Zinc under the DIP Facility;

(v)    authorizing and directing the Debtor to pay the principal, interest, fees, expenses

and other amounts payable under the DIP Facility Documents as such become

due, including, without limitation, the letter of credit fees (including issuance and

other related charges), continuing commitment fees, closing fees, servicing fees,

audit fees, structuring fees, administration fees, the fees and disbursements of the

DIP Lender's attorneys, advisers, accountants, and other consultants, all to the

extent provided in the DIP Credit Agreement and other DIP Facility Documents

in accordance with the terms of those documents;

(vi)    authorizing the use of Cash Collateral of certain Prepetition Lenders (as defined

herein) under the Prepetition Obligations (as defined herein) and to provide

adequate protection to the Prepetition Lenders to the extent of any outstanding

prepetition indebtedness owed to the Prepetition Lenders for any diminution in

1    value of the Prepetition Collateral (as defined herein), including the Cash

2    Collateral;

3    (vii)    vacating and modifying the automatic stay imposed by section 362 of the

4    Bankruptcy Code to the extent necessary to implement and effectuate the terms

5    and provisions of the DIP Facility Documents and this Interim Order; and

6

7    (viii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in

8    the Motion and approving the form of notice with respect to the Final Hearing.

9    **WHEREFORE**, for all these reasons, the Debtor prays that this Court: (a) enter the

10    Interim Order, in the form attached hereto as Exhibit B, (i) permitting the Debtor to obtain

11    postpetition financing on a super-priority administrative expense basis, to be secured by a lien on

12    the Debtor's assets that is junior in priority to the Permitted Liens, in accordance with the terms

13    of the DIP Financing Agreement, (ii) providing for the use of cash collateral and adequate

14    protection to the DIP Lender; and (b) schedule a hearing for final approval of the DIP Financing

15    Agreement, and granting such other, and further relief as may be just and proper.

16    Dated:  October 16, 2007

CLARKSON, GORE & MARSELLA
A Professional Law Corporation


By:_____/s/ (Scott C. Clarkson)_____
    Scott C. Clarkson
    Eve A.  Marsella
    Proposed Attorneys for MTI Technology
    Corporation, Debtor and Debtor-in-Possession

## DECLARATION OF THOMAS P. RAIMONDI, JR.

I, Thomas P. Raimondi, Jr., declare as follows:

1.      I am the Chairman, CEO, and President of MTI Technologies, Inc. (the "Debtor"). I have direct supervisory responsibilities over the financial affairs and operations of the Debtor. I have reviewed the appropriate books and records of the Debtor which are maintained and obtained in the ordinary course of business, and have personal knowledge of the matters set forth herein because of that review or because of direct personal knowledge.  If called upon as a witness in this case, I would and could testify competently thereto.

2.      The Case was commenced by the filing of a voluntary petition under chapter 11 of title 11, United States Code on October 15, 2007 (the "Petition Date"), in the Central District of California, Santa Ana Division ("Court").

3.      The Debtor is a global provider of end-to-end information infrastructure solutions for mid to large size companies. With more than 20 years experience in delivering innovative technology solutions and more than 5 million hours of providing professional services, the Debtor is a leader in end-to-end information infrastructure solutions that span analysis, design, implementation and has strategic technology and services relationships with industry leaders including, EMC, Microsoft, VMWARE, Symantec and Cisco.

4.      The Debtor has three primary groups of assets at this time: (a) the European Subsidiaries – the Debtor owns all of the issued and outstanding capital stock of each of all of the issued and outstanding share capital of each of MTI Technology GmbH, incorporated in Germany ("MTI Germany"), MTI Technology Limited, incorporated in Scotland with company number SC112019 ("MTI UK"), and MTI France S.A.S., incorporated in France ("MTI France", and together with MTI Germany and MTI UK, the "Companies," and each a "Company"); (b) Collective – Debtor owns a U.S. based service division know as "Collective", which was

1   purchased approximately 18 months ago; and (c) the U..S. based service division other than

2   Collective.

3       5.      The Debtor has aggressively attempted to sell each of these asset groups as going

4   concerns over the past year.  Debtor has entered into a purchase agreement to sell the European

5   Subsidiaries to Zinc, and is working with prospective buyers for the U.S.-based assets over the

6

7   next sixty (60) days.

8       6.      Debtor has remained in possession of all of its assets and continues to operate and

9   manage its business as a debtor in possession pursuant to sections 1107 and 1108 of the

10  Bankruptcy Code.

11      7.      Canopy and Wells Fargo are the Debtor's primary secured creditors, holding

12  security interests in all or substantially all assets of Debtor's chapter 11 estate.  All of the

13
    Debtor's cash, including the cash in its deposit accounts, wherever located, whether as original
14
15  collateral or proceeds of other Pre-petition Collateral, may constitutes Cash Collateral of the Pre-

16  petition Lenders within the meaning of section 363(a) of the Bankruptcy Code.

17      8.      Pursuant to that certain Account Purchase Agreement, dated as of November 27,

18  2006 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the

19  "Wells Fargo Prepetition Agreement" and together with all other loan and security documents
20
21  executed in connection therewith, the "Wells Fargo Facility"), between the Debtor and Wells

22  Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating

23  division ("Wells Fargo"), the Debtor sold and assigned to Wells Fargo certain of its accounts

24  receivable.  Accounts sold to Wells Fargo under the Wells Fargo Facility become the sole

25  property of Wells Fargo upon payment of the initial payment for the account.  However, under

26  certain circumstances, the Debtor is required to repurchase accounts sold to Wells Fargo.  To

27  secure obligations of the Debtor under the Wells Fargo Facility, and pursuant to the terms of the

28

1  Wells Fargo Facility, the Debtor granted Wells Fargo a first priority security interest and lien

2  (the "Wells Fargo Lien") on the Debtor's then existing or thereafter arising accounts, the reserve

3  account established in connection with the Wells Fargo Facility, and, to the extent that they

4  pertain to such accounts, any contract rights, inventory, general intangibles, chattel paper,

5  documents, books and records, and the proceeds and products of the foregoing property (the

6  "Wells Fargo Collateral").  The Debtor is currently in default under the terms of the Wells Fargo

7  Facility.  As of October 10, 2007, $1,711,670.04 remains outstanding in connection with the

8  

9  Wells Fargo Facility (the "Wells Fargo Obligations").

10      9.      Pursuant to that certain Loan Agreement, dated as of June 27, 2002 (as amended,

11  supplemented, restated or otherwise modified prior to the Petition Date, the "Canopy Pre-petition

12  Agreement" and, together with all other loan and security documents executed in connection

13  therewith, the "Canopy Facility"), Canopy guaranteed the Debtor's performance and prompt

14  payment when due of all of the Debtor's obligations under that certain Loan and Security

15  

16  Agreement between the Borrower and Comerica Bank-California (the "Comerica Line of

17  Credit"), and secured its guarantee of the Comerica Line of Credit through a Seven Million

18  Dollar ($7,000,000) letter of credit issued by Bank of America, which letter of credit was called

19  by Comerica Bank-California prior to the Petition Date and used to satisfy in full the Comerica

20  Line of Credit.  To secure the Canopy Facility, and pursuant to the terms of the Canopy Pre-

21  petition Agreement, the Borrower granted Canopy a first priority security interest and lien (the

22  "Canopy Lien", and, together with the Wells Fargo Lien, the "Pre-petition Liens") on all of

23  

24  Borrower's presently existing and after-acquired general intangibles, accounts (including but not

25  limited to accounts receivable), inventory, equipment, goods, fixtures, chattel paper, documents

26  (including but not limited to investment property), instruments and records (except for the

27  Released Accounts, the Released Inventory and certain other items of collateral as more fully set

28

1   forth in the Canopy Pre-petition Agreement) (hereinafter the "Canopy Collateral", and, together

2   with the Wells Fargo Collateral, the "Pre-petition Collateral"). As of the Petition Date,

3   $5,190,546.60 plus interest and attorneys' fees and costs remains outstanding in connection with

4   the Canopy Facility (the "Canopy Obligations", and, together with the Wells Fargo Obligations,

5   the "Pre-petition Obligations").

6

7        10.   Due to the Debtor's financial condition and lack of available capital, the Debtor

8   has determined that it is in the best interests of the Debtor's creditors and shareholders to

9   immediately sell the Debtor's interests in the European Companies. Crucial to Debtor's success

10  was finding a buyer who would be willing to fund operating expenses during the interim period

11  between negotiating and closing the sale. Not only has identified Zinc as the best candidate to

12  acquire the Debtor's interest in the European Companies; but Zinc is willing to provide the

13  required financing. After negotiations, the Debtor and Zinc prepared a term sheet and entered

14  into a Purchase Agreement dated as of October 15, 2007 (the "Purchase Agreement"). A true

15  and correct copy of the Purchase Agreement is attached hereto As Exhibit "A".

16

17       11.   Pursuant and subject to the terms of the Purchase Agreement, Zinc has offered to

18  purchase all of the Debtor's interest in the European Companies for $5.5 million cash and the

19  assumption of certain limited obligations (the "Purchase Price"), and to provide financing to

20  allow the Debtor's business to continue in operation through the closing of the sale under the

21  Purchase Agreement. Zinc has offered to provide post-petition financing on a secured basis

22  pursuant to Bankruptcy Code Section 364(c)(1) and (3) in the maximum amount of $5,000,000

23  (the "DIP Financing"), subject to the terms and conditions as more specifically set forth in the

24  DIP Financing Agreement, which is attached hereto as Exhibit "A." The DIP Financing will

25  bridge the period through the close of the sale of the European Companies, which will allow the

26  company to continue marketing the remaining United States-based assets to various buyers, and

27

28

1   repayment of all DIP Financing Facility is intended to occur by the use of a credit bid procedure

2   during the auction of the European Companies, or in the case of a successful overbid by another

3   purchaser, a superpriority administrative lien of the proceeds of the sale.

4           12.    The Debtor believes that this outcome is far superior to the treatment creditors

5   would receive if Debtor simply filed a Chapter 7 bankruptcy petition, as was otherwise imminent

6   in this case. Due to the amounts owed to Canopy and Wells Fargo, the Debtor's assets may be

7   fully encumbered. As a consequence, in a Chapter 7 case, under-secured, priority and unsecured

8   creditors likely would recover little or nothing. However, under the proposed transactions with

9   ZINC, coupled with other possible sales of remaining MTI assets, fund may be available for

10  payment of administrative, priority unsecured claims and unsecured claims.

11          13.    The Debtor seeks post-petition financing to fund working capital and to maintain

12  business operations until the Debtor's assets are sold. As a first day motion, the Debtor shall also

13  file a motion seeking to establish bidding procedures and for approval of a sale of substantially

14  all of the Debtor's European Company assets under section 363 of the Bankruptcy Code. The

15  Debtor also seeks an order approving its use of cash collateral and granting to Zinc as adequate

16  protection for its post-petition DIP financing a super priority administrative expense claim under

17  Section 507(b), which is junior to certain interests granted to Canopy and Wells Fargo.

18          14.    The Debtor will not have sufficient funds to meet its payroll or to pay other

19  continuing expenses necessary for the operation of its business during the pendency of this case.

20  The Debtor believes that the interests of the creditors and other parties in interest will be served

21  under the DIP Financing. Any credit incurred will be used to fund continued operations and to

22  maintain business operations to enable a maximization of proceeds from the sale of the Debtor's

23  assets. The DIP Financing will also be used to retain key employees, the loss of which

24  employees would undermine the ability to consummate a sale of the Debtor's assets to Zinc and

any other person or entity.  Notwithstanding the severe cost-cutting measures taken and described herein, the Debtor's financial condition has become critical and without the Zinc DIP Financing, the Debtor will be unable to operate and faces immediate shutdown of its business operations.   The financing under the DIP Facility provides new liquidity to the Debtor and will enable the Debtor, *inter alia,* to (a) minimize disruption to its business and on-going operations through the date of a sale of its European operations, (b) preserve and maximize the value of the Debtor's estate for the benefit of all the Debtor's stakeholders, (c) avoid immediate and irreparable harm to the Debtor, its creditors, its businesses, its employees, and its assets, and (d) continue to pursue the sale process that has already been underway prepetition. Such financing is the sole means of preserving and enhancing the Debtor's going concern value.  Indeed, without the financing provided by the DIP Facility, the Debtor will not be able to pay its employees or meet its direct operating expenses and the Debtor will suffer irreparable harm.

15.      The Debtor has been unable to obtain unsecured financing strictly based on 364(c).  New borrowing facilities are unavailable to the Debtor without the Debtor or this Court granting a super-priority administrative expense, and security for such obligations through the granting of a junior security interest and liens.  The Debtor believes it to be impossible to obtain unsecured financing in any amount (or financing that is merely accorded administrative loan status), much less the amount necessary to keep the Debtor afloat pending the sale of the "Assets" described in the proposed asset purchase agreement with Zinc.

16.      Pending the sale to Zinc or a higher bidder, the Debtor has negotiated in good faith and entered into an agreement with Zinc whereby (subject to the approval of this Court) the Debtor may borrow and obtain letters of credit up to $5, 000,000 as debtor-in-possession financing ("DIP Financing") from Zinc.  A copy of the agreement evidencing this agreement regarding DIP Financing is attached hereto as <u>Exhibit A</u> (the "DIP Financing Agreement").

1  Pursuant to the DIP Financing Agreement, Zinc has agreed to provide a total commitment, in the

2  maximum amount of $5,000,000 pursuant to a budget that has been approved by Zinc, Canopy

3  and Wells Fargo. Attached hereto as Exhibit "C" is a true and correct copy of the Budget.

4  ///

5  ///

6  ///

7  ///

8        I declare under penalty of perjury under the laws of the United States of America that the

9  above is true and correct and that this Declaration was executed on October 16, 2007 at Tustin,

10  California.

11

12                                   /s/
                            Thomas P. Raimondi, Jr.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28