SCOTT C. CLARKSON, ESQ. SBN 143271
EVE A. MARSELLA, ESQ. SBN 165797
CLARKSON, GORE & MARSELLA
A PROFESSIONAL LAW CORPORATION
3424 Carson Street, Suite 350
Torrance, California 90503
(310) 542-0111 Telephone
(310) 214-7254 Facsimile

Attorneys for MTI Technology Corporation

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA,

SANTA ANA DIVISION

| | |
|---|---|
| In Re<br><br>MTI TECHNOLOGY CORPORATION,<br>a Delaware corporation,<br><br>Debtor in Possession.<br><br>Federal Tax I.D. # 95-3601802 | Case No. SA 07-13347-ES<br><br>Chapter 11<br><br>**DECLARATION OF THOMAS P. RAIMONDI, JR. REGARDING PREPETITION ASSET MARKETING ACTIVITIES** (Filed concurrently with Notice Of Motion And Motion For Order Pursuant To Sections 105, 363(b), 363(f) And 365 Of Title 11 Of The United States Code (i) Approving The Sale Of Certain Of The Debtor's Assets Free And Clear Of All Liens, Claims, Encumbrances And Interests; (ii) Approving The Debtor's Assumption And Assignment Of Certain Executory Contracts; And (iii) Waiving The 10-Day Stay Periods Set Forth In Bankruptcy Rules 6004(H) And 6006(D))<br><br>Date: November 20, 2007<br>Time: 2:00 p.m.<br>Ctrm: 5A |

## DECLARATION OF THOMAS P. RAIMONDI, JR.

I, Thomas P. Raimondi, Jr., declare as follows:

1.  I am the Chairman, CEO, and President of MTI Technology Corporation (the "Debtor," "MTI" or the "Company"). I have direct supervisory responsibilities over the

financial affairs and operations of the Debtor. I have reviewed the appropriate books and records of the Debtor which are maintained and obtained in the ordinary course of business, and have personal knowledge of the matters set forth herein because of that review or because of direct personal knowledge. If called upon as a witness, I would and could testify competently thereto.

2. On January 30, 2007, MTI's management made a presentation to its Board of Directors (the "Board") in which it recommended to the Board that it consider selling the on January 30, 2007, with the objective of maximizing shareholder value. In response to their recommendation, the Board also established an Independent Directors Committee, subcommittee of the Board (the "Independent Committee"), to explore strategic alternatives in cooperation with MTI's management, including the possibility of selling the Company.

3. At a subsequent Board meeting held on February 27, 2007, the Independent Committee made a recommendation to hire Needham & Company, LLC ("Needham"), as MTI's exclusive financial advisor for the purposes of developing strategic alternatives and ultimately pursuing a sale of the Company.

4. Needham was engaged on March 2, 2007, as exclusive financial advisor to the Company in connection with the evaluation and implementation of a possible transaction. Needham was paid a $75,000 retainer and asked to review various strategic alternatives, including:

    (a) A merger, consolidation or other business combination with another party;

    (b) The acquisition by a party of 50% of outstanding stock of the Company; or

    (c) The sale of substantially all of the assets of the Company.

5. Needham was also engaged to the extent requested by the company to:

    (a) Review with the Board and members of management the Company's financial plans, strategic plans and business alternatives;

    (b) Review and analyze the historical and projected financial information of the Company and prospective purchasers or acquirers of the Company;

    (c) Assist the Company's Board and management in the valuation of the

business(es) involved in the transaction;

(d)     Assist the financial due diligence efforts of the Company with respect to prospective purchasers;

(e)     Advise the Company with regard to the financial structure and terms of any transaction that might be realized in the current market environment, and to assist the Company in structuring and negotiating the financial aspects of the transaction, including if appropriate the drafting of a proxy statement or registration statement to be filed with the Securities and Exchange Commission (SEC); and

(f)     If requested, render to MTI's Board opinion as to the fairness, from a financial point of view, to the stockholders of the Company of the consideration to be received by the stockholders of the Company in connection with the transaction (the "Fairness Opinion"). If requested, any such opinion will be in written form and performing certain other appropriate and customary financial advisory services in connection with the transaction.

A true and correct copy of the Needham engagement letter is attached hereto as **Exhibit "A"** and incorporated herein by reference.

6.     Needham and the MTI management team collaborated to create a list of potential acquirers of MTI. EMC, which holds an advisory position on the Board, also provided the names of potential acquirers. Because MTI can be logically and geographically divided into two business operation – the USA operations and the European operations – Needham and MTI's management considered the possibility of selling or finding investment partners in either MTI's entire business or in MTI USA or European operations separately, although the preference was to sell the entire company. In connection with their marketing efforts, Needham cooperated with MTI in preparing a Corporate Overview in April, 2007, which was provided to the various prospects. A true and correct copy of the Corporate Overview is attached hereto as **Exhibit "B"** and incorporated herein by reference.

7.     A total 132 parties were initially contacted to determine whether or not they had an interest in acquiring the Debtor as a whole. MTI and Needham received preliminary indications of interest from the following 18 companies:

1. Battery Ventures
2. Dell
3. Brocade
4. Garnett & Helfrich Capital
5. Golden Gate Capital
6. Pomeroy IT Solutions
7. The Gores Group
8. LSI Corporation
9. L3 Communications
10. INX, Inc.
11. White Capital Private Equity Management LLC and The Canopy Group
12. Fusion Storm
13. Agilysys
14. Hitachi
15. Francisco Partners II
16. Dell
17. Dyntek
18. Platinum Equity

Each of these 18 parties proceeded to execute formal Non-Disclosure Agreements ("NDAs") with MTI in connection with their continuing discussions and evaluations. The Company thereafter, on a continuing basis, provided each potential bidder with all data requested in connection with their due diligence processes. Needham kept the Board informed of its progress and periodically provided the Board with status reports summarizing the results of their efforts. A true and correct copy of two of these reports, dated May 4, May 22, May 23, May 30, and July 9, 2007, are attached hereto as **Exhibit "C"** and incorporated herein by reference.

8. MTI's management initially held 16 management meetings where MTI's management presented information regarding MTI and its operations to potential purchasers and investment partners. This effort resulted in the identification of the three companies that were

most immediately interested in a prospective transaction: (a) Pomeroy Solutions, Inc. ("Pomeroy"), which was interested in acquiring all of the Company; (b) Brocade Systems ("Brocade"), which was most interested in the Company's European operations only: and (c) INX, Inc. ("INX"), which was interested in MTI's USA operations only.

9. Management had follow-up meetings with the management of Pomeroy in June of 2007, both at MTI's corporate headquarters our and once at Pomeroy's offices. However, Pomeroy's CEO was fired, and Pomeroy withdrew with its interest in July of 2007. MTI's management also had a face-to-face meeting in August of 2007, in Europe, with Brocade's management. Brocade offered between $10.0 million and $12.0 million for the European operations. However, Brocade thereafter withdrew its interest. Management also had many discussions and two face-to-face meetings with INX, which was the only bidder seriously, interested in MTI's USA operations.

10. Needham had begun marketing MTI Europe as a stand-alone basis in July after the Pomeroy proposal was withdrawn. After further discussions, The Gores ("Gores") made a non-binding bid of $13 million for MTI Europe in late July, but contingent upon its ability to utilize $24.0 million of NOL associated with the Company's operations. However, the vast majority of the NOLs were not usable by Gores, and Gores decreased its offer $3.5 million. This offer was rejected.

11. In light of the Company's inability as of this point to find a buyer for the entire Company, MTI then instructed Needham on August 8, 2007 to seek buyers for the separate components of the Company. Needham then contacted its list of 133 companies to see if any would be interested in acquiring MTI Europe, on a stand-alone basis.

12. Also, in August of 2007, the company contacted to Gartner Research to seek additional possible purchasing parties to contact. Gartner reviewed Needham's prospect list and suggested approximately six additional companies. Needham contacted these Companies, but none of them expressed any interest in MTI.

13. In August of 2007 the Company received an offer from INX to purchase the Company's USA operations for $8.0 million. However, this proposal required that the Company

provide at least $3.0 million of working capital and that the Company also retire its credit debt with Canopy. Since none of the bids that Needham and the Company received for Europe provide the company with enough cash to meet INX's offer INX ultimately withdrew its bid because it decided that the USA operations had deteriorated and could not survive a Section 363 sale process.

14. In light of the absence of potential purchasers for the Company, in early September of 2007 MTI decided to consider a sale of the Company's assets. Another factor motivating this decision was the MTI's management being informed by its European counsel that its German subsidiary would be unable to transfer $2.3 million owed to the Company. This new information suggested that the USA business could face a cash shortage in the near future and made the sale of the Company or its assets more time critical.

15. When the Board of Directors decided to pursue an asset sale, Needham remarketed it to the 132 initial contacts, as well as other European only entities that Needham felt appropriate to market to. This effort results in three interested bidders for MTI's European operations, which included:

1. Advent/Canopy: A bid of $4.0 million cash and a note of $1.5 million payable on December 2008 from Advent International/Canopy Group. Canopy Group later dropped out of the bid and Advent International re-bid on similar terms. Good consideration was given to Advent's note based on prior business dealing with Advent.

2. Gores: A bid of $4.0 million, all cash from Gores, or a bid of $3.5 million cash and a note for $2.3 million payable from the free cash flow from the MTI German subsidiary. Not much credit was given to the note for $2.3 million since the German subsidiary free cash flow was not considered sufficient to fund the note.

3. MBO – From Europe Team: An offer from the European management team of $5.0 million, all cash, subject to due diligence and the due diligence of their funding source.

Incentra Solution had previously made unsolicited offer to purchase the European operation in late 2006. However, these operations were not for sale at that time. MTI re-contacted Incentra Solutions in 2007. Incentra Solutions also indicated that they might have an interest in the August time frame, but failed to submit a bid.

16. The Independent Committee gave all interested parties until Wednesday, September 8, 2007 to present their bids. The Independent Committee thereafter considered all bids that were submitted. The Independent Committee was advised by special counsel that they could place more weight on the security likelihood and timeliness of closing versus pure purchase price, particularly in light of the possible cash shortage facing the USA operations. Needham worked with all the bidders in doing its best job to secure the best bids from all bidders. Needham went back to all bidders to provide guidance to the bidders based on input from the Independent Committee.

17. The Independent Committee and its legal counsel met on Sunday, September 9, 2007, to consider all bids. Needham provided the Independent Committee with a summary of the bids for them to consider. After considering all bids, the Independent Committee selected the Advent/Canopy offer, which now included closing within 20 days and immediate access to Canopy's credit line up to $1.8 million. A true and correct copy of the European Bid Summary prepared by Needham and presented to the Board is attached hereto as **Exhibit "D"** and is incorporated herein by reference.

18. Following MTI's selection of the Advent/Canopy offer, the Company nonetheless continued its marketing efforts until approximately late August of 2007, at which point MTI was required to enter into an exclusive arrangement with Advent.

19. In late September of 2007, the Board made the determination to file a Chapter 11 bankruptcy petition and to liquidate its assets through the bankruptcy process.

20. During this time frame, Gores raised its offer on an unsolicited basis to $5.5 million all cash, and also proposed to provide DIP financing. The company also received an offer from the European Management team of $6.0 million that had a 72 hour expiration notice with it. In the meantime, the company was having difficulty coming to terms with Advent in a

bankruptcy context (particularly with regard to DIP Financing). By this time, the European management bid had expired (and, in any event, the Company had concerns about the credibility of this offer).

21. The Gores offer of $5.5 million, combined with their offer to provide DIP financing, was still valid at this time. Moreover, Canopy indicated a willingness to work with Gores to provide the DIP financing so the Company moved forward with the Gores transaction. Consequently, on October 4, 2007, the Company terminated its discussions with Advent and decided, instead, to proceed with The Gores increased offer.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that this Declaration was executed on October 22, 2007 at Tustin, California.

/s/
Thomas P. Raimondi, Jr.