1  SCOTT C. CLARKSON, ESQ. SBN 143271
   EVE A. MARSELLA, ESQ. SBN 165797
2  CLARKSON, GORE & MARSELLA
   A PROFESSIONAL LAW CORPORATION
3  3424 Carson Street, Suite 350
   Torrance, California 90503
4  (310) 542-0111 Telephone
   (310) 214-7254 Facsimile
5
   Attorneys for MTI Technology Corporation
6

7                UNITED STATES BANKRUPTCY COURT
8
                 CENTRAL DISTRICT OF CALIFORNIA,
9
                       SANTA ANA DIVISION
10

11 In Re                          | Case No.  SA 07- 13347-ES

12 MTI TECHNOLOGY CORPORATION,     | Chapter 11
   a Delaware corporation,
13                                 | MOTION TO REJECT EXECUTORY
                                   | CONTRACTS AND LEASES WITH:
14          Debtor in Possession.
15                                 |   1.  CIT TECHNOLOGY FINANCING
                                   |       SERVICES, INC.;
16 Federal Tax I.D. # 95-3601802   |   2.  DELL FINANCIAL SERVICES, L.P.
                                   |       AND,
17                                 |   3.  NEEDHAM & COMPANY
18                                 | DECLARATION OF THOMAS RAIMONDI,
                                   | JR. IN SUPPORT
19
20                                 | Date:    No Hearing Required
                                   | Time:
21                                 | Ctrm:
22

23

24     TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY

25 JUDGE, THE UNITED STATES TRUSTEE AND ALL INTERESTED PARTIES:

26     PLEASE TAKE NOTICE that debtor and debtor in possession, MTI Technology

27 Corporation, a Delaware corporation (the "Debtor"), hereby moves the Court pursuant to 11

28

                              1        Motion to Reject Executory Contract and Leases

U.S.C. §365 for an Order rejecting certain executory contracts and leases (collectively, the "Leases"), as fully described in the within motion and in support thereof represents as follows:

**A.    Preliminary Statement.**

The Debtor is in the process of liquidating its assets.

The Debtor hereby moves the Court for an order approving the rejection of the following Leases:

1.  Equipment lease agreement dated November 14, 2006 between the Debtor and Cit Technology Financing Services, Inc. ("CIT") for 16 Dell/Latitude computers.

2.  13 equipment leases between the Debtor and Dell Financial Services, L.P. ("Dell") for computers, monitors, printers, servers and other miscellaneous products:

| Lease No: | Date |
|---|---|
| 501-6715765-001 | May 30, 2004 |
| 501-6715765-002 | June 4, 2004 |
| 001-6900735-003 | October 25, 2004 |
| 001-6900735-004 | November 29, 2004 |
| 001-6900735-005 | December 28, 2004 |
| 001-6900735-006 | February 28, 2005 |
| 001-6900735-007 | April 5, 2005 |
| 001-6900735-008 | April 12, 2005 |
| 001-6900735-009 | June 5, 2005 |
| 001-6900735-010 | August 5, 2005 |
| 001-6900735-011 | September 5, 2005 |
| 001-6900735-013 | June 1, 2005 |
| 001-6900735-015 | October 17, 2006 |

3.  Contract dated March 2, 2007 between the Debtor and Needham & Company ("Needham") in which the Debtor retained Needham as exclusive financial advisors to the Debtor in connection with (a) a merger, consolidation or other business combination pursuant to which the Debtor is combined with that of another party or (b) the acquisition by another party of all or substantially all of the assets of, or more

than 50% of the outstanding capital stock of the Debtor by way of a negotiated purchase, tender offer, exchange offer or other similar means.

As fully set forth below, the Debtor has no further need for the services and/or equipment provided pursuant to these executor contracts. The Debtor has determined in its business judgment it is in the best interest of the estate to reject the Leases.

**B.    General Case Background**

On October 16, 2007 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"). Under Bankruptcy Code §§1107 and 1108, the Debtor has remained in possession of all of its assets and continues to operate and manage its business as a debtor in possession in the Case.

1.    Debtor's Business

Founded in 1987, the Debtor has become a global provider of end-to-end information infrastructure solutions for mid to large size companies with its headquarters at 15641 Red Hill Ave. in Tustin, California. With more than 20 years experience in delivering innovative technology solutions and more than 5 million hours of providing professional services, the Debtor is a leader in end-to-end information infrastructure solutions that span analysis, design, implementation and has strategic technology and service relationships with industry leaders including, EMC, Microsoft, VMWARE, Symantec and Cisco. MTI served more than 3,500 customers throughout North America and Europe (directly and through wholly owned subsidiaries). The Debtor's revenues for its fiscal year 2006 exceeded $135,000,000.00.

Debtor is also a reseller and service provider of EMC Automated Networked Storage systems and software pursuant to a reseller agreement with EMC Corporation, a world leader in information storage systems software, networks and services. The sale of EMC products accounted for 88% and 56% of net product revenue and total revenue, respectively for the three months ended July 7, 2007 and 89% and 70% of net product revenue and total revenue, respectively for the three months ended July 1, 2006.

2.    Events Leading To Bankruptcy Filing

Founded as a developer, manufacturer and seller of computer storage equipment, the Debtor enjoyed a period of strong profitable growth that ended with the severe slowdown of the technology sector in 2000. After 2000, the Debtor has revised its strategy and business model, but has been unable to consistently return to profitability. The first major restructuring occurred in the 2001-2002 time period. Spending was significantly reduced. In 2003, the Debtor undertook a series of actions in support of a revised strategy. When fully implemented, all development and manufacturing operations were discontinued. Intellectual property was sold to EMC Corporation and the Debtor became an EMC reseller and strategic partner. The Debtor also raised $15 million in support of the strategy in a preferred stock offering.

In 2005, the Debtor's further revised its restructuring strategy in an attempt to achieve profitability and maximize shareholder value by deciding to substantially increase the mix of professional services that it sold and delivered. To achieve this goal, the Debtor raised $20 million from the same investors in a Series "B" preferred offering in November of 2005. $3.5 million of the proceeds from the Series "B" were used to provide needed working capital for the European subsidiaries, which were focused on providing professional services on behalf of the Debtor.

In addition, in 2006 the Debtor acquired Collective Technologies ("Collective"), a professional services company for $11 million in cash, debt, stock and warrants. The conversion to a professional services focused company proved more difficult than anticipated and required more time and investment. Synergies assumed in the acquisition were not realized and losses continued.

In the first half of 2007, the Debtor hired Needham as outside consultants to advise it on strategic alternatives. A decision was made to find strategic partners to sell or merge MTI Technology. Thus, the process of contacting over 130 companies proceeded, without a buyer for the entire company emerging.

The outside consultants were able to attract several potential buyers for the Debtor's European business. The sale process took much longer then anticipated and the U.S. product

4    Motion to Reject Executory Contract and Leases

sales took a much unexpected downward turn, leaving the Debtor faced with a significant cash flow issue.

In further restructuring efforts, the Debtor has closed its offices located in other states, has downsized its employee base, and has arranged for a sale of the stock of its European subsidiaries.

By this motion, the Debtor seeks to reject its agreement with Needham and its equipment lease with CIT.

### C.    The Agreements Proposed to be Rejected

The agreements proposed to be rejected (the "Leases"), along with relevant contractual provisions, are as follows:

1.  Equipment lease agreement dated November 14, 2006 between the Debtor and Cit Technology Financing Services, Inc. ("CIT") for 16 Dell/Latitude computers.

The significant terms of the CIT equipment lease are as follows:

```
Lease No:      #457948
Date:          11/14/06
Terms:         24 months
Equipment:     16 Dell/Lattitude d620 computers
Payment:       $1,234.91, plus applicable taxes, per month for 24 months
Purchase Opt.  FMV
```

A true and correct copy of the CIT equipment lease is attached hereto as **Exhibit "A"**. The Debtor has ceased using these laptops as of the Petition date.

2.  13 equipment leases between the Debtor and Dell Financial Services, L.P. ("Dell") for computers, monitors, printers, servers and other miscellaneous products:

| Lease No: | Date: | Term: | Balance: |
|---|---|---|---|
| 501-6715765-001 | May 30, 2004 | 48 mos. | $1,015.75 |
| 501-6715765-002 | June 4, 2004 | 48 mos. | $1,341.51 |
| 001-6900735-003 | October 25, 2004 | 36 mos. | $9,900.90 |
| 001-6900735-004 | November 29, 2004 | 36 mos. | $421.64 |
| 001-6900735-005 | December 28, 2004 | 36 mos. | $15,983.94 |
| 001-6900735-006 | February 28, 2005 | 36 mos. | $1,535.94 |
| 001-6900735-007 | April 5, 2005 | 36 mos. | $6,308.84 |

Motion to Reject Executory Contract and Leases

| 001-6900735-008 | April 12, 2005 | 36 mos. | $6,078.80 |
| 001-6900735-009 | June 5, 2005 | 36 mos. | $6,704.59 |
| 001-6900735-010 | August 5, 2005 | 36 mos. | $7,547.60 |
| 001-6900735-011 | September 5, 2005 | 36 mos. | $7,089.76 |
| 001-6900735-013 | June 1, 2005 | 24 mos. | $6,265.00 |
| 001-6900735-015 | October 17, 2006 | 24 mos. | $21,854.46 |

True and correct copies of these agreements are attached hereto, collectively, as **Exhibit "B"**.

3.    Contract dated March 2, 2007 between the Debtor and Needham & Company ("Needham") in which the Debtor retained Needham as exclusive financial advisors to the Debtor in connection with (a) a merger, consolidation or other business combination pursuant to which the Debtor is combined with that of another party or (b) the acquisition by another party of all or substantially all of the assets of, or more than 50% of the outstanding capital stock of the Debtor by way of a negotiated purchase, tender offer, exchange offer or other similar means.

The significant terms of the agreement are as follows:

Date:       03/02/07

Term:       Debtor retained Needham as exclusive financial advisors to the Debtor in connection with (a) a merger, consolidation or other business combination pursuant to which the Debtor is combined with that of another party or (b) the acquisition by another party of all or substantially all of the assets of, or more than 50% of the outstanding capital stock of the Debtor by way of a negotiated purchase, tender offer, exchange offer or other similar means.

Payment:    $75,000 within 30 days of signing the Agreement and if, during the term of the agreement, or within 12 months after termination of the agreement, a transaction is consummated with another party identified by Needham in writing prior to the termination of the agreement, the Debtor shall pay to Needham a fee in an amount equal to 1.5% of the aggregate purchase price received by the Debtor's stockholders, subject to a minimum success fee of $750,000, against which any fees previously paid shall be credited.

If an Opinion is rendered on a potential transaction, the Debtor shall pay Needham $250,000.

If a Transaction is terminated or it does not occur and the Debtor is paid a

1    break up or termination fee, the Debtor shall pay Needham 25% of such
     fee.

2    Needham is also entitled to reimbursement of reasonable out-of-pocket
3    expenses incurred up to $25,000.

4    A true and correct copy of the Needham agreement is attached hereto as **Exhibit "C"**.

5    The Debtor utilized these services until the Petition Date. This agreement may have

6    already been terminated; the Debtor has included it in this rejection motion out of an abundance

7    of caution.

8

9    D.    **Argument**

10   1.  The Debtor may Reject the Leases

11   Section 365 governs the duties and obligations of the trustee with regard to executory

12   contracts and unexpired leases.  11 U.S.C. §365 provides:
13

14   Except as provided in sections 765 and 766 of this title and in subsections (b), (c) and (d)
     of this section, the trustee, subject to the court's approval, may assume or reject any
15   executory contract or unexpired lease of the debtor.

16   11 U.S.C. §365(a).

17   2.  Rejection of the Above Contracts is in the Best Interest of the Estate
18
     In determining whether to approve rejection of a lease, the Debtor should apply the
19
20   "business judgment" test. *In re Chi-Feng Huang*, 23 B.R. 798, 800 (Bankr. 9th Cir. 1982); *Group*

21   *of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523,

22   550, 87 L. Ed. 959, 63 S. Ct. 727 (1943). "Under the business judgment test, a court should

23   approve a debtor's proposed rejection if such rejection will benefit the estate. *In re Chi-Feng*
24
25   *Huang, supra.* A debtor's decision in determining whether to reject an unperformed contract is

26   normally given deference, unless taken in bad faith or plainly contrary to good business

27   judgment." *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047

28   (4th Cir. 1985).

Under the business judgment test, the primary issue is whether rejection would benefit general unsecured creditors which may involve a balancing of interests. In re Chi-Feng Huang, supra. *In Chi-Feng Huang*, "the BAP noted the test should be flexible and the Court must exercise discretion fairly in the interests of all who have had the misfortune of dealing with the debtor". *In re Circle K Corp.*, 1991 Bankr. Lexis 1990.

In the present case, under the business judgment test, rejection of the Needham agreement and CIT Lease is in the best interest of the estate for the following reasons[1]: The Debtor has ceased utilizing Needham's services. Moreover, the Debtor no longer utilizes the Dell/Lattitude laptops.

Rejection of the agreements benefit the estate by eliminating further potential administrative claims.

III.

CONCLUSION

Under the Debtor's business judgment, the Debtor has determined that it is in the best interests of the estate to reject the agreements identified herein. Accordingly, the Debtor respectfully requests that the Court enter an order rejecting the above agreements as of the date of entry of the order approving this motion.

Dated: November 2**7**, 2007

CLARKSON, GORE & MARSELLA
A Professional Law Corporation

By: _____
Scott C. Clarkson
Eve A. Marsella
Attorneys for Debtor

---

[1]  All of the factual assertions asserted throughout the Motion are supported by the attached declaration of Thomas P. Raimondi, Jr.

## DECLARATION OF THOMAS P. RAIMONDI, JR.

I, Thomas P. Raimondi, Jr., declare:

1.      I am the President and CEO of MTI Technology Corporation, Debtor and Debtor in Possession herein. I have either personal knowledge of the following facts or have gained such knowledge from my review of the Debtor's books and records, which are created, obtained and maintained in the ordinary course of business. If called as a witness, I would and could testify completely thereto.

2.      Founded in 1987, the Debtor has become a global provider of end-to-end information infrastructure solutions for mid to large size companies with its headquarters at 15641 Red Hill Ave. in Tustin, California. With more than 20 years experience in delivering innovative technology solutions and more than 5 million hours of providing professional services, the Debtor is a leader in end-to-end information infrastructure solutions that span analysis, design, implementation and has strategic technology and service relationships with industry leaders including, EMC, Microsoft, VMWARE, Symantec and Cisco.  MTI served more than 3,500 customers throughout North America and Europe (directly and through wholly owned subsidiaries).  The Debtor's revenues for its fiscal year 2006 exceeded $135,000,000.00.

3.      Debtor is also a reseller and service provider of EMC Automated Networked Storage systems and software pursuant to a reseller agreement with EMC Corporation, a world leader in information storage systems software, networks and services. The sale of EMC products accounted for 88% and 56% of net product revenue and total revenue, respectively for the three months ended July 7, 2007 and 89% and 70% of net product revenue and total revenue, respectively for the three months ended July 1, 2006.

4.     Founded as a developer, manufacturer and seller of computer storage equipment, the Debtor enjoyed a period of strong profitable growth that ended with the severe slowdown of the technology sector in 2000. After 2000, the Debtor has revised its strategy and business model, but has been unable to consistently return to profitability. The first major restructuring occurred in the 2001-2002 time period. Spending was significantly reduced. In 2003, the Debtor undertook a series of actions in support of a revised strategy. When fully implemented, all development and manufacturing operations were discontinued. Intellectual property was sold to EMC Corporation and the Debtor became an EMC reseller and strategic partner. The Debtor also raised $15 million in support of the strategy in a preferred stock offering.

5.     In 2005, the Debtor's further revised its restructuring strategy in an attempt to achieve profitability and maximize shareholder value by deciding to substantially increase the mix of professional services that it sold and delivered. To achieve this goal, the Debtor raised $20 million from the same investors in a Series "B" preferred offering in November of 2005. $3.5 million of the proceeds from the Series "B" were used to provide needed working capital for the European subsidiaries, which were focused on providing professional services on behalf of the Debtor.

6.     In addition, in 2006 the Debtor acquired Collective Technologies ("Collective"), a professional services company for $11 million in cash, debt, stock and warrants. The conversion to a professional services focused company proved more difficult than anticipated and required more time and investment. Synergies assumed in the acquisition were not realized and losses continued.

7.     In the first half of 2007, the Debtor hired outside consultants to advise it on strategic alternatives. A decision was made to find strategic partners to sell or merge MTI

Technology. Thus, the process of contacting over 130 companies proceeded, without a buyer for the entire company emerging.

8.    The outside consultants, Needham, were able to attract several potential buyers for the Debtor's European business. The sale process took much longer then anticipated and the U.S. product sales took a much unexpected downward turn, leaving the Debtor faced with a significant cash flow issue.

9.    In further restructuring efforts, the Debtor has closed its offices located in other states, has downsized its employee base, and has arranged for a sale of the stock of its European subsidiaries. By this motion, the Debtor seeks to reject the leases for the offices it closed, pre-petition.

10.    I am familiar with the terms of all of the leases proposed to be rejected, which are as follows:

A.    Equipment lease agreement dated November 14, 2006 between the Debtor and Cit Technology Financing Services, Inc. ("CIT") for 16 Dell/Latitude computers.

The significant terms of the CIT equipment lease are as follows:

```
Lease No:       #457948
Date:           11/14/06
Terms:          24 months
Equipment:      16 Dell/Lattitude d620 computers
Payment:        $1,234.91, plus applicable taxes, per month for 24 months
Purchase Opt.   FMV
```

A true and correct copy of the CIT equipment lease is attached hereto as **Exhibit "A"**. The Debtor has ceased using these laptops as of the Petition date.

B.    13 equipment leases between the Debtor and Dell Financial Services, L.P. ("Dell") for computers, monitors, printers, servers and other miscellaneous products:

| Lease No: | Date: | Term: | Balance: |
|---|---|---|---|
| 501-6715765-001 | May 30, 2004 | 48 mos. | $1,015.75 |
| 501-6715765-002 | June 4, 2004 | 48 mos. | $1,341.51 |

| | | | |
|---|---|---|---|
| 001-6900735-003 | October 25, 2004 | 36 mos. | $9,900.90 |
| 001-6900735-004 | November 29, 2004 | 36 mos. | $421.64 |
| 001-6900735-005 | December 28, 2004 | 36 mos. | $15,983.94 |
| 001-6900735-006 | February 28, 2005 | 36 mos. | $1,535.94 |
| 001-6900735-007 | April 5, 2005 | 36 mos. | $6,308.84 |
| 001-6900735-008 | April 12, 2005 | 36 mos. | $6,078.80 |
| 001-6900735-009 | June 5, 2005 | 36 mos. | $6,704.59 |
| 001-6900735-010 | August 5, 2005 | 36 mos. | $7,547.60 |
| 001-6900735-011 | September 5, 2005 | 36 mos. | $7,089.76 |
| 001-6900735-013 | June 1, 2005 | 24 mos. | $6,265.00 |
| 001-6900735-015 | October 17, 2006 | 24 mos. | $21,854.46 |

True and correct copies of these agreements are attached hereto, collectively, as **Exhibit "B"**.

C.    Contract dated March 2, 2007 between the Debtor and Needham & Company ("Needham") in which the Debtor retained Needham as exclusive financial advisors to the Debtor in connection with (a) a merger, consolidation or other business combination pursuant to which the Debtor is combined with that of another party or (b) the acquisition by another party of all or substantially all of the assets of, or more than 50% of the outstanding capital stock of the Debtor by way of a negotiated purchase, tender offer, exchange offer or other similar means.

The significant terms of the agreement are as follows:

Date:        03/02/07

Term:        Debtor retained Needham as exclusive financial advisors to the Debtor in connection with (a) a merger, consolidation or other business combination pursuant to which the Debtor is combined with that of another party or (b) the acquisition by another party of all or substantially all of the assets of, or more than 50% of the outstanding capital stock of the Debtor by way of a negotiated purchase, tender offer, exchange offer or other similar means.

Payment:     $75,000 within 30 days of signing the Agreement and if, during the term of the agreement, or within 12 months after termination of the agreement, a transaction is consummated with another party identified by Needham in writing prior to the termination of the agreement, the Debtor shall pay to Needham a fee in an amount equal to 1.5% of the aggregate purchase price received by the Debtor's stockholders, subject to a minimum success fee of $750,000, against which any fees previously paid shall be credited.

If an Opinion is rendered on a potential transaction, the Debtor shall pay

1    Needham $250,000.

2    If a Transaction is terminated or it does not occur and the Debtor is paid a
     break up or termination fee, the Debtor shall pay Needham 25% of such
3    fee.

4    Needham is also entitled to reimbursement of reasonable out-of-pocket
     expenses incurred up to $25,000.

5
     A true and correct copy of the Needham agreement is attached hereto as **Exhibit "C"**.

6
     The Debtor utilized these services until the Petition Date. This agreement may have
7
8    already been terminated; the Debtor has included it in this rejection motion out of an abundance

9    of caution.

10    I declare under penalty of perjury under the laws of the United States of America that the

11   foregoing is true and correct. Executed this 26 th day of November, 2007, at Tustin, California.

12

13

14                          Thomas P. Raimondi, Jr.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

 **CIT**

**LEASE AGREEMENT #: 457948    DATED: 11/14/2006**

| CUSTOMER NAME MTI TECHNOLOGY CORPORATION | | # ADVANCE PAYMENTS 0 | TOTAL ADVANCE PAYMENT * $0.00 |
|---|---|---|---|
| DBA NAME (IF ANY) | EQUIPMENT DESCRIPTION **See Attached Addendum** | PURCHASE OPTION Fair Market Value | LEASE TERM 24 |
| ADDRESS 17595 CARTWRIGHT RD IRVINE, CA 92614 | EQUIPMENT LOCATION **See Attached Addendum** | MONTHLY PAYMENT * $1,234.91 | DOCUMENTATION FEE $65.00 |

\* Includes estimated sales, rental & use tax. This amount may be adjusted based on *actual* tax

**DEAR CUSTOMER:** This Lease Agreement (the "Lease") contains the terms of your agreement with us. Please read it carefully and ask us any questions you may have. The words You, Your and Lessee mean you, our customer. The words We, Us, Our and the Lessor, mean CIT Technology Financing Services, Inc.

1. **EQUIPMENT LEASED; TERM, RENT AND FEES:** We agree to lease to you and you agree to lease from us the equipment ("Equipment") identified above. You certify that the Equipment will be used for a business purpose, and not for personal, family or household purposes. You agree to pay the Documentation Fee, your Total Advance and the Security Deposit (if any) when you sign this Lease. All Advances in excess of one month will be applied to the end of the Term. This Lease shall commence on the date that any of the Equipment is delivered to you ("Commencement Date"). Your first Monthly Payment shown above ("Monthly Payment"), is due 30 days from the Commencement Date ("First Payment Date"), and your remaining Monthly Payments shall be due on the same day of each subsequent month until you have paid all the Monthly Payments due under this Lease. You will execute a Certificate of Acceptance upon receipt of the Equipment, if we provide one to you and if not, you expressly agree that you accepted the Equipment no later than 14 days after it was shipped to you. You agree that this Lease is a net lease which may not be terminated or cancelled; that you have an unconditional obligation to make all payments due under the Lease according to the terms set forth herein and in any amendment or addendum hereto signed by you and us, and that you can not withhold, set off or reduce such payments for any reason. You authorize us to adjust the Monthly Payment by not more than 15% if the actual total cash price for the Equipment differs from the estimated total cash price.
2. **SUPPLY CONTRACT:** If you have entered into any purchase or supply contract ("Supply Contract") with any supplier, you assign to us your rights under such Supply Contract, but none of your obligations (other than the obligation to pay for the Equipment if it is accepted by you). If you have not entered into a Supply Contract, you authorize us to enter into a Supply Contract on your behalf. You will arrange for the delivery of the Equipment to you. Neither the supplier nor any salesperson are our agent. Their statements will not affect your rights or obligations under this Lease.
3. **ASSIGNMENT:** YOU MAY NOT SELL, PLEDGE, TRANSFER, ASSIGN OR SUBLEASE THE EQUIPMENT OR THIS LEASE. We may sell, assign, transfer or grant a security interest in all or any part of this Lease and/or the Equipment without your consent or without notifying you. The new owner will have the same rights that we have, but not our obligations. You agree you will not assert against the new owner any claims, defenses or set-offs that you may have against us and/or the supplier.
4. **NO WARRANTIES:** We are leasing the Equipment to you "AS-IS". YOU ACKNOWLEDGE THAT WE DO NOT MANUFACTURE THE EQUIPMENT, WE DO NOT REPRESENT THE MANUFACTURER OR THE SUPPLIER, AND YOU HAVE SELECTED THE EQUIPMENT AND SUPPLIER BASED UPON YOUR OWN JUDGMENT. WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE. We transfer to you for the term of this Lease any warranties made by the manufacturer or supplier under a Supply Contract. You agree that you will not assert against us any claim or defense that you have against the supplier.
5. **EQUIPMENT LOCATION; USE AND REPAIR; RETURN:** We are the owner of the Equipment unless your Purchase Option is $1.00. You agree to keep the Equipment free from liens and encumbrances. You will keep and use the Equipment only at the address set forth above. You may not move the Equipment without our prior written consent. At your own cost, you will keep the Equipment eligible for any manufacturer's certification, in compliance with all applicable laws and in good condition, except for ordinary wear and tear. You will not make any alterations, additions or replacements to the Equipment without our prior written consent. All permitted alterations, additions and replacements will become our property at no cost to us. We may inspect the Equipment during normal business hours. Unless your Purchase Option is $1.00 or you purchase the Equipment at the end of this Lease, you will immediately deliver the Equipment to the party and location directed by us in as good condition as when you received it, except for ordinary wear and tear. You will pay all shipping and other expenses, and you will insure the Equipment for its full replacement value during shipping.
6. **TAXES:** You agree to pay when due or reimburse us for all taxes, fines, and penalties relating to the use or ownership of the Equipment or to this Lease, now or hereafter imposed, or assessed by any state, federal or local government or agency. If your Purchase Option is $1.00, you agree to file all required tax returns and reports concerning the Equipment with all appropriate governmental agencies. If your Purchase Option is not $1.00, we will file all such reports.

If we file such reports, you will pay estimated property taxes with each Monthly Payment or as invoiced by us. We do not have to contest any taxes, fines or penalties You will not take (or fail to take) any action which we determine will result in the loss or disallowance of all or any portion of the maximum accelerated cost recovery

*(CONTINUED ON NEXT PAGE - ALL PARTIES AGREE, INCLUDING GUARANTOR(S), THAT THE CORRECT VERSION OF THE NEXT PAGE IS THE FORM ATTACHED TO OUR COPY AND SHALL BE BINDING ON ALL PARTIES)*

**ACCEPTANCE**    **THIS LEASE MAY NOT BE CANCELED**

| (LESSEE) MTI TECHNOLOGY CORPORATION | (LESSOR) CIT Technology Financing Services, Inc. |
|---|---|
| By: X _____ Controller<br>Authorized Signer    Title | By: _____ |
| Print Name X Todd Williams | Title: _____ EMMA CAPPELLETTI Date: X _____<br>VICE PRESIDENT |

**FAX EXECUTION:** A fax version of this Lease when received by us shall be binding on you for all purposes as if originally signed. However, the Lease shall only become effective and binding against us when originally signed by us in one of our corporate offices. You agree that the only version of the Lease that is the original for all purposes is the version containing your fax signature and our original signature. If you elect to sign and transmit a Lease by fax, you waive notice of our acceptance of this Lease and receipt of a copy of the originally signed Lease.

**PERSONAL GUARANTY**

When we use the words you and your in this Guaranty, we mean the Guarantor(s) indicated below. When we use the words we, us and our in this Guaranty, we mean CIT Technology Financing Services, Inc. All other terms shall have the same meanings as used in the Lease. You guaranty that the Lessee will make all payments and perform all other obligations under the Lease until completed. Your obligations shall be non cancelable, continuing, direct and unconditional. You waive notice of Lessee's default, acceptance, demand and protest and you consent to any modifications to the Lease and/or release of any obligations. You are not entitled to subrogation. You shall not assign this Guaranty. This Guaranty shall be binding upon your permitted successors and assigns and inure to the benefit of our successors and assigns. If there is more than one Guarantor, your obligations are joint and several. You authorize us or any of our affiliates to obtain credit bureau reports regarding your credit and make other credit inquiries that we determine are necessary. THIS GUARANTY IS GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY. YOU CONSENT TO THE JURISDICTION OF ANY COURT LOCATED WITHIN NEW JERSEY. YOU EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY.

Guarantor (Signature) X _____    Do not include title    Guarantor (Signature) X _____    Do not include title

Print Name: _____    Date: X _____    Print Name: _____    Date: X _____

deductions permitted to us by the Internal Revenue Code of 1986, as amended. You will indemnify us for any loss in our after tax economic yields caused by your acts or failure to act.

7. **LOSS OR DAMAGE; INSURANCE:** You are responsible for any loss, theft, destruction or damage to, the Equipment (collectively "Loss") from any cause, whether or not insured, until the Equipment is delivered to us at the end of this Lease. You are required to make all lease payments even if there is a Loss. You must notify us in writing immediately of any Loss. Then, at our option, you will either (a) repair the Equipment so that it is in good condition and working order, eligible for any manufacturer's certification, or (b) pay us the amounts specified in Section 9 below. You agree to keep the Equipment insured for its full replacement value against any type of Loss, and name us as loss payee until the Lease is paid in full. You also agree to obtain a general public liability insurance policy, and include us as an additional insured on the policy. If you do not give us evidence of insurance acceptable to us, we have the right, but not the obligation, to obtain insurance covering our interest in the Equipment from an insurer of our choice. We may add the costs of acquiring such insurance and our fees for our services in placing and maintaining such insurance (collectively "Insurance Charge") to the amounts due from you under this Lease. You will pay the Insurance Charge to us upon demand.

8. **LATE CHARGES; SECURITY DEPOSIT; SECURITY INTEREST:** If any payment is not made when due, you agree to pay a late charge at the rate of ten percent (10%) of such late payment; and each month thereafter, a finance charge of one and one-half percent (1.5%) on any unpaid delinquent balance, but in no event greater than the maximum rate allowable under applicable law. In the event this transaction is deemed to create a security interest, you grant us a purchase money security interest in the Equipment (including any replacements, substitutions, additions, attachments and proceeds). You will deliver to us signed financing statements or other documents we request to protect our interest in the Equipment. You appoint us or our agent as attorney in fact to execute, deliver and record financing statements on your behalf to perfect our interest in the Equipment.

9. **DEFAULT; REMEDIES:** Each of the following is a "Default" under this Lease: (a) you fail to pay any lease payment or any other payment when due, (b) you fail to perform any of your other obligations or breach any representation, covenant or warranty under this Lease or in any other agreement with us or with any of our affiliates, and this failure continues for 10 days after we have notified you of it, (c) you become insolvent, you dissolve or are dissolved, you fail to pay your debts as they mature, you assign your assets for the benefit of your creditors, or you enter (voluntarily or involuntarily) any bankruptcy or reorganization proceeding, or (d) any guarantor of this Lease dies, does not perform its obligations under the guaranty, or becomes subject to any of the events listed above, (e) you sell or encumber the Equipment or attempt to do so. If a Default occurs, we may do any one or more of the following: (i) cancel or terminate this Lease or any or all other agreements that we have entered into with you; (ii) require you to immediately pay us, as compensation for loss of our bargain and not as a penalty, a sum equal to (x) all amounts then due under this Lease plus, (y) all unpaid lease payments for the remainder of the term plus our anticipated residual interest in the Equipment each discounted to present value at the rate of 6% per annum; (iii) deliver the Equipment to us as set forth in Section 6; (iv) peacefully repossess the Equipment without court order and you will not make any claims against us for damages or trespass or any other reason; and (v) exercise any other right or remedy available at law or in equity. You agree to pay all of our costs of enforcing our rights against you, including reasonable attorneys' fees and costs. If we take possession of the Equipment, we may sell or otherwise dispose of it with or without notice, at a public or private sale, and apply the net proceeds (after we have deducted all costs related to the sale or disposition of the Equipment) to the amounts that you owe us. You agree that if notice of sale is required by law to be given, 10 days notice shall constitute reasonable notice. You will remain responsible for any amounts that are due after we have applied such net proceeds. All our remedies are cumulative, are in addition to any other remedies provided for by law and may be exercised either concurrently or separately. Any failure or delay by us to exercise any right shall not operate as a waiver of any right, other or future rights or to modify the terms of this Lease.

10. **FINANCE LEASE STATUS:** You agree that if Article 2A - Leases of the Uniform Commercial Code applies to this Lease, this Lease will be considered a "finance lease" as that term is defined in Article 2A. By signing this Lease, you agree that either (a) you have reviewed, approved and received, a copy of the Supply Contract or (b) that we have informed you of the identity of the supplier, that you may have rights under the Supply Contract, and that you may contact the supplier for a description of those rights. TO THE EXTENT PERMITTED BY APPLICABLE LAW, YOU WAIVE ANY AND ALL RIGHTS AND REMEDIES CONFERRED UPON A LESSEE BY ARTICLE 2A.

11. **PURCHASE OPTION; AUTOMATIC RENEWAL:** If no Default exists under this Lease, you may have the option at the end of the original or any renewal term to purchase all (but not less than all) of the Equipment at the purchase option price above, plus any applicable taxes. Unless the purchase option price is $1.00, you must give us at least 90 days written notice before the end of the original term that you will purchase the Equipment or that you will return the Equipment to us. If you do not give us such written notice or if you do not purchase or deliver the Equipment to us in accordance with the terms of this Lease, this Lease will automatically renew for successive one month terms until you deliver the Equipment to us. During such renewal term(s) the lease payment will remain the same. We may cancel an automatic renewal term by sending you written notice 10 days prior to such renewal term. If the Fair Market Value Purchase Option has been selected, we will use our reasonable judgment to determine the Equipment's fair market value. If you do not agree with our determination of the Equipment's fair market value, the fair market value will be determined at your expense by an independent appraiser selected by us. Upon payment of the purchase option price, we shall transfer our interest in the Equipment to you "AS IS, WHERE IS" without any representation or warranty whatsoever, and this Lease will terminate.

12. **INDEMNIFICATION:** You are responsible for and agree to indemnify and hold us harmless from any (a) losses, damages, penalties, claims, suits and actions (collectively "Claims") caused by or related to the manufacture, installation, ownership, use, lease, possession, or delivery of the Equipment or any defects in the Equipment and (b) all costs and attorneys' fees incurred by us relating to any Claim. You agree to reimburse us for and if we request, to defend us, at your own cost and expense, against any Claims. You agree that your obligations under this Section 12 shall survive the termination of this Lease.

13. **SOFTWARE:** The Equipment may include certain software ("Software") which we do not own. Where required by the Software owner, you agree to execute a separate license agreement with the owner for the use of the Software ("License Agreement"). The License Agreement shall be separate and distinct from this Agreement, and we are not a party to such agreement and do not have any obligations under the License Agreement. Except as expressly modified by this Section 13, all the terms and conditions of this Agreement shall apply to the Software including, without limitation, Section 4. Upon expiration or earlier termination of this Agreement, we have no obligation to return the Software and/or any data stored therein to you or any other party.

14. **MISCELLANEOUS:** (a) Choice of Law. This Lease shall be governed by the laws of the state of NEW JERSEY (without regard to the conflict of laws principles of such state). (b) Jurisdiction. You consent to the jurisdiction of any local, state or federal court located within the state of NEW JERSEY. (c) Jury Trial. YOU EXPRESSLY WAIVE TRIAL BY JURY AS TO ALL ISSUES ARISING OUT OF OR RELATED TO THIS LEASE. (d) Entire Agreement. The Lease constitutes the entire agreement between you and us and supercedes all prior agreements. (e) Enforceability. If any provision of this Lease is unenforceable, illegal or invalid, the remaining provisions shall continue to be effective. (f) Amendment. This Lease may not be modified or amended except by a writing signed by you and us. You agree however, that we are authorized, without notice to you, to supply missing information or correct obvious errors in the Lease. (g) Notice. All notices shall be in writing and shall be delivered to the appropriate party personally, by private courier, by facsimile transmission or by mail, postage prepaid, at its address shown herein or to such other address as directed in writing by such party. (h) Usury. It is the express intent of both of us not to violate any applicable usury laws or to exceed the maximum amount of interest permitted to be charged or collected by applicable law, and any excess payment will be applied to the lease payments in inverse order of maturity, and any remaining excess will be refunded to you. (i) Prepayment. Prepayment or early termination is not permitted except at such time and on such terms and conditions as we may agree to in writing. (j) Time is of the essence.

(2)

Lease Agreement #: 457948
I have received and reviewed this page and certify that each of the provisions set forth is clear and legible.

Customer Initials  X _____

## ADDENDUM TO LEASE AGREEMENT NO. <u>457948</u>

This Addendum is made a part of the Lease Agreement ("Lease")above by and between  ("Lessee") and CIT Technology Financing Services, Inc. ("Lessor") and adds the below equipment thereto.  Capitalized terms used but not defined will have the same meaning given to them in the Lease.

| Qty | New/ Used | Asset Description / Equipment Address |
|-----|-----------|---------------------------------------|
| 16  | N         | DELL/latitude d620 17595 cartwright rd  irvine,ca 92614, |

This Addendum supplements and amends the Lease only to the extent and in the manner set forth, and in all other respects the Lease will remain in full force and effect.

LESSEE: MTI TECHNOLOGY CORPORATION

By: X _____

Title: X  Controller

Date: X  11/5/06

LESSOR: CIT Technology Financing Services, Inc.

By: _____

Title: _____
EMMA CARDELLETTI
VP/ATTORNEY IN FACT

Date: _____
2-9-07



**DELIVERY AND ACCEPTANCE RECEIPT**

Lease No.: 457948

Lessee: MTI TECHNOLOGY CORPORATION

Lessee certifies that all of the EQUIPMENT covered by the above referenced lease number has been delivered, inspected, installed, is in good working condition, and is, therefore, accepted for purposes of the Lease.

We request that Lessor pay the vendor for the EQUIPMENT and we understand that rental payments will now commence.

X _____
(Authorized Lessee Signature)

X  SCOTT POTERACKI
(Signer's Printed Name)

X  CFO
(Signer's Title)

X  11/29/06
(Date Signed)

## **WORKSHEET**

Lessee:  MTI TECHNOLOGY CORPORATION

Lessor:  CIT Technology Financing Services Inc.

Equipment: 1-Lattitudes Computer

Equipment Location:                     _____

                                        _____

                                        _____

Name of Contact Person                  _____

Phone Number of Contact Person          _____

Scott C. Clarkson hereby provides CIT Technology Financing Services Inc., authority to recover and dispose of the above equipment.

                              _____
                              Scott C. Clarkson