PATRICIA B. TOMASCO
Texas Bar No. 01797600
BROWN McCARROLL, L.L.P.
111 Congress Avenue, Suite 1400
Austin, Texas 78702
(512) 479-1141 (telephone)
(512) 226-7326 (fax)

Attorneys for The Collective Group, LLC

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | | |
|---|---|---|
| In re | § | Case No. SA-07-13347-ES |
| | § | |
| MTI TECHNOLOGY CORPORATION, | § | Chapter 11 |
| | § | |
| Debtor | § | REPLY TO COMMITTEE'S |
| | § | RESPONSE TO DEBTOR'S MOTION |
| | § | FOR ORDER APPROVING |
| | § | ASSUMPTION OF CLIENT |
| | § | TRANSITION AGREEMENT WITH |
| Federal Tax I.D. #95-3601802 | § | THE COLLECTIVE GROUP, LLC |

The Collective Group, LLC ("Collective Group") a creditor herein, respectfully files this its Reply to Committee's Response to Debtor's Motion for Order Approving Assumption of Client Transition Agreement with The Collective Group, LLC, and in support thereof, shows the Court as follows:

**I.
JURISDICTION**

1.    Pursuant to 28 U.S.C. §§ 1334 and 157, the Court has jurisdiction to hear this Motion. Under 28 U.S.C. § 157(b)(2)(A) and (O), this matter is a core proceeding. The relief requested in this Motion is sought pursuant to 11 U.S.C. § 365(a).

4039894.1
56094.1

## II.
## BACKGROUND

2.     Collective made numerous attempts from August 2007 through October 2007 to negotiate the purchase of the Debtor's domestic services business as a going concern. MTI, however, did not respond to Collective's efforts and was quickly running out of money. In response, Collective assembled and delivered to MTI's board a plan for operation during bankruptcy with the goal of keeping the Debtor's business together to sell to a third party under a 11 U.S.C. § 363 sale. The week prior to the filing, however, MTI's board rejected Collective's attempts citing a lack of funds to continue to operate the services business. To this end, the MTI notified both employees and customers that it was terminating all employees of the services division on October 12, 2007, because it lacked funds to pay them beyond that date. MTI reiterated this on October 11, 2007, indicating that termination letters and final payments were being mailed by overnight delivery that day and employees in fact received these packages beginning on the morning of October 12, 2007. At this point, Collective determined to form a new company and hire all terminated employees and offered to service prior MTI clients. MTI and Collective knew that unless an alternative was immediately available to customers, some $600,000 in accounts receivable from those customers would be threatened by recoupment and counterclaims for cover damages to replace the personnel on site to complete the installations and equipment moves. Thus, the basis of the contract was to mitigate offsets and lawsuits, maximize collection of the MTI's accounts receivable in exchange for a percentage based fee and use of existing, on-site equipment.

3.     Thus, the parties negotiated the Client Transition Agreement late in the day on October 12, 2007, but the agreement was not actually signed by Collective until October 13, 2007. In connection with the Client Transition Agreement, MTI sent out 56 letters to its former clients informing them that MTI was ceasing operations, but that Collective had hired MTI's employees and was

2

4039894.1
56094.1

available to fulfill the remaining needs of the customers under a new contract. Collective followed up on these letters. Only one former client responded and indicated no interest in transitioning service to Collective. Collective then contacted certain "OEM"[1] clients, indicating that MTI had laid off all employees and that Collective would be available to enter into new contracts. As a result of additional efforts by Collective after the filing of MTI's reorganization proceeding, Collective eventually entered into new contracts with eight of MTI's former contractual relationships as follows.

| MTI Payment | LoB | Project # | Project | Revenue to Date | Future Revenue | Cur MTI Pay | Future MTI Pay |
|---|---|---|---|---|---|---|---|
| Y | CS | 43271 | MIT Sloan School Mgt Fxd | 18,000.00 | | 1,800.00 | |
| | | 43319 | CEB EV Exch | 15,200.00 | | 1,520.00 | |
| | | 43344 | ECFMG 2 | 10,800.00 | | 1,080.00 | |
| | | 44026 | CEB-DC-EV Training | 7,000.00 | | 700.00 | |
| | CS Total | | | 51,000.00 | | 5,100.00 | |
| | DCS | 43014 | Monsanto Company Fixed | 441,357.00 | 112,320.00 | 44,135.70 | 11,232.00 |
| | | 43015 | Monsanto Company #2 | 50,050.00 | | 5,005.00 | |
| | | 43209 | CEB Move 4 Fixed | | 43,526.00 | | 4,352.60 |
| | | 43210 | CEB Move 5 Fixed | | 26,028.00 | | 2,602.80 |
| | DCS Total | | | 491,407.00 | 181,876.00 | 49,140.70 | 18,187.60 |
| Y Total | | | | 542,407.00 | 181,876.00 | 54,240.70 | 18,187.60 |
| Grand Total | | | | 542,407.00 | 181,876.00 | 54,240.70 | 18,187.60 |

In addition, Collective has devoted numerous hours to insure that the Debtor's sudden shutdown did not impair the collection of accounts receivable that remained due under its contracts.

   4.  **None of the Debtor's contracts with Direct or OEM customers were ever assigned to Collective.** Rather, the Debtor abruptly laid off its employees, angering its customers. Collective, having been thwarted in its attempts to purchase the business or to broker a sale in a competitive § 363 auction, did the only thing it could to prevent the dispersal of employees necessary to effectively complete the existing work. Collective understood the need to get the agreement approved as soon as possible as indicated by the requirement that the Debtor file its motion to assume the Client Transition

---

[1] OEM refers to customers who were purchasing equipment from manufacturers such as EMC who would then contract with the Debtor for the installation of the equipment. Certain customers of the Debtors fell into both direct and OEM customers. There was no double-counting or mistake in the Client Transition Agreement.

Agreement on or before three days' following the filing of the voluntary petition. *See* Client Transition Agreement, ¶ 1.

5. On October 15, 2007, Debtor filed its voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code ("the Bankruptcy Code"). Pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtor is managing its affairs as a debtor in possession. Debtor filed its Motion to Assume the Client Transition Agreement on November 14, 2007, some 30 days after the filing of the Petition. On December 4, 2007, the Official Committee of Unsecured Creditors (the "Committee") filed its Response to the Debtor's Motion (the "Response") that contains a number of factual inaccuracies and sleights of hand.[2] These inaccuracies are most efficiently handled in tabular form.

| Committee Concerns | Response |
|---|---|
| "Failure to Finalize Sale of Collective Services Division" [Response ¶6.a.] "It has been more than six weeks since the Debtor and the Collective Group entered into the Agreement, but the Debtor and the Collective Group still have not finalized an agreement for the Collective Group to acquire the collective Services Division. | The Client Transition Agreement does not contemplate the sale of the division. It licenses equipment and trademarks to Collective in exchange for 10% of the revenues from specified contracts and a separate transaction to purchase those assets in a competitive bid. The Debtor destroyed any chance to sell the division when it laid off its employees. |
| "Piecemeal Transfer of Client Contracts" [Response ¶6.b] "The Debtor should disclose the effect the proposed agreement will have on the Debtor's ability to sell the Collective Services Division." | Again, there is no "Collective Services Division" to sell. The Debtor's ability to sell the division as a whole was lost when the Debtor laid off all of its employees that were necessary to service customers. |
| "Overbid" [Response ¶6.c] "The Motion does not reference any possibility of overbidding." | The Client Transition Agreement is an executory contract between the Debtor and Collective. There are no assets or customer contracts being sold. Nothing in the Motion to Assume Client Transition Agreement is a sale |

---

[2] Counsel for Collective made numerous attempts to contact Committee counsel to answer any questions that the Committee had about the Transition Services Agreements. Those voicemails and e-mails were ignored such that the Committee made no effort to determine the true facts underlying the basis for its objection.

| Committee Concerns | Response |
|---|---|
| | of assets. NO CONTRACTS WERE OR WILL BE TRANSFERRED TO COLLECTIVE. Therefore the Committee's invocation "overbidding" is a tragic *non sequitur*. |
| "Collective Ability to Perform Client Contracts" [Response ¶6.d.] | As indicated above, Collective has already performed most of the contracts subject to the Client Transition Agreement for those few customers that transitioned over. Further, because this performance is being conducted under NEW contracts entered into with the Direct Clients and Collective, Collective's ability to perform has no effect on the estate. NO CONTRACTS WERE OR WILL BE ASSIGNED TO COLLECTIVE. |
| "No Consideration for Transfer of Contracts" [Response ¶6.e.i.] "The Committee questions why the Debtor is receiving no consideration of the transfer of such contracts." | NO CONTRACTS WERE OR WILL BE TRANSFERRED TO COLLECTIVE. |
| "Inconsistency Between Agreement and Exhibit "C" Thereto" [Response ¶6.e.ii.] EMC and Symantec are listed on Exhibit "C" as direct clients but are also OEM clients | Some OEM clients had direct contracts with the Debtor. Those contracts are included on Exhibit "C." The exclusion of OEM **contracts** is the subject of the Contract language, not OEM **clients. This was explained to Committee counsel to no avail.** |
| "Status of Client Consent to Transfer" [Response ¶6.e.iii.] "The Debtor has not, but should provide a list of all Clients that have accepted a transfer of its Client Contract with the Debtor to the Collective Group." | This information has been communicated to the Committee and is included in this Reply. |

5

| Committee Concerns | Response |
|---|---|
| "License to Use Assets" [Response ¶ 6.e.iv.] "Debtor is providing to the collective Group a license – without charge – to use all of the assets of the Debtor required to fulfill the Client Contracts." | The charge for the license is the 10% of money received on account of the Direct Clients who entered into new contracts with Collective to finish what was unfinished work under the Debtor's Contracts. Thus, the Committee completely ignores the quid pro quo of the Agreement and apparently believes that the Debtor should receive 10% for Collective's work on completing the Debtor's unfinished work for nothing in exchange. |
| "Lease for Austin Facility" [Response ¶ 6.e.v.] "The Debtor authorizes the collective Group to use the Debtor's Austin Facility for no charge." | The Austin Facility is among the assets licensed to Collective in exchange for the 10% commission. |
| "Accounting" [Response ¶ 6.e.vi.] | Collective does not object to adding accounting and audit rights on customary terms and conditions. |
| "Indemnification" [Response ¶ 6.4.vii.] "The Collective Group should indemnify the Debtor from any claims that may be asserted against the Debtor on account of the Collective Group's performance under the Client Contracts." | Again, this is a tragic *non sequitur*. **Collective entered into new contracts** with a small subset of the Debtor's Direct Customers. Collective is not performing under any of the **Debtor's** contracts with any of its customers. |

### III.
### ARGUMENT AND AUTHORITIES

6.      As of the date of this pleading, of the customers for which performance remained due from the Debtor as of the Petition Date, Collective provided $542,407 worth of remaining service to the Debtor's pre-petition customers, fully performing 5 of 8 of this small subset of the Debtor's 57 pre-petition contracts that the Debtor abandoned. Of the 3 remaining pre-petition contracts, three have some performance remaining due by the Debtor, and Collective is continuing to perform that work under its new contracts with those customers. A total of $181,876 of work remains to be completed and, again, those customers have contracted separately with Collective to do this completion. Despite

6

repeated attempts to dispel the myths that permeate the Committee's response, the Committee continues to defy logic and attempt to create issues where none exist.

7.  Assumption of the Client Services Agreement is in the best interests of the estate because it provides and has already provided the estate with a means to collect under those contracts that it breached because Colllective was willing to take on those employees and complete the job. That required Collective's considerable expenditure of cost and risks. Although the Committee has hinted that it thinks it can reject the agreement and still collect the 10% commission from Collective, that proposition ignores Collective's rights of recoupment and offset. Recoupment "'is the setting up of a demand arising from the same transaction as the plaintiff's claim or cause of action, strictly for the purpose of abatement or reduction of such claim.'" *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1399 (9th Cir. 1996) It involves "netting out debt," *Oregon v. Harmon (In re Harmon)*, 188 B.R. 421, 425 (9th Cir. 1995), and is allowed "because it would be inequitable not to allow the defendant to recoup those payments against the debtor's subsequent claim." *Newbery*, 95 F.3d at 1401 "[When the damage for the rejection of the Lease by the trustee] is ascertained, because the obligation breached arises out of the same transaction as that on which the trustee is suing, it is not a separate unsecured claim against the estate, but a recoupment which may be defensively asserted . . . ." *Howard Johnson, Inc. v. Tucker*, 157 F.2d 959, 961 (5th Cir. 1946).

8.  Moreover, Collective's performance, all occurring post-petition, gives rise to an administrative claim that can be offset against any claim by the estate against it. *See In re Tuscon Yellow Cab Co., Inc.*, 789 F.2d 701, 704-05 (9th Cir. 1986) (administrative status awarded to reimburse post-petition services that were induced by a "reasonable belief" that post-petition treatment under pre-petition agreement would remain unchanged); *In re Santa Monica Beach Hotel, Ltd.*, 209 B.R. 722, 727 (Bankr. 9th Cir. 1997) (administrative status granted in connection with services provided post-

7

petition). This administrative claim is chargeable by offset against any corresponding claim by the estate against Collective. Although the express language of Section 553 preserves setoff rights that arise pre-petition, the section says nothing about such rights that arise post-petition. *Id.* ¶ 553.03[6] at 553-56. Thus, the general rule is that "subject to the restrictions of 362, a post-petition claim may be offset against a post-petition debt so long as the claim and debt constitute valuable, mutual obligations. *Id.* (citing *Palm Beach County Bd. Of Pub. Instruction v. Alfar Dairy, Inc.*, 458 F.2d 1258, 1262 (5th Cir. 1972)).

9. The post-petition Debtor cannot reap the benefits of its dealings with Collective while ignoring its burdens under the same transaction. To conclude otherwise would be tantamount to chilling any post-petition dealings with debtors in possession and would sanction the Committee's apparent position that the Bankruptcy Code is both a sword and a shield. The estate succeeds only to those rights as they existed under state law and subject to recoupment and other defenses.

10. The Committee similarly ignores the realities under which the parties are now operating. Under section 365, the Debtor may not assume any customer contract unless it cures any defaults existing under that contract. 11 U.S.C. § 365(b)(1). No one contests that the Debtor was in breach of the customer contracts as of the filing date, having anticipatorily repudiated its obligations by shutting down operations, terminating all of its employees and sending a letter to its customers advising them of these events. Further, a contract is no longer executory if it has been fully performed. The sequence of events here makes it impossible for the contracts at issue to be assigned to an assignee because the contracts are either (a) fully performed by Collective making them non-executory; or (b) subject to the subrogation rights of Collective for performing the Debtor's cure obligations in part. As of the date of this pleading, of the customers for which performance remained due from the Debtor as of the Petition Date, Collective has performed $542,407 worth of remaining service, fully

performing 5 of 8 of work remaining on the Debtor's contracts. Of the remaining three of the Debtor's contracts, three have some performance remaining due by the Debtor. A total of $181,876 of work remains to be completed and those customers have contracted separately with Collective to do this completion. If the Committee is successful in forcing these customers to take service from Fusionware, these customers would be liable to Collective for breach of these separate contracts entered into between Collective and these customers when these counterparties contracted with Collective for cover. Thus, the Debtor would be required to pay, as a cure payment, these flow-through cover damages to those customers as required by 11 U.S.C. § 365(b)(1)(A).

## IV.
## CONCLUSION

11.  For the reasons stated above, Collective respectfully requests that the Debtor's Motion to Assume the Client Transition Agreement be granted and that Collective have such other and further relief to which it is entitled.

    Respectfully submitted,

    BROWN MCCARROLL, L.L.P.


    By: /s/ Patricia B. Tomasco
        Patricia Baron Tomasco
        Texas State Bar No. 01797600
        111 Congress Avenue, Suite 1400
        Austin, Texas 78701
        Telephone: (512) 479-1141
        Facsimile: (512) 226-7326

    ATTORNEYS FOR THE COLLECTIVE GROUP, LLC

4039894.1
56094.1

# CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of January, 2008, a true and correct copy of the foregoing document was served via the Court's CM/ECF notification system and/or regular first class mail, on all parties listed below.

/s/ Patricia B. Tomasco
Patricia B. Tomasco

**Debtor**
MTI Technology Corporation
15641 Red Hill Avenue, Suite 200
Tustin, CA 92780

**Debtor's Counsel**
Ivan L. Kallick
MANATT PHELPS & PHIL
11355 West Olympic Boulevard
Los Angeles, CA 90064

Scott C. Clarkson
Eve A. Marsella
CLARKSON, GORE & MARSELLA
3424 Carson Street, Suite 350
Torrance, CA 90503

**Counsel for Creditor Committee**
Richard H. Golubow
Robert E. Opera
WINTHROP COUCHOT
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660

4039894.1
56094.1