1   SHARON Z. WEISS (State Bar No. 169446)
    ANDY S. KONG (State Bar No. 243933)
2   WEINSTEIN, WEISS & ORDUBEGIAN LLP
    1925 Century Park East, Suite 1150
3   Los Angeles, California  90067-2712
    Telephone (310) 203-9393
4   Facsimile (310) 203-8110
    sweiss@wwolawyers.com
5   akong@wwolawyers.com

6   Attorneys for Creditor AM-PM, Inc. dba
    Aries Internet Services, Inc.
7

8               UNITED STATES BANKRUPTCY COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10                    SANTA ANA DIVISION

11
    In re                          )   Case No. 8:07-bk-13347-ES
12                                  )   [Chapter 11]
    MTI TECHNOLOGY                  )
13  CORPORATION, a Delaware         )   OPPOSITION TO MTI TECHNOLOGY
    corporation,                    )   CORPORATION'S MOTION FOR
14                                  )   ORDER APPROVING ASSUMPTION OF
              Debtor-in-Possession. )   CLIENT TRANSITION AGREEMENT
15                                  )   WITH THE COLLECTIVE GROUP,
                                    )   L.L.C.; DECLARATIONS OF WILLIAM
16                                  )   L. LAWRENCE JR. AND SHARON Z.
                                    )   WEISS IN SUPPORT THEREOF
17                                  )
                                    )   [Request for Judicial Notice Filed
18                                  )   Concurrently Herewith]
                                    )
19                                  )   DATE:    January 29, 2008
                                    )   TIME:    10:30 a.m.
20                                  )   PLACE:   Courtroom 5A
                                    )            411 W. Fourth St.
21  _____ )           Santa Ana, CA  92701

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

1    AM-PM, Inc. dba Arise Internet Services, Inc.[1] ("Aries") respectfully submits

2    its opposition to the *Motion for Order Approving Assumption of Client Transition*

3    *Agreement with The Collective Group, L.L.C.* (the "Assumption Motion") filed by MTI

4    Technology Corporation (the "Debtor") and requests that the Assumption Motion be

5    denied on the following grounds:[2]

6                                            I.

7                                 **INTRODUCTION**

8           The Debtor seeks approval of an agreement entitled Client Transition

9    Agreement (the "Agreement") entered between the Debtor and The Collective Group,

10   L.L.C. ("Collective"), a business entity formed by a former employee of the Debtor. The

11   Agreement purports to be a necessary vehicle to "facilitate transition, perpetuate good

12   will; and reduce claims against the Debtor' chapter 11 estate." Under the Agreement,

13   the Debtor will (or has already) provide Collective with its accumulated backlog orders

14   of approximately $1,249,844 in exchange for a 10% commission of the revenues

15   actually collected by Collective for providing such services. The Debtor will also grant

16   Collective the exclusive right to use all of its assets including confidential information

17   and other intellectual property in order to service the customers. Notwithstanding

18

19   _____

20        [1]    Effective January 21, 2008, Fusionware-Pacific Software, Inc.
     ("Fusionware") purchased claim number 125-1 from Aries and the evidence of
21   transfer of claim was filed with the bankruptcy court on January 23, 2008.

22        [2]    Prior to purchasing the Aries claim, Fusionware has made
     several offers which it believes were significantly better than the terms and
23   conditions of the *Client Transition Agreement.* Attempts to reach an
     agreement have either been received with silence or have been frustrated by
24   the Debtor and The Collective Group. After several months of attempted
     discussions, Fusionware has concluded that the Debtor is not seriously
25   considering its offers and files this opposition to inform the Court and
     interested parties of this matter. Aries therefore requests that the Court
26   consider this opposition although untimely. If the Court so desires Aries will
     request a continuance of this hearing to permit for timely briefing and
27   response

28

1   Collective's assertion to the contrary, the Agreement is in reality a sale of estate

2   property disguised that has the effect of stripping the estate of a valuable asset --

3   namely access to its customer base, with very little benefit to the estate.  Accordingly, to

4   be fair and to be in the best interest of the estate and its creditors, the court should

5   deny the Motion and require the Debtor to make these assets available for a traditional

6   sale and overbid process to ensure that the estate is receiving the best possible value for

7   those assets, especially in light of Fusionware's previous offers that significantly

8   improve the estate's recovery.

9                                                     II.

10                              <u>**FACTUAL BACKGROUND**</u>

11          On October 15, 2007 (the "Petition Date"), the Debtor filed for relief under

12   Chapter 11 of the Bankruptcy Code.  Just days before the Petition Date, on or about

13   October 12, 2007, the Debtor and Collective entered into the Agreement, under which

14   the Debtor would provide Collective with its backlog orders in exchange for a 10%

15   commission of revenues actually received by Collective in servicing those clients.  *See*

16   RJN "1", Agreement at sections 2-3.  The Agreement also required a $1.5 million

17   financing contingency and specifically excluded any warranty regarding Collective's

18   services on the backlog orders.  It also provides releases to certain insides.

19          Although the Agreement required the Debtor to file a Motion to "approve" the

20   Agreement within three business days of the Petition Date, in fact, the Debtor did not

21   file the Assumption Motion until a month later on November 14, 2007 (just one week

22   before the Thanksgiving Holiday).  Once the terms of the Assumption Motion became

23   public knowledge, Fusionware immediately expressed its interest in the assets that are

24   the subject of the Agreement.  Within days, Fusionware contacted the Debtor's counsel

25   and the Committee's counsel and quickly provided offers in writing that created both a

26   higher monetary recovery and lower risk to the estate.

27          Since that time, the Debtor's response remains constant -- its too late to sell

28   these assets to anyone; especially Fusionware.  If that is true (which Aries most

1   certainly refutes), then the estate would lose a higher recovery directly attributable to

2   its own delay.  The estate need not lose this opportunity.

3           Specifically, while Fusionware contacted the Committee's counsel immediately,

4   on or about December 3, 2007, Fusionware formally expressed to the Debtor and the

5   Official Committee of Unsecured Creditors (the "Committee") a serious interest in

6   purchasing the assets associated with the Agreement.  *See Stipulation to Continue*

7   *Motion for Order Approving Assumption of Client Transition Agreement with The*

8   *Collective Group, L.L.C. and Chapter 11 Status Conference* (RJN "3").  Accordingly, the

9   Debtor and the Committee requested a continuance to January 8, 2008 to permit

10  Fusionware and the Debtor to address Fusionware's interest.

11          On December 4, 2007, Fusionware formally submitted an offer (the "First

12  Offer") to the Debtor which significantly improved the terms and conditions of the

13  Agreement.  *See* Exhibit "A".  The First Offer removed the $1.5 million financing

14  contingency imposed by Collective and increased commissions to 15%; a 50% increase.

15  *Id.*  Fusionware also provided a warranty for the work it would performed on the

16  contracts, thereby insuring that the estate would not be subject to administrative

17  claims for disputed workmanship.  In addition, Fusionware did not require the Debtor's

18  release any of its former employees.

19          On December 9, 2007, Fusionware submitted a second offer (the "Second Offer")

20  to the Debtor increasing the terms in the First Offer.  *See* Exhibit "B".  In addition to

21  the terms in the First Offer, the Second Offer proposed to pay the Debtor 15% of <u>all</u>

22  revenues collected from <u>new business</u> from the clients identified in the Agreement for a

23  period of six months from the date the Second Offer is approved by the Court.  *Id.*  In

24  other words, not only would the Debtor reap a higher percentage on its existing orders,

25  it would also receive a percentage of new work that it would not otherwise be entitled to

26  collect.  Both offers were subject to Fusionware's due diligence, which the Debtor

27  conditioned on the execution of a nondisclosure agreement ("NDA").  Fusionware

28  agreed to execute a NDA, but the Debtor failed to provide one until January 3, 2008 --

over a month after Fusionware submitted its First Offer.  Fusionware immediately

provided its edits to the NDA, but it has never received a finalized version.  As such,

Fusionware has been completely shut out from performing <u>any</u> due diligence on the

subject assets.  All of Fusionware's requests for a substantive response to its offers have

likewise been met with silence.  Exhibit "C".[3/]

On January 2, 2008, a third offer (the "Third Offer) was sent to the Debtor.

Exhibit "D".  The Third Offer withdrew Fusionware's previous offers and proposed to

purchase certain assets for a lump sum price of $50,000 without financing

contingencies and to provide commissions equal to 15% of new business resulting from

the existing contracts for a period of six months.  *Id.*

Fusionware, the Committee and the Debtor continued to try and discuss

Fusionware's interest and on January 3, 2008, a second stipulation was entered at the

request of the Debtor and the Committee continuing the hearing on the Assumption

Motion to the current date of January 29, 2008.  *See Stipulation to Continue Motion for

Order Approving Assumption of Client Transition Agreement with The Collective

Group, L.L.C.* (RJN "4").

On January 8, 2008, Fusionware again unilaterally enhanced its Third Offer

and related to the Debtor that it was continuing to offer the same terms and conditions

as set forth in the Third Offer with two modifications of import; the lump sum price

would now be <u>$125,000</u> and the Debtor would not receive any commission (the

"Amended Third Offer").  Exhibit "E".  To date, the Debtor has not responded to the

Amended Third Offer.  *See* Exhibit "F".  In response to the mounting frustration in

---

[3/]    Noteably, the Collective Group file its Reply on January 22, 2008
in essence claiming there are no assets for the Debtor to sell.  (*See* RJN "5", pg.
4, box).  In the Collective Reply, it also admits that it has entered into new
contracts with the Debtor's customer which are really a continuation of the
Debtor's agreements, without paying the estate any compensation whatsoever.
(RJN "5", pg. 6, ¶ 6; pg. 9 ¶ 10).  It is this asset that has value to the estate as
evidenced by Fusionware's bids.

1  attempting to negotiate a deal with Debtor and Collective, Fusionware purchased claim

2  no. 125-1 from Aries as of January 21, 2008 and files the instant opposition to the

3  Assumption Motion for the interest of the estate.

4                                          III.

5  **THE AGREEMENT IS A DISGUISED SALE OF ESTATE PROPERTY**

6          The disposition of estate assets by way of the Agreement is the equivalent of a

7  sale of estate property outside the ordinary course of the Debtor's business. *See*

8  *Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson Entm't*

9  *Group, Inc.)*, 292 B.R. 415 (B.A.P. 9th Cir. 2003) (The disposition of estate property by

10 way of a compromise is the equivalent of a sale of estate assets.); *Peltz v. Gulfcoast*

11 *Workstation Group (In Bridge Info. Sys., Inc.)*, 293 B.R. 479, 486 (Bankr.E.D.Mo. 2003)

12 (The settlement of a cause of action belonging to the estate has the same effect on the

13 estate as a sale of that cause of action for purposes of § 363(b).).  The Court must look

14 beyond the label or terminology used in the Agreement in determining whether the

15 transaction is really a sale. *Cf. Fireman's Fund Ins. Companies v. Grover (In re*

16 *Woodson)*, 813 F.2d 266, 272 (9th Cir. 1987); *European American Bank v. Sackman*

17 *Mortg. Co. (In re Sackman Mortg. Corp.)*, 158 B.R. 926, 932 (Bankr.S.D.N.Y. 1993); *Bell*

18 *Intercontinental Corp. v. United States*, 381 F.2d 1004, 1011 (Ct.Cl. 1967).

19         Here, pursuant to the Agreement, the Debtor not only transfers to Collective

20 its customer list in "piecemeal", as noted by the Committee in its Response, but retains

21 no right to use or license its assets under section 4 of the Agreement, granting

22 Collective "the sole and exclusive right to use all of the assets of MTI" including

23 confidential information, trade secrets and intellectual property.  RJN "1", Agreement

24 at section 4; RJN "2", *Committee's Response to Debtor's Motion for Order Approving*

25 *Assumption of Client Transition Agreement with The Collective Group, LLC* at pg. 3;

26 *cf. Bell Intercontinental Corp., supra* at 1010-11 (A grant of all substantial rights of

27 value in a patent constitutes a sale.).  The combination of the transfer of the client

28 contracts to Collective, the scope of the rights conveyed under the Agreement and the

1  fact that the Agreement is just a "first step in the process" of the Debtor selling to

2  Collective its Collective Services Division mandate a conclusion that the Agreement

3  constitutes a sale of estate property.  RJN "1".  Consequently, it implicates the sale

4  provisions under 11 U.S.C. § 363.

5  **A.**    **The Assets Associated With the Agreement are Property of the**

6         **Estate.**

7         11 U.S.C. § 541(a) defines property of the estate broadly to include all of the

8  debtor's legal and equitable interest as of the petition date.  It cannot be disputed that

9  the backlog orders and the Debtor's assets indicated in Section 4 of the Agreement are

10  estate property.  As such, any sale or use of that property must comply with § 363(b).

11  **B.**    **The Sale is Not in the Ordinary Course of the Debtor's Business.**

12        The sale of the assets associated with the Agreement is not in the ordinary

13  course of the Debtor's business.  11 U.S.C. § 363(b)(1) provides that "the trustee [or

14  debtor-in-possession], after notice and a hearing, may use, sell, or lease, other than in

15  the ordinary course of business, property of the estate."  The Ninth Circuit has adopted

16  the following two tests in determining whether a post-petition transaction is in the

17  ordinary course of business: (1) horizontal dimension test; and (2) vertical dimension

18  test.  *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143,

19  147-48 (B.A.P. 9th Cir. 1988); *Burlington Northern R.R. Co. v. Dant & Russell, Inc. (In*

20  *re Dant & Russell, Inc.)*, 853 F.2d 700, 705 (9th Cir. 1988).

21        **1.**    **Horizontal Dimension Test.**

22        The horizontal dimension test examines whether the transaction is of a

23  type that is commonly undertaken within the debtor's industry.  *Blumer, supra* at 148,

24  *Dant & Russell, Inc., supra* at 704.

25        Here, there is no evidence that transferring customer lists for no

26  consideration, along with the granting of exclusive rights to use all of the Debtor's

27  assets including confidential information, trade secrets and intellectual property to

28  service those customers is a type of transaction that is common within the Debtor's

1   industry. This is further supported by the fact that Collective is not paying any fees for

2   the granting of such licenses to use the Debtor's assets, is not bearing the rent expense

3   for the Austin facility despite having the exclusive right to use the premises and is

4   released from all covenants not to compete, non-solicitation agreements and

5   confidentiality obligations. *Id.* Moreover, the "piecemeal" transfer of the client

6   contracts threatens the Debtor's ability to sell the Collective Services Division to other

7   potential buyers.

8           **2.      Vertical Dimension Test.**

9           The vertical dimension test examines the transaction from the viewpoint

10  of a hypothetical creditor and focuses on the creditors's reasonable expectations of what

11  transactions the debtor-in-possession is likely to enter in the course of its business. *Ids.*

12          This inquiry yields the same conclusion as above. A hypothetical

13  creditor would not reasonably expect the Debtor to agree to provide Collective with its

14  client contracts for no consideration despite the lack of evidence that Collective is even

15  able to perform under the client contracts. Likewise, a hypothetical creditor would not

16  expect that the Debtor might agree to license and grant to Collective the exclusive

17  right to use all of its assets for no consideration and even waive all covenants not to

18  compete, non-solicitation agreements and confidentiality obligations.

19                                  **IV.**

20  **THE COURT MUST OPEN THE SALE FOR A COMPETITIVE PROCESS**

21          Having established that the Agreement is a sale of estate property not in the

22  ordinary course of the Debtor's business, the Court should deny the Assumption Motion

23  and allow Fusionware or other interested parties to bid on the assets. *See generally*

24  *Goodwin*, 292 B.R. 415. "A sale of assets is appropriate if all the provisions of section

25  363 are followed, the bid is fair, and the sale is in the best interests of the estate and its

26  creditors." *In re Quality Stores, Inc.*, 272 B.R. 643, 647 (Bankr.W.D.Mich. 2002) citing

27  *Matter of Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr.W.D.Mich. 1995). For

28  example, in *Goodwin*, the trustee entered into a compromise with the parties against

1    whom the estate had potential fraudulent transfer claims whereby the settling parties

2    would pay the estate $40,000 to purchase the potential claims. *Id.* at 421-22. The

3    trustee did not give serious consideration to a third party offer of $45,000 for the claims

4    plus 15% of any proceeds it recovered in litigation against the settling parties. *Id.* The

5    bankruptcy court agreed with the trustee that the compromise was in the best interest

6    of the estate. *Id.* at 422. The Ninth Circuit Bankruptcy Appellate Panel reversed the

7    bankruptcy court holding that the possibility of a higher price obligates the trustee to

8    allow for competitive bidding. *Id.*

9            Similarly, in this case, Fusionware has submitted several offers, each of which

10    significantly improved the terms and conditions of the Agreement in favor of the Debtor

11    and the estate. Thus, the Court should require the Debtor to offer a competitive auction

12    and allow interested parties to bid on the assets. Moreover, the only way the sale will be

13    fair and in the best interest of the estate and its creditors is to permit interested parties

14    to bid on the assets associated with the Agreement. *See In re Chung King, Inc.*, 753

15    F.2d 547, 549 (7th Cir. 1985) (the sale must result in the estate obtaining the best

16    possible value under the circumstances); *G-K Dev. Co., Inc. v. Broadmoor Place*

17    *Investments, L.P. (In re Broadmoor Place Investments, L.P.)*, 994 F.2d 744, 746 (10th

18    Cir. 1993) (the bankruptcy court may disapprove a proposed sale if it is aware of

19    another proposal that will be better for the estate); *In re S.N.A. Nut Co.*, 186 B.R. 98,

20    104 (Bankr.N.D.Ill. 1995) ("When a debtor or trustee conducts a sale under § 363(b), it

21    has an obligation to maximize revenues for the estate.").

22            Fusionware has made several offers to the Debtor since December 3, 2007. *See*

23    Exhibits "A"-"F". All of the offers significantly improved the terms and conditions of the

24    Agreement in favor of the Debtor and the estate. However, attempts to reach an

25    agreement have either been received with silence or been frustrated by the Debtor and

26    Collective. *See* Exhibits "C" and "F". The Debtor's desire not to do business with

27    Fusionware is especially telling given Collective's Reply where it now claims there are

28    no assets to sell (RJN "4"). Therefore, to be fair and to be in the best interest of the

1    estate and its creditors, the Court must consider whether the estate property that would

2    be disposed of in connection with the Agreement would draw higher prices through a

3    competitive process.  Moreover, the instant sale deserves particular scrutiny because

4    the transaction is between the Debtor and an entity created by a former employee of the

5    Debtor.

6                                                   V.

7                                            **CONCLUSION**

8            The Assumption Motion must be denied and the Agreement rejected.  The

9    Agreement disposes of estate property in a transaction outside the ordinary course of

10   the Debtor's business.  The Agreement is cloaked as an executory contract which

11   purports that it is necessary to "mitigate claims for damages by the Clients against

12   MTI for its breach of the Client Contracts . . ."  But when one strips away the "disguise"

13   and examines the substance of the Agreement, the Agreement has all the

14   characteristics of a sale of estate assets.  As a result, to be fair and to be in the best

15   interest of the estate, interested parties, like Fusionware, must be allowed to bid on the

16   assets associated with the Agreement, especially in light of Fusionware's previous offers

17   to the Debtor significantly improving the terms and conditions of the Agreement in

18   favor of the Debtor and the estate.  As such, the Assumption Motion should be denied.

19

20   DATED:  January 23, 2008                Respectfully submitted,

21                                                        WEINSTEIN, WEISS & ORDUBEGIAN LLP

22

23                                                        By

24                                                             SHARON Z. WEISS
                                                             ANDY S. KONG
25                                                             Attorneys for Creditor AM-PM, Inc.
                                                             dba Aries Internet Services, Inc.

26

27

28

## DECLARATION OF WILLIAM L. LAWRENCE JR.

I, William L. Lawrence Jr., declare:

1.      I am over the age of 18.  I am the Chief Financial Officer of Fusionware Corporation.  I have personal knowledge of the facts described hereinabove and if called as a witness I could and would testify competently thereto.

2.      I am in receipt of the agreement between the Debtor and Collective entered into on October 12, 2007 which was attached to the Debtor's Assumption Motion.

3.      After obtaining a copy of the Assumption Motion, I instructed my counsel to investigate whether Fusionware could purchase the assets that are the subject of the Agreement.  I understand those conversations occurred immediately.

4.      Through my counsel, on December 4, 2007, Fusionware submitted an offer (the "First Offer") to the Debtor which I believed significantly improved the terms and conditions of the Agreement.  The First Offer removed the $1.5 million financing contingency imposed by Collective and increased commissions to 15%; a 50% increase. Fusionware also provided a warranty for the work it performed on the contracts, thereby insuring that the estate would not be subject to administrative claims for disputed workmanship.  In addition, Fusionware did not require a release of the Debtor's former employees.

5.      I also had several conversations with the Debtor's principles regarding Fusionware's interest to purchase assets during this period of time.

6.      On December 9, 2007, though my counsel, Fusionware submitted a second offer (the "Second Offer") to the Debtor increasing the terms in the First Offer. In addition to the terms in the First Offer, the Second Offer proposed to pay the Debtor 15% of all revenues collected from new business from the clients identified in the Agreement for a period of six months from the date the Second Offer is approved by the Court.  In other words, I believed that not only would the Debtor reap a higher

percentage on its existing orders, it would also receive a percentage of new work that it would not otherwise be entitled to collect. Despite the offers and repeated requests for a written representation regarding the status of Agreement, the Debtor failed to timely respond and react.

7.    I participated with my counsel in many phone conferences with the Committee and the Debtor's professionals and continued to try and discuss Fusionware's interest in purchasing the Debtor's assets contained in the Agreement.

8.    On January 2, 2008, a third offer (the "Third Offer") was sent to the Debtor on behalf of Fusionware, through my counsel. The Third Offer withdrew Fusionware's previous offers and proposed to purchase certain assets for a lump sum price of $50,000 without financing contingencies and provide commissions equal to 15% for a period of six months.

9.    On January 8, 2008, I related to the Debtor and the Debtor's counsel through my attorney that Fusionware was continuing to offer the same terms and conditions as set forth in the Third Offer with two modifications of import; the lump sum price would now be $125,000 and the Debtor would not receive any commission on new business.

10.    To date, the Debtor has not responded to the Amended Third Offer.

11.    In response to the mounting frustration in attempting to negotiate a deal with the Debtor and Collective, Fusionware purchased claim no. 125-1 as of January 21, 2008 and filed the instant opposition to the Assumption Motion for the interest of the estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of January 2008, at Hillsboro, Oregon.

WILLIAM L. LAWRENCE JR.

# DECLARATION OF SHARON Z. WEISS

I, Sharon Z. Weiss, declare:

1.       I am an attorney duly admitted to practice before the United States Bankruptcy Court.  I am a partner at Weinstein, Weiss & Ordubegian LLP, counsel for Fusionware Corporation and creditor AM-PM, Inc. dba Aries Internet Services, Inc.  I have personal knowledge of the facts described hereinabove and if called as a witness I could and would testify competently thereto.

2.       In November 2007, I contacted the Committee's counsel to discuss Fusionware's interest in purchasing the assets that are subject to the Agreement with Collective.

3.       After many conversations, on December 4, 2007, I submitted Fusionware's formal offer (the "First Offer") to the Debtor.  Attached hereto as Exhibit "A" is a true and correct copy of the First Offer.

4.       On December 9, 2007, I submitted on behalf of Fusionware its second offer (the "Second Offer") to the Debtor.  Attached hereto as Exhibit "B" is a true and correct copy of the Second Offer.

5.       Attached hereto as Exhibit "C" is a true and correct copy of the emails from me to the Debtor and the Debtor's counsel.

6.       I participated in many calls with counsel for the Committee and the Debtor to try and discuss Fusionware's interest in the assets subject to the Agreement. As part of those discussions, I was advised that before Fusionware could conduct any due diligence, it would first be required to execute a non-disclosure agreement ("NDA") which Fusionware agreed to execute.  After waiting over a month to receive a draft NDA from the Debtor's counsel, I provided edits to the NDA within days.  To date, I have not received a final version of the NDA.  As a result, Fusionware has not been permitted access to the Debtor's books and records relating to the Assets that are the subject of the Agreement.

1        7.     Attached collectively as Exhibit "F" are various email exchanges

2  between me, counsel for the Committee and counsel for the Debtor relating to

3  Fusionware's efforts to acquire the estate's assets.

4        8.     On January 2, 2008, I submitted on behalf of Fusionware a third offer

5  (the "Third Offer).  Attached hereto as Exhibit "D" is a true and correct copy of the

6  Third Offer.

7        9.     On January 8, 2008, I related to the Debtor and the Debtor's counsel via

8  email that Fusionware was continuing to offer the same terms and conditions as set

9  forth in the Third Offer with two modifications of import; the lump sum price would now

10  be $125,000 and the Debtor would not receive any commission.  Attached hereto as

11  Exhibit "E" is a true and correct copy of the email.  To date, the Debtor has not

12  responded to the Third Offer.

13        I declare under penalty of perjury under the laws of the United States of

14  America that the foregoing is true and correct.

15        Executed this __23rd__ day of January 2008, at Los Angeles, California.

16

17                                _____

18                               SHARON Z. WEISS

19

20

21

22

23

24

25

26

27

28

h:\h\c\1696.001_opposition_motiontoassumeCTA.wpd
1/23/08 (1:55 pm) cu