1   and 1123(b)(3)(B) of the Bankruptcy Code and, as such, will be vested with the authority and

2   power, subject to the provisions of the Plan, to take, among others, the following acts:  (a) manage,

3   administer and dispose of Plan Assets for the benefit of holders of Allowed Claims; (b) file, litigate,

4   prosecute, settle, adjust, retain, enforce, collect and abandon all Causes of Action in the name of,

5   and for the benefit of, the Estate; (c) make all Distributions provided for by the Plan; and (d) such

6   other acts as may be appropriate to administer, wind-down, and close the Case.  As the

7   representative of the Estate, the Plan Agent, under the supervision of the Post-Effective Date

8   Committee, will succeed to all of the rights and powers of the Debtor and the Estate with respect to

9   all Causes of Action, and will be substituted for, and will replace, the Debtor, the Estate and the

10  Committee, as applicable, as the party-in-interest in all such litigation pending as of the Effective

11  Date.

12          **4.      Plan Agent Disclosure.**

13          On or before the thirtieth (30th) day prior to the Confirmation Hearing Date, the

14  Plan Proponents will file with the Bankruptcy Court a pleading disclosing the identity of the Plan

15  Agent, its credentials, and any and all relevant information regarding the retention of the Plan

16  Agent, including, without limitation, any and all affiliations, connections and actual or potential

17  conflicts of interest that the Plan Agent may have in the Case ("Plan Agent Disclosure").  A copy of

18  the Plan Agent's engagement agreement will be attached to the Plan Agent Disclosure.

19          **5.      No Liability of Post-Effective Date Committee, the Plan Agent or the**

20                  **Reorganized Debtor.**

21          To the maximum extent permitted by law, the Post-Effective Date Committee, the

22  Plan Agent and the Reorganized Debtor, and their respective employees, officers, directors,

23  shareholders, agents, members, representatives, and Professionals (collectively, "Representatives")

24  will not have or incur liability to any Creditor, Interest Holder, party-in-interest or to any other

25  entity for an act taken or omission made in good faith in connection with or related to the

26  administration of the Plan Assets, the implementation of the Plan and the making of Distributions

27  under the Plan.  The Post-Effective Date Committee, the Plan Agent, the Reorganized Debtor and

28  the Representatives will be entitled in all respects to reasonably rely on the advice of counsel with

CLARKSON, GORE & MARSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

1 respect to their respective duties and responsibilities under the Plan.  Entry of the Confirmation

2 Order constitute a judicial determination that the exculpation provisions contained in Section 6.8.5

3 of the Plan are necessary to, <u>inter alia</u>, facilitate Confirmation and to minimize potential claims

4 arising after the Effective Date for indemnity, reimbursement or contribution from the Plan Assets.

5 The approval of the Plan by the Confirmation Order constitutes a res judicata determination of the

6 matters included in the exculpation provisions of the Plan.  Notwithstanding the foregoing, nothing

7 in Section 6.8.5 of the Plan will absolve the Post-Effective Date Committee, the Plan Agent or the

8 Reorganized Debtor of any potential liability that any of them respectively may have to any

9 Creditor (which liability will be several and not joint) on account of any acts or omissions by it

10 constituting willful misconduct or gross negligence.

### 6. **Funding of Post-Effective Date Plan Expenses.**

12 All Post-Effective Date Plan Expenses will be expenses of the Reorganized Debtor.

13 Except as may be provided expressly to the contrary in the Plan Agent Disclosure, the Plan Agent

14 will have no personal liability for any Post-Effective Date Plan Expenses.  The Plan Agent will

15 disburse Plan Fund Proceeds from the Plan Fund for the purpose of funding the Post-Effective Date

16 Plan Expenses.

### I. **Termination of the Committee and Appointment of the Post-Effective Date Committee.**

### 1. **Replacement of the Committee.**

20 As of the Effective Date, the Committee will terminate and disband, and the

21 Committee will be released from and discharged of all further authority, duties, responsibilities and

22 obligations related to the Case.  As of the Effective Date, the Committee will be replaced by the

23 Post-Effective Date Committee, which will be comprised of members of the Committee.  The Post-

24 Effective Date Committee will have the right to supervise the Plan Agent and will have the other

25 powers, rights, responsibilities and functions identified in the Plan and in a disclosure document to

26 be filed in the Bankruptcy Court on or before the thirtieth (30th) day prior to the Confirmation

27 Hearing Date ("Post-Effective Date Committee Disclosure").

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

2.    **Members of Post-Effective Date Committee.**

In the event of the death or resignation of any member of the Post-Effective Date Committee, the remaining members of the Post-Effective Date Committee will have the right to designate a successor member from among the holders of Allowed General Unsecured Claims. If a Post-Effective Date Committee member assigns its Claim in full, or releases the Debtor from payment of the balance of such member's Claim, such act will constitute a resignation from the Post-Effective Date Committee. Until a vacancy on the Post-Effective Date Committee is filled, the Post-Effective Date Committee will function in its reduced number. Upon the Case Closing Date, the Post-Effective Date Committee will be dissolved and the members thereof will be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Post-Effective Date Committee members.

3.    **Duties of Members of Post-Effective Date Committee.**

The members of the Post-Effective Date Committee will undertake their duties as specified in the Plan and in the Post-Effective Date Committee Disclosure. In serving as a member of the Post-Effective Date Committee, such member will not assume, or be deemed to have assumed, any liability to Creditors, the Debtor, or any other parties-in-interest in the Case and will not be liable for any acts or omissions while acting in that capacity, except for acts or omissions constituting willful misconduct or gross negligence.

J.    **The Reorganized Debtor.**

1.    **Corporate Powers.**

The Debtor, as the Reorganized Debtor, will continue to exist after the Effective Date of the Plan. The Reorganized Debtor will have all of the powers and rights of a corporation under the laws of the State of Delaware, and, except as set forth in the Plan expressly to the contrary, will continue to have all corporate powers and rights accorded to it under its Articles of Incorporation, Bylaws and other corporate governance agreements.

2.    **Board of Directors.**

On the Effective Date, the members of the Board of Directors of the Reorganized Debtor will be the following persons:  the Plan Agent; Mr. Poteracki; and another individual to be

CLARKSON, GORE & MARSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

1  named by the Post-Effective Date Committee.  The Reorganized Debtor will maintain customary

2  directors and officers insurance coverage through the Case Closing Date, or as otherwise determined

3  by the Plan Agent.  The members of the Board of Directors will be entitled to payment of

4  compensation, for serving on the Reorganized Debtor's Board of Directors, in the amount of

5  $1,250.00 per calendar quarter, or as otherwise determined reasonably by the Plan Agent in the

6  exercise of its sole and absolute discretion; provided, however, that such compensation paid to the

7  Plan Agent for serving on the Reorganized Debtor's Board of Directors will be applied against the

8  compensation payable to the Plan Agent pursuant to the Plan and as set forth in the Plan Agent

9  Disclosure.

10  **3.    Officer of Reorganized Debtor.**

11  As of the Effective Date, the Plan Agent will serve as the Chief Executive Officer of

12  the Reorganized Debtor.  The Board of Directors of the Reorganized Debtor may appoint other

13  officers as appropriate to aid in the implementation of the Plan.  The Plan Agent will be authorized

14  to take any act, and to execute any documents, necessary to preserve the corporate existence of the

15  Reorganized Debtor, with no additional authorization required for the Plan Agent to do so.

16  **4.    Effectuation of Merger Transaction.**

17  The Reorganized Debtor will continue in existence after the Effective Date, as

18  appropriate to effectuate a Merger Transaction.  In accordance with the provisions of Section 6.18 of

19  the Plan, the Plan Agent, under the supervision of the Post-Effective Date Committee, will determine

20  whether a Merger Transaction is viable, whether a Merger Transaction should be effectuated for the

21  benefit of holders of Allowed General Unsecured Claims and the terms thereof, and/or whether to

22  terminate any efforts to effectuate a Merger Transaction and instead to wind up the affairs of the

23  Reorganized Debtor; provided, however, that, in accordance with the provisions of Section 6.18.3 of

24  the Plan, in the event that no Merger Transaction is consummated by the Merger Consummation

25  Date, all efforts to effectuate a Merger Transaction will terminate and the Plan Agent will take all

26  acts appropriate to wind up the affairs of the Reorganized Debtor.

27

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

**K.**     **Causes of Action.**

The right to enforce, file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon on behalf of the Debtor and the Estate any and all Causes of Action, including, but not limited to, any Avoidance Actions, is deemed automatically transferred on the Effective Date from the Estate to the Plan Agent.  From and after the Effective Date, only the Plan Agent will have the right to enforce, file, litigate, prosecute, settle, collect and abandon any Cause of Action.

Notwithstanding the rights of the Plan Agent with respect to Causes of Action, nothing in the Plan will require the Plan Agent to file or to prosecute any Cause of Action, both of which may be determined by the Plan Agent, in the exercise of its sole and absolute discretion.

**THE PLAN PROPONENTS HAVE NOT COMPLETED THEIR INVESTIGATION REGARDING THE EXISTENCE OF CAUSES OF ACTION.  THE INVESTIGATION IN THIS REGARD IS ONGOING.  AS A RESULT, ALL PARTIES-IN-INTEREST ARE HEREBY ADVISED THAT, NOTWITHSTANDING THE FACT THAT THE EXISTENCE OF ANY PARTICULAR CAUSE OF ACTION MAY NOT BE LISTED, DISCLOSED OR SET FORTH IN THE PLAN OR IN THIS DISCLOSURE STATEMENT, A CAUSE OF ACTION MAY BE FILED AGAINST ANY CREDITOR OR OTHER PARTY AS THE PLAN AGENT MAY DETERMINE, IN THE EXERCISE OF ITS SOLE AND ABSOLUTE DISCRETION.**

**L.**     **Post-Effective Date Professional Fees.**

The Plan Agent may employ, without any need to give notice to Creditors or other parties-in-interest or obtain any approval of the Bankruptcy Court, any Professional to aid the Plan Agent in performing the Plan Agent's duties under the Plan, including, without limitation, in connection with a possible Merger Transaction, as the Plan Agent deems appropriate in the exercise of its sole and absolute discretion.  Any Professional employed by the Plan Agent after the Effective Date will be entitled to obtain from the Plan Fund payment of the Professional's fees and costs as a Post-Effective Date Plan Expense, in the ordinary course, without any need to give notice to Creditors or other parties-in-interest or to obtain any approval of the Bankruptcy Court.  Notwithstanding the foregoing, if the Plan Agent should fail to pay any post-Effective Date fees and costs of a

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-65-

1   Professional entitled to such payment, within thirty (30) days after the Professional's rendering of its

2   billing statement, the Professional will be entitled to seek, by application filed in accordance with the

3   Bankruptcy Rules, an order of the Bankruptcy Court requiring the Plan Agent to forthwith pay to the

4   Professional its fees and costs.

5   **M.    Approval for Disposition of Plan Assets.**

6   Except as provided expressly to the contrary in the Plan, from and after the Effective Date,

7   the Plan Agent will be entitled to sell, transfer, assign, encumber or otherwise dispose of any interest

8   in any of the Plan Assets, without any need to give notice to Creditors or parties-in-interest or to

9   obtain any approval of the Bankruptcy Court.  Notwithstanding the foregoing, the Plan Agent will be

10  entitled to seek, from the Bankruptcy Court, an order authorizing the sale of any Plan Asset free and

11  clear of Liens pursuant to the provisions of section 363(f) of the Bankruptcy Code.

12  **N.    Compromise of Controversies.**

13  From and after the Effective Date, the Plan Agent will be entitled to compromise any

14  objections to Disputed Claims, or any controversies relating to Causes of Action or other litigation

15  pending after the Confirmation Date, without any need to give notice to Creditors or parties-in-

16  interest or to obtain any approval of the Bankruptcy Court.

17  **O.    Bankruptcy Court Approval Relative to Post-Confirmation Matters.**

18  Nothing contained in the Plan will be deemed to impair in any manner the right of the Plan

19  Agent or any party-in-interest to seek at any time after the Effective Date orders of the Bankruptcy

20  Court approving actions to be taken consistent with the Plan as may be necessary or desirable to

21  effectuate the provisions of the Plan.

22  **P.    Plan Agent Certification.**

23  On or before the date upon which the Plan Agent determines, in the exercise of its sole and

24  absolute discretion, that any Causes of Action and objections to Disputed Claims have been resolved

25  by Final Order, that all other Plan Assets have been liquidated or otherwise disposed of, that a

26  Merger Transaction has been effectuated or cannot or should not be effectuated by the Merger

27  Consummation Date, and that all Distributions required to be made under the Plan have been made

28  or that final Distributions are being made or will be made by the Plan Agent within ten (10) days or

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1    as soon thereafter as is practicable, the Plan Agent is required to file with the Bankruptcy Court and

2    serve upon the United States Trustee, the Post-Effective Date Committee, the Reorganized Debtor

3    and any Creditor that files after the Effective Date a request for notice of any proceedings in the

4    Case (collectively, "Post-Effective Date Notice Parties") a certification attesting to such

5    determination ("Plan Agent Certification").

6    **Q.    Final Decree.**

7    Unless earlier filed by the Plan Agent, by the thirtieth (30th) day after the filing of the Plan

8    Agent's Certification, the Plan Agent is required to file, in accordance with Rule 3022 of the Federal

9    Bankruptcy Rules, an application with the Bankruptcy Court to obtain a final decree to close the

10    Case ("Final Decree").

11    **R.    Merger Transaction.**

12    **1.    Background.**

13    Although, as of the Effective Date, the Reorganized Debtor will have no significant

14    operations, the Reorganized Debtor may possess substantial net operating losses for tax purposes,

15    and, as a publicly-traded company, will possess a shareholder base, which may make it an attractive

16    acquisition or merger candidate, including, without limitation, to an operating, privately-held

17    corporation seeking to become a publicly-held company (e.g., through a "reverse merger"

18    transaction).  The Plan permits any such acquisition, merger transaction, or other business

19    combination, including, without limitation, a stock exchange, that would benefit the holders of

20    Allowed General Unsecured Claims, as holders of Post-Effective Date Stock in the Reorganized

21    Debtor, by allowing them potentially to have an interest in a viable, operating business enterprise

22    (any such transaction is referred to herein as a "Merger Transaction").  The Plan Agent, under the

23    supervision of the Post-Effective Date Committee, will investigate whether a Merger Transaction is

24    viable, and should be pursued for the benefit of holders of Allowed General Unsecured Claims.

25    **2.    Merger Consummation Date.**

26    The Reorganized Debtor is required to complete a Merger Transaction by the second-

27    year anniversary of the Effective Date of the Plan ("Merger Consummation Date"); provided,

28    however, that the Plan Agent, after consultation with the Post-Effective Date Committee, will be

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1  authorized to request from the Bankruptcy Court an extension of the Merger Consummation Date,

2  for a period not to exceed one additional year.  The Plan Agent is required to give to the Post-

3  Effective Date Notice Parties notice of any such request and an opportunity to obtain a hearing on

4  any such request, in accordance with the requirements of the Bankruptcy Rules.

5      **3.    Cancellation of Post-Effective Date Stock and Wind-Up of Reorganized**

6           **Debtor.**

7           The Plan Agent, after consultation with the Post-Effective Date Committee, will be

8  authorized to terminate efforts to effectuate a Merger Transaction or to cancel the Post-Effective

9  Date Stock, prior to the Merger Consummation Date, in the event that the Plan Agent determines, in

10 the exercise of its sole and absolute discretion, that a Merger Transaction is not viable, a Merger

11 Transaction should not be effectuated, or the Post-Effective Date Stock is burdensome or is of

12 inconsequential value and benefit to the holders of Allowed General Unsecured Claims.  The Plan

13 Agent may terminate any efforts to effectuate a Merger Transaction, or may cancel the Post-

14 Effective Date Stock, only after obtaining approval of the Bankruptcy Court for so doing ("Stock

15 Termination Approval") after giving to the Post-Effective Date Notice Parties notice and an

16 opportunity to obtain a hearing thereon, in accordance with the requirements of the Bankruptcy

17 Rules.  In the event that a Stock Termination Approval is obtained by the Plan Agent, or in the event

18 that no Merger Transaction is consummated by the Merger Consummation Date, the Plan Agent is

19 required to take all acts appropriate to wind up the affairs of the Reorganized Debtor.

20      **4.    Terms of any Merger Transaction.**

21          The terms of any Merger Transaction and the terms of any Distribution of Post-

22 Effective Date Stock, including, without limitation, any "lock-up" agreements or other restrictions

23 on the disposition of the Post-Effective Date Stock, will be determined by the Plan Agent, subject to

24 the supervision of the Post-Effective Date Committee.  The Plan Agent is required to obtain from the

25 Bankruptcy Court approval of any such Merger Transaction, after giving to the Post-Effective Date

26 Notice Parties and other parties-in-interest notice and an opportunity to obtain a hearing thereon, in

27 accordance with the requirements of the Bankruptcy Rules.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

**5.**    **Valuation of Post-Effective Date Stock.**

Unless and until a Merger Transaction is effectuated, the Post-Effective Date Stock will be deemed, for all purposes, to have no value of any nature whatsoever.  In connection with effectuating any Merger Transaction, the Plan Agent will request that the Bankruptcy Court enter an order determining the value of the Post-Effective Date Stock that will be distributed to holders of Allowed General Unsecured Claims pursuant to the Plan, after giving to the Post-Effective Date Notice Parties and other parties-in-interest notice and an opportunity to obtain a hearing thereon, in accordance with the requirements of the Bankruptcy Rules.

**6.**    **Election Not to Receive Post-Effective Date Stock.**

Prior to the consummation of any Merger Transaction, a holder of an Allowed General Unsecured Claim may provide to the Plan Proponents or to the Plan Agent, as applicable, written notice of an election not to receive a Distribution of Post-Effective Date Stock.  Such an election will be effective, binding and irrevocable upon receipt by the Plan Proponents or the Plan Agent, as applicable, of written notice of such an election.  In the event that a holder of an Allowed General Unsecured Claim makes such an election, any Distributions of Plan Fund Proceeds to which such Creditor is entitled under the Plan on account of its Allowed General Unsecured Claim will not be reduced in any manner based upon any value of the Post-Effective Date Stock that such Creditor otherwise would receive under the Plan.

**S.**    **Distributions.**

**1.**    **Designation and Role of the Disbursing Agent.**

**a.**    **Plan Agent to Serve as Disbursing Agent.**

The Plan Agent will serve as the Disbursing Agent under the Plan.  The terms of the employment of the Plan Agent, including the compensation of the Plan Agent as Disbursing Agent under the Plan, will be disclosed in the Plan Agent Disclosure and will be approved by the Bankruptcy Court pursuant to the Confirmation of the Plan.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

b.    **No Bond.**

The Plan Agent will not be required to be bonded in connection with the performance of its duties as Plan Agent under the Plan, including its duties as Disbursing Agent under the Plan.

c.    **Payment of Fees and Expenses of Disbursing Agent.**

The fees, expenses and any bond premiums incurred by the Plan Agent, in connection with the performance of its duties as Disbursing Agent under the Plan, will be paid from the Plan Fund.

d.    **Employment of Agents.**

The Plan Agent, as Disbursing Agent under the Plan, will be authorized to implement such procedures as it deems necessary to make Distributions pursuant to the Plan so as to efficiently and economically assure prompt and accurate Distributions, including, without limitation, the employment of one or more agents on such terms and conditions as it deems appropriate in the exercise of its sole and absolute discretion.

2.    **Distribution of Property Under the Plan.**

a.    **Cash Distributions.**

Except for any Post-Effective Date Stock that may be issued to holders of Allowed General Unsecured Claims pursuant to a Merger Transaction, all Distributions under the Plan will be in Cash.  Cash Distributions made pursuant to the Plan will be in United States funds, by checks drawn on a domestic bank, or, if the Plan Agent so elects, in the exercise of its sole and absolute discretion, by wire transfers from a domestic bank.

b.    **Setoffs and Recoupment.**

Pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Plan Agent, as Disbursing Agent under the Plan, may set off, recoup or withhold against any Allowed Claim and Distribution to be made pursuant to the Plan on account of such Allowed Claim (before any Distribution is made on account of such Allowed Claim), any pre-Petition Date or post-Petition Date account stated, claim, right, or cause of action which the Debtor or the Estate may possess against the holder of such Allowed Claim.  Neither the failure to effect

CLARKSON, GORE & MARSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

1  such a setoff or recoupment nor the allowance of any Claim will constitute a waiver or release by the

2  Debtor, the Estate or the Plan Agent of any such account, claim, right, or cause of action that the

3  Debtor or the Estate may possess against the holder of such Allowed Claim.  To the extent that the

4  Plan Agent in allowing a Claim fails to effect a setoff with a Creditor and seeks to collect a claim

5  from such Creditor after a Distribution to such Creditor pursuant to the Plan, the Plan Agent will be

6  entitled to full recovery on its claim against such Creditor, notwithstanding any payment of the

7  Creditor's Allowed Claim pursuant to the Plan.

8                    **c.      Timeliness of Distributions.**

9              Any Distribution required to be made on the Effective Date will be deemed

10  timely if made as soon as practicable after such date but, in any event, within fourteen (14) days after

11  such date.  Any Distribution required to be made upon a Disputed Claim becoming an Allowed

12  Claim and no longer being a Disputed Claim will be deemed timely if made as soon as practicable

13  thereafter but, in any event, within fourteen (14) days thereafter.

14                    **d.      Limitation on Liability.**

15              Neither the Debtor, the Reorganized Debtor, the Committee, the Post-

16  Effective Date Committee, the Plan Agent, nor any of their respective Representatives will be liable

17  for (i) any acts or omissions (except for gross negligence or willful misconduct) in connection with

18  implementing the Distribution provisions of the Plan and the making or withholding of Distributions

19  pursuant to the Plan, or (ii) any change in the value of Distributions made pursuant to the Plan

20  resulting from any delays in making such Distributions in accordance with the terms of the Plan

21  (including, but not limited to, any delays caused by the resolution of Disputed Claims).

22                    **e.      Delivery of Distributions.**

23                    (i)      All Distributions under the Plan on account of an Allowed

24  Claim will be tendered only to the holder of such Allowed Claim, as set forth in

25  Section 7.2.6.2 of the Plan.

26                    (ii)      Except as provided in Section 7.2.8 of the Plan with respect to

27  Unclaimed Property, Distributions to holders of Allowed Claims and Allowed

28  Administrative Claims will be distributed by mail as follows:  (1) with respect to each holder

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-71-

1  of an Allowed Claim that has filed a Proof of Claim, at the address for such Creditor

2  reflected in such Proof of Claim; (2) with respect to each holder of an Allowed Claim that

3  has not filed a Proof of Claim, at the address reflected in the Bankruptcy Schedules filed by

4  the Debtor; provided, however, that, if the Plan Agent receives a written notice of a change

5  of address for such Creditor, the address set forth in such notice will be used; or (3) with

6  respect to each holder of an Allowed Administrative Claim, at such address as the holder

7  thereof may specify in writing.

8  **f.**      **Approval for Schedule of Proposed Distributions.**

9        In the discretion of the Plan Agent, the Plan Agent will be entitled to prepare a

10  preliminary schedule of proposed Distributions to Creditors ("Distribution Schedule"), and to apply,

11  on an expedited basis, for an order of the Bankruptcy Court approving the making of such

12  Distributions pursuant to the Distribution Schedule.  Notice of any such application will be served on

13  the Post-Effective Date Notice Parties or as otherwise determined by the Bankruptcy Court.

14  **g.**      **Further Assurances Regarding Distributions.**

15        In accordance with the provisions of Section 13.22 of the Plan, as a condition

16  to obtaining Distributions under the Plan, each Creditor must execute and deliver to the Plan Agent,

17  or join in the execution and delivery of, any agreement or instrument appropriate for the

18  consummation of the Plan.

19  **h.**      **Creditor's Payment of Obligations or Turn Over of Property to the**

20            **Plan Agent.**

21        As a condition to obtaining Distributions under the Plan, any Creditor from

22  which property is recoverable pursuant to a Final Order of the Bankruptcy Court under sections 542,

23  543, 550 or 553 of the Bankruptcy Code, or otherwise, or that is a transferee of a transfer avoidable

24  pursuant to a Final Order of the Bankruptcy Court under sections 522, 544, 545, 547, 548 or 549 of

25  the Bankruptcy Code or otherwise, must pay to the Plan Agent the amount, or turn over to the Plan

26  Agent any such property, for which such Creditor is liable to the Debtor.

27

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-72-

1     **i.**     <u>**Miscellaneous.**</u>

2          The treatment of De Minimis Distributions and undeliverable Distributions and

3 other issues pertaining to Distributions under the Plan are set forth in Article VII of the Plan.

4     **T.**     <u>**Objections to Disputed Claims.**</u>

5         **1.**     <u>**Exclusive Right to Object to Claims.**</u>

6          From and after the Effective Date, the Plan Agent will have the sole and exclusive

7 right to file, litigate and settle objections to Disputed Claims.  As the representative of Estate, the

8 Plan Agent, under the supervision of the Post-Effective Date Committee, will succeed to all of the

9 rights and powers of the Debtor and the Estate with respect to all objections to Disputed Claims, and

10 will be substituted for, and will replace, the Debtor, the Estate and the Committee, as applicable, as

11 the party-in-interest in all litigation regarding Disputed Claims pending as of the Effective Date.

12         **2.**     <u>**Claims Objection Deadline.**</u>

13          Unless another date is established by order of the Bankruptcy Court, an objection to a

14 Claim must be filed with the Bankruptcy Court and served on the Creditor holding such Claim on or

15 before the Claims Objection Deadline.  The Plan Agent will have the right to request that the

16 Bankruptcy Court extend the Claims Objection Deadline for cause shown.

17         **3.**     <u>**Investigation Regarding Disputed Claims.**</u>

18          Notwithstanding the fact that the Plan Agent will have, after the Effective Date, the

19 sole and exclusive right to file objections to Disputed Claims, nothing contained in the Plan will be

20 deemed to obligate the Plan Agent to file any objection to a Claim, which action will be determined

21 by the Plan Agent in the exercise of its sole and absolute discretion.

22         **THE PLAN PROPONENTS HAVE NOT COMPLETED THEIR**

23 **INVESTIGATION REGARDING THE CLAIMS IN THE CASE AND THE FILING OF**

24 **OBJECTIONS TO DISPUTED CLAIMS.  THIS INVESTIGATION IS ONGOING AND,**

25 **SUBJECT TO THE CLAIMS OBJECTION DEADLINE, MAY OCCUR AFTER THE**

26 **CONFIRMATION DATE.  AS A RESULT, CREDITORS AND OTHER PARTIES-IN-**

27 **INTEREST ARE HEREBY ADVISED THAT AN OBJECTION TO A DISPUTED CLAIM**

28 **MAY BE FILED AT ANY TIME, SUBJECT ONLY TO THE CLAIMS OBJECTION**

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

**DEADLINE.  THE PLAN AGENT WILL HAVE THE RIGHT TO OBJECT TO AMOUNTS THAT HAVE BEEN SCHEDULED BY THE DEBTOR, OR THAT ARE REFLECTED IN THE DEBTOR'S BOOKS AND RECORDS, AND WHICH ARE FOUND TO BE OBJECTIONABLE IN ANY RESPECT.**

      **4.**     <u>**Treatment of Disputed Claims**</u>.

        **a.**     <u>**No Distribution Pending Allowance**</u>.

All Distributions under the Plan will be made only on account of Allowed Claims.  If any portion of a Claim is a Disputed Claim, no Distribution provided for under the Plan will be made on account of such Claim unless and until such Claim becomes an Allowed Claim and is no longer a Disputed Claim.

        **b.**     <u>**Distribution After Allowance**</u>.

Within fourteen (14) days following the date on which a Disputed Claim becomes an Allowed Claim and is no longer a Disputed Claim, the Plan Agent, as Disbursing Agent under the Plan, will distribute to the Creditor holding such Allowed Claim any Cash or other property that would have been distributable to such Creditor as if, at the time of the making of any Distribution to the Class of which such Creditor is a member, such Claim had been an Allowed Claim and not a Disputed Claim.  No interest will be paid on such Claim, except as provided in Section 8.4.3 of the Plan.

        **c.**     <u>**Reserve for Disputed Claims**</u>.

On or as soon as practicable after the Effective Date, the Plan Agent, as Disbursing Agent under the Plan, will establish, in a segregated, interest-bearing account, a reserve for any Disputed Claim ("Disputed Claims Reserve") in an amount equal to 100% of the Distribution to which the holder of the Disputed Claim would be entitled under the Plan based upon the liquidated, face amount of its non-duplicative Disputed Claim unless such Claim is estimated by Final Order of the Bankruptcy Court; provided, however, that the Plan Agent, as Disbursing Agent under the Plan, will have the right to seek from the Bankruptcy Court an order reducing the amount of such Reserve pending the resolution of the Disputed Claim.  If the Disputed Claim does not set forth a liquidated amount of such Claim, then the amount of the Reserve to be established on account

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1    of such Disputed Claim will be the amount fixed mutually by the Creditor and by the Plan Agent or

2    the amount estimated by the Bankruptcy Court pursuant to Section 8.4.3 of the Plan.  If the Disputed

3    Claim is estimated, the amount of the Reserve to be established on account of such Disputed Claim

4    will be the estimated amount of such Disputed Claim as determined by Final Order of the

5    Bankruptcy Court, and such estimated amount will set forth the maximum amount of the

6    Distribution on account of such Disputed Claim.

7            **d.**    **No Distribution Until Allowance of Disputed Claim.**

8            No disbursement of funds from a Disputed Claims Reserve will be made on

9    account of a Disputed Claim until such Disputed Claim has been determined by a Final Order of the

10    Bankruptcy Court.  Any amount of a Claim which has been disallowed pursuant to an order of the

11    Bankruptcy Court will be deemed to be extinguished and no Distribution of any amount will be paid

12    on account thereof.  The amount reserved for any Disputed Claim (plus any interest thereon) which

13    has been disallowed by the Bankruptcy Court will be released to the Plan Agent for the purpose of

14    funding further Distributions to Creditors under the Plan.

15            **5.**    **Bar Date for Filing Avoidance Action Payment Claims.**

16            Any Avoidance Action Payment Claim will be forever barred, will not be

17    enforceable against the Debtor or the Reorganized Debtor and will not be entitled to any Distribution

18    under the Plan, unless a Proof of Claim for such Avoidance Action Payment Claim is filed and

19    served on the Plan Agent within thirty (30) days after the later of (a) the date of entry of the order of

20    the Bankruptcy Court adjudging the Creditor's liability to the Debtor or to the Reorganized Debtor

21    on account of such Avoidance Action, or (b) the Effective Date.

22    **U.**    **Litigation.**

23            **1.**    **Plan Agent's Authorization to Assert Causes of Action.**

24            As of the Effective Date, the Plan Agent will be authorized to exercise and to perform

25    the rights, powers and duties held by the Estate with respect to the Causes of Action.  From and after

26    the Effective Date, the Plan Agent will have the sole and exclusive right, to file, litigate, prosecute,

27    settle, adjust, retain, enforce, collect and abandon claims and interests of the Estate with respect to

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

1  the Causes of Action, without the consent or approval of any third party, and without any further

2  order of the Bankruptcy Court.

3      **2.      Plan Agent's Evaluation of Causes of Action.**

4          The Plan Agent, under the supervision of the Post-Effective Date Committee, will

5  make the decision whether to prosecute or to continue to prosecute any Causes of Action.  This

6  decision will be based, in part, upon the Plan Agent's evaluation of the merits of the Causes of

7  Action as well as the costs required to prosecute such Causes of Action taking into account the

8  resources available to make Distributions to Creditors.  The Plan Agent, under the supervision of

9  the Post-Effective Date Committee, will be entitled to determine, in the exercise of its business

10  judgment, not to prosecute, or to abandon, any Cause of Action.

11      **3.      Retention of Professionals.**

12          The Plan Agent may retain Professionals to represent it in prosecution of Causes of

13  Action.  The Plan Agent will determine the terms of the retention of Professionals, in the exercise of

14  its business judgment, and will be entitled to retain counsel on a contingency fee basis to prosecute

15  some or all of the Causes of Action, and may seek to finance any costs relating to the prosecution of

16  Causes of Action.

17      **4.      Preservation of Causes of Action.**

18          Unless a Cause of Action is expressly waived, relinquished, released, compromised,

19  or settled in the Plan or in any Final Order, the Plan Proponents expressly reserve such Cause of

20  Action for later adjudication by the Plan Agent (including, without limitation, Causes of Action of

21  which the Plan Proponents presently may be unaware, or which may arise or exist by reason of facts

22  or circumstances unknown to the Plan Proponents at this time, or facts or circumstances which may

23  change or be different from those which the Plan Proponents now believe to exist) and, therefore,

24  no principle of law or equity, including, without limitation, the doctrines of res judicata, collateral

25  estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or

26  laches will apply to the Plan Agent's prosecution of Causes of Action based on this Disclosure

27  Statement, the Plan, or the Confirmation Order.  Without limiting the generality of the foregoing,

28  any entity with respect to which the Debtor has incurred an obligation (whether on account of

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-76-

1  services, purchase or sale of property, or otherwise), or who has received services from the Debtor

2  or a transfer of money or property of the Debtor, or who has transacted business with the Debtor, or

3  leased equipment or property from the Debtor, should assume that such obligation, transfer, or

4  transaction may be evaluated by the Plan Agent subsequent to the Effective Date and may be the

5  subject of an Avoidance Action or other action or proceeding filed after the Effective Date.

6          **5.**     **Subordination of Claims.**

7         A Plan Proponent will have the right to file an action to subordinate Claims.  If a Plan

8  Proponent has filed such an action prior to the entry of the Disclosure Statement Order, any Claim

9  subject to such an action will be deemed to be in Class 5 for the purpose of voting on the Plan

10  unless the Bankruptcy Court enters a Final Order to the contrary.  If a Plan Proponent has filed such

11  an action after the entry of the Disclosure Statement Order, but prior to the Effective Date, such

12  action will not affect the right of the Creditor to vote with respect to the Class to which it otherwise

13  would be entitled.  After the Effective Date, only the Plan Agent, under the supervision of the Post-

14  Effective Date Committee, will have the right to file an action to subordinate a Claim.

15  **V.**     **Executory Contracts And Unexpired Leases.**

16          **1.**     **Executory Contracts and Unexpired Leases Being Assumed.**

17         Effective as of, and conditioned on, the occurrence of the Effective Date, the Debtor

18  will assume under the Plan all of the executory contracts and unexpired leases of the Debtor listed on

19  Exhibit "2" to the Plan.  The Plan Proponents may amend, through and including the Confirmation

20  Hearing Date, Exhibit "2" to the Plan to add thereto any executory contract or unexpired lease, or to

21  delete therefrom any executory contract or unexpired lease.  However, if any amendments are made

22  to Exhibit "2" to the Plan less than thirty (30) days before the Confirmation Hearing Date, the

23  affected contract or lease parties will have fifteen (15) days from the date of service of notice of such

24  amendments within which to serve on the Plan Proponents a written objection to the same.  Upon

25  receipt of any such objection, the Debtor will promptly set a hearing on the same, and the

26  assumption or rejection of the affected contract or lease will be delayed until the Bankruptcy Court

27  makes a determination on such issue (such determination may be made after the Confirmation Date,

28  without delaying the confirmation of the Plan).  To the extent that an executory contract or

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-77-

1    unexpired lease has been assumed by the Debtor prior to the Confirmation Date pursuant to an order

2    of the Bankruptcy Court, such assumption will not be affected by the Plan.  The assumption of any

3    contract or lease pursuant to the provisions of the Plan will be only to the extent that such assumed

4    contract or lease constitutes an executory contract or unexpired lease within the meaning of

5    section 365 of the Bankruptcy Code.  Inclusion of an agreement in Exhibit "2" to the Plan does not

6    constitute an admission by the Plan Proponents that (a) such agreement is an executory contract or

7    unexpired lease within the meaning of section 365 of the Bankruptcy Code, (b) the Debtor must

8    assume such agreement in order to continue to receive or retain rights, benefits, or performance

9    thereunder or that any Claim under such agreement must be paid or any default thereunder must be

10    cured, or (c) such agreement is a valid contract or lease.  Any contract or lease assumed pursuant to

11    the Plan will be assumed as previously amended or otherwise modified by the parties thereto,

12    whether before or after the Petition Date.

### 2.    Executory Contracts and Unexpired Leases Being Rejected.

14    Effective as of, and conditioned on, the occurrence of the Effective Date, the Debtor

15    will reject under the Plan all of the executory contracts and unexpired leases of the Debtor not listed

16    on Exhibit "2" to the Plan, including, without limitation, those executory contracts and unexpired

17    leases listed on Exhibit "3" to the Plan.  The Plan Proponents reserve the right to amend, through and

18    including the Confirmation Hearing Date, Exhibit "3" to the Plan to add thereto any executory

19    contract or unexpired lease, or to delete therefrom any executory contract or unexpired lease.

20    However, if any amendments are made to Exhibit "3" to the Plan less than thirty (30) days before the

21    Confirmation Hearing Date, the affected contract or lease parties will have fifteen (15) days from the

22    date of service of notice of such amendments within which to serve on the Plan Proponents a written

23    objection to the same.  Upon receipt of any such objection, the Debtor will promptly set a hearing on

24    the same, and the rejection of the affected contract or unexpired lease will be delayed until the

25    Bankruptcy Court makes a determination on such issue (such determination may be made after the

26    Confirmation Date, without delaying the confirmation of the Plan).  To the extent that an executory

27    contract or unexpired lease has been rejected by the Debtor prior to the Confirmation Date pursuant

28    to an order of the Bankruptcy Court, such rejection will not be affected by the Plan.  The rejection of

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1   any contract or lease pursuant to the provisions of the Plan will be only to the extent that such

2   rejected contract or lease constitutes an executory contract or unexpired lease within the meaning of

3   section 365 of the Bankruptcy Code.  Inclusion of an agreement in Exhibit "3" to the Plan does not

4   constitute an admission by the Plan Proponents that (a) such agreement is an executory contract or

5   unexpired lease within the meaning of section 365 of the Bankruptcy Code, or (b) such agreement is

6   a valid contract or lease.  Any contract or lease rejected pursuant to the Plan will be rejected as

7   previously amended or otherwise modified by the parties thereto, whether before or after the Petition

8   Date.  Any executory contract or unexpired lease not listed in Exhibit "2" or in Exhibit "3" to the

9   Plan will be deemed to be rejected by the Debtor on the Effective Date.

10              **3.    Retention of Property Rights.**

11              To the extent that the Debtor has obtained property rights under the executed portion

12  of an executory contract or unexpired lease, rejection of such agreement will not constitute an

13  abandonment by the Debtor of any such property rights.

14              **4.    Bar Date for Rejection Claims.**

15              Any Rejection Claim will be forever barred, will not be enforceable against the

16  Debtor or the Reorganized Debtor, and will not be entitled to any Distribution under the Plan, unless

17  a Proof of Claim for such Rejection Claim is filed and served on the Plan Agent within thirty

18  (30) days after the later of (a) the date of entry of the order of the Bankruptcy Court approving the

19  rejection of the executory contract or unexpired lease, or (b) the Effective Date.

20              **5.    Cure Claims Schedule.**

21              A schedule of the amounts necessary to cure any defaults under executory contracts

22  and unexpired leases assumed under the Plan ("Cure Claims") will be set forth in a schedule ("Cure

23  Claims Schedule") to be filed with the Bankruptcy Court, and served on the non-debtor parties to

24  such executory contracts and unexpired leases, on or before the thirtieth (30th) day prior to the

25  Confirmation Hearing Date.  Any objection to the amount of any Cure Claim set forth in the Cure

26  Claims Schedule must be filed and served upon the respective counsel for the Plan Proponents on or

27  before the fifteenth (15th) day prior to the Confirmation Hearing Date.  In the event that any such

28  objection to the amount stated for a Cure Claim in the Cure Claims Schedule is not duly filed and

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-79-

1  served, the amount of the Creditor's Cure Claim will be deemed forever to be the amount set forth in

2  the Cure Claims Schedule, and any Cure Claim in excess of the amount set forth in the Cure Claims

3  Schedule will be waived and will be forever barred in the Bankruptcy Case, without further notice.

4  If the Plan Proponents cannot resolve any such objection with the Creditor, the Debtor may either

5  (a) elect to reject the executory contract or unexpired lease at the Confirmation Hearing, or (b) have

6  the Bankruptcy Court determine the merits of the objection on or after the Confirmation Hearing

7  (without delaying the confirmation of the Plan).  Any amount of a Cure Claim payable upon the

8  assumption of an executory contract or unexpired lease will be due and payable on or before the

9  fourteenth (14th) day after the entry of a Final Order fixing the amount of the Cure Claim and then

10  only in the amount fixed by such Final Order.

11    **W.**  **Post-Effective Date Notice.**

12     From and after the Effective Date, any entity that desires to obtain notice of any pleading or

13  document filed in the Case, or of any hearing in the Bankruptcy Court, or of any matter as to which

14  notice is to be provided under the Plan, must file a request for post-Effective Date notice and serve

15  such request on the Plan Agent, the Post-Effective Date Committee, and any counsel for the Plan

16  Agent; provided, however, that the  United States Trustee, the Post-Effective Date Committee, the

17  Reorganized Debtor and the Plan Agent each will be deemed to have requested such post-Effective

18  Date notice.

19    **X.**  **Miscellaneous Plan Provisions.**

20     Other provisions of the Plan, including provisions pertaining to the Plan Agent's duty to file

21  after the Effective Date reports regarding the status of implementation of the Plan, the Plan

22  Proponents' right to revoke the Plan prior to the Confirmation Date, the governing law relating to the

23  Plan, the Bankruptcy Court's retention of jurisdiction over the Case and the Plan after the Effective

24  Date, and the Plan Proponents' right to seek to modify the Plan are set forth in Article XIII of the

25  Plan.

26

27

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

# IX.

# EFFECT OF CONFIRMATION OF THE PLAN

### A.    Discharge.

Confirmation of the Plan will have all of the effects provided by section 1141 of the Bankruptcy Code which are not inconsistent with the terms of the Plan.  Except as provided expressly to the contrary in the Plan or in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Distributions and rights that are provided in the Plan will be in complete satisfaction, settlement, release and discharge, effective as of the Effective Date, of all known or unknown Claims and Administrative Claims against, rights against, liabilities of, obligations of, and any Liens encumbering the Debtor's assets and properties, including but not limited to, Claims of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (2) such Claim is allowed under section 502 of the Bankruptcy Code, or (3) the holder of such Claim accepted the Plan.  The Confirmation Order will constitute a determination of the discharge of all Claims and Administrative Claims against the Debtor, subject only to the occurrence of the Effective Date, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Any obligations to Creditors and to Interest Holders imposed by the Plan will be compensable only from Distributions of Cash made from the Plan Fund and from any Distributions of Post-Effective Date Stock, and will not be obligations of the Reorganized Debtor, which will have no obligations or liabilities of any kind or character whatsoever, known or unknown, suspected or unsuspected, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, to any Creditor, Interest Holder or to any other party-in-interest, except only (a) for Post-Effective Date Plan Expenses, and (b) that holders of Allowed General Unsecured Claims will have in accordance with the provisions of the Plan an equity security interest in (but not any Claim or post-Effective Date claim of any nature whatsoever against) the Reorganized Debtor in the event of any Distribution of Post-Effective Date Stock.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

**B.    Injunction/Release.**

On the Effective Date, an injunction against Creditors' acts will be issued in accordance with the provisions of Section 11.2 of the Plan, and Claims will be forever waived and released in accordance with the provisions of Section 11.3 of the Plan.

**C.    Distribution of Property Free and Clear of Liens, Claims, and Interests.**

Except as otherwise provided in the Plan or in the Confirmation Order, all property distributed under the Plan will be distributed free and clear of all Liens and other Claims of Creditors and all Interests of Interest Holders.

**D.    Binding Effect of Plan.**

Upon the Effective Date, the provisions of the Plan will be binding upon the Debtor, the Reorganized Debtor, the Plan Agent and each Creditor and Interest Holder.

# X.

# LIMITATION OF LIABILITY

**A.    No Liability for Solicitation or Participation.**

As specified in section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

**B.    Good Faith.**

Confirmation of the Plan will constitute a finding that the Plan was proposed, and that acceptances of the Plan were solicited, in good faith and in compliance with applicable provisions of the Bankruptcy Code.

**C.    Limitation of Liability Regarding Plan Confirmation.**

Effective as of the Effective Date, neither the Committee, the Post-Effective Date Committee, the Debtor, the Reorganized Debtor, the Plan Agent nor any of their respective Representatives will have or incur any liability to any Creditor or Interest Holder or to any other party-in-interest or entity for any act or omission in connection with or arising out of the negotiation,

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1   preparation and pursuit of confirmation of the Plan, the approval of the Disclosure Statement, the

2   consummation of the Plan, the administration of the Plan, the Bankruptcy Case or the property to be

3   distributed under the Plan or the making of Distributions under the Plan, to the fullest extent

4   permitted by applicable statutory and case law, except only that the Plan Agent will be responsible

5   for making the Distributions provided for by the Plan.

6                                               **XI.**

7                   **CERTAIN RISK FACTORS TO BE CONSIDERED**

8            Holders of Claims and Interests entitled to vote on the Plan should read and consider

9   carefully the factors set forth below, as well as other information set forth in this Disclosure

10  Statement and the documents delivered together herewith and/or incorporated by reference herein,

11  prior to voting to accept or reject the Plan.

12      **A.    Risk that the Debtor Will Have Insufficient Cash for the Plan to Become**

13          **Effective.**

14          The Plan cannot be confirmed by the Bankruptcy Court unless the Debtor has Cash sufficient

15  by the Effective Date to pay or reserve for all Allowed Administrative Claims, Allowed Priority Tax

16  Claims and Allowed Priority Non-Tax Claims, unless Creditors holding such Claims agree to a

17  deferred payment of their Claims.  The Plan Proponents believe that, at the time of the Confirmation

18  Hearing, the Debtor will have Cash sufficient to satisfy or reserve for all such Claims.  For a further

19  discussion of this issue, please refer to paragraph XII(F) hereof.

20      **B.    Risk Regarding the Distributions to Be Made to Creditors.**

21          While the Plan Proponents have endeavored to project pursuant to paragraph XII(F) of this

22  Disclosure Statement what they believe are likely to be the Distributions to be made to Creditors,

23  there can be no certainty that those projections will be accurate and that Creditors will receive the

24  Distributions projected in this Disclosure Statement.  The projections contained in this Disclosure

25  Statement will be affected by, among other things: (1) the amount of any recoveries that the Plan

26  Agent generates from prosecuting Causes of Action; (2) the amount of any recoveries that the Plan

27  Agent generates in connection with the liquidation of all other Assets; (3) the outcome of objections

28  to Disputed Claims; and (4) the costs of administering the Plan.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-83-

C.    **Bankruptcy Risks.**

Even if all Classes of Claims that are entitled to vote with respect to the Plan vote to accept the Plan, the Plan still might not be confirmed by the Bankruptcy Court. Class 6 under the Plan, the Class of Interest Holders, is deemed under the Plan not to have accepted the Plan and, therefore, the Plan Proponents will need to "cram down" on Class 6 pursuant to section 1129(b) of the Bankruptcy Code in order to obtain confirmation of the Plan. The cram down provisions of section 1129(b) of the Bankruptcy Code are fairly complex, and require, among other things, that the Plan and the Plan Proponents comply with the provisions of sections 1129(a)(1)-(7), and (9)-(16) of the Bankruptcy Code as applicable, and that the Plan not discriminate unfairly and be fair and equitable with respect to each Class of Claims or Interests that is impaired under and that has not accepted the Plan. While the Plan Proponents believe that the Plan satisfies all of the requirements for confirmation of a plan under section 1129(b), there is no assurance that the Bankruptcy Court will make such a determination.

**XII.**

**CONFIRMATION OF THE PLAN**

A.    **Introduction.**

CREDITORS CONCERNED WITH CONFIRMATION OF THE PLAN OR THE PROVISIONS OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW WITH RESPECT TO CONFIRMING A PLAN IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting Creditors about basic confirmation issues which they may desire to consider. The Plan Proponents CANNOT and DO NOT represent that the discussion contained below is a complete summary of the law on this topic and are not providing any legal opinions with respect thereto.

Many requirements must be met before a bankruptcy court can confirm a Chapter 11 plan. Such requirements include that the plan must be accepted by at least one impaired class established by the plan, must be feasible and that the distributions to non-accepting creditors in impaired classes must be at least as much as such creditors would receive in a Chapter 7 liquidation. These requirements are not the only requirements for confirmation.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

**B.    <u>Votes Necessary to Confirm the Plan.</u>**

A bankruptcy court cannot confirm a Chapter 11 plan unless (1) all impaired classes under the Plan have voted to accept the plan, or (2) at least one impaired class has accepted the plan without counting the votes of any insiders within that class and the plan is eligible to be confirmed by "cramdown" on non-accepting classes pursuant to section 1129(b) of the Bankruptcy Code.

**C.    <u>Votes Necessary for a Class to Accept the Plan.</u>**

A class of claims is deemed to have accepted a Chapter 11 plan where more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims that actually vote, vote in favor of the plan.

**D.    <u>Treatment of Non-Accepting Classes.</u>**

As noted above, even if there are impaired classes that do not accept a Chapter 11 plan, a bankruptcy court may nonetheless confirm the plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code and there is at least one impaired class that accepts the plan.  The process by which a plan can be confirmed and become binding on non-accepting classes notwithstanding rejection by one or more classes is commonly referred to as "cramdown."  The Bankruptcy Code allows a plan to be "crammed down" on non-accepting classes of claims or interests if the Plan meets all of the requirements for confirmation, except the voting requirements of section 1129(a)(8) of the Bankruptcy Code, and if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not voted to accept the plan, as provided in section 1129(b) of the Bankruptcy Code and applicable case law.

In this case, the Plan Proponents will seek to have the Plan confirmed notwithstanding the rejection of the Plan by any impaired Class of Creditors and the deemed rejection of the Plan by the Class of Interests.  To obtain such confirmation, the Plan Proponents must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each such dissenting impaired Class.  A Chapter 11 plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class, and if no class

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-85-

1  receives more than that to which it is entitled for its claims or interests.  The Plan Proponents believe

2  that the Plan satisfies this requirement.

3      The Bankruptcy Code establishes different "fair and equitable" tests for General Unsecured

4  Claims and Interests.

5              **1.    General Unsecured Claims.**

6          In order to meet the "fair and equitable" requirements of section 1129(b) related to

7  the treatment of the Class of General Unsecured Claims (Class 3), either (a) each Holder of a

8  General Unsecured Claim must receive or retain under the Plan property of a value, as of the

9  Effective Date, equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests

10 that are junior in priority to the General Unsecured Claims must not receive any property under the

11 Plan.

12             **2.    Interests.**

13         In order to meet the fair and equitable requirements of section 1129(b) relative to the

14 treatment of the Class of Interests (Class 6), either (a) each Interest Holder must receive or retain

15 under the Plan property of a value, as of the Effective Date, equal to the greatest of (i) the allowed

16 amount of any fixed liquidation preference to which such Interest Holder is entered, (ii) any

17 redemption price to which the Interest Holder is entitled; or (iii) the value of the Interests, or (b) the

18 holders of any Interests that are junior to the dissenting Class of Interests will not receive or retain

19 any property under the Plan.

20          THE PLAN PROPONENTS BELIEVE THAT THE PLAN MAY BE CONFIRMED

21 ON A NONCONSENSUAL (CRAMDOWN) BASIS PROVIDED THAT AT LEAST ONE

22 IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN. ACCORDINGLY, THE

23 PLAN PROPONENTS INTEND TO ATTEMPT TO DEMONSTRATE AT THE

24 CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF

25 SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.

26     **E.    Request for Confirmation Despite Non-Acceptance by Impaired Class(es).**

27          The Plan Proponents will ask the Bankruptcy Court to confirm the Plan by cramdown on the

28 Class 6 Interest Holders and on any impaired Class if such Class does not vote to accept the Plan.  In

CLARKSON, GORE & MARSALLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-86-

1  this regard, it is important to note that the Plan Proponents have established under the Plan a Class of

2  Allowed Secured Claims (Class 1) and a Class of Allowed Subordinated Claims (Class 5) which

3  may not exist in the Case.  The Plan Proponents have done so in an abundance of caution.  The Plan

4  Proponents will seek confirmation of the Plan notwithstanding (as is expected) a failure by such

5  Class to cast any affirmative vote with respect to the Plan.

6  **F.**      **Feasibility of the Plan.**

7          **1.**      **Feasibility Analysis.**

8          Section 1129(a)(11) of the Bankruptcy Code requires that, for the Plan to be

9  confirmed, the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by

10  the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation

11  or further reorganization is proposed in the Plan.

12          The Plan contemplates that all Assets of the Debtor ultimately will be liquidated,

13  sold, transferred, abandoned, or otherwise disposed of by the Plan Agent, and that all Plan Fund

14  Proceeds will be distributed to Creditors and, if and to the extent there is sufficient value, to Interest

15  Holders pursuant to the terms of the Plan.  Such provisions of the Plan contemplate, then, an orderly

16  liquidation of the Debtor's Assets and a distribution of the value realized therefrom to Creditors.

17          The Plan also provides for a potential reorganization of the Debtor by means of a

18  Merger Transaction.  Pursuant to the Plan, the Plan Agent is authorized to investigate the viability of

19  a Merger Transaction, and, if appropriate, to pursue a Merger Transaction for the benefit of Class 3

20  Creditors.  The Reorganized Debtor may enter into a Merger Transaction, subject to the approval of

21  the Bankruptcy Court, in accordance with the provisions of the Plan.

22          The Plan Proponents have prepared an analysis, set forth hereinbelow, of the

23  feasibility of the Plan in order to demonstrate that the Plan satisfies the feasibility requirements of

24  section 1129(a)(11) of the Bankruptcy Code ("Feasibility Analysis").  The Feasibility Analysis sets

25  forth, among other things, the Plan Proponents' estimate of the resources available to fund the

26  Distributions required by the Plan.

27          THE FEASIBILITY ANALYSIS REPRESENTS A PREDICTION OF FUTURE

28  EVENTS BASED UPON CERTAIN ASSUMPTIONS MADE BY THE PLAN PROPONENTS, AS

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-87-

1  SET FORTH HEREINBELOW.  WHILE THE PLAN PROPONENTS ARE CONFIDENT THAT

2  IT WILL BE FEASIBLE TO MAKE THE DISTRIBUTIONS TO CREDITORS PROVIDED BY

3  THE PLAN, THERE IS NO ABSOLUTE GUARANTY OR OTHER ASSURANCE THAT THE

4  FEASIBILITY ANALYSIS WILL PROVE TO BE ACCURATE.  BY REASON OF THE

5  UNCERTAINTIES INHERENT IN THE PREDICTION OF FUTURE EVENTS, THE

6  FINANCIAL RESULTS MAY WELL BE DIFFERENT FROM THOSE PREDICTED, AND

7  SUCH A DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF

8  CREDITORS.

9  Significant assumptions underlying the Feasibility Analysis include the following:

10  **a.    Effective Date of the Plan.**

11  For the purpose of the Feasibility Analysis, the  Plan Proponents estimate that

12  the Confirmation Date will occur in or about June 2010 and that the Effective Date will occur in or

13  about July 2010.  Payments to Creditors, then, will commence to be funded in or about July 2010.

14  **b.    Debtor's Cash Resources as of the Effective Date.**

15  The Plan Proponents project that the Debtor will have, on the Effective Date,

16  the following Cash resources available to it to fund the Distributions required to be paid on or about

17  the Effective Date:

18  (i)    Accumulated Cash from Operations ($387,517).

19  As of February 28, 2010, the Debtor had approximately $1,181,017

20  in Cash.  The Plan Proponents project that, from March 1, 2010 through the Effective Date,

21  the Debtor will pay approximately $143,500 in operating expenses and approximately

22  $650,000 in fees and expenses of Professionals.  The Plan Proponents project, therefore, that,

23  after the Debtor pays its accruing operating expenses and the accruing fees and expenses of

24  Professionals, as of the Effective Date, the Debtor will have approximately $387,517 in Cash

25  (i.e., exclusive of the EMC Settlement Payment or recoveries from other Causes of Action).

26  (ii)    EMC Settlement Payment ($1,900,000).

27  Pursuant to the EMC Settlement Agreement, EMC will pay to the

28  Debtor $1,900,000 Cash.  For the purpose of the Feasibility Analysis, the Plan Proponents

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1  SET FORTH HEREINBELOW.  WHILE THE PLAN PROPONENTS ARE CONFIDENT THAT

2  IT WILL BE FEASIBLE TO MAKE THE DISTRIBUTIONS TO CREDITORS PROVIDED BY

3  THE PLAN, THERE IS NO ABSOLUTE GUARANTY OR OTHER ASSURANCE THAT THE

4  FEASIBILITY ANALYSIS WILL PROVE TO BE ACCURATE.  BY REASON OF THE

5  UNCERTAINTIES INHERENT IN THE PREDICTION OF FUTURE EVENTS, THE

6  FINANCIAL RESULTS MAY WELL BE DIFFERENT FROM THOSE PREDICTED, AND

7  SUCH A DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF

8  CREDITORS.

9        Significant assumptions underlying the Feasibility Analysis include the following:

10          **a.**    **Effective Date of the Plan.**

11        For the purpose of the Feasibility Analysis, the  Plan Proponents estimate that

12  the Confirmation Date will occur in or about June 2010 and that the Effective Date will occur in or

13  about July 2010.  Payments to Creditors, then, will commence to be funded in or about July 2010.

14          **b.**    **Debtor's Cash Resources as of the Effective Date.**

15        The Plan Proponents project that the Debtor will have, on the Effective Date,

16  the following Cash resources available to it to fund the Distributions required to be paid on or about

17  the Effective Date:

18          (i)    Accumulated Cash from Operations (387.517).

19        As of February 28, 2010, the Debtor had approximately $1,181,017

20  in Cash.  The Plan Proponents project that, from March 1, 2010 through the Effective Date,

21  the Debtor will pay approximately $143,500 in operating expenses and approximately

22  $650,000 in fees and expenses of Professionals.  The Plan Proponents project, therefore, that,

23  after the Debtor pays its accruing operating expenses and the accruing fees and expenses of

24  Professionals, as of the Effective Date, the Debtor will have approximately $387,517 in Cash

25  (i.e., exclusive of the EMC Settlement Payment or recoveries from other Causes of Action).

26          (ii)    EMC Settlement Payment ($1,900,000).

27        Pursuant to the EMC Settlement Agreement, EMC will pay to the

28  Debtor $1,900,000 Cash.  For the purpose of the Feasibility Analysis, the Plan Proponents

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-88-

1  assume that the EMC settlement Payment will be approved by the Bankruptcy Court. The

2  EMC Settlement Payment should be received by the Debtor prior to the Confirmation

3  Hearing.

4     The Plan Proponents project, therefore, that the Debtor should have, on or about the

5  Effective Date, about $2,287,517 to fund Distributions which must be made on or about the

6  Effective Date.

7     **c.    Allowed Secured Claims ($0).**

8     The Plan Proponents' projection of the Allowed Secured Claims derives from

9  the Debtor's financial books and records and from a review of the Proof of Claim filed in the case.[11]

10    **d.    Administrative Claims ($175,000).**

11    The Plan Proponents' projection of the Administrative Claims which will

12 have to be paid on or about the Effective Date derives, in large part, from information provided to

13 the Debtor by the Professionals employed in the Debtor's Case.  In accordance with monthly

14 payment procedures approved by the Bankruptcy Court, the Debtor has paid, and intends to continue

15 to pay, on a monthly basis through the Confirmation Date, the fees of Professionals employed in the

16 Bankruptcy Case.  The Plan Proponents estimate that unpaid fees of Professionals will be

17 approximately $175,000 as of the Effective Date.[12]  The projection of Administrative Claims of

18 Professionals employed in the Case is only an estimate, and is not to be construed as any agreement

19 by the Plan Proponents as to the amount or reasonableness of such fees.  The actual fees of the

20 Professionals which may be allowed by the Bankruptcy Court and which will have to be paid on or

21 soon after the Effective Date may be higher or lower than the amount estimated by the Plan

22 Proponents.[13]

23 [11] Dell has asserted a Secured Claim in the amount of $33,810.  The Plan Proponents believe that such Secured Claim
24 has no merit, and, for the purpose of the Feasibility Analysis, assume that such Secured Claim will be disallowed by the
   Bankruptcy Court.

25 [12] This projection assumes that, from March 1, 2010 through the Effective Date, pursuant to the monthly payment
   procedures approved by the Bankruptcy Court, the Debtor will pay approximately $650,000 in Administrative Claims of
   Professionals.

26 [13] This projection assumes that there will be no material Administrative Claims that will need to be paid on or about the
   Effective Date, other than the unpaid Administrative Claims of Professionals.  In this regard, it should be noted that Dell
27 has asserted an Administrative Claim in the amount of approximately $90,510.  The Plan Proponents, dispute such
   Administrative Claim and believe that it is of no merit and will be disallowed by the Bankruptcy Court. For the purpose
28 of the Feasibility Analysis, the Plan Proponents, assume that Dell's Administrative Claim will be disallowed in full.
   Moreover, EMC has asserted an Administrative Claim in an amount of approximately $578,649.  Pursuant to the EMC

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

**e.    United States Trustee Fees ($6,500).**

The Plan Proponents project that the Debtor will have to pay, on or about the Effective Date, approximately $6,500 in United States Trustee Fees.  This projection is based upon the Debtor's estimate of the disbursements that it will make through the Effective Date and is believed to be accurate.

**f.    Cure Claims ($0).**

The Plan Proponents project that the Debtor will owe no amount of Cure Claims.  Such projection derives from the Plan Proponents' analysis of the Debtor's contracts and unexpired leases and their present determination that the Debtor will not assume any executory contract or unexpired lease under the Plan.

**g.    Allowed Priority Non-Tax Claims ($453,585).**

The Plan Proponents' projection of the amount of the Priority Non-Tax Claims derives from the Debtor's accounting of the obligations owed to its employees by virtue of vacation time, sick leave time and personal time and is believed to be accurate.[14]

**h.    Allowed Priority Tax Claims ($163,729).**

The Plan Proponents' projection of the amount of Priority Tax Claims derives from the Debtor's financial books and records and the Plan Proponents' review of Proofs of Claims filed by Creditors asserting Priority Tax Claims.[15]

**i.    Allowed General Unsecured Claims.**

The Debtor has filed numerous objections to Disputed Claims, and in so doing, has obtained from the Bankruptcy Court orders disallowing numerous Disputed Claims.  Based upon the Debtor's efforts in reducing the amount of Disputed Claims, and the Plan Proponents' analysis of the General Unsecured Claims asserted in the Case, the Plan Proponents

---

Settlement Agreement, EMC has agreed to waive and release such Administrative Claim. The Plan Proponents assume, for the purpose of the Feasibility Analysis, that the EMC Settlement Agreement will be approved by the Bankruptcy Court and, accordingly, that such Administrative Claim will be disallowed.

[14] Approximately $110,597 in disputed Priority Non-Tax Claims have been asserted against the Debtor.  The Plan Proponents believe that such Priority Non-Tax Claims have no merit, and assume, for the purpose of the Feasibility Analysis, that such Claims will be disallowed.

[15] Approximately $300,000 in disputed Priority Tax Claims have been asserted against the Debtor.  The Plan Proponents believe that such Priority Tax Claims have no merit, and, for the purpose of the Feasibility Analysis, assume that such Priority Tax Claims will be disallowed by the Bankruptcy Court.

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

believe preliminarily that there may be approximately $3,771,560 in undisputed, liquidated and non-contingent General Unsecured Claims, and, hence, that these Claims may be allowed in the Case.  A list of such Claims is attached as **Exhibit "B"** hereto.[16]

In addition, approximately $9,472,198 in disputed General Unsecured Claims have been asserted against the Debtor.  Substantial disputed General Unsecured Claims include the following:

| Creditor | Claim |
|---|---|
| (i)  Pencom Systems, Inc. | $179,354[17] |
| (ii)  Wade Saadi | $403,120[18] |
| (iii)  Edgar Saadi | 403,120[19] |
| (iv)  Edward Ateyeh | $1,043,486[20] |
| (v)  Mr. Raimondi | $410,950[21] |
| (vi)  EMC | $4,464,523[22] |
| (vii)  Keith Clark | $410,950[23] |
| (viii)  William Kerley | $435,880[24] |

For the purpose of the Feasibility Analysis only, the Plan Proponents will assume that General Unsecured Claims will be allowed in a range between approximately $3,771,560 and $8,368,285.[25]  The Plan Proponents believe, however, that the amount of General Unsecured Claims ultimately allowed by the Bankruptcy Court will be closer to the $3,771,560 figure.

---

[16] **Exhibit "B"** is provided for informational purposes only.  Nothing contained herein will impair or affect in any manner any right that the Plan Proponents may have, and the Plan Proponents reserve the right, to object to the allowance of any of the General Unsecured Claims listed on **Exhibit "B."**
[17] Subject of pending litigation and potential disallowance pursuant to such litigation.
[18] Subject of pending litigation and potential disallowance pursuant to such litigation.
[19] Subject of pending litigation and potential disallowance pursuant to such litigation.
[20] Subject of pending litigation and potential disallowance pursuant to such litigation.
[21] The Committee and Mr. Raimondi have reached an agreement, subject to the approval of the Bankruptcy Court, resolving Mr. Raimondi's General Unsecured Claim, pursuant to which Mr. Raimondi will waive and release such Claim.  The Plan Proponents believe that such settlement will be approved by the Bankruptcy Court, and, therefore, that Mr. Raimondi will have no Allowed General Unsecured Claim in the Case.
[22] Pursuant to the EMC Settlement Agreement, EMC has agreed to waive and release its General Unsecured Claim.
[23] Subject of review and possible objection and potential disallowance pursuant to such an objection.
[24] Subject of pending litigation and potential disallowance pursuant to such litigation.
[25] Assuming that the Bankruptcy Court approves the EMC Settlement Agreement and the Committee's proposed settlement with Mr. Raimondi, an aggregate amount of approximately $4,875,473 in disputed General Unsecured Claims will be disallowed, and, hence, the total estimated amount of $13,243,758 in General Unsecured Claims will be reduced to $8,368,285.

CLARKSON, GORE & MARSHALL, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

j.    **Causes of Action**.

The Debtor believes that it has collected virtually all of its collectable receivables, and has liquidated virtually all of its tangible assets, and, accordingly, that the only remaining material Assets are the Causes of Action.[26]  In light of the EMC Settlement Agreement, the remaining material Causes of Action now known to the Plan Proponents are as follows:  the Pencom Action; the FusionStorm Action; and preference actions being pursued by the Committee.

For the purpose of the Feasibility Analysis only, the Plan Proponents project that, from the prosecution of the Causes of Action, approximately $100,000 in net proceeds (*i.e.*, gross recoveries from litigation, less attorneys' fees and other litigation costs associated with prosecuting the Causes of Action) ("Net Litigation Proceeds") will be recovered to fund the Plan Fund.[27]  The Plan Proponents believe that this is a conservative projection, and that, by prosecuting the Causes of Action (including the Pencom Action and the FusionStorm Action), there is a potential of recovering substantially greater value for the benefit of Class 3 Creditors.

k.    **Expenses of Administering the Plan**.

Apart from effectuating any Merger Transaction, the Reorganized Debtor will have no operations, and, hence, no material operating expenses.  The Plan Agent will incur, however, costs with respect to administering the Plan, and the accruing United States Trustee Fees.  The Plan Proponents estimate that, during the first year after the Effective Date, such expenses will be in the amount of approximately $75,000.[28]

While the Plan Proponents recognize that these projections are subject to a variety of unpredictable outside forces and circumstances which could affect adversely such projections, the Plan Proponents believe that the Feasibility Analysis has been prepared with sufficient care to allow them to endorse it.

---

[26] The Plan Agent will pursue a potential Merger Transaction for the benefit of the Class 3 Creditors.  Such a transaction could produce substantial value for the benefit of Class 3 Creditors.  However, since the viability of a Merger Transaction is uncertain, to be conservative, the Plan Proponents have attributed pursuant to the Feasibility Analysis no value to such a transaction.

[27] For the purpose of the Feasibility Analysis only, the Plan Proponents project, conservatively, gross recoveries from litigation in an amount of approximately $200,000 and attorneys' fees and other litigation costs associated with prosecuting the Causes of Action in an amount of approximately $100,000.

[28] Litigation fees and costs that will be incurred by the Plan Agent are included in the projection of Net Litigation Proceeds set forth in paragraph XII(F)(1)(j) hereinabove.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

**2.** **Funding of Distributions Required by the Plan.**

The Feasibility Analysis indicates that the Debtor will have Cash sufficient to pay the expenses which will be incurred in connection with the administration of the Plan and to make all Distributions required to be made pursuant to the Plan.

**a.** **Distributions Payable on or Soon After the Effective Date.**

Given the nature of the Plan, the primary issue relative to the feasibility of the Plan is whether the Debtor will have Cash sufficient to fund the Distributions that are required to be made on or soon after the Effective Date of the Plan.  On or about the Effective Date, the Debtor must pay all of the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, United States Trustee Fees, and any Cure Claims.  The Plan Proponents estimate that, on or about the Effective Date, the Debtor will have Cash sufficient to pay such Claims.

The Plan Proponents project that the Debtor will have the following Cash available to it to pay Allowed Claims on or soon after the Effective Date:

| | | |
|---|---|---|
| (i)  Accumulated Cash: | | $387,517 |
| (ii) EMC Settlement Payment | | $1,900,000 |
| | **TOTAL:** | **$2,287,517** |

The Plan Proponents project that the Debtor will have to pay, on or about the Effective Date, the following obligations:

| | |
|---|---|
| (i)   Allowed Administrative Claims | $175,000 |
| (ii)  United States Trustee Fees | $6,500 |
| (iii) Cure Claims | $   0 |
| (iv) Allowed Priority Tax Claims | $163,729 |
| (v)  Allowed Priority Non-Tax Claims | $453,585 |
| **TOTAL:** | **$798,814** |

The Feasibility Analysis indicates, therefore, that, by virtue of the EMC Settlement Payment, the Debtor will have Cash sufficient to fund the Distributions required to be paid to Creditors on or about the Effective Date.

**b.** **Ongoing Distributions Under the Plan.**

After payment of Allowed Administrative Claims, any Cure Claims, United States Trustee Fees, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, the only

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-93-

1  remaining material Claims to be paid pursuant to the Plan are Allowed General Unsecured Claims

2  (Class 3).[29]

3              Recovery by Class 3 Creditors will depend, in part, on the following:

4              (i)      The Amount of Allowed Administrative Claims, Cure

5                       Claims, United States Trustee Fees, Allowed Priority Tax

6                       Claims and Allowed Priority Non-Tax Claims.

7              The Plan Proponents project that the amount of such Claims will be

8  approximately $798,814 and that, after paying such Claims, there will be approximately

9  $1,488,703 Cash remaining available to fund the Plan Fund for the benefit of Class 3

10  Creditors.  If the amount of such Claims is higher than projected, recoveries by the Class 3

11  Creditors may be reduced.

12             (ii)     Recoveries from Causes of Action.

13             For the purpose of the Feasibility Analysis only, the Plan Proponents

14  project that there will be approximately $100,000 in Net Litigation Proceeds recovered from

15  the prosecution of Causes of Action.  If the amount of Net Litigation Proceeds is less than

16  projected, the recoveries by Class 3 Creditors may be adversely affected.  On the other hand,

17  if the amount of Net Litigation Proceeds is higher than projected, recoveries by Class 3

18  Creditors may be favorably affected.

19             (iii)    Merger Transaction.

20             For the purpose of the Feasibility Analysis only, the Plan Proponents

21  project that no Merger Transaction will be effectuated.  If a Merger Transaction is

22  effectuated, recoveries by Class 3 Creditors may be favorably affected.

23             (iv)     Amount of Allowed General Unsecured Claims.

24             As stated hereinabove, there remains in the Case a substantial amount

25  of disputed General Unsecured Claims to which objections are being and will be prosecuted.

26  The Plan Proponents assume that a range between approximately $3,771,560 and $8,368,285

27  in General Unsecured Claims will be allowed by the Bankruptcy Court.  However, the Plan

28  ───────────────

[29] At present, no order has been entered subordinating any Claims, and, accordingly, for the purpose of the Feasibility Analysis only, the Plan Proponents project that there will be no Allowed Subordinated Claims in the Case.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

Proponents believe that, if their filed and likely to be filed objections to disputed General Unsecured Claims are sustained by the Bankruptcy Court, General Unsecured Claims closer to the $3,771,560 figure will be allowed by the Bankruptcy Court.

Based upon such assumptions, the Plan Proponents project the following potential recoveries by Class 3 Creditors:

| | | |
|---|---|---|
| Cash Remaining After Payment of Effective Date Obligations | $1,488,703 | |
| Net Litigation Proceeds | $100,000 | |
| Total Cash: | | $1,588,703 |
| Less Costs of Administering Plan | | ($75,000) |
| Net Amount Available for Distribution to Class 3 Creditors | | <u>$1,513,703</u> |
| Est. Amount of Allowed General Unsecured Claims | $3,771,560-$8,368,285 | |
| Est. Percentage Recovery by holders of Allowed General Unsecured Claims | | **18%-40%** |

By the Feasibility Analysis, therefore, the Plan Proponents project that the holders of Allowed General Unsecured Claims will recover approximately 18%-40% on account of their Allowed General Unsecured Claims.  The Plan Proponents caution, however, that, if any of the assumptions underlying the Feasibility Analysis proves to be materially inaccurate, recoveries by holders of Allowed General Unsecured Claims may prove to be more favorable or less favorable than those projected.

G.    **Liquidation Analysis.**

Pursuant to section 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless the bankruptcy court determines that distributions under the plan to all holders of claims who have not accepted the plan, and whose claims are classified in classes that are impaired under the plan, are not less than those which they would receive in a liquidation case under Chapter 7. This test must be

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-95-

1    satisfied even if a plan is accepted by each impaired class of claims.   This test, which is often

2    referred to as the "best interests of creditors" test, requires the bankruptcy court to find either that (1)

3    all holders of claims in an impaired class of claims have accepted the plan, or (2) the plan will

4    provide to each holder of a claim in an impaired class who has not accepted the plan a recovery of

5    property of a value, as of the effective date of the plan, that is not less than the amount that such

6    holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

7        To satisfy the "best interests of creditors" test, the bankruptcy court must reach a conclusion

8    regarding the probable distribution to the holders in each impaired class of claims if the debtor were

9    liquidated in a Chapter 7 case.  The first step in this process is to determine the "liquidation value"

10   that would be generated from a forced sale of the debtor's assets by a Chapter 7 trustee. The second

11   step requires the application of the projected liquidation proceeds in accordance with the various

12   rights of any creditors holding liens on the property.  If such proceeds are sufficient to retire any

13   such liens, then the excess would be made available to satisfy the claims of unsecured creditors.

14       Once all of the claims secured by liens on assets of a debtor's estate are deducted from the

15   projected liquidation proceeds of the sale of the creditor's collateral, then the costs and expenses

16   associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid.  These

17   costs would include the compensation of the trustee, as well as compensation of counsel and other

18   professionals retained by the trustee, and asset disposition expenses.

19       After payment of the costs and expenses associated with the Chapter 7 liquidation are paid,

20   all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as

21   compensation of attorneys, financial advisors, and accountants) and all unpaid claims arising from

22   the operations of the debtor during the pendency of the Chapter 11 case must be paid.

23       After the payment of Chapter 11 administrative expenses, the remaining liquidation proceeds

24   would be used to pay priority unsecured claims, such as tax and wage claims that are entitled to

25   priority under the Bankruptcy Code. Thereafter, the remaining liquidation proceeds would be made

26   available to pay general unsecured claims.  Finally, to the extent that any proceeds remain after

27   paying all allowed claims, such proceeds would be distributed to interest holders.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-96-

1    Attached hereto as **Exhibit "C"** is a liquidation analysis prepared by the Plan Proponents that

2    estimates the probable liquidation value of the Debtor, and applies the foregoing liquidation

3    methodology to the estimated Claims against the Estate in a Chapter 7 liquidation in an effort to

4    quantify what each Class of Creditors would receive in a Chapter 7 liquidation ("Liquidation

5    Analysis").  Any Liquidation Analysis of this nature entails a significant degree of estimation and

6    projection regarding both probable asset value and probable Allowed Claim totals.  For example, in

7    preparing the Liquidation Analysis, the Plan Proponents have been required to evaluate the very

8    substantial amount of Disputed Claims in the Case, and have necessarily quantified what they

9    believe will be the Allowed Claims within each Class.  Although this quantification was based upon

10    a thorough assessment of the information contained in the Debtor's books and records and the Plan

11    Proponents' review of the Disputed Claims asserted against the Debtor, as of the date of the

12    preparation of the Liquidation Analysis, it was not possible to quantify exactly the amount of

13    Allowed Claims given the substantial amount of Disputed Claims and the fact that no judicial

14    determinations had been made regarding the merits of the Disputed Claims.  These and other factors

15    may significantly increase or reduce the total amount of Allowed Claims within each Class.

16    On the valuation side of the Liquidation Analysis, the Plan Proponents have estimated the

17    liquidation value of the Debtor's Assets utilizing their best estimate of the value of the Debtor's

18    Assets in a Chapter 7 liquidation.

19    Material assumptions underlying the Liquidation Analysis include the following:

20    **1.**    **Potentially Reduced Value of Assets in Liquidation.**

21    Liquidation values for many types of assets are typically substantially lower than

22    going concern values for such assets.  In this case, the Debtor's primary Assets are the following:

23    (i) Cash; (ii) Causes of Action; and (iii) a potential Merger Transaction.

24    **a.**    **Cash.**

25    Cash is fully recoverable either in a going concern scenario or in a liquidation

26    scenario.

27

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

1

### b.   Causes of Action.

The Plan Proponents believe that there would be a significant difference in the value of the Causes of Action if the Case were converted to a Chapter 7 liquidation.  If the Debtor remains in Chapter 11, the Plan Agent will prosecute the Causes of Action for the benefit of Class 3 Creditors.  As stated hereinabove, the Plan Proponents project, conservatively, that approximately $100,000 in Net Litigation Proceeds will be obtained from the prosecution of Causes of Action.  On the other hand, the Plan Proponents believe that, in a Chapter 7 liquidation, a trustee may not be inclined to prosecute aggressively the Causes of Action and even may abandon the Causes of Action. The Plan Proponents believe that, as a result thereof, the value of the Causes of Action in a liquidation would be less than the value thereof in a Chapter 11 case.

### c.   Merger Transaction.

As stated hereinabove, a Merger Transaction potentially may have substantial value for Class 3 Creditors.  While it is uncertain whether a Merger Transaction will be viable, it is certain that, if the Debtor's Case were converted to a Chapter 7 liquidation, no Merger Transaction would be possible.  Therefore, in any liquidation scenario, any potential value that may be obtained in a Merger Transaction would be lost.

### 2.   Increased Amount of Claims in Liquidation.

As set forth hereinabove, a liquidation of the Debtor's Assets may result in a significant reduction of the value of the Debtor's Assets.  In a Chapter 7 liquidation, Creditors' interests also would be impaired by the creation of a substantial amount of Claims, including substantial Administrative Claims, that otherwise would not be asserted against the Debtor.

In a Chapter 7 liquidation, holders of Allowed Claims would receive Distributions based on the liquidation of the Debtor's Assets.  Such Assets are the same Assets being liquidated under the Plan.  However, the proceeds from the liquidation of the Assets available for funding Distributions to Creditors would be reduced by the commission payable to the Chapter 7 trustee and by the fees and expenses of the Professionals who would be retained by the trustee and who would be required to "get up to speed" in the Case, and, hence, likely to incur fees in excess of the accruing fees of the Professionals now employed in the Case.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1    The Debtor has few remaining Assets to reduce to Cash, primarily Causes of Action

2    to be prosecuted.  Therefore, except for the expense attributable to the fees and costs of prosecuting

3    Causes of Action, the Debtor already has absorbed a substantial amount of the expense of liquidating

4    the Debtor's Assets.  In a Chapter 7 case, the trustee would be entitled to seek a sliding scale

5    commission based upon the Cash that would be distributed by such trustee to Creditors, even though

6    the Debtor already has accumulated or soon obtain (e.g., by means of the EMC Settlement

7    Agreement) a very substantial amount of such Cash, and the Debtor already has incurred the expense

8    associated with generating such Cash.  Accordingly, there is a likelihood that Creditors would "pay

9    again" for the Cash accumulated by the Debtor in the Case because the Chapter 7 trustee would be

10    entitled to receive a commission for distributing the Cash "handed over" to the trustee by the Debtor.

11    In addition, a Chapter 7 trustee would employ Professionals and assistants that would

12    add additional administrative expense that would be paid prior to payment of Allowed General

13    Unsecured Claims.  The Plan Proponents already have legal counsel who are knowledgeable about

14    the Case and the legal issues concerning the disposition of the Assets and the resolution of Claims

15    asserted against the Estate; by reason of the knowledge of the Professionals already employed in the

16    Case, they likely can complete the legal work necessary to resolve the Case much more efficiently

17    and economically than a new set of Professionals who would be employed by a trustee.  The Debtor

18    already has its own accounting and administrative personnel who are better qualified to resolve

19    Disputed Claims and issues related to the prosecution of Causes of Action than would a Chapter 7

20    trustee who would have no knowledge or familiarity of such matters.  Moreover, the advice of the

21    Committee, which will be reconstituted under the Plan as the Post-Effective Date Committee to

22    supervise the Plan Agent, would be lost in a Chapter 7.  The costs of familiarizing the trustee, the

23    trustee's new Professionals, and the trustee's new staff with issues relating to the Case undoubtedly

24    will increase the Administrative Claims that must be paid before payment of Allowed General

25    Unsecured Claims.

26    It also must be noted that the issues related to the Debtor's Assets and the Claims

27    adjudication process in the Case are fairly complex.  The Plan Proponents believe that the process of

28    disposing of the Assets (primarily Causes of Action) and the process of adjudicating Claims in the

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1  Case are best handled by the Debtor's experienced and knowledgeable staff that will assist the Plan

2  Agent.  The Debtor's staff has knowledge of the Debtor's business and financial affairs that will be

3  invaluable in the Claims adjudication process and in the Plan Agent's efforts to prosecute Causes of

4  Action.  There is no assurance that the Debtor's staff would remain available in a Chapter 7

5  liquidation; several critical employees remain (or make themselves available on an hourly basis)

6  solely out of loyalty to the Debtor.  The Plan Proponents believe that there is a significant risk that,

7  in a Chapter 7 liquidation, with a loss of the "institutional knowledge" of the Debtor's financial

8  affairs possessed by the Debtor's staff, the resolution of Disputed Claims and the disposition of the

9  Debtor's Assets will be affected adversely to the interests of Creditors.

10            In addition to a potentially significant increase in Administrative Claims in the Case

11  associated with the fees and expenses of the Chapter 7 trustee and the Professionals and assistants

12  who would be employed by the Chapter 7 trustee, the amount of Claims allowed in the Case may

13  increase in a Chapter 7.  As set forth hereinabove, in any Chapter 7 liquidation, the trustee may not

14  be inclined to prosecute aggressively Causes of Action.  As a result, not only could there be a

15  potential loss in value of Causes of Action, but there could be an increase in Allowed Claims

16  because, by not pursuing aggressively Causes of Action against the holders of Disputed Claims (e.g.,

17  the Pencom Defendants), Disputed Claims could be allowed in a Chapter 7 that otherwise would not

18  be allowed in the Case.

19            Although there are difficulties inherent in quantifying, with any exactitude, the

20  potential recoveries that Creditors would receive in a Chapter 7 liquidation scenario, the Plan

21  Proponents believe that the Liquidation Analysis provides a fair estimate of the results that would

22  occur in a Chapter 7 liquidation.  The Liquidation Analysis indicates that, in a Chapter 7 liquidation

23  scenario, a significantly smaller Distribution would be paid on account of Allowed General

24  Unsecured Claims compared with the Distributions pursuant to the Plan.  Moreover, the Plan

25  Proponents believe that the Distributions to Creditors pursuant to the Plan will be paid much more

26  expeditiously than in a Chapter 7 liquidation scenario.  Pursuant to the Plan, Distributions to satisfy

27  Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax

28  Claims will be paid on or about the Effective Date (projected to occur in or about July 2010) and

-100-

1  Distributions to holders of Allowed General Unsecured Claims will commence to be paid on or

2  about 180 days after the Effective Date of the Plan.  In contrast, a Chapter 7 trustee would have no

3  familiarity with the Debtor, the Debtor's Assets, the Claims and the Debtor's Case, and likely would

4  seek to retain Professionals that are similarly unfamiliar with these matters.  The Plan Proponents

5  believe that it is likely that there would be no Distributions to Creditors in a Chapter 7 liquidation for

6  a period of many months, if not years.

7       Based on the foregoing, the Plan Proponents believe that the Plan Agent, under the

8  supervision of the Post-Effective Date Committee, is in the best position to produce the highest

9  return to Creditors, and that it will be advantageous to Creditors to finish the liquidation of the

10  Debtor's Assets and the resolution of the Case in Chapter 11, rather than in Chapter 7.

11       While the Plan Proponents' conclusions regarding the results of a liquidation

12  scenario are unavoidably speculative and depend upon a number of variables, the Plan Proponents

13  believe that there is a good basis for them to believe that, pursuant to the Plan, Creditors will be able

14  to recover significantly more on account of their Claims, on a much more expeditious basis, than

15  they would in a Chapter 7 liquidation proceeding.  Accordingly, the Plan Proponents have concluded

16  that the Plan is the best alternative for Creditors, and will maximize recoveries by Creditors.[30]

17

18  [30] In the Plan Proponents' view, generally, liquidation of a debtor's assets under Chapter 7 is not faster or less expensive

19  than liquidation under Chapter 11.  To the contrary, it has been concluded that "Chapter 7 liquidations appear to be no
    faster or cheaper ... than Chapter 11 reorganizations.  However, Chapter 11 seems to preserve assets better, thereby

20  allowing creditors to recover relatively more."  Arturo Bris, Ivo Welch, and Ning Zhu, *The Costs of Bankruptcy:*
    *Chapter 7 Liquidation versus Chapter 11 Reorganization*, The Journal of Finance, Vol. LXI, No. 3, pp. 1253-1303 (June

21  2006).[30]  This study concludes that the typical Chapter 7 case has a more detrimental impact on the value of a debtor's
    assets than the typical Chapter 11 case -- effectively that the value of a debtor's assets declines more in a Chapter 7 case

22  than in a Chapter 11 case, which results in a lower distribution for creditors.  *Id.* at 1264.  This study notes that "the
    typical chapter 7 case takes 2 years to unwind" and that this is virtually the same amount of time as the average

23  Chapter 11 case.  *Id.* at 1266, 1270.  Particularly noteworthy is the conclusion to the study that "conversions from
    Chapter 11 to Chapter 7 take longer" than cases filed initially under Chapter 7.  *Id.* at 1271.  Furthermore, the study

24  concludes that the "median expense ratio in Chapter 7 is a slightly higher 2.5% than the 1.9% in Chapter 11."  *Id.* at
    1279.  In other words, the study concludes that Chapter 7 cases cost *more* than Chapter 11 cases (although the study

25  cautions that the cost difference may not be "statistically significant").  The study further concludes that "Chapter 11
    unequivocally seems better for creditors from the perspective of total recovery rate," which the study concludes is based

26  on the advantages "of the [Chapter 11] procedure itself" that results in a higher recovery rate.  *Id.* at 1290.  In sum, the
    study concludes as follows:  "Chapter 7 seems to offer few advantages: It takes almost as long to resolve, requires

27  similar fees, and in the end provides creditors with lower recovery rates . . . than a comparable Chapter 11 procedure."
    *Id.* at 1301.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-101-

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

# XIII.

## CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

**CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITIES SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX ADVISORS.** The following disclosure of possible tax consequences of the Plan is intended solely for the purpose of alerting Creditors to possible tax issues that the Plan may present to the Debtor. The Plan Proponents CANNOT and DO NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Internal Revenue Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

### B.    Consequences to the Debtor.

In general, the Internal Revenue Code provides that a debtor in a bankruptcy case is not taxable on cancellation of debt ("COD") income, but must reduce certain of its tax attributes (such as its net operating loss carryforwards and its tax basis in its assets) by the amount of COD income. COD income results when the amount of debt discharged exceeds the consideration given in exchange therefor, and is equal to such excess amount. In this case, it is likely that a cancellation of debt will be deemed to have occurred on the Effective Date of the Plan. Any reduction in tax attributes does not occur, however, until the end of the Debtor's taxable year or, in the case of asset basis reduction, the first day of the taxable year following the taxable year in which the COD is incurred.

Under the Plan, the Debtor will be treated for United States federal income tax purposes as transferring the Assets directly to the Plan Agent (in accordance with the provisions of Section 6.6.2

---

A law review article assessing, in part, the value of Chapter 11 liquidations concludes that there are advantages to a Chapter 11 liquidation case compared to a Chapter 7 liquidation case: "Indeed, there are many advantages of a chapter 11 liquidation over a chapter 7 liquidation. First, chapter 11 provides additional flexibility, with less rigid procedures than those found in chapter 7. Second, in a chapter 11 liquidation, preexisting management may remain in place to conduct the liquidation, which helps to maximize value by virtue of management's historical knowledge of the business and familiarity with the assets. Additionally, chapter 11 has distinct advantages where third-party interests must be protected. . . . [F]acilitators for collective action are absent . . . from chapter 7 . . . procedures." Ali M.M. Mojdehi and Janet Dean Gertz, The Implicit "Good Faith" Requirement in Chapter 11 Liquidations: A Rule in Search of a Rationale?, American Bankruptcy Institute Journal, Spring 2006, at 153.

MTI Disclosure Statement v1.4
MAINDOCS-#142646-v3-MTI_Jt_2nd_Amd_DS_3-24-2010.DOC

CLARKSON, GORE & MARSHLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1  of the Plan, on the Effective Date, the Assets will be transferred to, vest in, and be held in trust by,

2  the Plan Agent). Accordingly, the Debtor's transfer of Assets may result in the Debtor's recognizing

3  gain or income, depending, in part, on the value of the Assets on the Effective Date and the adjusted

4  basis of the Assets on the Effective Date.

5  **C.    Withholding of Taxes.**

6  All Distributions to holders of Allowed Priority Unsecured Claims and Allowed

7  General Unsecured Claims are subject to any applicable tax withholding, including employment tax

8  withholding. Under federal income tax law, interest, dividends, and other reportable payments may,

9  under certain circumstances, be subject to "backup withholding" at the then applicable withholding

10  rate (currently 28%). Backup withholding generally applies if the holder 1) fails to furnish its social

11  security number or other taxpayer identification number ("TIN"), (2) furnishes an incorrect TIN,

12  (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to provide a

13  certified statement, signed under penalty of perjury, that the TIN provided is its correct number and

14  that it is not subject to backup withholding. Backup withholding is not an additional tax but merely

15  an advance payment, which may be refunded to the extent that it results in an overpayment of tax.

16  Certain persons are exempt from backup withholding, including, in certain circumstances,

17  corporations and financial institutions.

18  THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR

19  INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS OR INTERESTS ARE

20  URGED TO CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX

21  ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX

22  CONSEQUENCES OF THE PLAN.

23  **XIV.**

24  **RECOMMENDATION**

25  The Plan Proponents recommend that all Creditors receiving a Ballot vote in favor of the

26  Plan. The Plan Proponents believe that the Plan maximizes recoveries to all Creditors and, thus, is in

27  the best interests of Creditors. The Plan likely will produce Distributions to Creditors in excess of

28

-103-

1  those that would be available if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code,

2  and will minimize delays in recoveries by Creditors.

3  Dated:  March 25, 2010                    **CLARKSON, GORE & MARSELLA, APLC**

4

5  By: _____
                                            Scott C. Clarkson
6                                           Attorneys for MTI Technology Corporation,
                                            Chapter 11 Debtor and Debtor in Possession

7  Dated:  March ___, 2010                   **WINTHROP COUCHOT**
                                            **PROFESSIONAL CORPORATION**
8

9                                           By: _____
10                                              Robert E. Opera
                                            Attorneys for the Official Committee of
11                                          Unsecured Creditors

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MTI Disclosure Statement v1.4
MAINDOCS #142646 v3 MTI_Jt_2nd_Amd_DS_3.24.2010.DOC

1  those that would be available if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code,

2  and will minimize delays in recoveries by Creditors.

3  Dated: March __, 2010                    **CLARKSON, GORE & MARSELLA, APLC**

4

5                                           By: _____
                                                Scott C. Clarkson
6                                               Attorneys for MTI Technology Corporation,
                                                Chapter 11 Debtor and Debtor in Possession

7  Dated: March 25, 2010                    **WINTHROP COUCHOT**
                                            **PROFESSIONAL CORPORATION**
8

9                                           By: _____
                                                Robert E. Opera
10                                              Attorneys for the Official Committee of
                                                Unsecured Creditors

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-104-

EXHIBIT "A"

| Case Name | Case Number | Date Filed | Status |
|---|---|---|---|
| Official Committee of Creditors Holding Unsecured Claims<br>  v. AFCO Premium Acceptance, Inc. | 8:09-ap-01261-ES | 10/14/09 | Dismissed 12/16/09 |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Avnet Computer | 8:09-ap-01624-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. B. Braun and B. Braun of America | 8:09-ap-01616-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Blue Shield of California | 8:09-ap-01638-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Carolina Casualty Insurance | 8:09-ap-01628-ES | 10/14/09 | Dismissed 03/02/10 |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Ciber UK LTD. | 8:09-ap-01619-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Cigna Dental Health | 8:09-ap-01615-ES | 10/14/09 | Dismissed 12/15/09 |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Cresa Partners – West Inc. | 8:09-ap-01622-ES | 10/14/09 | Dismissed 12/16/09 |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Dell Computer Corp. and Dell, Inc. | 8:09-ap-01630-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Edward W. Kirnbauer | 8:09-ap-01634-ES | 10/14/09 | Dismissed 11/25/09 |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Franz Cristiani | 8:09-ap-01632-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Ingram Micro Inc. | 8:09-ap-01626-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. James M. Cunha | 8:09-ap-01618-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>  v. Kent D. Smith | 8:09-ap-01649-ES | 10/14/09 | Dismissed 01/04/10 |

| | | | |
|---|---|---|---|
| Official Committee of Creditors Holding Unsecured Claims<br>v. Lawrence Begley | 8:09-ap-01648-ES | 10/14/09 | Pending (Request for Entry Default) |
| Official Committee of Creditors Holding Unsecured Claims<br>v. LSI Corp | 8:09-ap-01640-ES | 10/14/09 | Dismissed 12/11/09 |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Marsh Risk & Insurance Service | 8:09-ap-01614-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Michael Pehl | 8:09-ap-01647-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Morrison & Foerster LLP | 8:09-ap-01610-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>v. My Office Inc. and Riverside Claims | 8:09-ap-01613-ES | 10/14/09 | Dismissed 01/04/10 |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Nick Ganio | 8:09-ap-01646-ES | 10/14/09 | Pending (Motion to Dismiss Filed) |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Norr Stiefenhofer Lutz | 8:09-ap-01611-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Pencom Systems Inc; Edward C. Ateyeh, Jr. aka Edward Taylor; Edgar Saadi; and Wade Saadi | 8:09-ap-01617-ES | 10/14/09 | Pending (Motion to Dismiss Filed) |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Ronald E. Heinz | 8:09-ap-01645-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims<br>v. Storewiz | 8:09-ap-01636-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims<br>v. William Atkins | 8:09-ap-01644-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims<br>v. William J. Kerley | 8:09-ap-01642-ES | 10/14/09 | Pending (Motion to Dismiss Filed) |
| MTI Technology Corporation<br>v. Lifeboat Distribution, Inc. | 8:09-ap-01607-ES | 10/14/09 | Pending (settled) |
| MTI Technology Corporation<br>v. Neoscale Systems, Incorporated | 8:09-ap-01608-ES | 10/14/09 | Pending (Application for |

| | | | Default Judgment filed) |
|---|---|---|---|
| MTI Technology Corporation v. EMC Corporation | 8:09-ap-01267-ES | 04/01/09 | Pending (settled) |
| MTI Technology Corporation v. Fusionstorm | 8:09-ap-01639-ES | 10/14/09 | Pending |
| MTI Technology Corporation v. Lenox Financial Mortgage Corporation | 8:08-ap-01227-ES | 06/20/08 | Closed 08/28/09 |

EXHIBIT "B"

**EXHIBIT "B" IS PROVIDED SOLELY FOR INFORMATIONAL PURPOSES AND CONSTITUTES ONLY THE PLAN PROPONENTS BEST ESTIMATE OF THE AMOUNT OF UNDISPUTED, LIQUIDATED, NON-CONTINGENT GENERAL UNSECURED CLAIMS AS OF THE DATE OF THIS DISCLOSURE STATEMENT. NOTHING CONTAINED HEREIN SHALL CONSTITUTE ANY ADMISSION REGARDING THE DEBTOR'S LIABILITY ON SUCH CLAIMS OR WHETHER SUCH CLAIMS ARE VALID OR WILL BE ALLOWED BY THE BANKRUPTCY COURT, OR SHALL IMPAIR OR AFFECT IN ANY MANNER ANY RIGHT THAT THE PLAN PROPONENTS MAY HAVE TO OBJECT TO ANY OF SUCH CLAIMS.**

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 2 | | | | |
| 3 | | | | |
| 4 | **General Unsecured Claims** | | | |
| 5 | All Claims May be Subject to Objection | | | |
| 6 | JS NORTHPOINTE L P | 187 | - | 209,565.71 |
| 7 | AMERICAN EXPRESS | 198 | - | 200,530.42 |
| 8 | EDWARD W. KIRNBAUER | 47 | - | 193,694.62 |
| 9 | GRANT THORNTON LLP | | - | 153,914.00 |
| 10 | LIFEBOAT DISTRIBUTION | 6 | - | 141,091.60 |
| 11 | QUANTUM CORPORATION | 210 | - | 137,005.43 |
| 12 | MORRISON & FOERSTER LLP | 397 | - | 121,486.85 |
| 13 | AVNET COMPUTER | 54 | - | 120,949.04 |
| 14 | KPMG LLP | 24 | - | 88,042.00 |
| 15 | HARTFORD FIRE INSURANCE COMPANY | 194 | 132 | 78,426.00 |
| 16 | AMERICAN EXPRESS | 199 | - | 73,268.11 |
| 17 | TELLABS OPERATIONS, INC. | | - | 61,764.34 |
| 18 | COMPNOLOGY, INC. | 391 | - | 58,400.00 |
| 19 | U.S. BANCORP OLIVER-ALLEN | | - | 57,541.00 |
| 20 | FINITI LLC | 451 | - | 55,772.50 |
| 21 | CCS | 11 | - | 54,160.00 |
| 22 | HARTZ MOUNTAIN | | - | 49,755.54 |
| 23 | ROCKWELL COLLINS, INC. | 209 | - | 47,240.00 |
| 24 | ALI DOWLATSHAHI | 609 | 205 | 46,407.43 |
| 25 | HALL 2611 INTERNET ASSOCIATES LLC | 151 | - | 45,929.23 |
| 26 | BOWNE OF LOS ANGELES, INC. | 229 | - | 45,015.00 |
| 27 | MEDIALAB TECHNOLOGIES, INC | 193 | - | 43,610.57 |
| 28 | FIREFLY COMMUNICATIONS LLC | 12 | - | 42,770.36 |
| 29 | INFO-X TECHNOLOGY SOLUTIONS | | - | 42,390.59 |
| 30 | RUSSELL ELDER | 568 | 198 | 38,252.13 |
| 31 | MID ATLANTIC CORPORATE SERVICES | | - | 37,136.45 |
| 32 | FED EX CUSTOM CRITICAL | 31 | - | 33,175.46 |
| 33 | OCCAM NETWORKS | | - | 32,625.00 |
| 34 | PIONEER ELECTRONICS (USA) INC. | | - | 28,144.84 |
| 35 | ACT TELECONFERENCING SERVICES, INC. | 221 | 75 | 27,744.91 |
| 36 | CORPORATION | 479 | - | 25,117.00 |
| 37 | INGRAM MICRO INC. | 179 | - | 24,905.03 |
| 38 | QUAKERBRIDGE VENTURES, LLC | 243 | - | 24,841.50 |
| 39 | CALWEST INDUSTRIAL HOLDINGS, LLC | | - | 24,312.03 |
| 40 | SPRINT NEXTEL | 177 | - | 22,873.56 |
| 41 | STEVEN D. PATTERSON | 215 | - | 22,839.16 |
| 42 | CIT TECHNOLOGY FINANCING SERVICE | 8-2 | 8 | 22,731.21 |
| 43 | MARK A. CAGGIANO | 612 | 131 | 21,778.47 |
| 44 | IT INFRASTRUCTURES, INC | 61 | - | 21,204.55 |
| 45 | DATA MANAGEMENT GROUP OF ILLINOIS | 14 | - | 20,603.74 |
| 46 | DISTRIBUTED SYSTEMS MANAGEMENT | 267 | - | 20,400.00 |
| 47 | SALVATORE MAITA | 604 | - | 19,783.06 |
| 48 | MY OFFICE, INC. | 3 | - | 19,697.50 |
| 49 | FRANK PARSONS PAPER COMPANY, INC. | 190 | - | 18,036.00 |
| 50 | BRIGGS DATACOMM | 232 | - | 17,946.30 |
| 51 | ALLIANCE STORAGE TECHNOLOGIES | 49 | - | 17,825.00 |
| 52 | LAWREN FENDRICH | 592 | 142 | 17,000.75 |
| 53 | MATTHEW BAKER | 56 | - | 16,483.38 |
| 54 | FUJITSU COMPUTER SYSTEMS CORP | | - | 16,281.00 |
| 55 | EXPRESS COMPUTER | | - | 15,921.26 |
| 56 | CHAMPAGNE LOGISTICS | 360 | - | 14,859.77 |
| 57 | FEDEX CUSTOMER INFORMATION SERVICE | 114 | - | 14,695.25 |
| 58 | WILLIAMS & CONNOLLY LLP | | - | 14,687.50 |
| 59 | HEWLETT PACKARD | 240 | - | 14,419.00 |
| 60 | EMI MUSIC PUBLISHING | | - | 14,106.26 |
| 61 | O'HARE CENTRE VENTURE | 593 | 428 | 14,000.00 |
| 62 | NMATRIXE/EPIQ SYSTEMS INC | | - | 13,784.82 |
| 63 | SAVAIL CONSULTING INC. | | - | 13,656.33 |
| 64 | SIRIUS COMPUTER SOLUTIONS | 34 | - | 13,650.00 |
| 65 | PITNEY BOWES CREDIT CORPORATION | 172 | - | 13,462.86 |
| 66 | DAVID P. WALKER | 181 | - | 13,148.06 |
| 67 | LOD COMMUNICATIONS INC | 159 | - | 12,846.83 |
| 68 | ELSEVIER MDL | | - | 12,788.77 |
| 69 | MONSTER, INC | 67 | - | 11,500.00 |
| 70 | PARADISE CANYON SYSTEMS | 231 | - | 11,500.00 |
| 71 | CARDIOVASCULAR PROVIDER RES | | - | 11,199.54 |
| 72 | LAKE MOUNTAIN, L.P. | | - | 11,087.43 |
| 73 | RON K. BOYINGTON | | - | 11,055.49 |
| 74 | JONATHAN HINES | | - | 10,880.07 |
| 75 | TED A. TURKINGTON | 71 | - | 10,854.00 |

Omni Management Group, LLC

Exhibit B, Page 109

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 76 | RONALD P. UMAGAT | TBD | | 10,723.48 |
| 77 | GREGG H. GOODNIGHT | | - | 9,613.46 |
| 78 | JASON E THOMAS | 598 | 500 | 9,389.73 |
| 79 | JOSEPH S SAHLI | 578 | 252 | 9,246.50 |
| 80 | JAMES R GALLAGHER | 480 | 126 | 8,816.39 |
| 81 | DAVID B. ARNETTE | | - | 8,776.09 |
| 82 | EDWARD J. DEVIN | | - | 8,586.46 |
| 83 | BARRY BICKFORD | 606 | 220 | 8,432.00 |
| 84 | WEBEX COMMUNICATIONS INC. | | - | 8,265.00 |
| 85 | AVERY WINFORD | 165 | - | 8,240.00 |
| 86 | CH REALTY IV/ROYAL CENTRE, LLC | 485 | - | 7,993.41 |
| 87 | WILLIAM HUFF | 564 | 296 | 7,892.50 |
| 88 | TECH TARGET | | - | 7,125.00 |
| 89 | STEWART A. SIMPSON | 135 | - | 7,034.22 |
| 90 | CLIFFORD H NADLER | 563 | 341 | 6,944.23 |
| 91 | DAVID P. THIBODEAU | 582 | 234,184 | 6,930.72 |
| 92 | MARK S. HATCHETT | 605 | 83 | 6,842.74 |
| 93 | AT&T | | - | 6,832.13 |
| 94 | POLARIS POOL SYSTEMS | 197 | - | 6,738.28 |
| 95 | RICKEY K EWING | 566 | 73 | 6,536.74 |
| 96 | MCCOLLISTER S MOVING & STORAGE | 28 | - | 6,581.48 |
| 97 | CYNTHIA T. HARRINGTON | 91 | - | 6,514.60 |
| 98 | JOHN M. BISAHA | 589 | 216 | 6,482.52 |
| 99 | IBM CORPORATION | 158 | - | 6,445.00 |
| 100 | NORMAN EISENBERG | 482 | 110 | 6,247.89 |
| 101 | WARGO & FRENCH LLP | | - | 6,247.89 |
| 102 | CECIL S BURNETTE | INF | 141 | 6,011.08 |
| 103 | ROGER D SANDS | 587 | 85 | 5,919.90 |
| 104 | AVIS RENT A CAR SYSTEM, INC | | - | 5,896.19 |
| 105 | AVRAHAM COHEN | 52 | - | 5,814.90 |
| 106 | ANTHONY HUK | | - | 5,814.90 |
| 107 | VERIZON WIRELESS WEST | 559 | 555 | 5,483.27 |
| 108 | PATRICIA A TRIMARCO | 572 | 103 | 5,402.50 |
| 109 | FAVIAN ZAVALZA | 591 | 123 | 5,353.40 |
| 110 | CRUISE ONE / CRUISES INC. | | - | 5,302.46 |
| 111 | GARY RICE | | - | 5,227.76 |
| 112 | KEVIN N. KEILS | | - | 5,149.65 |
| 113 | LAWRENCE E. REED | 571 | 97 | 5,136.97 |
| 114 | CONWAY MEDICAL CENTER | | - | 5,038.50 |
| 115 | MICHAEL WHEELER | | - | 5,014.26 |
| 116 | ALAN MADDISON | TBD | 54 | 4,949.84 |
| 117 | WELLSTAR HEALTH SYSTEM | | - | 4,822.10 |
| 118 | RAYMOND J. DESROCHERS | | - | 4,782.69 |
| 119 | TODD A. ANDERSON | 452 | - | 4,748.79 |
| 120 | ROBERTO MATOS | | - | 4,748.79 |
| 121 | YANG WANG | 581 | 21 | 4,689.26 |
| 122 | KIPA WANAMAKER | 146 | - | 4,682.50 |
| 123 | RICHARD T. RUGGIRELLO | 458 | 143 | 4,613.07 |
| 124 | BELL MICROPRODUCTS | 176 | - | 4,550.00 |
| 125 | NILS JULIN | | - | 4,540.95 |
| 126 | PRAMANA, INC. | 214 | - | 4,540.81 |
| 127 | UNISYS CORPORATION | 249 | - | 4,500.00 |
| 128 | JEFFREY BENJAMIN | 573 | 107,106 | 4,322.16 |
| 129 | KRISTOPHER C. BECAN | 599 | 116 | 4,304.06 |
| 130 | TERESA F. HIRSCH | | - | 4,291.50 |
| 131 | LESLIE GEHL | | - | 4,275.04 |
| 132 | DAVID ROBERTSON | | - | 4,230.78 |
| 133 | RICHARD S. PIERCE | | - | 4,228.28 |
| 134 | TECHNICAL CABLE CONCEPTS | 4 | - | 4,206.60 |
| 135 | RANDALL E. POTTER | | - | 4,206.33 |
| 136 | PURE NATURE MUSIC, INC. | 50 | - | 4,200.00 |
| 137 | MERRITT PROPERTIES, LLC | | - | 4,046.57 |
| 138 | MT. OLIVE PICKLES | 19 | - | 3,967.50 |
| 139 | BRIGGS ELECTRIC INC. | 349 | 196 | 3,957.63 |
| 140 | JOHN M. SCHIAVI | 169 | - | 3,943.54 |
| 141 | MICHAEL J. JONES | | - | 3,920.94 |
| 142 | KEVIN B. WOOD | | - | 3,919.79 |
| 143 | JESSICA KILEY | | - | 3,832.48 |
| 144 | DIGITAL MOUNTAIN, INC | 109 | - | 3,788.15 |
| 145 | KEVIN B. WOOD | | - | 3,778.70 |
| 146 | ATLANTA CAPITAL MANAGEMENT | 446 | - | 3,751.14 |
| 147 | RIVIERA HOTEL AND CASINO | 297 | - | 3,678.31 |
| 148 | STEWART, P.C. | 164 | - | 3,675.00 |
| 149 | BRYAN CAVE LLP | | - | 3,601.25 |

Omni Management Group, LLC

Exhibit B, Page 110

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 150 | INVISION.COM INC. | | - | 3,600.00 |
| 151 | NETWORK APPLIANCE | | - | 3,600.00 |
| 152 | PHILIP E. HORNSEY | 147 | - | 3,536.73 |
| 153 | INVISION.COM INC. | | - | 3,511.00 |
| 154 | ANDREW R. STAHELIN | | - | 3,505.15 |
| 155 | STUART E. JOHNSON | 120 | - | 3,490.67 |
| 156 | BRUCE MOSHASHA | 36 | - | 3,474.51 |
| 157 | T-MOBILE USA, INC | 55 | - | 3,448.14 |
| 158 | RONALD SCHNIEBER | 306 | 112 | 3,373.85 |
| 159 | JAMES STELLE | 30-2 | 30 | 3,307.40 |
| 160 | SHAWN SMITH | 570 | 102 | 3,280.67 |
| 161 | JONATHAN TIPTON | TBD | - | 3,266.37 |
| 162 | WAYNE H. UHRIG | | - | 3,176.25 |
| 163 | DOUGLAS REGULA | 501 | - | 3,093.27 |
| 164 | ANTHONY J. TOCCO | | - | 3,093.27 |
| 165 | MICHEAL J. MOON | | - | 3,077.84 |
| 166 | TIM DEAR | 577 | 82 | 3,004.56 |
| 167 | AMERICAN EXPRESS | 201 | - | 2,971.32 |
| 168 | RAJESH KUMAR | | - | 2,929.24 |
| 169 | DEBORAH M FONZINO | 574 | 17 | 2,921.63 |
| 170 | REBECCA REED | 569 | 98 | 2,906.31 |
| 171 | WILLIAM WHITLEY | 584 | 136 | 2,881.83 |
| 172 | MARTIN ROACH / LIQUIDITY SOLUTIONS | 594 | - | 2,850.60 |
| 173 | VERIZON - BANKRUPTCY DEPARTMENT | 206 | - | 2,850.03 |
| 174 | MELLON INVESTOR SERVICES, LLC | 326 | - | 2,822.96 |
| 175 | MARK CROWELL | | - | 2,812.38 |
| 176 | RONALD E. KITTENDORF | | - | 2,776.16 |
| 177 | UNITED VAN LINES, INC | | - | 2,758.48 |
| 178 | MARK ROGAN | 588 | 128 | 2,710.17 |
| 179 | WILLIAM DAVIS | 567 | 113 | 2,698.72 |
| 180 | MCKESSON CORPORATION | | - | 2,676.20 |
| 181 | JOYCE M. SHINN | 613 | 186 | 2,502.05 |
| 182 | JONATHAN R. DILLOWAY | 139 | - | 2,498.08 |
| 183 | DWANE E. PORTER | 145 | - | 2,480.63 |
| 184 | JOHN NOTAH | 610 | 247 | 2,457.52 |
| 185 | JENNIFER K. PLANK | 596 | - | 2,408.62 |
| 186 | ARIES INTERNET SERVICES | 125 | - | 2,400.00 |
| 187 | VMWARE INC. | | - | 2,396.00 |
| 188 | WAYNE H. UHRIG | | - | 2,377.87 |
| 189 | EDWARD J. DEVIN | | - | 2,359.40 |
| 190 | EASYLINK SERVICES INC | 5 | - | 2,295.00 |
| 191 | MAULIK DESAI | 51 | - | 2,294.44 |
| 192 | KURT WINCWICH | 579 | 213 | 2,206.25 |
| 193 | CORREINE WIECHEC | | - | 2,155.41 |
| 194 | JORGE A. VALES | 61 | - | 2,142.98 |
| 195 | JAMES STRONG | | - | 2,142.56 |
| 196 | MARSH RISK & INSURANCE SERVICE | 171 | - | 2,125.00 |
| 197 | SPENCER E WALLIS | 118 | - | 2,120.03 |
| 198 | AT&T MOBILITY - 6463 | | - | 2,116.84 |
| 199 | JESSICA KILEY | | - | 2,115.00 |
| 200 | SIGNIANT CORP | 40 | - | 2,042.50 |
| 201 | JORGE MARTINEZ | | - | 2,042.50 |
| 202 | KEVIN CARLSEN | | - | 2,041.34 |
| 203 | BOGDAN PETRESCU | | - | 2,030.19 |
| 204 | RON K. BOYINGTON | | - | 2,025.42 |
| 205 | STEPHEN J SUTTON | 565 | 7 | 2,018.07 |
| 206 | SENTINEL REAL ESTATE CORPORATION | | - | 1,950.21 |
| 207 | JEFFREY NEWMAN | TBD | 18 | 1,902.02 |
| 208 | USAEPAY | | - | 1,900.27 |
| 209 | PHILIP MORRISON | | - | 1,857.22 |
| 210 | COR-O-VAN | 127 | - | 1,840.78 |
| 211 | AT&T | | - | 1,812.06 |
| 212 | JAMES E. TYLER | 358 | 106 | 1,804.25 |
| 213 | FRANK VIGGIANO | | - | 1,765.56 |
| 214 | PAUL PISHCHENKO | 59 | - | 1,718.02 |
| 215 | ENTERPRISE LOSS CONTROL DEPT | | - | 1,718.02 |
| 216 | ACCUTECH DATA SUPPLIES, INC | | - | 1,697.32 |
| 217 | SCOTT TAYLOR | | - | 1,680.00 |
| 218 | MEDICORP HEALTH SYSTEM | | - | 1,619.26 |
| 219 | GREGORY GRIMES | | - | 1,613.23 |
| 220 | SPECIALIZED TRANSPORTATION, INC | 39 | - | 1,600.07 |
| 221 | GUINGYU HU | | - | 1,581.00 |
| 222 | OHIO DEPT OF JOB & FAMILY SERVICES | 270 | - | 1,564.24 |
| 223 | CARL PAYNE | 430 | - | 1,563.52 |

Omni Management Group, LLC

Exhibit B, Page 111

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 224 | ROBIN NORRIS | 583 | 33 | 1,502.55 |
| 225 | INC | 1 | - | 1,497.88 |
| 226 | THOMAS REID | 163 | - | 1,458.56 |
| 227 | ERIC HEINRICHS | 611 | - | 1,454.79 |
| 228 | WILLIAM HEATH | 580 | 94 | 1,444.31 |
| 229 | LLP | 195 | - | 1,417.50 |
| 230 | PHILIP MORRISON | | - | 1,402.08 |
| 231 | PR NEWSWIRE | 218 | - | 1,391.40 |
| 232 | BCP SYSTEMS | | - | 1,369.48 |
| 233 | HERTZ CORPORATION | 162 | - | 1,355.64 |
| 234 | STAPLES BUSINESS ADVANTAGE | | - | 1,319.24 |
| 235 | WRIGHT FORD YOUNG & CO. | 44 | - | 1,300.00 |
| 236 | COLLEN E. FERRIER | TBD | - | 1,272.82 |
| 237 | RAYMOND J. DESROCHERS | | - | 1,267.07 |
| 238 | CHIH-HSIN SHEN | TBD | 124-1 | 1,245.09 |
| 239 | JON P. SUTTON | 346 | - | 1,227.87 |
| 240 | KEITH WASNOK | | - | 1,219.72 |
| 241 | PATRICK J SUTTON | | - | 1,216.72 |
| 242 | ABSO | 2 | - | 1,211.95 |
| 243 | MANAGEMENT, INC | 57 | - | 1,175.55 |
| 244 | SPHERION CORP | 299 | - | 1,166.00 |
| 245 | STEVEN LIEBERMAN | | - | 1,129.49 |
| 246 | JOEL D. STEPHENS | 204 | - | 1,113.12 |
| 247 | GREGORY EDGINGTON | 89 | - | 1,111.74 |
| 248 | LESLIE GEHL | | - | 1,087.03 |
| 249 | GRANDE COMMUNICATIONS | | - | 1,085.86 |
| 250 | OPTIMAL OUTSOURCE | 486 | - | 1,059.54 |
| 251 | CORPORATION | 211 | - | 1,027.07 |
| 252 | PAMELA J. LYNCH | INF | - | 1,008.00 |
| 253 | FIRST CHOICE SERVICES | | - | 1,005.81 |
| 254 | DOMINION VIRGINIA POWER | | - | 947.28 |
| 255 | ANDREWS KURTH LLP | | - | 946.50 |
| 256 | ANTHONY HUK | | - | 924.72 |
| 257 | FRANK VIGGIANO | | - | 878.85 |
| 258 | AMERICA'S INSTANT SIGNS | 223 | - | 875.00 |
| 259 | BYRON JOSLIN | | - | 864.35 |
| 260 | SOLUTIONS INC. | 575 | 134 | 857.26 |
| 261 | MATTHEW DWYER | | - | 853.34 |
| 262 | AT&T WIRELESS SERVICES-6100 | | - | 842.44 |
| 263 | FRANKFURT KURNIT KLEIN AND SEL | 42 | - | 815.39 |
| 264 | WOOD COUNTY HOSPITAL | | - | 810.00 |
| 265 | GLEN CARLEY | | - | 793.52 |
| 266 | PUBLIC STORAGE | | - | 770.00 |
| 267 | GERHARD MEHLDAU | 585 | 10 | 748.50 |
| 268 | GREGG H. GOODNIGHT | | - | 742.17 |
| 269 | GREAT PLAINS VENTURES LLP | | - | 717.40 |
| 270 | ANTHONY J. TOCCO | | - | 710.31 |
| 271 | MESIROW FINANCIAL, INC | 495 | - | 672.00 |
| 272 | ROBERT COLASANTO | INF | - | 671.95 |
| 273 | MICHEAL J. MOON | | - | 663.32 |
| 274 | ARMANDO E. ESPINOZA | | - | 657.17 |
| 275 | MEGACITY | 376 | - | 640.00 |
| 276 | ALLIANCE ELEC. DISTRIBUTOR INC. | 228 | - | 635.00 |
| 277 | DUSTIN AVOL | | - | 599.53 |
| 278 | RANDY S. TURER | 58 | - | 591.85 |
| 279 | JOHN ERIC WEST | | - | 568.90 |
| 280 | LESLIE V. DIXON | | - | 562.01 |
| 281 | ASIA PLANT RENTAL | 53 | - | 552.86 |
| 282 | SCOTT TAYLOR | | - | 530.05 |
| 283 | MANHATTAN MINI STORAGE LLC | | - | 508.00 |
| 284 | MARK CROWELL | | - | 504.18 |
| 285 | YUNSONG GAO | | - | 500.00 |
| 286 | FRANK DE ANGELIS | | - | 494.52 |
| 287 | JONATHAN HINES | | - | 492.31 |
| 288 | STEVENS GLOBAL LOGISTICS | | - | 489.00 |
| 289 | GREGORY GRIMES | | - | 469.28 |
| 290 | AMERICAN EXPRESS | 200 | - | 453.00 |
| 291 | PARTHASARATHY SUBRAMANIAN | 121 | - | 442.05 |
| 292 | RENEE T. DITTMER | | - | 400.00 |
| 293 | RICK SLAN | | - | 389.97 |
| 294 | JAMES M. CUNHA | | - | 387.22 |
| 295 | SENTARA HEALTH | | - | 382.50 |
| 296 | DAHILL INDUSTRIES | 219 | - | 364.72 |
| 297 | GARY RICE | | - | 364.72 |

4 of 5

Omni Management Group, LLC

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 298 | MICHAEL L. SAMS | | - | 350.63 |
| 299 | BRIDGEHEAD SOFTWARE INC. | | - | 351.00 |
| 300 | EVERGREEN DATA SYSTEMS, INC. | 37 | - | 331.45 |
| 301 | RENEE T. DITTMER | | - | 326.15 |
| 302 | CONCIERGE LIMOUSINE | 16 | - | 324.30 |
| 303 | MUZAK | | - | 309.48 |
| 304 | REBECCA A. MASON | TBD | - | 277.16 |
| 305 | SAFESITE INC. | 233 | - | 275.00 |
| 306 | TRI DU | | - | 268.75 |
| 307 | AMERICAN EXPRESS | 2C2 | - | 259.77 |
| 308 | JOSEPH BURKHARDT | INF | 230 | 250.75 |
| 309 | WILLIAM ATKINS | 361 | - | 246.82 |
| 310 | FRANK DE ANGELIS | | - | 241.54 |
| 311 | ARMANDO E. ESPINOZA | | - | 236.92 |
| 312 | COLIN CAMPBELL | | - | 221.55 |
| 313 | MINI U STORAGE | | - | 215.00 |
| 314 | MICHAEL SLONIN | 2C3 | - | 186.68 |
| 315 | RONALD E. KITTENDORF | | - | 186.68 |
| 316 | BRADLEY MARKETING GROUP | | - | 182.99 |
| 317 | AERONET | | - | 176.40 |
| 318 | UNITED PARCEL SERVICE | 175 | - | 154.13 |
| 319 | ROBIN SPERLING | | - | 147.00 |
| 320 | SPRAGUE MAGNETICS | | - | 139.50 |
| 321 | MICHAEL A. TRIPPE | 379 | - | 132.80 |
| 322 | PUBLIC STORAGE | | - | 132.80 |
| 323 | TEXAS WIRED MUSIC, INC. | | - | 126.90 |
| 324 | COMED | | - | 115.68 |
| 325 | WASHINGTON GAS | | - | 114.21 |
| 326 | WAXIE SANITARY SUPPLY | | - | 112.34 |
| 327 | MICHAEL J. JONES | | - | 100.00 |
| 328 | RANDALL E. POTTER | | - | 100.00 |
| 329 | TY C JONES | 93 | - | 97.47 |
| 330 | CAL H. CONNOLLY | | - | 83.19 |
| 331 | AT&T WIRELESS SERVICES-8100 | | - | 77.23 |
| 332 | CULLIGAN | | - | 72.64 |
| 333 | CULLIGAN | | - | 66.66 |
| 334 | EXTRA SPACE STORAGE OF STERLING | | - | 66.03 |
| 335 | CHRISTOPHER B. GUEST | | - | 51.97 |
| 336 | DONOHOE ADVISORY ASSOCIATES LLC | | - | 50.00 |
| 337 | ADT SECURITY SERVICES | | - | 42.43 |
| 338 | JOHN FAULKNER | | - | 42.22 |
| 339 | AT&T - 630047 | | - | 40.61 |
| 340 | RECYCLING SERVICES, INC | | - | 40.59 |
| 341 | MARLIN LEASING CORP | | - | 34.13 |
| 342 | DISH NETWORK | | - | 32.97 |
| 343 | DWAYNE POLLINGER | 154 | - | 32.48 |
| 344 | REFRESH2O | | - | 32.48 |
| 345 | CRYSTAL SPRINGS WATER COMPANY | | - | 26.76 |
| 346 | AT&T - IC5262 | | - | 20.96 |
| 347 | EAGLE TELECONFERENCING | | - | 12.21 |
| 348 | MCI COMM SERVICE | | - | 3.18 |
| 349 | GAS COMPANY | | - | 1.10 |
| 350 | DONALD A. WILHELM | 74 | - | 0.00 |
| 351 | HERMIE CLOETE | 157 | - | 0.00 |
| 352 | JAMES C. DEAN | 72 | - | 0.00 |
| 353 | JAMES D. HEIMAN | 69 | - | 0.00 |
| 354 | JOSEPH A ZIMMERMAN | 586 | 25 | 0.00 |
| 355 | RICHARD W. CUNNINGHAM | 590 | 60 | 0.00 |
| 356 | STEVEN M DIGIUSEPPE | 324 | 78 | 0.00 |
| 357 | TODD F. HAWKINS | 86 | - | 0.00 |
| 358 | | | | |
| 359 | | | | 3,711,560.68 |
| 360 | | | | |

Omni Management Group, LLC

Exhibit B, Page 113

EXHIBIT "C"

# MTI Technology Corporation

Liquidation Analysis

*Note: This is an Estimate Only*

| | Notes | Chapter 7 | Chapter 11 |
|---|---|---|---|
| Cash | (1) | $2,635,620 | $2,287,518 |
| Net Litigation Proceeds | (2) | 0 | 100,000 |
| Merger Transaction Proceeds | (3) | 0 | 0 |
| *Less* | | | |
| Post-Effective Date Expenses | (4) | 0 | (75,000) |
| Chapter 7 Trustee payments | (5) | (102,319) | 0 |
| Chapter 7 counsel/Professionals and on-going expenses | (6) | (330,000) | 0 |
| Proceeds available to General Unsecured Creditors | | $2,203,301 | $2,312,518 |
| | | | |
| Creditor Claims | | | |
| Accrued Chapter 11 Administrative Claims | | $111,350 | $175,000 |
| Unites States Trustee Fees | | 0 | 6,500 |
| Cure Claims | | 0 | 0 |
| Allowed Priority Tax Claims | | 163,729 | 163,729 |
| Allowed Priority Non-Tax Claims | | 453,585 | 453,585 |
| Less payments to be made upon Plan Confirmation | | $728,664 | $798,814 |
| | | | |
| Proceeds available to the General Unsecured Creditors | | $1,474,637 | $1,513,704 |
| | | | |
| General Unsecured Creditor Claims | | | |
| General Unsecured Claims - low end of range | (7) | 3,771,560 | 3,771,560 |
| General Unsecured Claims - high end of range | (7) | 8,368,285 | 8,368,285 |
| **Estimated distribution on account of Est. Allowed General Unsecured Claims (low end of range)** | | **39.1%** | **40.1%** |
| **Estimated distribution on account of Est. Allowed General Unsecured Claims (high end of range)** | | **17.6%** | **18.1%** |

Therefore, even with the conservative assumptions made herein, the Plan Proponents project that holders of Allowed General Unsecured Claims will receive a higher recovery in Chapter 11 than in Chapter 7. The Plan Proponents believe that, in fact, there would be a more significant differential in recovery in a Chapter 7 scenario, to the detriment of holders of Allowed General Unsecured Claims, than that which is indicated herein.

Notes

1    See Attachment #1 for calculation.

2    See Attachment #2.

3    See Attachment #3

4    See Attachment #4

5    Pursuant to section 326(a) of the Bankruptcy Code.  See Attachment #5 for calculation.

6    Estimated fees and expenses through end of Chapter 7 case.  See Attachment #6 for calculation.

7    Estimated recovery after objection to disputed General Unsecured Claims.  The current range of Allowed General Unsecured Claims is $3,771,560 - $8,368,285.  Note, however, that the Plan Proponents believe that the amount of Allowed General Unsecured Claims will be higher in Chapter 7 than in Chapter 11 because it is unlikely that the Chapter 7 Trustee would be able to challenge Disputed Claims as effectively as would the Plan Proponents.

## ATTACHMENT #1

| | Chapter 7 | Chapter 11 |
|---|---|---|
| Cash as of most recent MOR | $1,181,018 | $1,181,018 |
| less: estimated accrued Chapter 11 Allowed Administrative Claims (2/28/2010) | | |
| less: accruing Professional Fees in Chapter 11 | (445,398) | (445,398) |
| less: ongoing operating expenses in Chapter 11 | 0 | (204,602) (1) |
| | | (143,500) |
| Total Cash | $735,620 | $387,518 |
| EMC settlement payment | 1,900,000 | 1,900,000 |
| | $2,635,620 | $2,287,518 |

(1)  The Plan Proponents project that, from March 1, 2010 through the Effective Date, the Debtor will pay in its Chapter 11 case $650,000 in Professional Fees, of which approximately $445,398 in Professional Fees had accrued as of February 28, 2010, and, hence, that the Debtor will pay, through the Effective Date, $204,602 in Professional Fees that will have accrued after February 28, 2010.  It should be noted, however, that only a portion of such Professional Fees, estimated to be only approximately $75,000, would be incurred in connection with Plan Confirmation Proceedings, and that the balance of such Professional Fees (approx. $129,602) would be incurred in connection with prosecuting Causes of Action and, accordingly, would be included in the calculation of Net Litigation Proceeds.

**ATTACHMENT #2**

The Plan Proponents project, conservatively, that $100,000 in Net Litigation Proceeds will be collected in Chapter 11. The Plan Proponents project that, in a Chapter 7 scenario, the Chapter 7 Trustee will not pursue such litigation, and, accordingly, that no Net Litigation Proceeds will be collected in a Chapter 7 scenario.

**ATTACHMENT #3**

Effectuating a Merger Transaction potentially could produce substantial value for holders of Allowed General Unsecured Claims. To be conservative, the Plan Proponents assume that no Merger Transaction will be effectuated in Chapter 11. There is no possibility, however, of effectuating any Merger Transaction in a Chapter 7 scenario.

**ATTACHMENT #4**

The Plan Proponents project that $75,000 in expenses will be incurred by the Plan Agent in connection with administering the Plan.

**ATTACHMENT #5**

Proceeds from Chapter 7 Liquidiation                    $2,635,620

Maximum amount for Trustee's Services

| | Amount | Percentage pursuant to 326(a) | Max amount payable to Trustee |
|---|---|---|---|
| | $5,000 | 25.00% | $1,250 |
| | $45,000 | 10.00% | $4,500 |
| | $950,000 | 5.00% | $47,500 |
| | $1,635,620 | 3.00% | $49,069 |
| TOTAL AMOUNT | $2,635,620 | | $102,319 |

**ATTACHMENT #6**

| | | |
|---|---|---|
| Chapter 7 counsel | | $200,000.00 |
| Accountants | | $40,000.00 |
| | Sub-Total | $240,000.00 |
| | | |
| Admin Costs | | |
| Bar Date | | $7,500.00 |
| Office closure / moving / storage | | $6,000.00 |
| Trustee's Staff | | $75,000.00 |
| Record storage and suppplies | | $9,000.00 |
| | Sub-Total | $90,000.00 |
| | | |
| | Total | $330,000.00 |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 660 Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as:  **DEBTOR'S AND COMMITTEE'S JOINT SECOND AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S AND COMMITTEE'S JOINT SECOND AMENDED CHAPTER 11 PLAN** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u> – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On March 25, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

II.  <u>SERVED BY U.S. MAIL OR OVERNIGHT MAIL</u>(indicate method for each person or entity served): On March ____, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

III.  <u>SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL</u> (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2010 I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 25, 2010 | Susan Connor | |
|---|---|---|
| Date | Type Name | Signature |

# NEF SERVICE LIST

- John O Campbell     ocampbell@houser-law.com
- Jeffrey D Cawdrey     jcawdrey@gordonrees.com, klasky@gordonrees.com
- Scott C Clarkson     sclarkson@lawcgm.com
- Robert L Eisenbach     reisenbach@cooley.com
- Christine M Fitzgerald     cfitzgerald@lawcgm.com
- Matthew A Gold     courts@argopartners.net
- Richard H Golubow     pj@winthropcouchot.com
- Brian T Harvey     bharvey@buchalter.com, IFS_filing@buchalter.com
- Lesley A Hawes     lhawes@mckennalong.com, pcoates@mckennalong.com
- Ivan L Kallick     ikallick@manatt.com, ihernandez@manatt.com
- Alexandra Kazhokin     akazhokin@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- Payam Khodadadi     pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Adam A Lewis     alewis@mofo.com
- Eve A Marsella     emarsella@lawcgm.com
- Elmer D Martin     elmermartin@msn.com
- Robert E Opera     pj@winthropcouchot.com, sconnor@winthropcouchot.com
- Eric S Pezold     epezold@swlaw.com, dwlewis@swlaw.com
- Michael B Reynolds     mreynolds@swlaw.com, kcollins@swlaw.com
- Mark A Shaiken     mshaiken@stinson.com
- Patricia B Tomasco     ptomasco@mailbmc.com
- United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov
- Michael A Wallin     mwallin@sheppardmullin.com
- Gilbert B Weisman     notices@becket-lee.com
- Sharon Z Weiss     sweiss@richardsonpatel.com, bkdeptnef@richardsonpatel.com
- David L Wilson     dlwilson@winston.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.3