Date, and the Plan Proponents' right to seek to modify the Plan are set forth in Article XIII of the Plan.

## IX.

## EFFECT OF CONFIRMATION OF THE PLAN

### A.    Discharge.

Confirmation of the Plan will have all of the effects provided by section 1141 of the Bankruptcy Code which are not inconsistent with the terms of the Plan.  Except as provided expressly to the contrary in the Plan or in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Distributions and rights that are provided in the Plan will be in complete satisfaction, settlement, release and discharge, effective as of the Effective Date, of all known or unknown Claims and Administrative Claims against, rights against, liabilities of, obligations of, and any Liens encumbering the Debtor's assets and properties, including but not limited to, Claims of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (1) a Proof of Claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (2) such Claim is allowed under section 502 of the Bankruptcy Code, or (3) the holder of such Claim accepted the Plan.  The Confirmation Order will constitute a determination of the discharge of all Claims and Administrative Claims against the Debtor, subject only to the occurrence of the Effective Date, to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Any obligations to Creditors and to Interest Holders imposed by the Plan will be compensable only from Distributions of Cash made from the Plan Fund and from any Distributions of Post-Effective Date Stock, and will not be obligations of the Reorganized Debtor, which will have no obligations or liabilities of any kind or character whatsoever, known or unknown, suspected or unsuspected, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, whether arising prior to, on or after the Petition Date, in contract or in tort, at law or in equity or under any other theory of law, to any Creditor, Interest Holder or to any other party-in-interest, except only (a) for Post-Effective Date Plan Expenses, and (b) that holders of Allowed General Unsecured Claims will have in accordance with the provisions of the Plan an equity security interest

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

in (but not any Claim or post-Effective Date claim of any nature whatsoever against) the

Reorganized Debtor in the event of any Distribution of Post-Effective Date Stock.

**B.    Injunction/Release.**

On the Effective Date, an injunction against Creditors' acts will be issued in accordance with the provisions of Section 11.2 of the Plan, and Claims will be forever waived and released in accordance with the provisions of Section 11.3 of the Plan.

**C.    Distribution of Property Free and Clear of Liens, Claims, and Interests.**

Except as otherwise provided in the Plan or in the Confirmation Order, all property distributed under the Plan will be distributed free and clear of all Liens and other Claims of Creditors and all Interests of Interest Holders.

**D.    Binding Effect of Plan.**

Upon the Effective Date, the provisions of the Plan will be binding upon the Debtor, the Reorganized Debtor, the Plan Agent and each Creditor and Interest Holder.

**X.**

**LIMITATION OF LIABILITY**

**A.    No Liability for Solicitation or Participation.**

As specified in section 1125(e) of the Bankruptcy Code, entities that solicit acceptances or rejections of the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, will not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

**B.    Good Faith.**

Confirmation of the Plan will constitute a finding that the Plan was proposed, and that acceptances of the Plan were solicited, in good faith and in compliance with applicable provisions of the Bankruptcy Code.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

C.    **Limitation of Liability Regarding Plan Confirmation**.

Effective as of the Effective Date, neither the Committee, the Post-Effective Date Committee, the Debtor, the Reorganized Debtor, the Plan Agent nor any of their respective Representatives will have or incur any liability to any Creditor or Interest Holder or to any other party-in-interest or entity for any act or omission in connection with or arising out of the negotiation, preparation and pursuit of confirmation of the Plan, the approval of the Disclosure Statement, the consummation of the Plan, the administration of the Plan, the Bankruptcy Case or the property to be distributed under the Plan or the making of Distributions under the Plan, to the fullest extent permitted by applicable statutory and case law, except only that the Plan Agent will be responsible for making the Distributions provided for by the Plan.

<div align="center">XI.</div>

<div align="center"><u>**CERTAIN RISK FACTORS TO BE CONSIDERED**</u></div>

Holders of Claims and Interests entitled to vote on the Plan should read and consider carefully the factors set forth below, as well as other information set forth in this Disclosure Statement and the documents delivered together herewith and/or incorporated by reference herein, prior to voting to accept or reject the Plan.

A.    **Risk that the Debtor Will Have Insufficient Cash for the Plan to Become Effective.**

The Plan cannot be confirmed by the Bankruptcy Court unless the Debtor has Cash sufficient by the Effective Date to pay or reserve for all Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims, unless Creditors holding such Claims agree to a deferred payment of their Claims.  The Plan Proponents believe that, at the time of the Confirmation Hearing, the Debtor will have Cash sufficient to satisfy or reserve for all such Claims.  For a further discussion of this issue, please refer to paragraph XII(F) hereof.

B.    **Risk Regarding the Distributions to Be Made to Creditors.**

While the Plan Proponents have endeavored to project pursuant to paragraph XII(F) of this Disclosure Statement what they believe are likely to be the Distributions to be made to Creditors,

there can be no certainty that those projections will be accurate and that Creditors will receive the Distributions projected in this Disclosure Statement. The projections contained in this Disclosure Statement will be affected by, among other things: (1) the amount of any recoveries that the Plan Agent generates from prosecuting Causes of Action; (2) the amount of any recoveries that the Plan Agent generates in connection with the liquidation of all other Assets; (3) the outcome of objections to Disputed Claims; and (4) the costs of administering the Plan.

**C. Bankruptcy Risks.**

Even if all Classes of Claims that are entitled to vote with respect to the Plan vote to accept the Plan, the Plan still might not be confirmed by the Bankruptcy Court. Class 6 under the Plan, the Class of Interest Holders, is deemed under the Plan not to have accepted the Plan and, therefore, the Plan Proponents will need to "cram down" on Class 6 pursuant to section 1129(b) of the Bankruptcy Code in order to obtain confirmation of the Plan. The cram down provisions of section 1129(b) of the Bankruptcy Code are fairly complex, and require, among other things, that the Plan and the Plan Proponents comply with the provisions of sections 1129(a)(1)-(7), and (9)-(16) of the Bankruptcy Code as applicable, and that the Plan not discriminate unfairly and be fair and equitable with respect to each Class of Claims or Interests that is impaired under and that has not accepted the Plan. While the Plan Proponents believe that the Plan satisfies all of the requirements for confirmation of a plan under section 1129(b), there is no assurance that the Bankruptcy Court will make such a determination.

## XII.

## CONFIRMATION OF THE PLAN

**A. Introduction.**

CREDITORS CONCERNED WITH CONFIRMATION OF THE PLAN OR THE PROVISIONS OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW WITH RESPECT TO CONFIRMING A PLAN IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting Creditors about basic confirmation issues which they may desire to consider. The Plan Proponents CANNOT and DO NOT represent

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1  that the discussion contained below is a complete summary of the law on this topic and are not

2  providing any legal opinions with respect thereto.

3      Many requirements must be met before a bankruptcy court can confirm a Chapter 11 plan.

4  Such requirements include that the plan must be accepted by at least one impaired class established

5  by the plan, must be feasible and that the distributions to non-accepting creditors in impaired classes

6  must be at least as much as such creditors would receive in a Chapter 7 liquidation.  These

7  requirements are not the only requirements for confirmation.

8      **B.**    <u>**Votes Necessary to Confirm the Plan.**</u>

9      A bankruptcy court cannot confirm a Chapter 11 plan unless (1) all impaired classes under

10  the Plan have voted to accept the plan, or (2) at least one impaired class has accepted the plan

11  without counting the votes of any insiders within that class and the plan is eligible to be confirmed

12  by "cramdown" on non-accepting classes pursuant to section 1129(b) of the Bankruptcy Code.

13      **C.**    <u>**Votes Necessary for a Class to Accept the Plan.**</u>

14      A class of claims is deemed to have accepted a Chapter 11 plan where more than one-half

15  (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims that actually vote, vote in

16  favor of the plan.

17      **D.**    <u>**Treatment of Non-Accepting Classes.**</u>

18      As noted above, even if there are impaired classes that do not accept a Chapter 11 plan, a

19  bankruptcy court may nonetheless confirm the plan if the non-accepting classes are treated in the

20  manner required by the Bankruptcy Code and there is at least one impaired class that accepts the

21  plan.  The process by which a plan can be confirmed and become binding on non-accepting classes

22  notwithstanding rejection by one or more classes is commonly referred to as "cramdown."  The

23  Bankruptcy Code allows a plan to be "crammed down" on non-accepting classes of claims or

24  interests if the Plan meets all of the requirements for confirmation, except the voting requirements of

25  section 1129(a)(8) of the Bankruptcy Code, and if the plan does not "discriminate unfairly" and is

26  "fair and equitable" with respect to each impaired class that has not voted to accept the plan, as

27  provided in section 1129(b) of the Bankruptcy Code and applicable case law.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#146613-v3-MTI-Joint3rdAmendDS5_20_10.DOC

1    In this case, the Plan Proponents will seek to have the Plan confirmed notwithstanding the

2    rejection of the Plan by any impaired Class of Creditors and the deemed rejection of the Plan by the

3    Class of Interests.  To obtain such confirmation, the Plan Proponents must demonstrate to the

4    Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with

5    respect to each such dissenting impaired Class.  A Chapter 11 plan does not discriminate unfairly if

6    the legal rights of a dissenting class are treated in a manner consistent with the treatment of other

7    classes whose legal rights are substantially similar to those of the dissenting class, and if no class

8    receives more than that to which it is entitled for its claims or interests.  The Plan Proponents believe

9    that the Plan satisfies this requirement.

10    The Bankruptcy Code establishes different "fair and equitable" tests for General Unsecured

11    Claims and Interests.

12    **1.    General Unsecured Claims.**

13    In order to meet the "fair and equitable" requirements of section 1129(b) related to

14    the treatment of the Class of General Unsecured Claims (Class 3), either (a) each Holder of a

15    General Unsecured Claim must receive or retain under the Plan property of a value, as of the

16    Effective Date, equal to the amount of its Allowed Claim, or (b) the holders of Claims and Interests

17    that are junior in priority to the General Unsecured Claims must not receive any property under the

18    Plan.

19    **2.    Interests.**

20    In order to meet the fair and equitable requirements of section 1129(b) relative to the

21    treatment of the Class of Interests (Class 6), either (a) each Interest Holder must receive or retain

22    under the Plan property of a value, as of the Effective Date, equal to the greatest of (i) the allowed

23    amount of any fixed liquidation preference to which such Interest Holder is entered, (ii) any

24    redemption price to which the Interest Holder is entitled; or (iii) the value of the Interests, or (b) the

25    holders of any Interests that are junior to the dissenting Class of Interests will not receive or retain

26    any property under the Plan.

27

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1   THE PLAN PROPONENTS BELIEVE THAT THE PLAN MAY BE CONFIRMED

2   ON A NONCONSENSUAL (CRAMDOWN) BASIS PROVIDED THAT AT LEAST ONE

3   IMPAIRED CLASS OF CLAIMS VOTES TO ACCEPT THE PLAN. ACCORDINGLY, THE

4   PLAN PROPONENTS INTEND TO ATTEMPT TO DEMONSTRATE AT THE

5   CONFIRMATION HEARING THAT THE PLAN SATISFIES THE REQUIREMENTS OF

6   SECTION 1129(b) OF THE BANKRUPTCY CODE AS TO ANY NON-ACCEPTING CLASS.

7       **E.**   **Request for Confirmation Despite Non-Acceptance by Impaired Class(es).**

8       The Plan Proponents will ask the Bankruptcy Court to confirm the Plan by cramdown on the

9   Class 6 Interest Holders and on any impaired Class if such Class does not vote to accept the Plan.  In

10   this regard, it is important to note that the Plan Proponents have established under the Plan a Class of

11   Allowed Secured Claims (Class 1) and a Class of Allowed Subordinated Claims (Class 5) which

12   may not exist in the Case.  The Plan Proponents have done so in an abundance of caution.  The Plan

13   Proponents will seek confirmation of the Plan notwithstanding (as is expected) a failure by such

14   Class to cast any affirmative vote with respect to the Plan.

15       **F.**   **Feasibility of the Plan.**

16          **1.**   **Feasibility Analysis.**

17       Section 1129(a)(11) of the Bankruptcy Code requires that, for the Plan to be

18   confirmed, the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by

19   the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation

20   or further reorganization is proposed in the Plan.

21       The Plan contemplates that all Assets of the Debtor ultimately will be liquidated,

22   sold, transferred, abandoned, or otherwise disposed of by the Plan Agent, and that all Plan Fund

23   Proceeds will be distributed to Creditors and, if and to the extent there is sufficient value, to Interest

24   Holders pursuant to the terms of the Plan.  Such provisions of the Plan contemplate, then, an orderly

25   liquidation of the Debtor's Assets and a distribution of the value realized therefrom to Creditors.

26       The Plan also provides for a potential reorganization of the Debtor by means of a

27   Merger Transaction.  Pursuant to the Plan, the Plan Agent is authorized to investigate the viability of

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

-90-

1   a Merger Transaction, and, if appropriate, to pursue a Merger Transaction for the benefit of Class 3

2   Creditors. The Reorganized Debtor may enter into a Merger Transaction, subject to the approval of

3   the Bankruptcy Court, in accordance with the provisions of the Plan.

4         The Plan Proponents have prepared an analysis, set forth hereinbelow, of the

5   feasibility of the Plan in order to demonstrate that the Plan satisfies the feasibility requirements of

6   section 1129(a)(11) of the Bankruptcy Code ("Feasibility Analysis"). The Feasibility Analysis sets

7   forth, among other things, the Plan Proponents' estimate of the resources available to fund the

8   Distributions required by the Plan.

9         THE FEASIBILITY ANALYSIS REPRESENTS A PREDICTION OF FUTURE

10   EVENTS BASED UPON CERTAIN ASSUMPTIONS MADE BY THE PLAN PROPONENTS, AS

11   SET FORTH HEREINBELOW. WHILE THE PLAN PROPONENTS ARE CONFIDENT THAT

12   IT WILL BE FEASIBLE TO MAKE THE DISTRIBUTIONS TO CREDITORS PROVIDED BY

13   THE PLAN, THERE IS NO ABSOLUTE GUARANTY OR OTHER ASSURANCE THAT THE

14   FEASIBILITY ANALYSIS WILL PROVE TO BE ACCURATE. BY REASON OF THE

15   UNCERTAINTIES INHERENT IN THE PREDICTION OF FUTURE EVENTS, THE

16   FINANCIAL RESULTS MAY WELL BE DIFFERENT FROM THOSE PREDICTED, AND

17   SUCH A DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF

18   CREDITORS.

19         Significant assumptions underlying the Feasibility Analysis include the following:[12]

20

21

22

23   _____

24   [12] The Plan Proponents prepared the Feasibility Analysis, and made the assumptions underlying the Feasibility Analysis, in or about March 2010. Certain of the assumptions underlying the Feasibility Analysis, such as the projected Confirmation Date and the projected Effective Date, have proven to be inaccurate. Also, there is no certainty that other assumptions, such as the amount of Cash that the Debtor will be able to accumulate from operations as of the Effective Date and the amount of Administrative Claims that will be asserted against the Debtor as of the Effective Date, as predictions of future events, will prove to be accurate and the actual financial results may be different from the projected financial results. Nevertheless, based upon the Plan Proponents' further review, the Plan Proponents continue to believe that the projected recovery by holders of Allowed General Unsecured Claims, contained in the Feasibility Analysis, is a materially accurate projection of the estimated recovery by holders of Allowed General Unsecured Claims.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#146613-v3-MTI-Joint3rdAmendDS5_20_10.DOC

a.      **Effective Date of the Plan.**

For the purpose of the Feasibility Analysis, the Plan Proponents estimate that the Confirmation Date will occur in or about June 2010 and that the Effective Date will occur in or about July 2010.  Payments to Creditors, then, will commence to be funded in or about July 2010.

b.      **Debtor's Cash Resources as of the Effective Date.**

The Plan Proponents project that the Debtor will have, on the Effective Date, the following Cash resources available to it to fund the Distributions required to be paid on or about the Effective Date:

(i)      Accumulated Cash from Operations ($387,517).

As of February 28, 2010, the Debtor had approximately $1,181,017 in Cash.  The Plan Proponents project that, from March 1, 2010 through the Effective Date, the Debtor will pay approximately $143,500 in operating expenses and approximately $650,000 in fees and expenses of Professionals.  The Plan Proponents project, therefore, that, after the Debtor pays its accruing operating expenses and the accruing fees and expenses of Professionals, as of the Effective Date, the Debtor will have approximately $387,517 in Cash (i.e., exclusive of the EMC Settlement Payment or recoveries from other Causes of Action).

(ii)     EMC Settlement Payment ($1,900,000).

Pursuant to the EMC Settlement Agreement, EMC will pay to the Debtor $1,900,000 Cash.  For the purpose of the Feasibility Analysis, the Plan Proponents assume that the EMC settlement Payment will be approved by the Bankruptcy Court.  The EMC Settlement Payment should be received by the Debtor prior to the Confirmation Hearing.

The Plan Proponents project, therefore, that the Debtor should have, on or about the Effective Date, about $2,287,517 to fund Distributions which must be made on or about the Effective Date.

MTI Disclosure Statement v1.4
MAINDOCS-#146613-v3-MTI-Joint3rdAmendDS5_20_10.DOC

1

#### c.    Allowed Secured Claims ($0).

2          The Plan Proponents' projection of the Allowed Secured Claims derives from

3    the Debtor's financial books and records and from a review of the Proof of Claim filed in the case.[13]

4

#### d.    Administrative Claims ($175,000).

5          The Plan Proponents' projection of the Administrative Claims which will

6    have to be paid on or about the Effective Date derives, in large part, from information provided to

7    the Debtor by the Professionals employed in the Debtor's Case.  In accordance with monthly

8    payment procedures approved by the Bankruptcy Court, the Debtor has paid, and intends to continue

9    to pay, on a monthly basis through the Confirmation Date, the fees of Professionals employed in the

10   Bankruptcy Case.  The Plan Proponents estimate that unpaid fees of Professionals will be

11   approximately $175,000 as of the Effective Date.[14]  The projection of Administrative Claims of

12   Professionals employed in the Case is only an estimate, and is not to be construed as any agreement

13   by the Plan Proponents as to the amount or reasonableness of such fees.  The actual fees of the

14   Professionals which may be allowed by the Bankruptcy Court and which will have to be paid on or

15   soon after the Effective Date may be higher or lower than the amount estimated by the Plan

16   Proponents.[15]

17

#### e.    United States Trustee Fees ($6,500).

18          The Plan Proponents project that the Debtor will have to pay, on or about the

19   Effective Date, approximately $6,500 in United States Trustee Fees.  This projection is based upon

20
---
21   [13] Dell has asserted a Secured Claim in the amount of $33,810. The Plan Proponents believe that such Secured Claim
     has no merit, and, for the purpose of the Feasibility Analysis, assume that such Secured Claim will be disallowed by the
22   Bankruptcy Court.
     [14] This projection assumes that, from March 1, 2010 through the Effective Date, pursuant to the monthly payment
23   procedures approved by the Bankruptcy Court, the Debtor will pay approximately $650,000 in Administrative Claims of
     Professionals.
     [15] This projection assumes that there will be no material Administrative Claims that will need to be paid on or about the
24   Effective Date, other than the unpaid Administrative Claims of Professionals. In this regard, it should be noted that Dell
     has asserted an Administrative Claim in the amount of approximately $90,510. The Plan Proponents, dispute such
25   Administrative Claim and believe that it is of no merit and will be disallowed by the Bankruptcy Court. For the purpose
     of the Feasibility Analysis, the Plan Proponents, assume that Dell's Administrative Claim will be disallowed in full.
26   Moreover, EMC has asserted an Administrative Claim in an amount of approximately $578,649.  Pursuant to the EMC
     Settlement Agreement, EMC has agreed to waive and release such Administrative Claim. The Plan Proponents assume,
27   for the purpose of the Feasibility Analysis, that the EMC Settlement Agreement will be approved by the Bankruptcy
     Court and, accordingly, that such Administrative Claim will be disallowed.
28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1  the Debtor's estimate of the disbursements that it will make through the Effective Date and is

2  believed to be accurate.

3                    **f.      Cure Claims ($0).**

4                    The Plan Proponents project that the Debtor will owe no amount of Cure

5  Claims.  Such projection derives from the Plan Proponents' analysis of the Debtor's contracts and

6  unexpired leases and their present determination that the Debtor will not assume any executory

7  contract or unexpired lease under the Plan.

8                    **g.      Allowed Priority Non-Tax Claims ($453,585).**

9                    The Plan Proponents' projection of the amount of the Priority Non-Tax

10 Claims derives from the Debtor's accounting of the obligations owed to its employees by virtue of

11 vacation time, sick leave time and personal time and is believed to be accurate.[16]

12                   **h.      Allowed Priority Tax Claims ($163,729).[17]**

13                   The Plan Proponents' projection of the amount of Priority Tax Claims

14 derives from the Debtor's financial books and records and the Plan Proponents' review of Proofs of

15 Claims filed by Creditors asserting Priority Tax Claims.[18]

16                   **i.      Allowed General Unsecured Claims.**

17                   The Debtor has filed numerous objections to Disputed Claims, and in so

18 doing, has obtained from the Bankruptcy Court orders disallowing numerous Disputed Claims.

19 Based upon the Debtor's efforts in reducing the amount of Disputed Claims, and the Plan

20 Proponents' analysis of the General Unsecured Claims asserted in the Case, the Plan Proponents

21 believe preliminarily that there may be approximately $3,771,560 in undisputed, liquidated and non-

22

23

24 [16] Approximately $110,597 in disputed Priority Non-Tax Claims have been asserted against the Debtor.  The Plan
   Proponents believe that such Priority Non-Tax Claims have no merit, and assume, for the purpose of the Feasibility
25 Analysis, that such Claims will be disallowed.
   [17] The Plan Proponents now estimate that the Debtor will owe approximately $515,851.07 in Allowed Priority Non-Tax
26 Claims.  See Exhibit "D" hereto.
   [18] Approximately $300,000 in disputed Priority Tax Claims have been asserted against the Debtor.  The Plan Proponents
27 believe that such Priority Tax Claims have no merit, and, for the purpose of the Feasibility Analysis, assume that such
   Priority Tax Claims will be disallowed by the Bankruptcy Court.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#146613-v3-MTI-Joint3rdAmendDS5_20_10.DOC

1   contingent General Unsecured Claims, and, hence, that these Claims may be allowed in the Case.  A

2   list of such Claims is attached as **Exhibit "B"** hereto.[19]

3         In addition, approximately $9,472,198 in disputed General Unsecured Claims

4   have been asserted against the Debtor.  Substantial disputed General Unsecured Claims include the

5   following:

|                          | **Creditor**              | **Claim**           |
| --- | --- | --- |
| (i)    | Pencom Systems, Inc.      | $179,354[20]        |
| (ii)   | Wade Saadi                | $403,120[21]        |
| (iii)  | Edgar Saadi               | 403,120[22]         |
| (iv)   | Edward Ateyeh             | $1,043,486[23]      |
| (v)    | Mr. Raimondi              | $410,950[24]        |
| (vi)   | EMC                       | $4,464,523[25]      |
| (vii)  | Keith Clark               | $410,950[26]        |
| (viii) | William Kerley            | $435,880[27]        |

13        For the purpose of the Feasibility Analysis only, the Plan Proponents will

14  assume that General Unsecured Claims will be allowed in a range between approximately

15  $3,771,560 and $8,368,285.[28]  The Plan Proponents believe, however, that the amount of General

16  Unsecured Claims ultimately allowed by the Bankruptcy Court will be closer to the $3,771,560

17  figure.

18

19  [19] **Exhibit "B"** is provided for informational purposes only.  Nothing contained herein will impair or affect in any
    manner any right that the Plan Proponents may have, and the Plan Proponents reserve the right, to object to the
20  allowance of any of the General Unsecured Claims listed on **Exhibit "B."**
    [20] Subject of pending litigation and potential disallowance pursuant to such litigation.
21  [21] Subject of pending litigation and potential disallowance pursuant to such litigation.
    [22] Subject of pending litigation and potential disallowance pursuant to such litigation.
22  [23] Subject of pending litigation and potential disallowance pursuant to such litigation.
    [24] The Committee and Mr. Raimondi have reached an agreement, subject to the approval of the Bankruptcy Court,
23  resolving Mr. Raimondi's General Unsecured Claim, pursuant to which Mr. Raimondi will waive and release such
    Claim.  The Plan Proponents believe that such settlement will be approved by the Bankruptcy Court, and, therefore, that
24  Mr. Raimondi will have no Allowed General Unsecured Claim in the Case.
    [25] Pursuant to the EMC Settlement Agreement, EMC has agreed to waive and release its General Unsecured Claim.
25  [26] Subject of review and possible objection and potential disallowance pursuant to such an objection.
    [27] Subject of pending litigation and potential disallowance pursuant to such litigation.
26  [28] Assuming that the Bankruptcy Court approves the EMC Settlement Agreement and the Committee's proposed
    settlement with Mr. Raimondi, an aggregate amount of approximately $4,875,473 in disputed General Unsecured Claims
27  will be disallowed, and, hence, the total estimated amount of $13,243,758 in General Unsecured Claims will be reduced
    to $8,368,285.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

### j.    **Causes of Action.**

The Debtor believes that it has collected virtually all of its collectable receivables, and has liquidated virtually all of its tangible assets, and, accordingly, that the only remaining material Assets are the Causes of Action.[29]  In light of the EMC Settlement Agreement, the remaining material Causes of Action now known to the Plan Proponents are as follows:  the Pencom Action; the FusionStorm Action; and preference actions being pursued by the Committee.

For the purpose of the Feasibility Analysis only, the Plan Proponents project that, from the prosecution of the Causes of Action, approximately $100,000 in net proceeds (i.e., gross recoveries from litigation, less attorneys' fees and other litigation costs associated with prosecuting the Causes of Action) ("Net Litigation Proceeds") will be recovered to fund the Plan Fund.[30]  The Plan Proponents believe that this is a conservative projection, and that, by prosecuting the Causes of Action (including the Pencom Action and the FusionStorm Action), there is a potential of recovering substantially greater value for the benefit of Class 3 Creditors.

### k.    **Expenses of Administering the Plan.**

Apart from effectuating any Merger Transaction, the Reorganized Debtor will have no operations, and, hence, no material operating expenses.  The Plan Agent will incur, however, costs with respect to administering the Plan, and the accruing United States Trustee Fees.  The Plan Proponents estimate that, during the first year after the Effective Date, such expenses will be in the amount of approximately $75,000.[31]

While the Plan Proponents recognize that these projections are subject to a variety of unpredictable outside forces and circumstances which could affect adversely such projections, the

---

[29] The Plan Agent will pursue a potential Merger Transaction for the benefit of the Class 3 Creditors.  Such a transaction could produce substantial value for the benefit of Class 3 Creditors.  However, since the viability of a Merger Transaction is uncertain, to be conservative, the Plan Proponents have attributed pursuant to the Feasibility Analysis no value to such a transaction.

[30] For the purpose of the Feasibility Analysis only, the Plan Proponents project, conservatively, gross recoveries from litigation in an amount of approximately $200,000 and attorneys' fees and other litigation costs associated with prosecuting the Causes of Action in an amount of approximately $100,000.

[31] Litigation fees and costs that will be incurred by the Plan Agent are included in the projection of Net Litigation Proceeds set forth in paragraph XII(F)(1)(j) hereinabove.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

Plan Proponents believe that the Feasibility Analysis has been prepared with sufficient care to allow them to endorse it.

## 2.    Funding of Distributions Required by the Plan.

The Feasibility Analysis indicates that the Debtor will have Cash sufficient to pay the expenses which will be incurred in connection with the administration of the Plan and to make all Distributions required to be made pursuant to the Plan.

### a.    Distributions Payable on or Soon After the Effective Date.

Given the nature of the Plan, the primary issue relative to the feasibility of the Plan is whether the Debtor will have Cash sufficient to fund the Distributions that are required to be made on or soon after the Effective Date of the Plan.  On or about the Effective Date, the Debtor must pay all of the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, United States Trustee Fees, and any Cure Claims.  The Plan Proponents estimate that, on or about the Effective Date, the Debtor will have Cash sufficient to pay such Claims.

The Plan Proponents project that the Debtor will have the following Cash available to it to pay Allowed Claims on or soon after the Effective Date:

| | |
|---|---|
| (i)  Accumulated Cash: | $387,517 |
| (ii)  EMC Settlement Payment | $1,900,000 |
| **TOTAL:** | **$2,287,517** |

The Plan Proponents project that the Debtor will have to pay, on or about the Effective Date, the following obligations:

| | |
|---|---|
| (i)  Allowed Administrative Claims | $175,000 |
| (ii)  United States Trustee Fees | $6,500 |
| (iii)  Cure Claims | $   0 |
| (iv)  Allowed Priority Tax Claims | $163,729 |
| (v)  Allowed Priority Non-Tax Claims | $453,585 |
| **TOTAL:** | **$798,814** |

The Feasibility Analysis indicates, therefore, that, by virtue of the EMC Settlement Payment, the Debtor will have Cash sufficient to fund the Distributions required to be paid to Creditors on or about the Effective Date.

CLARKSON, GORE & MARSILLA, APLC
ATTORNEYS AT LAW
TORRANCE CALIFORNIA

**b.    Ongoing Distributions Under the Plan.**

After payment of Allowed Administrative Claims, any Cure Claims, United States Trustee Fees, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, the only remaining material Claims to be paid pursuant to the Plan are Allowed General Unsecured Claims (Class 3).[32]

Recovery by Class 3 Creditors will depend, in part, on the following:

(i)    The Amount of Allowed Administrative Claims, Cure Claims, United States Trustee Fees, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims.

The Plan Proponents project that the amount of such Claims will be approximately $798,814 and that, after paying such Claims, there will be approximately $1,488,703 Cash remaining available to fund the Plan Fund for the benefit of Class 3 Creditors. If the amount of such Claims is higher than projected, recoveries by the Class 3 Creditors may be reduced.

(ii)    Recoveries from Causes of Action.

For the purpose of the Feasibility Analysis only, the Plan Proponents project that there will be approximately $100,000 in Net Litigation Proceeds recovered from the prosecution of Causes of Action. If the amount of Net Litigation Proceeds is less than projected, the recoveries by Class 3 Creditors may be adversely affected. On the other hand, if the amount of Net Litigation Proceeds is higher than projected, recoveries by Class 3 Creditors may be favorably affected.

---

[32] At present, no order has been entered subordinating any Claims, and, accordingly, for the purpose of the Feasibility Analysis only, the Plan Proponents project that there will be no Allowed Subordinated Claims in the Case.

CLARKSON, GORE & MASSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#146613-v3-MTI-Joint3rdAmendDS5_20_10.DOC

(iii)   Merger Transaction.

For the purpose of the Feasibility Analysis only, the Plan Proponents project that no Merger Transaction will be effectuated.  If a Merger Transaction is effectuated, recoveries by Class 3 Creditors may be favorably affected.

(iv)   Amount of Allowed General Unsecured Claims.

As stated hereinabove, there remains in the Case a substantial amount of disputed General Unsecured Claims to which objections are being and will be prosecuted. The Plan Proponents assume that a range between approximately $3,771,560 and $8,368,285 in General Unsecured Claims will be allowed by the Bankruptcy Court.  However, the Plan Proponents believe that, if their filed and likely to be filed objections to disputed General Unsecured Claims are sustained by the Bankruptcy Court, General Unsecured Claims closer to the $3,771,560 figure will be allowed by the Bankruptcy Court.

Based upon such assumptions, the Plan Proponents project the following potential recoveries by Class 3 Creditors:

| | | |
|---|---|---|
| Cash Remaining After Payment of Effective Date Obligations | $1,488,703 | |
| Net Litigation Proceeds | $100,000 | |
| Total Cash: | | $1,588,703 |
| Less Costs of Administering Plan | | ($75,000) |
| Net Amount Available for Distribution to Class 3 Creditors | | $1,513,703 |
| Est. Amount of Allowed General Unsecured Claims | $3,771,560-$8,368,285 | |
| Est. Percentage Recovery by holders of Allowed General Unsecured Claims | | **18%-40%** |

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1    By the Feasibility Analysis, therefore, the Plan Proponents project that the

2  holders of Allowed General Unsecured Claims will recover approximately 18%-40% on account of

3  their Allowed General Unsecured Claims.  The Plan Proponents caution, however, that, if any of the

4  assumptions underlying the Feasibility Analysis proves to be materially inaccurate, recoveries by

5  holders of Allowed General Unsecured Claims may prove to be more favorable or less favorable

6  than those projected.

7    **G.    Liquidation Analysis.**

8    Pursuant to section 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless

9  the bankruptcy court determines that distributions under the plan to all holders of claims who have

10  not accepted the plan, and whose claims are classified in classes that are impaired under the plan, are

11  not less than those which they would receive in a liquidation case under Chapter 7. This test must be

12  satisfied even if a plan is accepted by each impaired class of claims.   This test, which is often

13  referred to as the "best interests of creditors" test, requires the bankruptcy court to find either that (1)

14  all holders of claims in an impaired class of claims have accepted the plan, or (2) the plan will

15  provide to each holder of a claim in an impaired class who has not accepted the plan a recovery of

16  property of a value, as of the effective date of the plan, that is not less than the amount that such

17  holder would receive if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

18    To satisfy the "best interests of creditors" test, the bankruptcy court must reach a conclusion

19  regarding the probable distribution to the holders in each impaired class of claims if the debtor were

20  liquidated in a Chapter 7 case.  The first step in this process is to determine the "liquidation value"

21  that would be generated from a forced sale of the debtor's assets by a Chapter 7 trustee. The second

22  step requires the application of the projected liquidation proceeds in accordance with the various

23  rights of any creditors holding liens on the property.  If such proceeds are sufficient to retire any

24  such liens, then the excess would be made available to satisfy the claims of unsecured creditors.

25    Once all of the claims secured by liens on assets of a debtor's estate are deducted from the

26  projected liquidation proceeds of the sale of the creditor's collateral, then the costs and expenses

27  associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid.  These

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

1  costs would include the compensation of the trustee, as well as compensation of counsel and other

2  professionals retained by the trustee, and asset disposition expenses.

3      After payment of the costs and expenses associated with the Chapter 7 liquidation are paid,

4  all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as

5  compensation of attorneys, financial advisors, and accountants) and all unpaid claims arising from

6  the operations of the debtor during the pendency of the Chapter 11 case must be paid.

7      After the payment of Chapter 11 administrative expenses, the remaining liquidation proceeds

8  would be used to pay priority unsecured claims, such as tax and wage claims that are entitled to

9  priority under the Bankruptcy Code. Thereafter, the remaining liquidation proceeds would be made

10  available to pay general unsecured claims. Finally, to the extent that any proceeds remain after

11  paying all allowed claims, such proceeds would be distributed to interest holders.

12      Attached hereto as **Exhibit "C"** is a liquidation analysis prepared by the Plan Proponents that

13  estimates the probable liquidation value of the Debtor, and applies the foregoing liquidation

14  methodology to the estimated Claims against the Estate in a Chapter 7 liquidation in an effort to

15  quantify what each Class of Creditors would receive in a Chapter 7 liquidation ("Liquidation

16  Analysis"). Any Liquidation Analysis of this nature entails a significant degree of estimation and

17  projection regarding both probable asset value and probable Allowed Claim totals. For example, in

18  preparing the Liquidation Analysis, the Plan Proponents have been required to evaluate the very

19  substantial amount of Disputed Claims in the Case, and have necessarily quantified what they

20  believe will be the Allowed Claims within each Class. Although this quantification was based upon

21  a thorough assessment of the information contained in the Debtor's books and records and the Plan

22  Proponents' review of the Disputed Claims asserted against the Debtor, as of the date of the

23  preparation of the Liquidation Analysis, it was not possible to quantify exactly the amount of

24  Allowed Claims given the substantial amount of Disputed Claims and the fact that no judicial

25  determinations had been made regarding the merits of the Disputed Claims. These and other factors

26  may significantly increase or reduce the total amount of Allowed Claims within each Class.

27

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

On the valuation side of the Liquidation Analysis, the Plan Proponents have estimated the liquidation value of the Debtor's Assets utilizing their best estimate of the value of the Debtor's Assets in a Chapter 7 liquidation.

Material assumptions underlying the Liquidation Analysis include the following:

**1.      Potentially Reduced Value of Assets in Liquidation.**

Liquidation values for many types of assets are typically substantially lower than going concern values for such assets.  In this case, the Debtor's primary Assets are the following: (i) Cash; (ii) Causes of Action; and (iii) a potential Merger Transaction.

**a.      Cash.**

Cash is fully recoverable either in a going concern scenario or in a liquidation scenario.

**b.      Causes of Action.**

The Plan Proponents believe that there would be a significant difference in the value of the Causes of Action if the Case were converted to a Chapter 7 liquidation.  If the Debtor remains in Chapter 11, the Plan Agent will prosecute the Causes of Action for the benefit of Class 3 Creditors.  As stated hereinabove, the Plan Proponents project, conservatively, that approximately $100,000 in Net Litigation Proceeds will be obtained from the prosecution of Causes of Action.  On the other hand, the Plan Proponents believe that, in a Chapter 7 liquidation, a trustee may not be inclined to prosecute aggressively the Causes of Action and even may abandon the Causes of Action.  The Plan Proponents believe that, as a result thereof, the value of the Causes of Action in a liquidation would be less than the value thereof in a Chapter 11 case.

**c.      Merger Transaction.**

As stated hereinabove, a Merger Transaction potentially may have substantial value for Class 3 Creditors.  While it is uncertain whether a Merger Transaction will be viable, it is certain that, if the Debtor's Case were converted to a Chapter 7 liquidation, no Merger Transaction would be possible.  Therefore, in any liquidation scenario, any potential value that may be obtained in a Merger Transaction would be lost.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

## 2. Increased Amount of Claims in Liquidation.

As set forth hereinabove, a liquidation of the Debtor's Assets may result in a significant reduction of the value of the Debtor's Assets. In a Chapter 7 liquidation, Creditors' interests also would be impaired by the creation of a substantial amount of Claims, including substantial Administrative Claims, that otherwise would not be asserted against the Debtor.

In a Chapter 7 liquidation, holders of Allowed Claims would receive Distributions based on the liquidation of the Debtor's Assets. Such Assets are the same Assets being liquidated under the Plan. However, the proceeds from the liquidation of the Assets available for funding Distributions to Creditors would be reduced by the commission payable to the Chapter 7 trustee and by the fees and expenses of the Professionals who would be retained by the trustee and who would be required to "get up to speed" in the Case, and, hence, likely to incur fees in excess of the accruing fees of the Professionals now employed in the Case.

The Debtor has few remaining Assets to reduce to Cash, primarily Causes of Action to be prosecuted. Therefore, except for the expense attributable to the fees and costs of prosecuting Causes of Action, the Debtor already has absorbed a substantial amount of the expense of liquidating the Debtor's Assets. In a Chapter 7 case, the trustee would be entitled to seek a sliding scale commission based upon the Cash that would be distributed by such trustee to Creditors, even though the Debtor already has accumulated or soon obtain (e.g., by means of the EMC Settlement Agreement) a very substantial amount of such Cash, and the Debtor already has incurred the expense associated with generating such Cash. Accordingly, there is a likelihood that Creditors would "pay again" for the Cash accumulated by the Debtor in the Case because the Chapter 7 trustee would be entitled to receive a commission for distributing the Cash "handed over" to the trustee by the Debtor.

In addition, a Chapter 7 trustee would employ Professionals and assistants that would add additional administrative expense that would be paid prior to payment of Allowed General Unsecured Claims. The Plan Proponents already have legal counsel who are knowledgeable about the Case and the legal issues concerning the disposition of the Assets and the resolution of Claims asserted against the Estate; by reason of the knowledge of the Professionals already employed in the

1  Case, they likely can complete the legal work necessary to resolve the Case much more efficiently

2  and economically than a new set of Professionals who would be employed by a trustee.  The Debtor

3  already has its own accounting and administrative personnel who are better qualified to resolve

4  Disputed Claims and issues related to the prosecution of Causes of Action than would a Chapter 7

5  trustee who would have no knowledge or familiarity of such matters.  Moreover, the advice of the

6  Committee, which will be reconstituted under the Plan as the Post-Effective Date Committee to

7  supervise the Plan Agent, would be lost in a Chapter 7.  The costs of familiarizing the trustee, the

8  trustee's new Professionals, and the trustee's new staff with issues relating to the Case undoubtedly

9  will increase the Administrative Claims that must be paid before payment of Allowed General

10  Unsecured Claims.

11         It also must be noted that the issues related to the Debtor's Assets and the Claims

12  adjudication process in the Case are fairly complex.  The Plan Proponents believe that the process of

13  disposing of the Assets (primarily Causes of Action) and the process of adjudicating Claims in the

14  Case are best handled by the Debtor's experienced and knowledgeable staff that will assist the Plan

15  Agent.  The Debtor's staff has knowledge of the Debtor's business and financial affairs that will be

16  invaluable in the Claims adjudication process and in the Plan Agent's efforts to prosecute Causes of

17  Action.  There is no assurance that the Debtor's staff would remain available in a Chapter 7

18  liquidation; several critical employees remain (or make themselves available on an hourly basis)

19  solely out of loyalty to the Debtor.  The Plan Proponents believe that there is a significant risk that,

20  in a Chapter 7 liquidation, with a loss of the "institutional knowledge" of the Debtor's financial

21  affairs possessed by the Debtor's staff, the resolution of Disputed Claims and the disposition of the

22  Debtor's Assets will be affected adversely to the interests of Creditors.

23         In addition to a potentially significant increase in Administrative Claims in the Case

24  associated with the fees and expenses of the Chapter 7 trustee and the Professionals and assistants

25  who would be employed by the Chapter 7 trustee, the amount of Claims allowed in the Case may

26  increase in a Chapter 7.  As set forth hereinabove, in any Chapter 7 liquidation, the trustee may not

27  be inclined to prosecute aggressively Causes of Action.  As a result, not only could there be a

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1  potential loss in value of Causes of Action, but there could be an increase in Allowed Claims

2  because, by not pursuing aggressively Causes of Action against the holders of Disputed Claims (e.g.,

3  the Pencom Defendants), Disputed Claims could be allowed in a Chapter 7 that otherwise would not

4  be allowed in the Case.

5           Although there are difficulties inherent in quantifying, with any exactitude, the

6  potential recoveries that Creditors would receive in a Chapter 7 liquidation scenario, the Plan

7  Proponents believe that the Liquidation Analysis provides a fair estimate of the results that would

8  occur in a Chapter 7 liquidation.  The Liquidation Analysis indicates that, in a Chapter 7 liquidation

9  scenario, a significantly smaller Distribution would be paid on account of Allowed General

10 Unsecured Claims compared with the Distributions pursuant to the Plan.  Moreover, the Plan

11 Proponents believe that the Distributions to Creditors pursuant to the Plan will be paid much more

12 expeditiously than in a Chapter 7 liquidation scenario.  Pursuant to the Plan, Distributions to satisfy

13 Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax

14 Claims will be paid on or about the Effective Date (projected to occur in or about July 2010) and

15 Distributions to holders of Allowed General Unsecured Claims will commence to be paid on or

16 about 180 days after the Effective Date of the Plan.  In contrast, a Chapter 7 trustee would have no

17 familiarity with the Debtor, the Debtor's Assets, the Claims and the Debtor's Case, and likely would

18 seek to retain Professionals that are similarly unfamiliar with these matters.  The Plan Proponents

19 believe that it is likely that there would be no Distributions to Creditors in a Chapter 7 liquidation for

20 a period of many months, if not years.

21           Based on the foregoing, the Plan Proponents believe that the Plan Agent, under the

22 supervision of the Post-Effective Date Committee, is in the best position to produce the highest

23 return to Creditors, and that it will be advantageous to Creditors to finish the liquidation of the

24 Debtor's Assets and the resolution of the Case in Chapter 11, rather than in Chapter 7.

25           While the Plan Proponents' conclusions regarding the results of a liquidation

26 scenario are unavoidably speculative and depend upon a number of variables, the Plan Proponents

27 believe that there is a good basis for them to believe that, pursuant to the Plan, Creditors will be able

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#146613-v3-MTI-Joint3rdAmendDS5_20_10.DOC

1   to recover significantly more on account of their Claims, on a much more expeditious basis, than

2   they would in a Chapter 7 liquidation proceeding.  Accordingly, the Plan Proponents have concluded

3   that the Plan is the best alternative for Creditors, and will maximize recoveries by Creditors.[33]

4                                         **XIII.**

5            **CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES OF THE PLAN**

6            **A.    Introduction.**

7            **CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN**

8   **MAY AFFECT THEIR TAX LIABILITIES SHOULD CONSULT WITH THEIR OWN**

9   **ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX ADVISORS.** The following

10  disclosure of possible tax consequences of the Plan is intended solely for the purpose of alerting

11  Creditors to possible tax issues that the Plan may present to the Debtor.  The Plan Proponents

12  CANNOT and DO NOT represent that the tax consequences contained below are the only tax

13

14  [33] In the Plan Proponents' view, generally, liquidation of a debtor's assets under Chapter 7 is not faster or less expensive than liquidation under Chapter 11.  To the contrary, it has been concluded that "Chapter 7 liquidations appear to be no faster or cheaper ... than Chapter 11 reorganizations.  However, Chapter 11 seems to preserve assets better, thereby allowing creditors to recover relatively more." Arturo Bris, Ivo Welch, and Ning Zhu, *The Costs of Bankruptcy: Chapter 7 Liquidation versus Chapter 11 Reorganization*, The Journal of Finance, Vol. LXI, No. 3, pp. 1253-1303 (June 2006).[33]  This study concludes that the typical Chapter 7 case has a more detrimental impact on the value of a debtor's assets than the typical Chapter 11 case -- effectively that the value of a debtor's assets declines more in a Chapter 7 case than in a Chapter 11 case, which results in a lower distribution for creditors.  *Id.* at 1264.  This study notes that "the typical chapter 7 case takes 2 years to unwind" and that this is virtually the same amount of time as the average Chapter 11 case.  *Id.* at 1266, 1270.  Particularly noteworthy is the conclusion to the study that "conversions from Chapter 11 to Chapter 7 take longer" than cases filed initially under Chapter 7.  *Id.* at 1271.  Furthermore, the study concludes that the "median expense ratio in Chapter 7 is a slightly higher 2.5% than the 1.9% in Chapter 11." *Id.* at 1279.  In other words, the study concludes that Chapter 7 cases cost *more* than Chapter 11 cases (although the study cautions that the cost difference may not be "statistically significant").  The study further concludes that "Chapter 11 unequivocally seems better for creditors from the perspective of total recovery rate," which the study concludes is based on the advantages "of the [Chapter 11] procedure itself" that results in a higher recovery rate.  *Id.* at 1290.  In sum, the study concludes as follows: "Chapter 7 seems to offer few advantages: It takes almost as long to resolve, requires similar fees, and in the end provides creditors with lower recovery rates . . . than a comparable Chapter 11 procedure." *Id.* at 1301.

A law review article assessing, in part, the value of Chapter 11 liquidations concludes that there are advantages to a Chapter 11 liquidation case compared to a Chapter 7 liquidation case: "Indeed, there are many advantages of a chapter 11 liquidation over a chapter 7 liquidation.  First, chapter 11 provides additional flexibility, with less rigid procedures than those found in chapter 7.  Second, in a chapter 11 liquidation, preexisting management may remain in place to conduct the liquidation, which helps to maximize value by virtue of management's historical knowledge of the business and familiarity with the assets.  Additionally, chapter 11 has distinct advantages where third-party interests must be protected. . . . [F]acilitators for collective action are absent . . . from chapter 7 . . . procedures." Ali M.M. Mojdehi and Janet Dean Gertz, <u>The Implicit "Good Faith" Requirement in Chapter 11 Liquidations: A Rule in Search of a Rationale?</u>, American Bankruptcy Institute Journal, Spring 2006, at 153.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Disclosure Statement v1.4
MAINDOCS-#146613-v3-MTI-Joint3rdAmendDS5_20_10.DOC

1  consequences of the Plan because the Internal Revenue Code embodies many complicated rules

2  which make it difficult to state completely and accurately all of the tax implications of any action.

3  **B.    Consequences to the Debtor.**

4  In general, the Internal Revenue Code provides that a debtor in a bankruptcy case is not

5  taxable on cancellation of debt ("COD") income, but must reduce certain of its tax attributes (such as

6  its net operating loss carry forwards and its tax basis in its assets) by the amount of COD income.

7  COD income results when the amount of debt discharged exceeds the consideration given in

8  exchange therefor, and is equal to such excess amount.  In this case, it is likely that a cancellation of

9  debt will be deemed to have occurred on the Effective Date of the Plan.  Any reduction in tax

10  attributes does not occur, however, until the end of the Debtor's taxable year or, in the case of asset

11  basis reduction, the first day of the taxable year following the taxable year in which the COD is

12  incurred.

13  Under the Plan, the Debtor will be treated for United States federal income tax purposes as

14  transferring the Assets directly to the Plan Agent (in accordance with the provisions of Section 6.6.2

15  of the Plan, on the Effective Date, the Assets will be transferred to, vest in, and be held in trust by,

16  the Plan Agent).  Accordingly, the Debtor's transfer of Assets may result in the Debtor's recognizing

17  gain or income, depending, in part, on the value of the Assets on the Effective Date and the adjusted

18  basis of the Assets on the Effective Date.

19  **C.    Withholding of Taxes.**

20  All Distributions to holders of Allowed Priority Unsecured Claims and Allowed

21  General Unsecured Claims are subject to any applicable tax withholding, including employment tax

22  withholding.  Under federal income tax law, interest, dividends, and other reportable payments may,

23  under certain circumstances, be subject to "backup withholding" at the then applicable withholding

24  rate (currently 28%).  Backup withholding generally applies if the holder 1) fails to furnish its social

25  security number or other taxpayer identification number ("TIN"), (2) furnishes an incorrect TIN,

26  (3) fails properly to report interest or dividends, or (4) under certain circumstances, fails to provide a

27  certified statement, signed under penalty of perjury, that the TIN provided is its correct number and

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1    that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely

2    an advance payment, which may be refunded to the extent that it results in an overpayment of tax.

3    Certain persons are exempt from backup withholding, including, in certain circumstances,

4    corporations and financial institutions.

5         THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR

6    INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE

7    URGED TO CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR OTHER TAX

8    ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX

9    CONSEQUENCES OF THE PLAN.

10        **XIV.**

11        **RECOMMENDATION**

12        The Plan Proponents recommend that all Creditors receiving a Ballot vote in favor of the

13   Plan.  The Plan Proponents believe that the Plan maximizes recoveries to all Creditors and, thus, is in

14   the best interests of Creditors.  The Plan likely will produce Distributions to Creditors in excess of

15   those that would be available if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code,

16   and will minimize delays in recoveries by Creditors.

17   Dated: June 4, 2010              **CLARKSON, GORE & MARSELLA, APLC**

18

19                                    By: _____
                                          Scott C. Clarkson
20                                        Attorneys for MTI Technology Corporation,
                                          Chapter 11 Debtor and Debtor in Possession
21   Dated: June 8, 2010              **WINTHROP COUCHOT**
                                      **PROFESSIONAL CORPORATION**
22

23                                    By: _____
                                          Robert E. Opera
24                                        Attorneys for the Official Committee of
                                          Unsecured Creditors
25

26

27

28

-108-

# EXHIBIT "A"

| Case Name | Case Number | Date Filed | Status |
|---|---|---|---|
| Official Committee of Creditors Holding Unsecured Claims v. AFCO Premium Acceptance, Inc. | 8:09-ap-01261-ES | 10/14/09 | Dismissed 12/16/09 |
| Official Committee of Creditors Holding Unsecured Claims v. Avnet Computer | 8:09-ap-01624-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. B. Braun and B. Braun of America | 8:09-ap-01616-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims v. Blue Shield of California | 8:09-ap-01638-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. Carolina Casualty Insurance | 8:09-ap-01628-ES | 10/14/09 | Dismissed 03/02/10 |
| Official Committee of Creditors Holding Unsecured Claims v. Ciber UK LTD. | 8:09-ap-01619-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. Cigna Dental Health | 8:09-ap-01615-ES | 10/14/09 | Dismissed 12/15/09 |
| Official Committee of Creditors Holding Unsecured Claims v. Cresa Partners – West Inc. | 8:09-ap-01622-ES | 10/14/09 | Dismissed 12/16/09 |
| Official Committee of Creditors Holding Unsecured Claims v. Dell Computer Corp. and Dell, Inc. | 8:09-ap-01630-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. Edward W. Kimbauer | 8:09-ap-01634-ES | 10/14/09 | Dismissed 11/25/09 |
| Official Committee of Creditors Holding Unsecured Claims v. Franz Cristiani | 8:09-ap-01632-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims v. Ingram Micro Inc. | 8:09-ap-01626-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. James M. Cunha | 8:09-ap-01618-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. Kent D. Smith | 8:09-ap-01649-ES | 10/14/09 | Dismissed 01/04/10 |

| | | | |
|---|---|---|---|
| Official Committee of Creditors Holding Unsecured Claims v. Lawrence Begley | 8:09-ap-01648-ES | 10/14/09 | Pending (Request for Entry Default) |
| Official Committee of Creditors Holding Unsecured Claims v. LSI Corp | 8:09-ap-01640-ES | 10/14/09 | Dismissed 12/11/09 |
| Official Committee of Creditors Holding Unsecured Claims v. Marsh Risk & Insurance Service | 8:09-ap-01614-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims v. Michael Pehl | 8:09-ap-01647-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims v. Morrison & Foerster LLP | 8:09-ap-01610-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. My Office Inc. and Riverside Claims | 8:09-ap-01613-ES | 10/14/09 | Dismissed 01/04/10 |
| Official Committee of Creditors Holding Unsecured Claims v. Nick Ganio | 8:09-ap-01646-ES | 10/14/09 | Pending (Motion to Dismiss Filed) |
| Official Committee of Creditors Holding Unsecured Claims v. Norr Stiefenhofer Lutz | 8:09-ap-01611-ES | 10/14/09 | Pending |
| Official Committee of Creditors Holding Unsecured Claims v. Pencom Systems Inc; Edward C. Ateyeh, Jr. aka Edward Taylor; Edgar Saadi; and Wade Saadi | 8:09-ap-01617-ES | 10/14/09 | Pending (Motion to Dismiss Filed) |
| Official Committee of Creditors Holding Unsecured Claims v. Ronald E. Heinz | 8:09-ap-01645-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims v. Storewiz | 8:09-ap-01636-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims v. William Atkins | 8:09-ap-01644-ES | 10/14/09 | Settled |
| Official Committee of Creditors Holding Unsecured Claims v. William J. Kerley | 8:09-ap-01642-ES | 10/14/09 | Pending (Motion to Dismiss Filed) |
| MTI Technology Corporation v. Lifeboat Distribution, Inc. | 8:09-ap-01607-ES | 10/14/09 | Pending (settled) |
| MTI Technology Corporation v. Neoscale Systems, Incorporated | 8:09-ap-01608-ES | 10/14/09 | Pending (Application for |

| | | | Default Judgment filed) |
|---|---|---|---|
| MTI Technology Corporation v. EMC Corporation | 8:09-ap-01267-ES | 04/01/09 | Pending (settled) |
| MTI Technology Corporation v. Fusionstorm | 8:09-ap-01639-ES | 10/14/09 | Pending |
| MTI Technology Corporation v. Lenox Financial Mortgage Corporation | 8:08-ap-01227-ES | 06/20/08 | Closed 08/28/09 |

# EXHIBIT "B"

EXHIBIT "B" IS PROVIDED SOLELY FOR INFORMATIONAL PURPOSES
AND CONSTITUTES ONLY THE PLAN PROPONENTS BEST ESTIMATE OF
THE AMOUNT OF UNDISPUTED, LIQUIDATED, NON-CONTINGENT
GENERAL UNSECURED CLAIMS AS OF THE DATE OF THIS DISCLOSURE
STATEMENT. NOTHING CONTAINED HEREIN SHALL CONSTITUTE ANY
ADMISSION REGARDING THE DEBTOR'S LIABILITY ON SUCH CLAIMS
OR WHETHER SUCH CLAIMS ARE VALID OR WILL BE ALLOWED BY THE
BANKRUPTCY COURT, OR SHALL IMPAIR OR AFFECT IN ANY MANNER
ANY RIGHT THAT THE PLAN PROPONENTS MAY HAVE TO OBJECT TO
ANY OF SUCH CLAIMS.

---

---

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| 1 | A Creditor Name | B Claim Number | C Amended Claim Number | D Unsecured Amount |
|---|---|---|---|---|
| 76 | RONALD P. UWAGAT | TBD | - | 10,723.48 |
| 77 | GREGG H. GOODNIGHT | | - | 9,913.46 |
| 78 | JASON E THOMAS | 598 | 500 | 9,385.73 |
| 79 | JOSEPH S SAHLI | 578 | 252 | 9,246.50 |
| 80 | JAMES R GALLAGHER | 480 | 126 | 9,816.39 |
| 81 | DAVID B. ARNETTE | | - | 8,776.09 |
| 82 | EDWARD J. DEVIN | | - | 8,588.46 |
| 83 | BARRY BICKFORD | 508 | 220 | 8,432.00 |
| 84 | WEBEX COMMUNICATIONS INC. | | - | 8,265.00 |
| 85 | AVERY WINFORD | 165 | - | 8,240.00 |
| 86 | CH REALTY IV/ROYAL CENTRE, LLC | 485 | - | 7,983.41 |
| 87 | WILLIAM HUFF | 604 | 296 | 7,862.50 |
| 88 | TECH TARGET | | - | 7,125.00 |
| 89 | STEWART A. SIMPSON | 35 | - | 7,004.22 |
| 90 | CLFFORD H NADLER | 563 | 341 | 6,944.23 |
| 91 | DAVID P. THIBODEAU | 582 | 234,184 | 6,930.72 |
| 92 | MARK S. HATCHETT | 605 | 83 | 6,842.74 |
| 93 | AT&T | | - | 6,832.13 |
| 94 | POLARIS POOL SYSTEMS | 97 | - | 6,736.28 |
| 95 | RICKEY K EWING | 566 | 73 | 6,636.74 |
| 96 | MCCOLLISTER'S MOVING & STORAGE | 28 | - | 6,581.46 |
| 97 | CYNTHIA T. HARRINGTON | 91 | - | 6,514.60 |
| 98 | JOHN M. BEARA | 589 | 216 | 6,482.52 |
| 99 | IBM CORPORATION | 158 | - | 6,445.00 |
| 100 | NORMAN EISENBERG | 482 | 110 | 6,247.89 |
| 101 | WARGO & FRENCH LLP | | - | 6,247.89 |
| 102 | CECIL S BURNETTE | INF | 141 | 6,011.08 |
| 103 | ROGER D SANDS | 587 | 85 | 5,915.90 |
| 104 | AVIS RENT A CAR SYSTEM, INC | | - | 5,896.19 |
| 105 | AVRAHAM COHEN | 52 | - | 5,814.90 |
| 106 | ANTHONY HUK | | - | 5,814.90 |
| 107 | VERIZON WIRELESS WEST | 559 | 555 | 5,483.27 |
| 108 | PATRICIA A TRINARCO | 572 | 100 | 5,402.50 |
| 109 | FAVIAN ZAVALZA | 561 | 123 | 5,363.40 |
| 110 | CRUISE ONE / CRUISES INC. | | - | 5,332.46 |
| 111 | GARY RICE | | - | 5,227.78 |
| 112 | KEVIN N. KEILS | | - | 5,149.55 |
| 113 | LAWRENCE E. REED | 571 | 97 | 5,136.97 |
| 114 | CONWAY MEDICAL CENTER | | - | 5,038.50 |
| 115 | MICHAEL WHEELER | | - | 5,014.26 |
| 116 | ALAN MADDISON | TBD | 64 | 4,949.84 |
| 117 | WELLSTAR HEALTH SYSTEM | | - | 4,822.10 |
| 118 | RAYMOND J. DESROCHERS | | - | 4,782.63 |
| 119 | TODD A. ANDERSON | 452 | - | 4,748.79 |
| 120 | ROBERTO MATOS | | - | 4,748.79 |
| 121 | YANG WANG | 581 | 21 | 4,699.26 |
| 122 | KIRA WANAMAKER | 146 | - | 4,682.50 |
| 123 | RICHARD T. RUGGIRELLO | 458 | 143 | 4,613.07 |
| 124 | BELL MICROPRODUCTS | 176 | - | 4,550.00 |
| 125 | NILS JULIN | | - | 4,540.96 |
| 126 | PRAMANA, INC. | 314 | - | 4,540.81 |
| 127 | UNISYS CORPORATION | 249 | - | 4,500.00 |
| 128 | JEFFREY BENJAMIN | 273 | 107, 108 | 4,322.16 |
| 129 | KRISTOPHER C. BECAN | 599 | 116 | 4,304.06 |
| 130 | TERESA F. HIRSCH | | - | 4,291.50 |
| 131 | LESLIE GEHL | | - | 4,275.04 |
| 132 | DAVID ROBERTSON | | - | 4,230.79 |
| 133 | RICHARD S. PIERCE | | - | 4,228.29 |
| 134 | TECHNICAL CABLE CONCEPTS | 4 | - | 4,208.60 |
| 135 | RANDALL E. POTTER | | - | 4,206.83 |
| 136 | PURE NATURE MUSIC, INC. | 50 | - | 4,200.00 |
| 137 | MERRITT PROPERTIES, LLC | | - | 4,046.57 |
| 138 | MT. OLIVE PICKLES | 19 | - | 3,967.50 |
| 139 | BRIGGS ELECTRIC INC. | 349 | 195 | 3,957.63 |
| 140 | JOHN M SCHIAVI | 189 | - | 3,943.34 |
| 141 | MICHAEL J. JONES | | - | 3,920.94 |
| 142 | KEVIN B. WOOD | | - | 3,919.79 |
| 143 | JESSICA KILEY | | - | 3,832.89 |
| 144 | DIGITAL MOUNTAIN, INC | 109 | - | 3,788.15 |
| 145 | KEVIN B. WOOD | | - | 3,778.79 |
| 146 | ATLANTA CAPITAL MANAGEMENT | 448 | - | 3,757.14 |
| 147 | RIVIERA HOTEL AND CASINO | 297 | - | 3,678.31 |
| 148 | S. STEWART, P.C. | 164 | - | 3,675.00 |
| 149 | BRYAN CAVE LLP | | - | 3,507.25 |

2 of 5

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 150 | INVISION.COM INC | | . | 3,600.00 |
| 151 | NETWORK APPLIANCE | | . | 3,600.00 |
| 152 | PHILIP E HORNSBY | 147 | . | 3,536.73 |
| 153 | INVISION.COM INC. | | . | 3,511.00 |
| 154 | ANDREW R. STAHELIN | | . | 3,505.15 |
| 155 | STUART E. JOHNSON | 126 | . | 3,490.67 |
| 156 | BRUCE MOSHASHA | 36 | . | 3,474.51 |
| 157 | T-MOBILE USA, INC | 55 | . | 3,448.14 |
| 158 | RONALD SCHNIEBER | 306 | 112 | 3,373.85 |
| 159 | JAMES STELLE | 30-2 | 30 | 3,307.46 |
| 160 | SHAWN SMITH | 570 | 102 | 3,230.67 |
| 161 | JONATHAN TIPTON | TBD | . | 3,206.37 |
| 162 | WAYNE H. UHRIG | | . | 3,176.25 |
| 163 | DOUGLAS REGULA | 501 | . | 3,033.27 |
| 164 | ANTHONY J. TOCCO | | . | 3,093.27 |
| 165 | MICHEAL J. MOON | | . | 3,077.84 |
| 166 | TIM DEAR | 577 | 82 | 3,004.56 |
| 167 | AMERICAN EXPRESS | 201 | . | 2,971.32 |
| 168 | RAJESH KUMAR | | . | 2,929.24 |
| 169 | DEBORAH M FONZINO | 574 | 17 | 2,921.63 |
| 170 | REBECCA REED | 569 | 98 | 2,906.31 |
| 171 | WILLIAM WHITLEY | 584 | 136 | 2,881.93 |
| 172 | MARTIN ROACH, LIQUIDITY SOLUTIONS | 594 | . | 2,859.60 |
| 173 | VERIZON - BANKRUPTCY DEPARTMENT | 206 | . | 2,859.03 |
| 174 | MELLON INVESTOR SERVICES, LLC | 326 | . | 2,822.86 |
| 175 | MARK CROWELL | | . | 2,812.38 |
| 176 | RONALD E. KITTENDORF | | . | 2,776.15 |
| 177 | UNITED VAN LINES, INC | | . | 2,769.49 |
| 178 | MARK ROGAN | 588 | 126 | 2,719.17 |
| 179 | WILLIAM DAVIS | 567 | 113 | 2,691.72 |
| 180 | MCKESSON CORPORATION | | . | 2,675.20 |
| 181 | JOYCE M SHINN | 613 | 186 | 2,502.05 |
| 182 | JONATHAN R. DILLOWAY | 139 | . | 2,499.08 |
| 183 | DWANE E. PORTER | 145 | . | 2,480.63 |
| 184 | JOHN NOTAH | 610 | 247 | 2,457.52 |
| 185 | JENNIFER K. PLANK | 596 | . | 2,424.62 |
| 186 | ARIES INTERNET SERVICES | 125 | . | 2,420.00 |
| 187 | VMWARE, INC | | . | 2,396.00 |
| 188 | WAYNE H. UHRIG | | . | 2,377.87 |
| 189 | EDWARD J. DEVIN | | . | 2,359.40 |
| 190 | EASYLINK SERVICES INC | 5 | . | 2,295.00 |
| 191 | MALLIK DESAI | 51 | . | 2,294.44 |
| 192 | KURT WINOWICH | 579 | 213 | 2,236.25 |
| 193 | CORRENE WIECHEC | | . | 2,156.41 |
| 194 | JORGE A. VALES | 61 | . | 2,142.98 |
| 195 | JAMES STRONG | | . | 2,142.98 |
| 196 | MARSH RISK & INSURANCE SERVICE | 171 | . | 2,125.00 |
| 197 | SPENCER E WALLIS | 118 | . | 2,120.03 |
| 198 | AT&T MOBILITY - 6463 | | . | 2,116.84 |
| 199 | JESSICA RILEY | | . | 2,115.00 |
| 200 | SIGNANT COMP | 40 | . | 2,042.50 |
| 201 | JORGE MARTINEZ | | . | 2,042.50 |
| 202 | KEVIN CARLSEN | | . | 2,041.34 |
| 203 | BOGDAN PETRESCU | | . | 2,020.14 |
| 204 | RON K. BOYINGTON | | . | 2,025.42 |
| 205 | STEPHEN J SUTTON | 565 | 7 | 2,018.07 |
| 206 | SENTINEL REAL ESTATE CORPORATION | | . | 1,950.21 |
| 207 | JEFFREY NEWMAN | TBD | 18 | 1,902.02 |
| 208 | USAEPAY | | . | 1,903.27 |
| 209 | PHILIP MORRISON | | . | 1,857.22 |
| 210 | COPI-O-VAN | 127 | . | 1,843.79 |
| 211 | AT&T | | . | 1,812.06 |
| 212 | JAMES E. TYLER | 359 | 108 | 1,804.25 |
| 213 | FRANK VIGGIANO | | . | 1,785.55 |
| 214 | PAUL PSHICHENKO | 59 | . | 1,715.02 |
| 215 | ENTERPRISE LOSS CONTROL DEPT | | . | 1,715.02 |
| 216 | ACCUTECH DATA SUPPLIES, INC | | . | 1,697.32 |
| 217 | SCOTT TAYLOR | | . | 1,663.03 |
| 218 | MEDGRIF HEALTH SYSTEM | | . | 1,613.23 |
| 219 | GREGORY GRIMES | | . | 1,613.23 |
| 220 | SPECIALIZED TRANSPORTATION, INC | 39 | . | 1,500.07 |
| 221 | GUINGYU HU | | . | 1,581.03 |
| 222 | OHIO DEPT OF JOB & FAMILY SERVICES | 270 | . | 1,564.24 |
| 223 | CARL PAYNE | 430 | . | 1,563.52 |

3 of 5

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 224 | ROBIN MORRIS | 583 | 33 | 1,502.56 |
| 225 | INC. | 1 | - | 1,497.88 |
| 226 | THOMAS REID | 163 | - | 1,458.56 |
| 227 | ERIC HEINRICHS | 611 | - | 1,454.79 |
| 228 | WILLIAM HEATH | 580 | 94 | 1,444.31 |
| 229 | LLP | 195 | - | 1,417.50 |
| 230 | PHILIP MORRISON | | - | 1,402.08 |
| 231 | PR NEWSWIRE | 218 | - | 1,391.40 |
| 232 | BCP SYSTEMS | | - | 1,369.48 |
| 233 | HERTZ CORPORATION | 162 | - | 1,355.64 |
| 234 | STAPLES BUSINESS ADVANTAGE | | - | 1,319.24 |
| 235 | WRIGHT FORD YOUNG & CO. | 44 | - | 1,300.00 |
| 236 | COLLEEN E. FERRIER | TBD | - | 1,272.82 |
| 237 | RAYMOND J. DESROCHERS | | - | 1,267.67 |
| 238 | CHIH-HSIN SHEN | TBD | 124-1 | 1,245.08 |
| 239 | JON P. SUTTON | 346 | - | 1,227.87 |
| 240 | KEITH WASNOK | | - | 1,219.72 |
| 241 | PATRICK J SUTTON | | - | 1,218.72 |
| 242 | ABSD | 2 | - | 1,211.85 |
| 243 | MANAGEMENT, INC | 57 | - | 1,175.55 |
| 244 | SPHERION CORP | 299 | - | 1,169.00 |
| 245 | STEVEN LIEDERMAN | | - | 1,129.49 |
| 246 | JOEL D STEPHENS | 204 | - | 1,113.12 |
| 247 | GREGORY EDGINGTON | 89 | - | 1,111.74 |
| 248 | LESLIE GEHL | | - | 1,087.03 |
| 249 | GRANDE COMMUNICATIONS | | - | 1,085.66 |
| 250 | OPTIMAL OUTSOURCE | 466 | - | 1,059.64 |
| 251 | CORPORATION | 211 | - | 1,027.07 |
| 252 | PAMELA J. LYNCH | INF | - | 1,008.00 |
| 253 | FIRST CHOICE SERVICES | | - | 1,005.81 |
| 254 | DOMINION VIRGINIA POWER | | - | 947.28 |
| 255 | ANDREWS KURTH LLP | | - | 946.50 |
| 256 | ANTHONY HUK | | - | 924.72 |
| 257 | FRANK VIGGIANO | | - | 878.65 |
| 258 | AMERICA'S INSTANT SIGNS | 223 | - | 875.00 |
| 259 | BYRON JOSLIN | | - | 864.25 |
| 260 | SOLUTIONS INC. | 575 | 134 | 857.26 |
| 261 | MATTHEW DWYER | | - | 853.24 |
| 262 | AT&T WIRELESS SERVICES-8100 | | - | 842.44 |
| 263 | FRANKFURT KURNIT KLEIN AND SEL | 42 | - | 816.39 |
| 264 | WOOD COUNTY HOSPITAL | | - | 810.00 |
| 265 | GLEN CARLEY | | - | 763.52 |
| 266 | PUBLIC STORAGE | | - | 770.00 |
| 267 | GERHARD MEHLDAU | 595 | 10 | 748.60 |
| 268 | GREGG M. GOODNIGHT | | - | 742.17 |
| 269 | GREAT PLAINS VENTURES LLP | | - | 717.40 |
| 270 | ANTHONY J. TOCCO | | - | 710.31 |
| 271 | MESIROW FINANCIAL, INC | 495 | - | 672.00 |
| 272 | ROBERT COLASANTO | INF | - | 671.55 |
| 273 | MICHEAL J. MOON | | - | 663.52 |
| 274 | ARMANDO E. ESPINOZA | | - | 657.17 |
| 275 | MEGACITY | 376 | - | 640.00 |
| 276 | ALLIANCE ELEC. DISTRIBUTOR INC. | 228 | - | 635.00 |
| 277 | DUSTIN AVOL | | - | 599.53 |
| 278 | RANDY S. TURER | 58 | - | 591.65 |
| 279 | JOHN ERIC WEST | | - | 568.50 |
| 280 | LESLIE V. DIXON | | - | 562.01 |
| 281 | ASIA PLANT RENTAL | 53 | - | 562.86 |
| 282 | SCOTT TAYLOR | | - | 530.65 |
| 283 | MANHATTAN MINI STORAGE LLC | | - | 509.00 |
| 284 | MARK CROWELL | | - | 504.18 |
| 285 | YUNSONG GAO | | - | 500.00 |
| 286 | FRANK DE ANGELIS | | - | 494.52 |
| 287 | JONATHAN HINES | | - | 492.31 |
| 288 | STEVENS GLOBAL LOGISTICS | | - | 469.00 |
| 289 | GREGORY GRIMES | | - | 469.28 |
| 290 | AMERICAN EXPRESS | 200 | - | 453.00 |
| 291 | PARTHASARATHY SUBRAMANIAN | 121 | - | 427.05 |
| 292 | RENEE Y. DITTMER | | - | 400.00 |
| 293 | RICK SLAN | | - | 389.97 |
| 294 | JAMES M. CUNHA | | - | 387.22 |
| 295 | BENTARA HEALTH | | - | 382.90 |
| 296 | CAHILL INDUSTRIES | 219 | - | 364.72 |
| 297 | GARY RICE | | - | 364.72 |

4 of 5

Omni Management Group, LLC

Exhibit B, Page116

**MTI**
Claims Analysis
Master

3/24/2010 1:25 PM

| | A | B | C | D |
|---|---|---|---|---|
| 1 | Creditor Name | Claim Number | Amends Claim Number | Unsecured Amount |
| 298 | MICHAEL L. SAMS | | - | 350.53 |
| 299 | BRIDGEHEAD SOFTWARE INC. | | - | 351.00 |
| 300 | EVERGREEN DATA SYSTEMS, INC. | 37 | - | 331.48 |
| 301 | RENEE T. DITTMER | | - | 325.15 |
| 302 | CONCIERGE LIMOUSINE | 16 | - | 324.30 |
| 303 | MUZAK | | - | 309.48 |
| 304 | REBECCA A. MASON | TBD | - | 277.16 |
| 305 | SAFESITE INC. | 223 | - | 275.00 |
| 306 | TRI CU | | - | 268.75 |
| 307 | AMERICAN EXPRESS | 262 | - | 258.77 |
| 308 | JOSEPH BURKHARDT | INF | 230 | 250.75 |
| 309 | WILLIAM ATKINS | 361 | - | 246.62 |
| 310 | FRANK DE ANGELIS | | - | 241.54 |
| 311 | ARMANDO E. ESPINOZA | | - | 236.92 |
| 312 | COLIN CAMPBELL | | - | 221.55 |
| 313 | MINI U STORAGE | | - | 215.00 |
| 314 | MICHAEL SLONIN | 203 | - | 186.68 |
| 315 | RONALD E. KITTENDORF | | - | 186.68 |
| 316 | BRADLEY MARKETING GROUP | | - | 182.99 |
| 317 | AERONET | | - | 176.40 |
| 318 | UNITED PARCEL SERVICE | 175 | - | 154.13 |
| 319 | ROBIN SPERLING | | - | 147.00 |
| 320 | SPRAGUE MAGNETICS | | - | 139.50 |
| 321 | MICHAEL A. TRIPPE | 379 | - | 132.80 |
| 322 | PUBLIC STORAGE | | - | 132.80 |
| 323 | TEXAS WIRED MUSIC, INC. | | - | 128.90 |
| 324 | COMBO | | - | 115.64 |
| 325 | WASHINGTON GAS | | - | 114.21 |
| 326 | WAXIE SANITARY SUPPLY | | - | 112.34 |
| 327 | MICHAEL J. JONES | | - | 100.00 |
| 328 | RANDALL E. POTTER | | - | 100.00 |
| 329 | TY C JONES | 593 | - | 97.47 |
| 330 | CAL H. CONNOLLY | | - | 83.19 |
| 331 | AT&T WIRELESS SERVICES-8100 | | - | 77.23 |
| 332 | CULLIGAN | | - | 72.84 |
| 333 | CULLIGAN | | - | 66.66 |
| 334 | EXTRA SPACE STORAGE OF STERLING | | - | 59.03 |
| 335 | CHRISTOPHER B. GUEST | | - | 51.97 |
| 336 | DONOHOE ADVISORY ASSOCIATES LLC | | - | 50.00 |
| 337 | ADT SECURITY SERVICES | | - | 43.43 |
| 338 | JOHN FAULKNER | | - | 42.22 |
| 339 | AT&T - 530047 | | - | 40.51 |
| 340 | RECYCLING SERVICES, INC | | - | 40.59 |
| 341 | MARLIN LEASING CORP | | - | 34.13 |
| 342 | DISH NETWORK | | - | 32.97 |
| 343 | DWAYNE POLLINGER | 184 | - | 32.43 |
| 344 | REFRESH2O | | - | 32.44 |
| 345 | CRYSTAL SPRINGS WATER COMPANY | | - | 26.76 |
| 346 | AT&T - 102262 | | - | 20.93 |
| 347 | EAGLE TELECONFERENCING | | - | 12.21 |
| 348 | MCI COMM SERVICE | | - | 3.13 |
| 349 | GAS COMPANY | | - | 1.13 |
| 350 | DONALD A. WILHELM | 74 | - | 0.03 |
| 351 | HERMIE CLOETE | 157 | - | 0.03 |
| 352 | JAMES C. DEAN | 72 | - | 0.03 |
| 353 | JAMES D. HEIMAN | 69 | - | 0.03 |
| 354 | JOSEPH A ZIMMERMAN | 585 | 25 | 0.03 |
| 355 | RICHARD W. CUNNINGHAM | 590 | 60 | 0.03 |
| 356 | STEVEN M DIGIUSEPPE | 324 | 78 | 0.02 |
| 357 | TODD P. HAWKINS | 86 | - | 0.02 |
| 358 | | | | |
| 359 | | | | 3,711,560.68 |
| 360 | | | | |

Omni Management Group, LLC

Exhibit B, Page117

# EXHIBIT "C"

## MTI Technology Corporation

Liquidation Analysis

*Note: This is an Estimate Only*

| | Notes | Chapter 7 | Chapter 11 |
|---|---|---|---|
| Cash | (1) | $2,635,620 | $2,287,518 |
| Net Litigation Proceeds | (2) | 0 | 100,000 |
| Merger Transaction Proceeds | (3) | 0 | 0 |
| *Less* | | | |
| Post-Effective Date Expenses | (4) | 0 | (75,000) |
| Chapter 7 Trustee payments | (5) | (102,319) | 0 |
| Chapter 7 counsel/Professionals and on-going expenses | (6) | (330,000) | 0 |
| Proceeds available to General Unsecured Creditors | | $2,203,301 | $2,312,518 |
| | | | |
| Creditor Claims | | | |
| Accrued Chapter 11 Administrative Claims | | $111,350 | $175,000 |
| Unites States Trustee Fees | | 0 | 6,500 |
| Cure Claims | | 0 | 0 |
| Allowed Priority Tax Claims | | 163,729 | 163,729 |
| Allowed Priority Non-Tax Claims | | 453,585 | 453,585 |
| | | | |
| Less payments to be made upon Plan Confirmation | | $728,664 | $798,814 |
| | | | |
| Proceeds available to the General Unsecured Creditors | | $1,474,637 | $1,513,704 |
| | | | |
| General Unsecured Creditor Claims | | | |
| General Unsecured Claims - low end of range | (7) | 3,771,560 | 3,771,560 |
| General Unsecured Claims - high end of range | (7) | 8,368,285 | 8,368,285 |
| | | | |
| Estimated distribution on account of Est. Allowed General Unsecured Claims (low end of range) | | 39.1% | 40.1% |
| Estimated distribution on account of Est. Allowed General Unsecured Claims (high end of range) | | 17.6% | 18.1% |

Therefore, even with the conservative assumptions made herein, the Plan Proponents project that holders of Allowed General Unsecured Claims will receive a higher recovery in Chapter 11 than in Chapter 7. The Plan Proponents believe that, in fact, there would be a more significant differential in recovery in a Chapter 7 scenario, to the detriment of holders of Allowed General Unsecured Claims, than that which is indicated herein.

| Notes | |
|---|---|
| 1 | See Attachment #1 for calculation. |
| 2 | See Attachment #2. |
| 3 | See Attachment #3 |
| 4 | See Attachment #4 |
| 5 | Pursuant to section 326(a) of the Bankruptcy Code. See Attachment #5 for calculation. |
| 6 | Estimated fees and expenses through end of Chapter 7 case. See Attachment #6 for calculation. |
| 7 | Estimated recovery after objection to disputed General Unsecured Claims. The current range of Allowed General Unsecured Claims is $3,771,560 - $8,368,285. Note, however, that the Plan Proponents believe that the amount of Allowed General Unsecured Claims will be higher in Chapter 7 than in Chapter 11 because it is unlikely that the Chapter 7 Trustee would be able to challenge Disputed Claims as effectively as would the Plan Proponents. |

**ATTACHMENT #1**

|  | Chapter 7 | Chapter 11 |
|---|---|---|
| Cash as of most recent MOR | $1,181,018 | $1,181,018 |
| less: estimated accrued Chapter 11 Allowed Administrative Claims (2/28/2010) | (445,398) | (445,398) |
| less: accruing Professional Fees in Chapter 11 | 0 | (204,602) (1) |
| less: ongoing operating expenses in Chapter 11 |  | (143,500) |
| Total Cash | $735,620 | $387,518 |
| EMC settlement payment | 1,900,000 | 1,900,000 |
| | $2,635,620 | $2,287,518 |

(1)  The Plan Proponents project that, from March 1, 2010 through the Effective Date, the Debtor will pay in its Chapter 11 case $650,000 in Professional Fees, of which approximately $445,398 in Professional Fees had accrued as of February 28, 2010, and, hence, that the Debtor will pay, through the Effective Date, $204,602 in Professional Fees that will have accrued after February 28, 2010. It should be noted, however, that only a portion of such Professional Fees, estimated to be only approximately $75,000, would be incurred in connection with Plan Confirmation Proceedings, and that the balance of such Professional Fees (approx. $129,602) would be incurred in connection with prosecuting Causes of Action and, accordingly, would be included in the calculation of Net Litigation Proceeds.

**ATTACHMENT #2**

The Plan Proponents project, conservatively, that $100,000 in Net Litigation Proceeds will be collected in Chapter 11. The Plan Proponents project that, in a Chapter 7 scenario, the Chapter 7 Trustee will not pursue such litigation, and, accordingly, that no Net Litigation Proceeds will be collected in a Chapter 7 scenario.

**ATTACHMENT #3**

Effectuating a Merger Transaction potentially could produce substantial value for holders of Allowed General Unsecured Claims. To be conservative, the Plan Proponents assume that no Merger Transaction will be effectuated in Chapter 11. There is no possibility, however, of effectuating any Merger Transaction in a Chapter 7 scenario.

**ATTACHMENT #4**

The Plan Proponents project that $75,000 in expenses will be incurred by the Plan Agent in connection with administering the Plan.

**ATTACHMENT #5**

Proceeds from Chapter 7 Liquidiation                    $2,635,620

Maximum amount for Trustee's Services

| Amount | Percentage pursuant to 326(a) | Max amount payable to Trustee |
|---|---|---|
| $5,000 | 25.00% | $1,250 |
| $45,000 | 10.00% | $4,500 |
| $950,000 | 5.00% | $47,500 |
| $1,635,620 | 3.00% | $49,069 |

TOTAL AMOUNT         $2,635,620                                    $102,319

**ATTACHMENT #6**

| | | |
|---|---|---|
| Chapter 7 counsel | | $200,000.00 |
| Accountants | | $40,000.00 |
| | Sub-Total | $240,000.00 |
| | | |
| Admin Costs | | |
| Bar Date | | $7,500.00 |
| Office closure / moving / storage | | $6,000.00 |
| Trustee's Staff | | $75,000.00 |
| Record storage and supplies | | $9,000.00 |
| | Sub-Total | $90,000.00 |
| | | |
| | Total | $330,000.00 |

# EXHIBIT "D"

Allowed Claims (includes Objections with Order Entered and POCs to which the Debtor does not Object)

| Creditor Name | Claim Number | Priority Amount | Unsecured Amount |
|---|---|---|---|
| ALAN MADDISON | 64-2 | 2,598.75 | 4,949.84 |
| ALI DOWLATSHAHI | 609 | 10,950.00 | 46,407.43 |
| AVERY WINFORD | 165 | 621.92 | 10,426.09 |
| AVRAHAM COHEN | 52 | 2,743.13 | 5,883.86 |
| BARRY BICKFORD | 608 | 3,850.50 | 8,432.00 |
| CARL PAYNE | 430 | 2,213.75 | 804.13 |
| CELINE PERRUCHOT | 129 | 607.01 | 0.00 |
| CHARLES R. SELTZER | 576 | 3,235.58 | 0.00 |
| CHIH-HSIN SHEN | 124 | 1,251.25 | 1,245.09 |
| CLIFFORD H NADLER | 563 | 3,850.00 | 6,944.23 |
| COLLEN E. FERRIER | 153 | 1,622.60 | 1,272.82 |
| DAVID P. THIBODEAU | 582 | 2,021.02 | 6,930.72 |
| DAVID P. WALKER | 181 | 6,739.65 | 3,666.72 |
| DEBORAH M FONZINO | 574 | 1,463.01 | 2,921.63 |
| DONALD A. WILHELM | 74 | 7,927.48 | 825.77 |
| DWANE E. PORTER | 145 | 4,188.46 | 2,480.63 |
| FAVIAN ZAVALZA | 591 | 1,368.18 | 5,363.40 |
| GERHARD MEHLDAU | 585 | 4,427.50 | 746.60 |
| GREGORY EDGINGTON | 89 | 3,855.29 | 1,111.74 |
| HANA T. NGO | 149 | 1,922.28 | 0.00 |
| HERMIE CLOETE | 157 | 3,368.52 | 1,438.79 |
| HUAN T. HUYNH | 100 | 2,661.19 | 0.00 |
| JAMES D. HEIMAN | 69 | 2,502.50 | 5,730.72 |
| JAMES E. TYLER | 358 | 775.00 | 1,804.25 |
| JAMES R GALLAGHER | 480 | 10,950.00 | 8,816.39 |
| JAMES STELLE | 30-2 | 2,117.50 | 3,307.40 |
| JASON E THOMAS | 598 | 5,775.00 | 9,389.73 |
| JEFFREY BENJAMIN | 573 | 9,378.16 | 4,322.16 |
| JEFFREY NEWMAN | 18 | 2,887.50 | 1,902.02 |
| JENNIFER K. PLANK | 596 | 8,270.88 | 2,408.62 |
| JENNIFER L NENNINGER | 148 | 1,454.67 | 0.00 |
| JOEL D. STEPHENS | TBD | 2,717.00 | 5,562.34 |
| JOHN M. BISAHA | 589 | 8,917.75 | 6,482.52 |
| JOHN NOTAH | 610 | 2,310.31 | 2,457.52 |
| JONATHAN R. DILLOWAY | 139 | 2,855.77 | 2,498.08 |
| JOSEPH A ZIMMERMAN | 586 | 3,696.00 | 4,350.93 |
| JOSEPH S SAHLI | 578 | 4,620.00 | 9,246.50 |

| Name | | |
|---|---|---|
| JOYCE M. SHINN | 613 | 1,443.75 | 2,502.05 |
| KEVIN CLARK | 66 | 982.00 | 0.00 |
| KIMBERLY A TORRENCE | 88 | 2,090.67 | 0.00 |
| KRISTOPHER C. BECAN | 599 | 2,586.00 | 4,304.06 |
| KURT WINOWICH | 579 | 2,887.50 | 2,206.25 |
| LAWREN FENDRICH | 592 | 10,950.00 | 17,000.75 |
| LAWRENCE E. REED | 571 | 4,552.55 | 5,136.97 |
| MARC K. FURON | 13 | 3,257.02 | 0.00 |
| MARK A. CAGGIANO | 612 | 10,950.00 | 21,778.47 |
| MARK D CRONENWETT/LIQUIDITY SOLUTIONS INC. | 575 | 2,439.96 | 857.26 |
| MARK ROGAN | 588 | 1,386.18 | 2,710.17 |
| MARK S. HATCHETT | 605 | 3,426.50 | 6,842.74 |
| MARTIN ROACH | 594 | 1,876.88 | 2,850.60 |
| MAULIK DESAI | 51 | 1,832.45 | 2,284.44 |
| MICHAEL SLONIN | 203 | 1,414.47 | 213.96 |
| NICHOLAS FULBRIGHT | 150 | 807.40 | 0.00 |
| NORMAN EISENBERG | 482 | 3,850.00 | 6,403.46 |
| PAMELA J. LYNCH | 174 | 2,834.66 | 1,008.00 |
| PARTHASARATHY SUBRAMANIAN | 121 | 3,065.19 | 442.05 |
| PATRICIA A TRIMARCO | 572 | 3,515.05 | 5,402.50 |
| PAUL PISHCHENKO | 59 | 962.50 | 1,726.45 |
| PHILIP E. HORNSEY | 147 | 4,569.23 | 3,536.73 |
| RANDY S. TURER | 58 | 2,713.64 | 591.85 |
| REBECCA A A MASON | 101 | 1,443.75 | 277.16 |
| REBECCA REED | 569 | 2,772.00 | 2,906.31 |
| RICHARD T. RUGGIRELLO | 458 | 9,461.40 | 4,613.07 |
| RICHARD W. CUNNINGHAM | 590 | 827.75 | 1,791.53 |
| RICKEY K EWING | 566 | 4,042.50 | 6,636.74 |
| ROBIN NORRIS | 583 | 1,674.04 | 1,502.55 |
| ROGER D SANDS | 587 | 4,235.00 | 5,919.90 |
| RONALD SCHNIEBER | 306 | 2,013.25 | 3,373.85 |
| RUSSELL ELDER | 568 | 10,950.00 | 38,525.13 |
| RYAN D. STEWART | 166 | 5,013.33 | 0.00 |
| SALVATORE MAITA | 604 | 10,950.00 | 19,783.06 |
| SHAWN SMITH | 570 | 3,272.50 | 3,280.67 |
| SPENCER E WALLIS | 118 | 2,095.46 | 2,120.03 |
| STEPHEN J SUTTON | 565 | 1,610.25 | 2,018.07 |
| STEVEN M DIGIUSEPPE | 324 | 3,850.00 | 7,792.50 |
| STEWART A. SIMPSON | 135 | 3,541.15 | 7,034.22 |
| STUART E. JOHNSON | 120 | 3,513.13 | 3,490.67 |

| | | | |
|---|---|---|---|
| TARA DUVAL | 155 | 485.80 | 0.00 |
| TED A. TURKINGTON | 71 | 6,933.35 | 10,854.00 |
| TIM DEAR | 577 | 3,980.90 | 3,004.56 |
| TY C. JONES | 93 | 617.36 | 97.47 |
| WILLIAM DAVIS | 567 | 3,850.00 | 2,688.72 |
| WILLIAM HEATH | 580 | 583.05 | 1,444.31 |
| WILLIAM HUFF | 564 | 5,005.00 | 7,882.50 |
| WILLIAM WHITLEY | 584 | 3,581.27 | 2,881.83 |
| YANG WANG | 581 | 3,465.00 | 4,689.26 |
| **TOTAL** | | **316,875.95** | |

Motion to Disallow/Object Pending to Allow Claims in Following Amounts:

| | | | |
|---|---|---|---|
| BRUCE MOSHASHA | 36 | 2,598.75 | 1,096.01 |
| DOUGLAS REGULA | 501 | 10,000.00 | 3,121.47 |
| DWAYNE POLLINGER | 154 | 856.63 | 32.94 |
| EDWARD W. KIRINBAUER | 47 | 4,620.00 | 193,694.62 |
| ERIC HEINRICHS | 611 | 2,588.25 | 1,454.79 |
| JOHN M. SCHIAVI | 189 | 2,643.81 | 3,943.54 |
| JON P. SUTTON | 346 | 2,288.13 | 1,227.87 |
| JONATHAN TIPTON | TBD | 3,650.25 | 3,256.37 |
| JORGE A. VALES | 61 | 1,575.17 | 2,162.91 |
| MICHAEL A. TRIPPE | 379 | 1,201.20 | 138.80 |
| ROBERT COLASANTO | INF | 1,954.05 | 671.95 |
| STEVEN D. PATTERSON | 215 | 9,021.25 | 22,839.16 |
| THOMAS NORERO | 245 | 0.00 | 0.00 |
| THOMAS REID | 163 | 6,613.25 | 1,458.56 |
| TODD A. ANDERSON | 452 | 1,503.30 | 4,765.80 |
| TODD P. HAWKINS | 86 | 2,887.50 | 3,763.78 |
| WILLIAM A. GOSS, JR. | 354 | 3,331.73 | 0.00 |
| WILLIAM DECKER | 363 | 2,672.79 | 0.00 |
| **TOTAL** | | **60,006.06** | |

Motion Pending to Allow Informal POC

| | | | |
|---|---|---|---|
| CECIL S BURNETTE | INF | 2,887.50 | 6,011.08 |
| CYNTHIA T. HARRINGTON | INF | 3,465.01 | 6,609.79 |
| JOSEPH BURKHARDT | INF | 1,663.94 | 250.76 |
| RONALD P. UMAGAT | INF | 5,390.01 | 10,723.48 |
| **TOTAL** | | **13,406.46** | **10,723.48** |

Allowed Scheduled Claims

| Name | | Amount |
|---|---|---|
| ANDREW R. STAHELIN | | 1,587.99 | 3,505.15 |
| ANTHONY B. ROBISON | | 932.88 | 0.00 |
| ANTHONY HUK | | 2,406.25 | 6,739.82 |
| ANTHONY J. TOCCO | | 2,800.87 | 3,803.58 |
| ARMANDO E. ESPINOZA | | 1,540.00 | 894.09 |
| BOGDAN PETRESCU | | 1,732.50 | 2,030.19 |
| CAL H. CONNOLLY | | 1,305.61 | 83.19 |
| CHRISTOPHER A. TONEY, SR. | | 298.08 | 0.00 |
| CHRISTOPHER B. GUEST | | 1,203.08 | 51.97 |
| CORREINE WIECHEC | | 555.29 | 2,166.41 |
| DARLENE SHAFFRON | | 539.06 | 0.00 |
| DAVID B. ARNETTE | | 3,031.88 | 8,776.09 |
| DUSTIN AVOL | | 1,044.23 | 599.53 |
| EDWARD J. DEVIN | | 1,925.00 | 10,947.86 |
| FRANK DE ANGELIS | | 1,540.00 | 736.06 |
| FRANK VIGGIANO | | 1,925.00 | 2,664.41 |
| FRANKIE DIAZ | | 1,901.31 | 0.00 |
| GARY RICE | | 2,617.82 | 5,592.50 |
| GLEN CARLEY | | 483.46 | 793.52 |
| GREGG H. GOODNIGHT | | 1,925.00 | 10,355.63 |
| GREGORY GRIMES | | 1,443.75 | 2,082.51 |
| GUADALUPE B. KNIGHT | | 1,150.00 | 0.00 |
| JAMES STRONG | | 4,389.01 | 2,142.98 |
| JESSICA KILEY | | 1,155.00 | 5,947.48 |
| JOHN ERIC WEST | | 1,423.08 | 568.90 |
| JOHN K. FORD | | 534.92 | 0.00 |
| JOLYNN TAYLOR | | 333.17 | 0.00 |
| JONATHAN HINES | | 6,074.15 | 11,372.38 |
| JORGE MARTINEZ | | 2,798.65 | 2,042.50 |
| KEITH WASNOK | | 710.77 | 1,219.72 |
| KEVIN B. WOOD | | 2,598.75 | 7,698.49 |
| KEVIN CARLSEN | | 2,117.50 | 2,041.34 |
| KEVIN N. KEILS | | 1,973.13 | 5,149.65 |
| KIMBERLY K. KOMULA | | 491.28 | 0.00 |
| LAVILLE TATE | | 894.02 | 0.00 |
| LESLIE GEHL | | 2,910.11 | 5,362.07 |
| LESLIE V. DIXON | | 1,588.32 | 562.01 |
| MARIE MARRUFO | | 34.80 | 0.00 |
| MARK CROWELL | | 3,234.00 | 3,316.56 |
| MICHAEL J. JONES | | 1,904.50 | 4,020.94 |

| Name | | |
|---|---|---|
| MICHAEL L. SAMS | 5,005.00 | 360.63 |
| MICHAEL P. LAPORTA | 2,994.92 | 0.00 |
| MICHAEL WHEELER | 3,031.88 | 5,014.26 |
| MICHAEL J. MOON | 2,598.75 | 3,741.16 |
| NILS JU.IN | 3,465.00 | 4,540.96 |
| PHILIP MORRISON | 2,367.75 | 3,259.30 |
| QUINGYU HU | 855.14 | 1,581.00 |
| RAJESH KUMAR | 1,343.80 | 2,929.24 |
| RANDALL E. POTTER | 2,310.31 | 4,306.33 |
| RAYMOND J. DESROCHERS | 2,310.00 | 6,050.36 |
| RENEE T. DITTMER | 1,695.00 | 726.15 |
| RICHARD S. PIERCE | 2,117.32 | 4,228.28 |
| ROBERTO MATOS | 3,465.00 | 4,748.79 |
| RON K. BOYINGTON | 2,213.75 | 13,080.91 |
| RONALD E. KITTENDORF | 3,116.25 | 2,962.84 |
| SANDRA P. METZGER | 44.42 | 0.00 |
| SCOTT J. POTERACKI | 5,141.68 | 0.00 |
| SCOTT TAYLOR | 1,347.50 | 2,210.05 |
| STEPHEN M. ZAPATKA | 1,216.95 | 0.00 |
| TERESA F. HIRSCH | 3,003.00 | 4,291.50 |
| THOMAS COPELAND | 2,415.50 | 0.00 |
| TRI DU | 2,316.62 | 268.75 |
| WAYNE H. UHRIG | 2,132.84 | 5,554.12 |
| TOTAL | 125,562.60 | |

Claims to which the Debtor may object

| Name | | | |
|---|---|---|---|
| CHRISTOPHER M. BUTTS | 63 | 5,202.92 | 0.00 |
| EDWARD ATEYEH JR. | 217 | 10,950.00 | 1,032,535.88 |
| KEITH CLARK | 257 | 10,950.00 | 400,000.00 |
| MARC FRANZ | 96 | 0.00 | 24,027.70 |
| ROBERT LINSKY | 497 | 10,950.00 | 118,889.63 |
| ROBERT OWEN | 246 | 10,950.00 | 3,589.79 |
| WILLIAM J. KERLEY | 130 | 10,950.00 | 424,930.14 |
| TOTAL | | 59,952.92 | |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 660
Newport Center Drive, 4th Fl., Newport Beach, CA 92660.

A true and correct copy of the foregoing document described as: **DEBTOR'S AND COMMITTEE'S JOINT THIRD
AMENDED DISCLOSURE STATEMENT DESCRIBING DEBTOR'S AND COMMITTEE'S JOINT THIRD
AMENDED CHAPTER 11 PLAN**  will be served or was served **(a)** on the judge in chambers in the form and manner
required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**   Pursuant to controlling
General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and
hyperlink to the document. On June 16, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding
and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email
address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____ 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this
bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States
Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here
constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each
person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, 2010 I served the following
person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile
transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will
be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 16, 2010 | Susan Connor | /s/ Susan Connor |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

## NEF SERVICE LIST

- Robert C Briseno    rbriseno@swlaw.com
- John O Campbell    ocampbell@houser-law.com
- Jeffrey D Cawdrey    jcawdrey@gordonrees.com, ebojorquez@gordonrees.com
- Scott C Clarkson    sclarkson@lawcgm.com
- Robert L Eisenbach    reisenbach@cooley.com
- Christine M Fitzgerald    cfitzgerald@lawcgm.com
- Matthew A Gold    courts@argopartners.net
- Richard H Golubow    rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Brian T Harvey    bharvey@buchalter.com, IFS filing@buchalter.com
- Lesley A Hawes    lhawes@mckennalong.com, pcoates@mckennalong.com
- Ivan L Kallick    ikallick@manatt.com, ihcrnandez@manatt.com
- Alexandra Kazhokin    akazhokin@buchalter.com,
  salarcon@buchalter.com;ifs_filing@buchalter.com
- Payam Khodadadi    pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Adam A Lewis    alewis@mofo.com
- Eve A Marsella    emarsella@lawcgm.com
- Elmer D Martin    elmermartin@msn.com
- Robert E Opera    pj@winthropcouchot.com, sconnor@winthropcouchot.com
- Eric S Pezold    epezold@swlaw.com, dwlewis@swlaw.com
- Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
- Mark A Shaiken    mshaiken@stinson.com
- Daniel C Silva    dsilva@gordonrees.com
- Patricia B Tomasco    ptomasco@mailbmc.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Michael A Wallin    mwallin@sheppardmullin.com
- Gilbert B Weisman    notices@becket-lee.com
- Sharon Z Weiss    sharon.weiss@hro.com
- David I Wilson    dlwilson@winston.com