1  SANDRA W. LAVIGNA (Cal. Bar No. 117965)

2  Attorneys for:
   U. S. SECURITIES AND EXCHANGE COMMISSION
3  Rosalind Tyson,  Regional Director
   5670 Wilshire Boulevard, 11th Floor
4  Los Angeles, California 90036
   Telephone: (323) 965-3998
5  Fax:  (323) 965-4530
   lavignas@sec.gov
6

7

8                  UNITED STATES BANKRUPTCY COURT
                    CENTRAL DISTRICT OF CALIFORNIA
9                      SANTA ANA DIVISION

10
                                        )  Case No.: 8-07-13347-ES
11                                      )
     In re:                             )  Chapter 11
12                                      )
     MTI TECHNOLOGY CORPORATION,        )  OBJECTION OF U. S. SECURITIES AND
13        a Delaware corporation        )  EXCHANGE COMMISSION TO
                                        )  CONFIRMATION OF DEBTOR'S AND
14                                      )  COMMITTEE'S THIRD AMENDED
                                        )  CHAPTER 11 PLAN
15              Debtor.                 )
                                        )
16                                      )  Date:   August 26, 2010
                                        )  Time:  10:30 a.m.
17                                      )  Place: Courtroom 5 A
                                        )
18   _____)  Judge: The Honorable Erithe A. Smith

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

## TABLE OF CONTENTS

| | | |
|---|---|---:|
| **BACKGROUND** | | 2 |
| **DISCUSSION** | | 5 |
| **I.** | **MTI Is Not Entitled to a Discharge** | 5 |
| | **A.**    The Plan Provides for the Liquidation of Substantially All the Property of the Estate. | 5 |
| |      **1.**    The Net Operating Loss. | 5 |
| |      **2.**    The Debtor's Status as a Public Company. | 5 |
| | **B.**    MTI Is Not Continuing In Business. | 7 |
| **II.** | **Fostering Corporate Shell-Trafficking Is Specifically Contrary to Basic Bankruptcy Code Policy.** | 7 |
| **III.** | **Bankruptcy Courts Have No Jurisdiction To Confirm Plans That Seek To Discharge Non-Debtor Liability** | 10 |
| **IV.** | **Conclusion** | 12 |

## TABLE OF AUTHORITIES

<u>CASES</u>

*Feld v. Zale (Matter of Zale Corp.)*
    *62 F.3d 746 (5th Cir. 1995)*                                        11

*Green v. Welsh. 956 F.2d 30*
    *(2nd Cir. 1992)*                                                    11

*In re Continental Airlines*,
    203 F.3d 203 (3rd Cir. 2000)                                        11

*In re CPT Corporation*,
    1992 Bankr. LEXIS 1474 (Bankr. D. Minn.), Sept. 21, 1992            6

*In re Fairchild Aircraft Corp.*,
    128 B.R. 976 (Bankr. W.D. Tex. 1991)                                8

*In re General Teamsters, Warehousemen and Helpers Union, Local 890,*
    265 F.3d 869 (9th Cir. 2001)                                        7

*In re Goodman,*
    873 F.2d 598, (2d Cir. 1989), *overruled on other grounds,*
    926 F.2d 191 (2nd Cir. 1991)                                        7

*In re Lowenschuss,*
    67 F.3d 1394 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 2497 (1996)  10

*In re Maxim Indus., Inc.*,
    22  B.R. 611 (Bankr. D. Mass. 1982)                                 9

*In re Mid-America Petroleum, Inc.*,
    71 B.R. 140 (Bankr. N.D. Tex. 1987)                                 6

*In re Panda Development Corp., Inc.*,
    76 B.R. 199 (Bankr. M.D. Fla. 1987)                                 6

*In re Pacific Lumber Co.,*
    584 F.3d 229, 251-253 (5th Cir. 2009)                               11

*In re Trans Max Tech., Inc.*,
    349 B.R. 80  (Bankr. D. Nev. 2006)                                  9

*In re Trinity Gas Corp. (Reorganized),*
    242 B.R. 344 (Bankr. N.D. Tex. 1999),
      aff'd., 2000 U.S. Dist. LEXIS 8940 (N.D. Tex., May 24, 2000)      6

*In re Western Real Estate Funds, Inc.,*
    922 F.2d 592 (10th Cir. 1990), *modified sub nom. on other grounds,*
    *Abel v. West, 932 F.2d 898 (10th Cir. 1991)*      11

*Matter of Paseo del Norte Oil Co.,*
    755 F.2d 421 (5th Cir. 1985)      6

*Nat'l Labor Relations Bd. v. Better Bldg. Supply Corp.,*
    837 F.2d 377 (9th Cir. 1988)      7

*Securities and Exchange Commission v. Datronics Engineers, Inc.,*
    490 F.2d 250 (4th Cir. 1973), cert. denied 416 U.S. 937 (1974)      4

*Underhill v. Royal,*
    769 F.2d 1426 (9th Cir. 1985)      10

**Legislative History**

H.R. Rep. No. 595, 95th Cong., 1st Sess. 384, 418-19 (1977), *reprinted in Collier on Bankruptcy,* App. C. at App. Pt. 4-1526, 4-1570 (15th rev.ed., 2006)      7

**Treatises and Other Documents**

Report of the Commission on Bankruptcy Laws of the United States,
H.R. Doc. No. 93-137, 93d Cong., 1st Sess. (1973), *reprinted in Collier on Bankruptcy,* Appendix Volume B at App. Pt. 4-703 through App. Pt. 4-704 (15th rev. ed. 2006)      8

W. Meigs, A. Mosich, et al., *Intermediate Accounting* (McGraw-Hill, 3rd ed.)      6

R. Dixon and H. Arnett, *The McGraw-Hill 36-Hour Accounting Course* (3rd ed. 1993)      6

SEC Release Nos. 33-8587; 34-52038; International Series Release No. 1293; File No. S7-19-04      4

1    The U. S. Securities and Exchange Commission ("SEC"), appearing herein as a

2  party in interest pursuant to 11 U.S.C. §1109(b), hereby objects to confirmation of the

3  Debtor's and Committee's Joint Third Amended Chapter 11 Plan ("Plan") filed by MTI

4  Technology Corporation ("MTI" or "Debtor") and the Official Committee of Unsecured

5  Creditors ("Committee").  The SEC, the federal agency responsible for enforcing the

6  federal securities laws, objects to confirmation of the Plan to protect the integrity of the

7  public securities markets and the bankruptcy process.  The Plan should not be confirmed

8  because:

9    (1) it seeks to discharge MTI of its liabilities while causing it to retain a public

10  base[1] in order to launch a liability-free corporate shell, the Reorganized Debtor,[2] for a

11  reverse merger transaction with a privately held company in direct contravention of basic

12  bankruptcy policy against trafficking in corporate shells; and

13    (2) the Plan improperly purports to force creditors, interest holders and parties-in-

14  interest to give releases of liability to third-party non-debtors, in contravention of sections

15  524(e) and 1129(a)(1) of the Bankruptcy Code.

16

17                              **BACKGROUND**

18    MTI is registered with the SEC pursuant to the Securities Exchange Act of 1934,

19  File No. 000-23418.  MTI is seriously delinquent in its public report filings, a violation of

20  federal securities laws.  It has filed no reports at all since September 25, 2008, and has

21  _____

22    [1]  MTI's approximately 340 general unsecured creditors will be allocated the value of an
undefined number of shares of the Reorganized Debtor's common stock.  In the usual bankrupt
23  corporate shell-private company merger, the bankrupt company's creditors or shareholders are
allocated only a token number of shares; their function is to constitute a public base of
24  shareholders to facilitate a market in the shares. The lion's share - sometimes as much as 98% -
25  of the stock goes to the private company's owners and the promoters of the deal.  A public
market enables the sale of the stock from which these large shareholders hope to profit.  The
26  small holders typically do not own enough shares to realize a significant amount upon sale.

27    [2]  The Reorganized Debtor would have no business operations, no real assets and no
28  liabilities.

2

1   been delinquent in filing the required annual and quarterly reports for an even longer
2   period. As a consequence, MTI faces an action from the Commission to revoke its
3   registration. On July 9, 2010, Commission staff notified MTI that it should file all
4   required reports within fifteen days; and that if it does not do so, it may be subject to an
5   administrative proceeding to revoke its registration, as well as a trading suspension
6   applicable to MTI's stock. (See letter attached as Exhibit 1.)  If MTI's registration is
7   revoked, it will have to re-register with the Commission in order to offer its stock for sale
8   and trading in the public markets.

9         MTI has had no business operations since Fall, 2007, almost three years ago. In
10  prior years, MTI was a "global provider of end-to-end information infrastructure solutions
11  for mid to large size companies." (Disclosure Statement p. 29). It filed its voluntary
12  petition on October 15, 2007, after its efforts to keep its business afloat had failed. On
13  November 20, 2007, the Debtor sold its European assets, and on or about December 22,
14  2007, the Debtor repaid its debtor-in-possession financier. The Debtor sold its domestic
15  assets, including its accounts receivable, its furniture and equipment and its "legacy"
16  hardware and parts, in early 2008. It entered into settlements with two secured creditors,
17  Wells Fargo Bank and Canopy, in 2007 and 2008, respectively. The Debtor has brought
18  various actions against other parties; some actions have settled and others remain
19  pending. MTI maintains that it has two additional assets, approximately $120 million in
20  net operating losses (Third Amended Disclosure Statement, p. 70) and its status as a
21  public company.

22        The Plan seeks to achieve these goals: (1) the distribution of MTI's cash to its
23  creditors; (2) the cancellation of its stock and other equity interests; (3) the discharge of
24  all its liabilities; and (4) creation of a Reorganized Debtor, essentially a new corporate
25  shell, with no business, no liabilities and no assets other than the claim of an NOL. An
26  undisclosed amount of the Reorganized Debtor's common stock will be issued to the Plan
27  Agent, in trust for the General Unsecured Creditors; and the Plan Agent will seek a
28  reverse merger with an unidentified privately held company.

1    Historically, and inside or outside bankruptcy, a privately held company might pay
2  those in control of a bankrupt publicly held corporate shell an agreed-upon sum in
3  exchange for the great majority of the shell's common stock, leaving a small percentage
4  of the stock to be distributed to other shareholders who would comprise the public base.
5  Thus, the privately held company would be transformed, without the burden of
6  registration (which would mandate full disclosure of facts about the private company),
7  into a publicly held company that could more easily sell stock to raise capital and whose
8  new majority owners would have more liquidity since (in theory at least) there would be a
9  market for the stock.

10    Starting in late 2005, however, Commission rules and rule amendments have
11  required that a shell company that is reporting an event that causes it to cease being a
12  shell company (e.g., merger with an operating company) must disclose the same type of
13  information that it would be required to provide when registering a class of securities
14  under the Securities Exchange Act of 1934.  Among other things, compliance with these
15  rules would require audited financial statements.  ( See Release Nos. 33-8587; 34-52038;
16  International Series Release No. 1293; File No. S7-19-04.)  The applicable reports are
17  required to be filed within four days of the reportable events.  These changed
18  requirements work to diminish the incentive for privately held companies to engage in
19  reverse mergers, which  have often been associated with fraudulent activities such as
20  "pump-and-dump" schemes.[3]

21    Another feature of the Plan is a provision (Section 12.3) which purports to bar
22  creditors, shareholders and other parties-in-interest from asserting "any liability" against
23  "the Committee, the Post-Effective Date Committee, the Debtor, the Reorganized Debtor,
24  the Board of the Reorganized Debtor, the Plan Agent [or] any of their respective

25

26    [3] Historically, corporate shell transactions have been a focal point of fraudulent conduct.
27  *See, e.g., Securities and Exchange Commission v. Datronics Engineers, Inc.,* 490 F.2d 250 (4th
   Cir. 1973), *cert. denied* 416 U.S. 937 (1974).  The advent of the internet has made this kind of
28  fraud even more prevalent.

1  Representatives" for any act or omission connected with or arising out of, generally, the

2  bankruptcy case or distributions to be made as a result of the bankruptcy case.

3  **DISCUSSION**

4  **I.    MTI Is Not Entitled to a Discharge**

5  **A.    The Plan Provides for the Liquidation of Substantially All the Property**

6  **of the Estate.**

7  **1.    The Net Operating Loss.** It is plain that except for some

8  outstanding pieces of litigation, the Debtor's affairs have been concluded and its assets

9  substantially liquidated. While the Debtor claims to have a net operating loss of

10  approximately $120 million, it has not made a showing that (1) this number is accurate

11  and (2) after application of the Tax Code, any value would remain. The Debtor has not

12  filed audited financial statements for any time periods later than 2007. Without audited

13  financial statements, it may not be possible to establish the true amount of any net

14  operating losses. Secondly, the Debtor has made no showing regarding how much of the

15  net operating loss might be usable by a company after application of relevant Tax Code

16  provisions. One factor in those Tax Code provisions may be the extent of the Debtor's

17  change in ownership. The Debtor will have a 100% (one hundred percent) change in

18  ownership, since all its common stock is cancelled under the Plan. In these

19  circumstances, it is entirely possible that any net operating loss may be of minimal value

20  to another company. Absent more than what the Debtor has so far presented, it is fair to

21  say that substantially all the property of the estate has been liquidated, satisfying the

22  requirement of 11 U.S.C. section 1141(d)(3)(A).

23  **2.    The Debtor's Status as a Public Company.** The Debtor also

24  maintains that its present status as a public company is actually an asset. That is

25  incorrect. It is elementary accounting that a corporation has assets and liabilities. The

26  owners of the corporation are those who hold its common stock, and one measure of the

27  value of that stock is the sum of the assets minus the liabilities. A debtor corporation's

28  own stock, whether issued or unissued, is not its asset and is not property of its estate. Its

5

1    *issued* stock is property of whoever owns that stock. *See, Matter of Paseo del Norte Oil*

2    *Co.,* 755 F.2d 421 (5th Cir. 1985); *In re Panda Development Corp., Inc.,* 76 B.R. 199

3    (Bankr. M.D. Fla. 1987). A debtor corporation's *unissued* stock likewise is not among its

4    assets. *In re Mid-America Petroleum, Inc.,* 71 B.R. 140, 141-142 (Bankr. N.D. Tex. 1987)

5    (holding that authorized but unissued stock is not property of the estate and therefore is

6    outside the scope of § 363); *see also, In re Trinity Gas Corp. (Reorganized),* 242 B.R.

7    344, 352 (Bankr. N.D. Tex. 1999) (debtor does not have a property interest in stock that it

8    issues), *aff'd.,* 2000 U.S. Dist. LEXIS 8940 (N.D. Tex., May 24, 2000); *In re CPT*

9    *Corporation,* 1992 Bankr. LEXIS 1474 (Bankr. D. Minn., Sept. 21, 1992 at *9 (Board of

10   Directors can honor obligations of convertible debentures without Bankruptcy Court

11   authority since debtor's securities are not assets or property of the estate).

12         Non-bankruptcy law also establishes the principle that a corporation's ownership is

13   separate and distinct from its assets and liabilities. As set forth in one accounting

14   textbook:

15         Authorized capital stock means the number of shares which the state has
       authorized a corporation to issue. . . . The securing of authority to issue
16         shares of stock does not bring an asset into existence nor does it give the
       corporation any capital. Authorization merely affords a legal opportunity to
17         obtain assets through the sale of stock . . .

18   W. Meigs, A. Mosich, et al., *Intermediate Accounting* (McGraw-Hill, 3rd ed.), p. 533,

19   excerpt attached as Exhibit 2. Even when a corporation buys back its own issued stock

20   ("treasury stock"), the issued stock is not counted as an asset. As stated in an accounting

21   textbook:

22         In describing what treasury stock *is*, we should also understand what it *is
       not*. The investments that your company makes and holds in the form of
23         securities issued by other companies are, without a doubt, *assets* . . .; the
       "investments" your company makes in its own stock, . . . are not
24         investments–shares of treasury stock are *not* an asset. [Emphasis in
       original.]
25

26   R. Dixon and H. Arnett, *The McGraw-Hill 36-Hour Accounting Course* (3rd ed. 1993), p.

27   145, excerpt attached as Exhibit 3. In other words, while a company's stock presents the

28   possibility of obtaining cash, that possibility is not in itself an asset. More broadly, the

6

1  public status of MTI is not its asset; at most the public status means that the company may

2  be able to issue and sell its stock on the public markets, although, as noted above, if the

3  company's registration is revoked, it will not even have that possibility.  Since MTI's

4  status as a public company is not an asset, it does not change the fact that substantially all

5  MTI's assets have been liquidated.

6        **B.    MTI Is Not Continuing In Business.**

7        MTI's business has been concluded.  The Reorganized Debtor will be looking for

8  a business, but that is not the same as being engaged in business.  No product is being

9  made or service offered; no money is coming in and going out.  The only activity other

10  than the continuing process of liquidation, will be the Plan Agent's quest for a merger

11  partner.  That activity is not the same as "engaging in business."

12       Therefore, MTI is not entitled to a discharge under the terms of Section 1141

13  (d)(3); and this result is consonant with the public policy reasons that underlie that

14  section:  the prevention of trafficking in corporate shells.

15

16  **II.    Fostering Corporate Shell-Trafficking Is Specifically Contrary to Basic**

17              **Bankruptcy Code Policy.**

18       It is well established that the underlying objectives of Chapter 11 include

19  facilitating the successful rehabilitation of a debtor or its orderly liquidation.  *In re*

20  *General Teamsters, Warehousemen and Helpers Union, Local 890,* 265 F.3d 869, 876 (9th

21  Cir. 2001).   These objectives specifically exclude use of Chapter 11 to foster corporate

22  shell-trafficking.   Congressional intent in this regard is reflected in the Code sections that

23  deny a discharge to a liquidating corporate debtor.  Congress reasoned that allowing a

24  failed corporation to use the bankruptcy process to dump the liabilities it accrued through

25  its past business activities, then to emerge scot-free to try another business, encourages

26  irresponsible, even fraudulent corporate behavior.

27       MTI's corporate shell proposal is a prime example of what Congress has sought to

28  discourage: MTI seeks to discard and leave by the wayside not only its liabilities but also

7

1    its old shareholders, who thus lose their entire investment, while New MTI goes forth as a

2    new corporation to try again, hoping to attract a new set of public shareholders, with

3    whom the cycle may repeat.

4          Congress enacted Section 1141(d)(3) to "avoid trafficking in corporate shells and

5    in bankrupt partnerships." H.R. Rep. No. 595, 95th Cong., 1st Sess. 384, 418-19 (1977),

6    *reprinted in Collier on Bankruptcy,* App. C. at App. Pt. 4-1526, 4-1570 (15th rev.ed.,

7    2006).   *See also, In re Goodman,* 873 F.2d 598, 602 (2d Cir. 1989), *overruled on other*

8    *grounds,* ("Congress deliberately excluded [liquidated] corporations from eligibility for

9    discharge . . . to avoid trafficking in corporate shells."); *Nat'l Labor Relations Bd. v.*

10   *Better Bldg. Supply Corp.,* 837 F.2d 377, 379 (9th Cir. 1988) (when liquidated corporation

11   resumed operations, it continued liable for its corporate debt). As stated in the Report of

12   the Commission on Bankruptcy Laws of the United States, "eliminating the discharge of

13   corporate bankrupts restricts the manipulative use of bankrupt shells in violation of

14   securities laws and other legislation protecting public investors in and creditors of

15   corporations." Report of the Commission on Bankruptcy Laws of the United States, H.R.

16   Doc. No. 93-137, 93d Cong., 1st Sess. (1973), *reprinted in Collier on Bankruptcy,*

17   Appendix Volume B at App. Pt. 4-703 through App. Pt. 4-704 (15th rev. ed. 2006).

18         The bankruptcy court in *In re Fairchild Aircraft Corp.,* 128 B.R. 976 (Bankr. W.D.

19   Tex. 1991), explained how Section 1141 (d)(3) of the Bankruptcy Code operates to

20   prevent the trafficking in corporate shells:

21         Congress designed Section 1141(d)(3) to discourage trading in corporate

22         shells.  It achieves that goal by freighting the shell with all the claims, so

23         that any claims or portions of claims not paid by the liquidation will attach

24         to the shell, making the shell much less attractive for use in starting up

25         another enterprise.

26   *Fairchild,* 128 B.R. at 982 (citation omitted).

27         The protection afforded by Section 1141(d)(3) against trafficking in corporate

28   shells is particularly meaningful with respect to publicly traded companies or companies

8

1  that go public through the bankruptcy process.  As the *Fairchild* court explained,
2  "[w]ithout it, entities would be tempted to pick up the shell, issue new stock, and start a
3  new business without the dead weight of old debt, undermining not only the integrity and
4  bona fides of the bankruptcy system but also the underlying salutary function of the
5  securities laws." *Id.*, at 982, n.6.  These policy concerns are particularly apt here, where
6  MTI, discharged of its debt, will not continue with its now-defunct business.  Instead, as
7  the "Reorganized Debtor," it will be a corporate shell in search of a business.  It should
8  also be noted that MTI has had almost three years to find a merger partner, and it has not
9  been successful.  Its speculative Plan should not be confirmed in the face of clear
10  Congressional intent to prevent the bankruptcy process from being used as an incubator
11  for corporate shells.

12      MTI may argue that its corporate shell proposal, however problematic, should be
13  approved because it offers some small possibility of a return to creditors.[4]  Because there
14  is no merger in sight, nothing whatsoever can be known about the merger terms.
15  Accordingly, MTI has no basis for such an argument.   Even when a debtor has an actual
16  proposal, courts will consider whether the plan proposal is contrary to underlying policy.
17  *See, In re Maxim Indus., Inc.*, 22  B.R. 611, 612-13 (Bankr. D. Mass. 1982) (court denied
18  confirmation of plan under which shell corporation would acquire stock of operating
19  corporation, even though creditors would have received distribution under plan but no
20  distribution if debtor were liquidated; court concluded that "Chapter 11 was not designed
21  to permit the use of shell corporations for the personal benefit of the officers of the
22  corporation").  Especially where, as here, the benefit to creditors is highly speculative and
23  likely to be inconsequential in any event, policy considerations should prevail.

24

25

26

---

27      [4] Courts sometimes find that the possibility is so small as to be illusory. *See, In re Trans
Max Tech., Inc.*, 349 B.R. 80, 94  (Bankr. D. Nev. 2006) (feasibility requires a showing of a
28  "viable business" and court should "protect creditors against visionary schemes").

1  **III.    Bankruptcy Courts Have No Jurisdiction To Confirm Plans That Seek To**

2  **Discharge Non-Debtor Liability**

3  **The Plan's Releases of Liability for Non-Debtors Contravene Established Law**

4  **and Make the Plan Non-Confirmable.**

5  A Bankruptcy Code discharge is for the benefit of a debtor only, and is not

6  available to benefit non-debtors, even when non-debtors are co-liable on the discharged

7  debt. 11 U.S.C. §524(e). Also, under 11 U.S.C. §1129(a)(1), a plan can be confirmed

8  only if it complies with all applicable provisions of Title 11. Thus, a Plan's inclusion of a

9  discharge of liability for non-debtor third parties, in contravention of §524(e), renders the

10 Plan unconfirmable.

11  When a debtor receives a discharge in a bankruptcy case, that discharge comes into

12 being as a matter of law.[5] *Underhill v. Royal,* 769 F.2d 1426, 1432 (9th Cir. 1985). In a

13 Chapter 11 case, the discharge applies to and binds the creditors and interest holders

14 whether or not they receive anything of value under the plan. Although the debtor can

15 compromise its claims under the plan (11 U.S.C. §1123(b)(3)(A)), a discharge is not a

16 settlement and does not arise because of an exchange of value. Accordingly, the fact that

17 certain creditors will receive value under a plan does not operate to confer a discharge on

18 the debtor, and *a fortiori* does not create an obligation on those creditors to give releases

19 of liability to non-debtor third parties.

20  Only a debtor that has submitted to the burdens of the bankruptcy process may be

21 entitled to a discharge. Section 524(e) of the Bankruptcy Code, 11 U.S.C. §524(e),

22 provides, "Except as provided in subsection (a)(3) of this section, discharge of a debt of

23 the debtor does not affect the liability of any other entity on, or the property of any other

24 entity for, such debt."

25  The Ninth Circuit is among the courts that have concluded that §524(e) prevents

26 the court's provision of discharges of liability for non-debtors. In *In re Lowenschuss,* 67

27

28  [5] As discussed above, the Debtors in this case are not entitled to a discharge.

10

1 F.3d 1394, 1401 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 2497 (1996), the court stated:

2 "The bankruptcy court lacks the power to confirm plans of reorganization which do not

3 comply with applicable provisions of the Bankruptcy Code .  .  .  . This court has

4 repeatedly held, without exception, that §524(e) precludes bankruptcy courts from

5 discharging the liabilities of non-debtors." See also, *In re Pacific Lumber Co.,* 584 F.3d

6 229, 251-253 (5th Cir. 2009) (confirmed plan's releases of liability that are contrary to

7 section 524(e) are not equitably moot and are stricken upon appeal).

8        Many other courts have reached the same conclusion.  *See, e.g.,  In re Continental*

9 *Airlines,* 203 F.3d 203, 211-217 (3rd Cir. 2000)(extensive review of law leads to

10 conclusion that plan cannot bar shareholder lawsuits against officers and directors); *Feld*

11 *v. Zale (Matter of Zale Corp.),* 62 F.3d 746, 760-61 (5th Cir. 1995) ("Section 524 prohibits

12 the discharge of debts of nondebtors"); *Green v. Welsh.* 956 F.2d 30, 33 (2nd Cir. 1992)

13 ("the language of [section 524(e)] reveals that Congress sought to free the debtor from his

14 personal obligations while ensuring that no one else reaps a similar benefit"); *In re*

15 *Western Real Estate Funds, Inc.*, 922 F.2d 592, 600 (10th Cir. 1990), *modified sub nom.*

16 *on other grounds, Abel v. West*, 932 F.2d 898 (10th Cir. 1991) ("Obviously, it is the

17 debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its

18 protections; Congress did not intend to extend such benefits to third-party bystanders.").

19        The Plan cannot be confirmed so long as it provides the releases embodied in

20 Section 12.3 of the Plan.  That section provides as follows:

21        Effective as of the Effective Date, neither the Committee, the Post-Effective

22        Date Committee, the Debtor, the Reorganized Debtor, the Board of the

23        Reorganized Debtor, the Plan Agent nor any of their respective

24        Representatives shall have or incur any liability to any Creditor or Interest

25        Holder or to any other party-in-interest or entity for any act or omission in

26        connection with or arising out of the negotiation, preparation and pursuit of

27        confirmation of this Plan, the approval of the Disclosure Statement, the

28        consummation of this Plan, the administration of this Plan, the Bankruptcy

11

1        Case or the property to be distributed under this Plan or the making of

2        Distributions under this Plan, to the fullest extent permitted by applicable

3        statutory and case law, except only that the Plan Agent shall be responsible

4        for making the Distributions provided for by this Plan.

5    The Committees may have certain limited immunities to the extent the Committee

6    members' acts and omissions are in good faith and within the purview of their official

7    duties. However, even the Committees are not entitled to the unqualified discharge of all

8    liability as set forth in this provision; and the "Representatives" – the officers, directors,

9    lawyers, accountants and other advisers for the enumerated entities – are not entitled to

10    protection from any and all activities related to the bankruptcy case, no matter what kind

11    of actions they may take or fail to take. Accordingly, the Plan cannot be confirmed with

12    these releases.

13        The Commission and the Plan Proponents have entered into negotiations regarding

14    the release language in Plan Section 12.3, and it may be that this issue will be resolved

15    before the hearing.

16    **IV.    Conclusion**

17        The Plan fosters corporate shell-trafficking by its provision of a new, liability-free

18    corporate shell, owned in undefined part by the former general unsecured creditors, who

19    constitute a base of public shareholders to benefit the promoters and principals of an

20    unknown company. In that connection, the Plan purports to discharge the liabilities of the

21    Debtor, a defunct shell corporation that is not continuing in business, in contravention of

22    11 U.S.C. § 1141(d)(3). The Plan Proponents' argument that they have an obligation to

23    exploit the "value" of the NOL and the company's public status for the benefit of the

24    general unsecured creditors has a questionable foundation. Most importantly, the

25    negligible benefit, if any,  to the creditors must be weighed against the violation of a

26    strong public policy against misuse of the Bankruptcy Code to promote trafficking in

27    public shells.

28

1       On these grounds and for these reasons, the Commission respectfully submits that

2  confirmation of the Plan should be denied.

3

4  Dated: July 22 , 2010

5                                     Respectfully submitted,

6                                     */s/ Sandra W. Lavigna*

7                                     SANDRA W. LAVIGNA

8                                     Senior Bankruptcy Counsel
                                   Los Angeles Regional Office
                                   U. S. Securities and

9                                     Exchange Commission

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1





DIVISION OF
CORPORATION FINANCE

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

July 9, 2010

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Mr. Scott J. Poteracki
Chief Restructuring Officer
MTI Technology Corporation
15641 Red Hill
Suite 200
Tustin, CA 92780

Re:  MTI Technology Corporation
     File No. 0-23418

Dear Mr. Poteracki:

We are writing to address the reporting responsibilities under the Securities Exchange Act of 1934 of the referenced company. For ease of discussion in this letter, we will refer to the referenced company as the "Registrant".

It appears that the Registrant is not in compliance with its reporting requirements under Section 13(a) of the Securities Exchange Act of 1934. If the Registrant is in compliance with its reporting requirements, please contact us (through the contact person specified below) within fifteen days from the date of this letter so we can discuss the reasons why our records do not indicate that compliance. If the Registrant is not in compliance with its reporting requirements, it should file all required reports within fifteen days from the date of this letter.

If the Registrant has not filed all required reports within fifteen days from the date of this letter, please be aware that the Registrant may be subject, without further notice, to an administrative proceeding to revoke its registration under the Securities Exchange Act of 1934. This administrative proceeding would be brought by the Commission's Division of Enforcement pursuant to Section 12(j) of the Securities Exchange Act of 1934. If the Registrant's stock is trading, it also may be subject to a trading suspension by the Commission pursuant to Section 12(k) of the Securities Exchange Act of 1934.

Exhibit 1 Page 14

Page 2

Finally, please consider whether the Registrant is eligible to terminate its registration under the Securities Exchange Act of 1934. If the Registrant is eligible to terminate its registration, it would do so by filing a Form 15 with the Commission. While the filing of a Form 15 may cease the Registrant's on-going requirement to file periodic and current reports, it would **not** remove the Registrant's obligation to file all reports required under Section 13(a) of the Securities Exchange Act of 1934 that were due on or before the date the Registrant filed its Form 15. Again, if the Registrant is eligible to terminate its registration under the Securities Exchange Act of 1934, please note that the filing of a Form 15 would not remove the Registrant's requirement to file delinquent Securities Exchange Act of 1934 reports – the Registrant would still be required to file with the Commission all periodic reports due on or before the date on which the Registrant filed a Form 15.

If you should have a particular question in regard to this letter, please contact the undersigned at (202) 551-3245 or by fax at (202) 772-9207.

Sincerely,

Marya D. Simpson
Special Counsel
Office of Enforcement Liaison
Division of Corporation Finance

cc: Scott C. Clarkson, Esq., Clarkson, Gore & Marsella, APC, 3424 Carson Street, Suite 350, Torrance, California 90503; Robert E. Opera, Esq., Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660

Exhibit 1 Page 15

# EXHIBIT 2

# INTERMEDIATE ACCOUNTING

## THIRD EDITION

**WALTER B. MEIGS, Ph.D., C.P.A.**
Professor of Accounting
University of Southern California

**A. N. MOSICH, Ph.D., C.P.A.**
Professor of Accounting and
Chairman, Department of Accounting
University of Southern California

**CHARLES E. JOHNSON, Ph.D., C.P.A.**
Late Professor of Accounting
University of Oregon

**THOMAS F. KELLER, Ph.D., C.P.A.**
Professor of Accounting
Duke University

**McGRAW-HILL BOOK COMPANY**

New York    St. Louis    San Francisco    Düsseldorf    Johannesburg
Kuala Lumpur    London    Mexico    Montreal    New Delhi    Panama
São Paulo    Singapore    Sydney    Tokyo    Toronto

Exhibit 2 Page 16

1 *Authorized capital stock* means the number of shares which the state has authorized a corporation to issue. Typically a corporation will obtain authorization for a much larger number of shares than it plans to issue in the foreseeable future. The securing of authority to issue shares of stock does not bring an asset into existence nor does it give the corporation any capital. Authorization merely affords a legal opportunity to obtain assets through the sale of stock. Consequently, authorization of capital stock does not constitute a transaction to be recorded in the debit-credit structure of accounts. A notation of the event in the general journal and in the ledger account for capital stock is appropriate.

2 *Issued capital stock* is the cumulative total number of authorized shares that have been issued to date. The number of issued shares includes treasury stock, as defined below.

3 *Unissued capital stock* describes the authorized shares that have not as yet been issued to investors.

4 *Outstanding capital stock* is the number of authorized shares that have been issued and are presently held by stockholders.

5 *Treasury stock* means the corporation's own shares which have been issued, fully paid, and reacquired by the issuing corporation but not canceled. Treasury stock is included in issued capital stock as defined above, but is not part of outstanding capital stock.

6 *Subscriptions to capital stock* represent an asset, in the form of a receivable from investors who have promised to pay the subscription price at a future date.

7 *Subscribed capital stock* refers to authorized but unissued shares which are earmarked for issuance under existing contracts with subscribers. The subscribed stock is issued when a subscription contract is collected in full. If financial statements are prepared between the date of obtaining stock subscriptions and the date of issuing the stock, the subscribed stock will appear in the stockholders' equity section of the balance sheet.

## Ledger accounts for contributed capital

Investments of capital by stockholders usually require the use of two types of stockholders' equity accounts: (1) capital stock accounts, and (2) accounts for paid-in capital in excess of par or stated value.

**Capital Stock Accounts**  A separate ledger account is used for each class of capital stock. The number of shares authorized and the par or stated value may be recorded by a memorandum entry in the general journal and may also be indicated by a memorandum in the ledger accounts as shown below.

---

**6% Preferred Stock**

*(Authorized 10,000 shares, $100 par value, cumulative)*

---

**Common Stock**

*(Authorized 1,000,000 shares, no par value, stated value $5)*

---

**Exhibit 2 Page 17**

# EXHIBIT 3

# THE McGRAW-HILL 36-HOUR ACCOUNTING COURSE

**Third Edition**

# ROBERT L. DIXON

Professor Emeritus of Accounting
School of Business Administration
University of Michigan

# HAROLD E. ARNETT

Professor of Accounting
School of Business Administration
University of Michigan

## McGraw-Hill, Inc.

New York  San Francisco  Washington, D.C.  Auckland
Bogotá  Caracas  Lisbon  London  Madrid  Mexico City
Milan  Montreal  New Delhi  San Juan  Singapore
Sydney  Tokyo  Toronto

Exhibit 3 Page 18

cookie and cracker maker, has found what it considers a hot invest-ment for some extra cash it has on hand. The investment is called Keebler Co."

To "buy itself," a corporation merely places an order for some of its own outstanding shares in the stock market, much as any of us might purchase shares through our broker. When the corporation does ac-quire its own shares, they may be canceled and retired or they may be held in an inactive state in the corporate treasury (wherever that may be). Shares held in the treasury are aptly termed *treasury shares* or *treasury stock.*

Treasury shares have no voting rights and dividends cannot be paid on them, since such an act would constitute the farce of taking money out of your pocket, putting it right back in the same pocket, and claim-ing you had both paid a dividend and received some dividend revenue. Before Securities and Exchange Commission rules put an end to the charade, some companies were actually siphoning book dollars out of their "surplus" accounts to symbolize a dividend and were reflecting the very same dollars as "dividend income" in their income statements! In the absence of the prohibition, a company with $1,000,000 in its Retained Earnings account could show net earnings of nearly $1,000,-000 per year and not do a tap of work. It would merely declare a dividend, mostly payable to itself, recorded as follows:

**(1)**

| | | |
|---|---|---|
| Retained Earnings | 1,000,000 | |
| Dividends Payable | | 1,000,000 |
| To record declaration of dividend. | | |

**(2)**

| | | |
|---|---|---|
| Dividends Payable | 1,000,000 | |
| Cash | | 100,000 |
| Dividend Revenue | | 900,000 |
| To record "payment" of dividend 10% of which is paid on stock held by outsiders and 90% on stock held in our treasury. | | |

In describing what treasury stock *is,* we should also understand what it *is not.* The investments that your company makes and holds in the form of securities issued by other companies are, without a doubt, *assets* (either current or noncurrent); the "investments" your company makes in its own stock, contrary to the implications of the headline quoted earlier, are not investments—shares of treasury stock are *not* an asset.

**Exhibit 3 Page 19**

| In re:<br>**MTI TECHNOLOGY CORPORATION**<br><br>Debtor(s). | CHAPTER **11**<br><br>CASE NUMBER **8:07-bk-13347-ES** |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**5670 Wilshire Blvd., 11th Floor, Los Angeles, California 90036.**

A true and correct copy of the foregoing document described **OBJECTION OF U.S. SECURITIES AND EXCHANGE COMMISSION TO CONFIRMATION OF DEBTOR'S AND COMMITTEE'S THIRD AMENDED CHAPTER 11 PLAN** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On July 22, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Scott C. Clarkson       sclarkson@lawcgm.com
- United States Trustee   ustpregion16.sa.ecf@usdoj.gov
- Richard H. Golubow      rgolubow@winthropcouchot.com, pj@winthropcouchot.com
- Payam Khodadadi         pkhodadadi@winthropcouchot.com, pj@winthropcouchot.com
- Robert E. Opera         pj@winthropcouchot.com, sconnor@winthropcouchot.com

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On __**July 22, 2010**__ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Erithe A. Smith
Judge, United States Bankruptcy Court
Central District of California – Santa Ana Division
411 W. Fourth Street,
Santa Ana, California 92701-4593

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| _July 22, 2010_ | _Louie M. Adame_ | _____ |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.