ROBERT E. OPERA – State Bar No. 101182
ropera@winthropcouchot.com
RICHARD H. GOLUBOW – State Bar No. 160434
rgolubow@winthropcouchot.com
JEANNIE KIM – State Bar No. 270713
jkim@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone:   (949) 720-4100
Facsimile:   (949) 720-4111

Counsel for the Plan Agent Appointed
Under Joint Fourth Amended Chapter 11 Plan

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:07-bk-13347 ES |
| MTI TECHNOLOGY CORPORATION, a Delaware corporation, | Chapter 11 Proceeding |
| | **PLAN AGENT'S MOTION FOR APPROVAL OF SALE, PURSUANT TO PROVISIONS OF CONFIRMED PLAN, OF STOCK IN THE DEBTOR; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF RICHARD J. FEFERMAN IN SUPPORT THEREOF** |
| Reorganized Debtor. | |
| | DATE:      July 9, 2013 |
| | TIME:      10:30 a.m. |
| | PLACE:     Courtroom 5A |
| |                 411 West Fourth Street |
| |                 Santa Ana, CA 92701 |

**TO THE HONORABLE ERITHE A. SMITH, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND CERTAIN CREDITORS AND OTHER PARTIES-IN-INTEREST:**

Corporate Recovery Associates, LLC, the duly acting Plan Agent under the Joint Fourth Amended Chapter 11 Plan ("Plan") filed jointly by Debtor MTI Technology Corporation ("Debtor")[1] and by the Official Committee of Unsecured Creditors ("Committee"), hereby submits this Motion for Approval of Sale, Pursuant to Provisions of Confirmed Plan, of Stock in the Debtor ("Motion").

By this Motion, the Plan Agent requests that this Court approve the Plan Agent's sale, free and clear of claims, liens and interests (collectively, "Liens"), of the stock in the Debtor to Fiber International, LLC ("Buyer") in accordance with the terms and conditions of that Stock Purchase Agreement, dated May 10, 2013 ("Agreement"), entered into by and between the Debtor and the Buyer.

The Plan Agent believes that the Court's approval of this Motion is in the best interests of the Debtor's creditors. The Plan provides that the Plan Agent is authorized to dispose of assets of the Debtor and to distribute the proceeds thereof to the Debtor's creditors in satisfaction of the Debtor's obligations to its creditors. The Plan provides specifically that the Plan Agent is authorized to evaluate the possibility of selling the Debtor's stock for value for the benefit of the Debtor's creditors. As set forth in detail in the Declaration of Richard J. Feferman attached hereto ("Feferman Declaration"), since the Effective Date of the Plan, the Plan Agent has acted diligently to sell the remaining assets of the Debtor and/or to sell the stock in the Debtor in order to generate value therefrom which may be distributed to creditors pursuant to the Plan. The Plan Agent's efforts in this regard now have borne fruit. Subject to the approval of this Court, the Plan Agent has entered into the Agreement pursuant to which the Plan Agent has agreed to sell to the Buyer, and the Buyer has agreed to purchase from the Plan Agent, the stock in the Debtor in exchange for the Buyer's paying to the Plan Agent, for the benefit of the creditors of the Debtor, the sum of $500,000 cash. The Plan Agent believes that the proposed sale of the Debtor's stock to the Buyer pursuant to the terms and conditions of the Agreement is on terms favorable to the Debtor's

---

[1]    References herein to the "Debtor" include the Reorganized Debtor.

creditors, will enhance significantly the recovery by the Debtor's creditors, and will facilitate the winding up of the Debtor's financial affairs and the Plan Agent's making final distributions to the Debtor's creditors under the Plan and the closing of this chapter 11 case.

This Motion is made and based upon the foregoing allegations and representations, the Memorandum of Points and Authorities and the Feferman Declaration attached hereto, the pleadings, papers and other documents on file in the Debtor's case, and any supplemental evidence, both oral and documentary, that the Plan Agent may submit to this Court at or before the time of the hearing on this Motion.

**WHEREFORE**, the Plan Agent hereby requests that this Court enter an order granting to the Plan Agent the following relief:

1.      Approving the terms and conditions of the Agreement;

2.      Authorizing the sale and assignment to the Buyer of the stock in the Debtor, free and clear of Liens, in accordance with the terms and conditions of the Agreement and as set forth herein;

3.      Authorizing the Plan Agent to take any acts, and to execute any documents, appropriate to effectuate the provisions of the Agreement;

4.      Waiving the fourteen-day stay of orders provided by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"); and

5.      Granting to the Plan Agent such other and further relief as this Court deems just and appropriate under the facts and circumstances of this case.

DATED: June 14, 2013                    **WINTHROP COUCHOT
PROFESSIONAL CORPORATION**


By: */s/ Robert E. Opera*
            Robert E. Opera
            Richard H. Golubow
            Jeannie Kim
Counsel for the Plan Agent Appointed
Under Joint Fourth Amended Chapter 11 Plan

### MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### FACTUAL BACKGROUND

**A.    THE DEBTOR AND THE DEBTOR'S BUSINESS.**

On October 15, 2007 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is a Delaware corporation.  The Debtor's stock was listed on the NASDAQ Capital Market but thereafter was delisted from the NASDAQ Capital Market for failure to meet certain listing standards.

The Debtor was in the business of providing end-to-end information infrastructure solutions and strategic technology services, and was a re-seller and service provider of EMC Corporation Automated Network Storage Systems and software pursuant to a re-seller agreement with EMC Corporation.

**B.    CESSATION OF DEBTOR'S BUSINESS OPERATIONS.**

As of the Petition Date, the Debtor ceased all business operations.  During this case, the Debtor has attempted to maximize the value of its bankruptcy estate by collecting its accounts receivable, selling, assigning or otherwise transferring its assets and properties, and by prosecuting causes of action, including actions seeking recoveries and avoidance of transfers pursuant to the provisions of sections 547 and 548 of the Bankruptcy Code.  During this case, the Debtor entered into, and consummated, a number of transactions to sell, assign or otherwise transfer assets and properties of its bankruptcy estate.

**C.    THE PLAN.**

On or about August 5, 2010, the Debtor and the Committee filed jointly the Plan for the resolution of the claims asserted against the Debtor's bankruptcy estate.  The Plan provides for a comprehensive debt restructuring of the Debtor in accordance with the terms and conditions of the Plan.  Provisions of the Plan pertinent to the relief requested herein include the following:[2]

---

[2]    The description of the provisions of the Plan contained herein is only a summary of such provisions and is not intended to be a complete statement of all material provisions of the Plan.  In the event of any inconsistency between the provisions of this summary and the provisions of the Plan, the provisions of the Plan will control.

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

1.   **Treatment of Allowed General Unsecured Claims (Section 5.3 of the Plan).**  Pursuant to the Plan, holders of Allowed General Unsecured Claims receive, in full and complete satisfaction of their Allowed General Unsecured Claims, pro rata distributions of the cash maintained in the Plan Fund established by the Plan.[3] The Plan Fund is funded primarily by the cash of the Debtor as of the Effective Date and from cash generated post-confirmation from the sale of assets of the Debtor and proceeds collected post-confirmation from the prosecution of avoidance claims and other causes of action.

In addition, pursuant to Section 5.3.1.5 of the Plan, each holder of an Allowed General Unsecured Claim is allocated under the Plan its pro rata number of shares of Post-Effective Date Stock (i.e., all of the stock in the Reorganized Debtor to be issued by the Plan Agent pursuant to the Plan) to be held in trust for such creditor by the Plan Agent.

2.   **Treatment of Allowed Interests (Section 5.6 of the Plan).**  Pursuant to the Plan, all (pre-confirmation equity) Interests in the Debtor were cancelled as of the Effective Date of the Plan.

3.   **Appointment of Plan Agent (Section 6.6 of the Plan).**  Pursuant to the Plan, the Plan Agent appointed by the Plan has, among others, the following rights, powers and duties:

(a)   Pursuant to Section 6.6.3 of the Plan, the Plan Agent, under the supervision of the Post-Effective Date Committee, may administer, manage, transfer, assign and otherwise dispose of all of the Plan Assets and take all acts appropriate to effectuate the same, free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Rules.

(b)   Pursuant to Section 6.8.2 of the Plan, the Plan Agent, under the supervision of the Post-Effective Date Committee, is authorized to take all acts appropriate to implement the provisions of the Plan.

---

[3]   Except as defined herein to the contrary, the definitions of the capitalized terms contained herein are as set forth in the Plan.

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

(c)    Pursuant to Section 6.8.3 of the Plan, the Plan Agent is appointed as the representative of the estate, and, as such, is vested with the authority and power to take, among others, the following acts on behalf of the Debtor: manage, administer and dispose of Plan Assets for the benefit of holders of Allowed Claims; make all distributions provided for by the Plan; and such other acts as may be appropriate to administer, wind down, and close this case.

Richard Feferman dba Corporate Recovery Associates ("Feferman") was appointed initially as the Plan Agent under the Plan.  Feferman resigned as the Plan Agent, and, in accordance with the provisions of the Plan, Corporate Recovery Associates, LLC has been appointed as, and serves as, the Plan Agent under the Plan.

**4.    Revesting of Assets (Section 6.6 of the Plan).**  Pursuant to the Plan, on the Effective Date of the Plan, the assets of the Debtor vested in the Reorganized Debtor, to be administered by the Plan Agent for the benefit of holders of Allowed Claims.

**5.    Post-Effective Date Committee (Section 6.9 of the Plan).**  Pursuant to the Plan, as of the Effective Date of the Plan, the Committee was terminated and disbanded, and was replaced by the Post-Effective Date Committee.  Pursuant to the Plan, the Post-Effective Date Committee has the right to supervise the Plan Agent in accordance with the terms and conditions of the Plan.

**6.    Evaluation of Possible Merger Transaction (Section 6.10.4 of the Plan).**  Pursuant to the Plan, the Plan Agent, under the supervision of the Post-Effective Date Committee, is authorized to determine whether a merger, stock exchange or comparable transaction (referred to in the Plan as a "Merger Transaction") is viable and whether a Merger Transaction should be effectuated for the benefit of the holders of Allowed General Unsecured Claims.

**7.    Disposition of Plan Assets (Section 6.13 of the Plan).**  Pursuant to the Plan, the Plan Agent is entitled to sell, transfer, assign, encumber or otherwise dispose of any interest in any of the Plan Assets, without any need to give notice to creditors or

parties-in-interest or to obtain any approval of this Court. Notwithstanding the foregoing, pursuant to Section 6.13 of the Plan, the Plan Agent is entitled to seek from this Court an order authorizing the sale of any Plan Asset free and clear of Liens pursuant to the provisions of section 363(f) of the Bankruptcy Code.

**8.     Court Approval of Post-Confirmation Matters (Section 6.15 of the Plan).** Pursuant to the Plan, the Plan Agent is authorized to seek from this Court orders approving actions to be taken consistent with the Plan as may be necessary or desirable to effectuate the provisions of the Plan.

**9.     Merger Transaction (Section 6.18 of the Plan).** Pursuant to the Plan, the Plan Agent is authorized to sell or exchange the Post-Effective Date Stock in the Debtor. Section 6.18.1 of the Plan provides, in part, that the Plan Agent, under the supervision of the Post-Effective Date Committee, may investigate whether a Merger Transaction is viable, and should be pursued for the benefit of holders of Allowed General Unsecured Claims.

Section 6.18.2 of the Plan provides that a Merger Transaction must be completed by the second-year anniversary of the Effective Date of the Plan (i.e., by September 27, 2012) ("Merger Consummation Date"), but authorizes the Plan Agent to request from the Court an extension of the Merger Consummation Date for a period not to exceed one additional year.[4]

**10.     Distribution of Property Free and Clear of Liens (Section 11.4 of the Plan).** Pursuant to the Plan, property distributed under the Plan is distributed free and clear of Liens.

**11.     Court's Retention of Jurisdiction (Section 13.10 of the Plan).** Pursuant to the Plan, this Court retains jurisdiction over any matter related to the Debtor's case or the Plan, including, without limitation, the entry of such orders as may be appropriate to implement or consummate the provisions of the Plan, and hearing and

---

[4]     The Plan contains no limitation as to when any such request for an extension of the Merger Consummation Date must be made by the Plan Agent. The one-year extension period has not yet expired.

1  determining of any manner relevant to the consummation of the Plan and the

2  administration of the Debtor's case.

3      **12.    Post-Effective Date Notice (Section 13.14 of the Plan).**  Pursuant to the

4  Plan, from and after the Effective Date of the Plan, any entity that desires to obtain

5  notice of any proceeding in the Debtor's case, or of any hearing in the Court, or of any

6  matter as to which notice is to be provided under the Plan, must file a request for such

7  notice and serve such request on the Plan Agent, counsel for the Plan Agent, and upon

8  the Post-Effective Date Committee.

9      A copy of the Plan is attached as Exhibit "2" to the Agreement, which is appended as

10  Exhibit "A" to the Feferman Declaration.

11      **D.    CONFIRMATION ORDER.**

12      On September 1, 2010, the Court entered an order confirming the Plan ("Confirmation

13  Order").  A copy of the Confirmation Order is attached as Exhibit "3" to the Agreement

14  (Exhibit "A" to the Feferman Declaration).

15      **E.    EFFECTIVE DATE OF THE PLAN.**

16      In accordance with the provisions of Sections 2.1.56 and 6.3 of the Plan, the Effective

17  Date of the Plan was September 27, 2010.

18      **F.    POST-EFFECTIVE DATE COMMITTEE.**

19      Pursuant to the provisions of Section 6.9 of the Plan, as of the Effective Date of the

20  Plan, the Committee was disbanded and was replaced by the Post-Effective Date Committee.

21  By the Plan, the Post-Effective Date Committee is granted the power, and assigned the duty, to

22  supervise the Plan Agent's performance of its responsibilities under the Plan.  The members of

23  the Post-Effective Date Committee are:  Compnology, Inc.; CCS, Inc.; and The Receivable

24  Management Services Corporation, as agent for FedEx Custom Critical.

25      **G.    DEBTOR'S CURRENT ASSETS.**

26      As set forth in the Feferman Declaration, the Debtor's current assets consist primarily of

27  the following:

28

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

1.    **Cash**.  As of May 1, 2013, the Debtor had approximately $800,000 in cash.

2.    **Intellectual Property**.  The Debtor retains certain intellectual property rights, including patent rights.  For the most part, such intellectual property rights are non-exclusive licenses of relatively older technology that the Debtor was not able to sell or liquidate during the case.

3.    **Intangible Assets**.  Every machine that is on a TCP/IP network (a local network or the internet) has a unique Internet Protocol version address.  Internet Protocol version 4 ("IPv4") is the fourth version in the development of the Internet Protocol.  IPv4 numbers have been given out or allocated by Internet registries (under contracts with the United States Government) to organizations that need such numbers to connect networks, devices and applications to the Internet.  As numbers were assigned to users, the number of unassigned numbers decreased.  It is the Plan Agent's understanding that more than 99% of the IPv4 numbers have been allocated, and, accordingly, that the supply of IPv4 numbers has effectively dried up (referred to as "IPv4 exhaustion").  In or about November 1990, the organization authorized at the time by the United States Government to allocate IPv4 numbers gave to the Debtor the block of IPv4 numbers described more fully in Exhibit "4" to the Agreement.  The Debtor still holds this IPv4 number block.

4.    **Avoidance Claims**.  Numerous avoidance actions and other actions have been filed in order to obtain recoveries for the Debtor's creditors.  The Plan Agent believes that all or virtually all of the claims and causes of action of the estate have been asserted and have been resolved by orders of the Court.

**H.    LIABILITIES OF THE ESTATE.**

By the Debtor's sale and assignment of assets of the Debtor's estate and collection of the Debtor's accounts receivable, the Debtor was able to generate cash sufficient to pay in full all secured claims against the Debtor.  As set forth in the Feferman Declaration, the Plan Agent believes that all priority claims have been paid in full, and that the only remaining pre-petition

1   claims against the Debtor are the claims of the holders of Allowed General Unsecured Claims.

2   As noted hereinabove, each holder of an Allowed General Unsecured Claim is entitled to

3   receive under the Plan, in full satisfaction and discharge of its Allowed General Unsecured

4   Claim, pro rata distributions of the cash on deposit in the Plan Fund.  The Plan Agent has made

5   interim distributions to holders of Allowed General Unsecured Claims, and anticipates that, if

6   the Motion is approved by the Court, the Plan Agent will make as promptly as practicable final

7   distributions on account of Allowed General Unsecured Claims and seek from the Court a Final

8   Decree closing the case.

9           Canopy Group, Inc. ("Canopy") asserts against the Debtor a claim (Class 4 under the

10   Plan) in the amount of $260,000.  The Plan Agent disputes Canopy's claim, and believes that it

11   recently reached with Canopy a settlement by which Canopy has agreed to accept the amount

12   of $150,000 as and for payment in full of its claim.

13           In addition to the obligations owed under the Plan, obligations have been incurred post-

14   confirmation in connection with the administration of the Plan, including obligations to

15   professionals employed by the Plan Agent.  The Debtor may owe a relatively insignificant

16   amount of corporate license and tax obligations associated with maintaining the Debtor's

17   corporate existence.  The Plan Agent believes that the Debtor is current in paying its

18   obligations to the United States Trustee.

19   **I.        MARKETING OF DEBTOR'S REMAINING ASSETS.**

20           As set forth in the Feferman Declaration, from and after the Effective Date of the Plan,

21   the Plan Agent has acted diligently to market the remaining assets of the Debtor in order to

22   generate recoveries therefrom for the benefit of the Debtor's creditors.  The Plan Agent has

23   investigated thoroughly the value of the Debtor's remaining assets, and has consulted with

24   experts in that regard.  Moreover, the Plan Agent has retained experts to assist the Plan Agent

25   to market and to sell the Debtor's remaining assets.

26           While the Plan Agent has obtained from time to time expressions of interest for the

27   acquisition of assets of the Debtor or the stock in the Debtor, the Plan Agent has not received

28

any viable offer for the acquisition of any of the assets of the Debtor or for the stock in the Debtor, except for the offer from the Buyer reflected by the Agreement.

### J.      TERMS OF THE AGREEMENT.

As set forth hereinabove, subject to the approval of the Court, the Plan Agent and the Buyer have entered into the Agreement pursuant to which the Plan Agent agrees to sell to the Buyer, and the Buyer agrees to purchase from the Plan Agent, the Post-Effective Date Stock (i.e., all of the stock in the Reorganized Debtor to be issued by the Plan Agent under the Plan). Material terms of the Agreement include the following:[5]

**1.      Sale of Post-Effective Date Stock (Section 1.1. of the Agreement).** Subject to the terms and conditions of the Agreement, and the approval of this Court, the Plan Agent has agreed to sell to the Buyer, free and clear of Liens, and the Buyer has agreed to purchase from the Plan Agent, the Post-Effective Date Stock.[6]

**2.      Excluded Assets (Section 1.2 of the Agreement).**  Prior to the Closing of the Transaction, the Plan Agent will transfer to a trust to be established for the benefit of the Debtor's creditors ("Trust"), and will not sell to the Buyer, the Debtor's right, title and interest in and to all of the Debtor's assets and properties, except only as provided expressly to the contrary in the Agreement ("Excluded Assets").  The Excluded Assets include the following:

(a)      The Debtor's cash.

(b)      Any refunds, deposits, rebates and comparable assets of the Debtor.

(c)      Any and all claims and causes of action of the Debtor.

(d)      Any furniture, fixtures, equipment, inventory and any other tangible personal property assets of the Debtor.

---

[5]      The description of provisions of the Agreement contained herein is only a summary of such provisions and is not intended to be a complete statement of all material provisions of the Agreement.  In the event of any inconsistency between the provisions of this summary and the provisions of the Agreement, the provisions of the Agreement will control.
[6]      Except as otherwise defined herein, the definitions of the capitalized terms contained in this paragraph "J" are as set forth in the Agreement.

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

3.    **Purchase Price (Section 1.3 of the Plan).**  The Buyer has agreed to pay to the Plan Agent $500,000 cash in order to acquire the Post-Effective Date Stock in the Debtor, and has agreed to pay certain taxes and costs, if any, associated with the Closing of the Transaction.  In accordance with the provisions of Section 1.4 of the Agreement, **the Buyer has provided to the Plan Agent's counsel a deposit for the entire $500,000 Purchase Price.**

4.    **Retained Assets (Section 1.5 of the Agreement).**  The Debtor will retain, and not will not transfer to the Plan Agent, and, accordingly, the Buyer will, as a consequence of its acquisition of the Post-Effective Date Stock, gain effective control of the following assets and properties of the Debtor ("Retained Assets"):

(a)    All intellectual property rights and interests of the Debtor, including any patents, trademarks and other general intangibles of a comparable nature that may be owned by the Debtor.

(b)    The Debtor's interests in the IPv4 numbers described in Exhibit "4" to the Agreement.

5.    **Excluded Liabilities (Article III of the Agreement).**  The Buyer will have no responsibility of any nature whatsoever for any liabilities, debts or obligations of the Debtor arising before the Closing, other than as provided expressly to the contrary in the Agreement.

6.    **Covenants of the Plan Agent (Article IV of the Agreement).**  Pursuant to the Agreement, the Plan Agent covenants and agrees, in part, as follows:

(a)    The Plan Agent will use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to consummate the Transaction.

(b)    The Plan Agent is required to cause the Debtor to pay in full by the Closing Date, or to establish by the Closing Date with the Plan Agent reasonable reserves for the prompt payment in full of, all of the Debtor's obligations to creditors under the Plan which arose on or before the Effective

1    Date of the Plan and all obligations which arose from the Effective Date of the

2    Plan to the date of execution of the Agreement or which may arise from the date

3    of execution of the Agreement through the Closing Date.

4        **7.     Plan Agent's Representations and Warranties (Article VI of the**

5    **Agreement).**  Pursuant to the Agreement, the Plan Agent provides, in part, the

6    following representations and warranties to the Buyer:

7            (a)     Subject to the Court's approval of the Agreement, the Plan Agent

8            has all requisite power and authority to enter into the Agreement and to carry

9            out all of its obligations under the Agreement.

10           (b)     Except as expressly provided in the Agreement, the Plan Agent

11           makes no representation or warranty to the Buyer, and disclaims any

12           representation or warranty, with respect to the Debtor, the Post-Effective Date

13           Stock, the Retained Assets or any other matter, including, without limitation,

14           any representation or warranty as to the value, merchantability, use or fitness

15           for a particular purpose of the Retained Assets.  Subject to the terms of the

16           Agreement, the Plan Agent is selling to the Buyer the Post-Effective Date Stock

17           on an "as is," "where is" and "with all faults" basis.

18       **8.     Survival of Representations, Warranties and Covenants/Limitation**

19   **of Liability (Sections 6.3 and 6.4 of the Agreement).**  Pursuant to Section 6.3 of the

20   Agreement, the representations, warranties, covenants, obligations and agreements of

21   the Plan Agent pursuant to the Agreement will survive any Closing of the Transaction

22   for a period of only 180 days after the Closing ("Buyer Claims Survival Deadline"),

23   after which time the representations, warranties, covenants, obligations and agreements

24   of the Plan Agent will automatically terminate.

25       Pursuant to Section 6.4 of the Agreement, neither the Plan Agent, the Debtor,

26   the Trust, Feferman nor any of their respective directors, officers, employees,

27   shareholders or affiliates will have any personal liability of any nature whatsoever for

28   any breach of any representation, warranty, covenant, obligation or agreement of the

Plan Agent pursuant to the Agreement.  The Buyer's <u>sole</u> remedies for any breach of any representation, warranty, covenant, obligation or agreement of the Plan Agent pursuant to the Agreement are as follows:

    (a)    Pursuant to Section 6.4.1 of the Agreement, the Buyer may terminate the Agreement.  Upon any such termination of the Agreement, the Buyer will have no recourse against the Plan Agent, the Debtor, Feferman or any of their respective directors, officers, employees, shareholders or affiliates.

    (b)    Pursuant to Section 6.4.2 of the Agreement, if the Buyer closes the Transaction, the Buyer may assert, by the Buyer Claims Survival Deadline (<u>i.e.</u>, within 180 days after the Closing) a claim for a credit or an offset against the Purchase Price, in an amount not to exceed $100,000 ("Purchase Price Adjustment Claim").  The Plan Agent is required to deposit into an escrow account or other segregated account ("Segregated Account") the sum of $100,000 from the Purchase Price ("Purchase Price Reserve").  In the event that the Buyer fails to assert by the Buyer Claims Survival Deadline a Purchase Price Adjustment Claim, the Plan Agent will have the right to disburse from the Segregated Account the Purchase Price Reserve as the Plan Agent deems appropriate, and the Buyer will have <u>no</u> claim of any nature whatsoever against the Plan Agent or against the Purchase Price Reserve.  On the other hand, in the event that the Buyer asserts by the Buyer Claims Survival Deadline a Purchase Price Adjustment Claim, the Plan Agent will not disburse from the Segregated Account any amount of the Purchase Price Reserve.  In the event that the Plan Agent and the Buyer are unable to resolve any Purchase Price Adjustment Claim, the Purchase Price Adjustment Claim will be resolved by this Court. Any Purchase Price Adjustment Claim is <u>non-recourse</u> as to the Plan Agent, the Debtor, Feferman and their respective directors, officers, employees, shareholders and affiliates.

**9.      Closing of the Transaction (Article VIII of the Agreement).**  The Closing of the Transaction will be held within three business days after the satisfaction of the conditions to the Closing of the Transaction set forth in Sections 10.1 and 10.2 of the Agreement.  **The most significant condition to the Closing of the Transaction is that the Court enter an order approving the Agreement on terms acceptable to the Buyer and to the Plan Agent.**

**10.      Prorations (Sections 12.1 and 13.1 of the Agreement).**  Pursuant to Section 12.1 of the Agreement, the Plan Agent is required to pay timely the Debtor's portion, prorated as of the Closing Date, of any and all taxes, fees and other costs and expenses affecting the Debtor, the Retained Assets or the Post-Effective Date Stock arising before the Closing.  Pursuant to Section 13.1 of the Agreement, the Buyer is required to pay timely, from and after the Closing Date, the Buyer's portion, prorated as of the Closing Date, of any and all taxes, fees and other costs and expenses affecting the Debtor, the Retained Assets or the Post-Effective Date Stock arising after the Closing.

**11.      Buyer's Indemnity (Section 13.2 of the Agreement).**  The Buyer is required to indemnify and hold harmless the Plan Agent and its directors, officers, employees, shareholders and affiliates from any loss incurred, in part, from the Buyer's ownership and operation of the Debtor or any of the Retained Assets at any time after the Closing.

A copy of the Agreement is attached as Exhibit "A" to the Feferman Declaration.

**II.**

**GOOD CAUSE EXISTS FOR THIS COURT TO APPROVE THE AGREEMENT**

The Plan Agent believes, and hereby respectfully submits to the Court, that good cause exists for this Court to approve the Agreement and to authorize the Plan Agent to sell to the Buyer the Post-Effective Stock in accordance with the terms and conditions of the Agreement.[7]

---

[7]    It may be argued that no Court approval is necessary for the Plan Agent to enter into the Agreement and to perform its obligations under the Agreement.  **Nevertheless, the Buyer has required, as a condition to closing the Transaction, that this Court approve the Agreement and authorize the Plan Agent to perform its obligations under the Agreement.  Therefore, the Plan Agent must obtain from this Court approval of the proposed Transaction in order to close the Transaction.**  Moreover, the Plan Agent believes that, under the circumstances of this case, it is prudent for creditors to obtain notice of the

A.    **THE PLAN AUTHORIZES THE PLAN AGENT TO SELL THE POST-
EFFECTIVE DATE STOCK.**

Pursuant to Section 5.6.1 of the Plan, on the Effective Date of the Plan, all (pre-confirmation equity) Interests in the Debtor were cancelled.  However, pursuant to Section 5.3.1.5 of the Plan, each holder of an Allowed General Unsecured Claim was allocated its pro rata number of shares of Post-Effective Date Stock, to be held in trust for such creditor by the Plan Agent.  The Plan authorizes the Plan Agent to transfer Post-Effective Date Stock if advisable to obtain a recovery for holders of Allowed General Unsecured Claims under the Plan.

This Court may authorize the sale of the Post-Effective Date Stock for, in part, the reasons set forth herein.

1.    **The Plan Provides to the Plan Agent Broad Discretion to Sell Assets for the Benefit of Creditors.**  Pursuant to the Plan, the Plan Agent is provided with broad discretion to sell assets for the benefit of the Debtor's creditors in furtherance of the administration of the Plan and the wind-up of the financial affairs of the Debtor.  In this regard, the Plan provides, in part, as follows:

(a)    Section 6.6.3 of the Plan.  Pursuant to Section 6.6.3 of the Plan, the Plan Agent may "convey, transfer, encumber, assign and otherwise dispose of any and all of the Plan Assets and take all acts appropriate to effectuate the same, free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Rules."

(b)    Section 6.8.2 of the Plan.  Pursuant to Section 6.8.2 of the Plan, the Plan Agent is "authorized to, and shall, take all acts appropriate to implement the provisions of this Plan . . . and, if the Plan Agent deems appropriate, effectuating a Merger Transaction."

(c)    Section 6.8.3 of the Plan.  Pursuant to Section 6.8.3 of the Plan, the Plan Agent is "vested with the authority and power . . . [to] manage, administer and dispose of Plan Assets for the benefit of holders of Allowed Claims . . . [and to

proposed Transaction and for this Court to consider the merits, and to give its approval, of the proposed Transaction.  Thus, by the Motion, the Plan Agent requests that the Court enter an order approving the Transaction.

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

1    take] such other acts as may be appropriate to administer, wind-down, and close the

2    case."

3          (d)    Section 6.10.4 of the Plan.  Pursuant to Section 6.10.4 of the Plan,

4    the Plan Agent is authorized to "determine whether a Merger Transaction is viable,

5    whether a Merger Transaction should be effectuated for the benefit of holders of

6    Allowed General Unsecured Claims and the terms thereof."

7          (e)    Section 6.13 of the Plan.  Pursuant to Section 6.13 of the Plan, the

8    Plan Agent is authorized "to sell, transfer, assign, encumber or otherwise dispose of

9    any interest in any of the Plan Assets, without any need to give notice to creditors

10   or parties in interest or to obtain any approval of the Bankruptcy Court."

11         (f)    Section 6.15 of the Plan.  Pursuant to Section 6.15 of the Plan, the

12   Plan Agent is authorized to seek from the Court orders "approving actions to be

13   taken consistent with this Plan as may be necessary or desirable to effectuate the

14   provisions of this Plan.

15         (g)    Section 6.18 of the Plan.  Pursuant to Section 6.18 of the Plan, the

16   Plan Agent is authorized to "investigate whether a Merger Transaction is viable,

17   and should be pursued for the benefit of holders of Allowed General Unsecured

18   Claims."  Pursuant to Section 6.18.4 of the Plan, "(t)he terms of any Merger

19   Transaction and the terms of any Distribution of Post-Effective Date Stock . . . shall

20   be determined by the Plan Agent."

21   **Thus, the Plan evidences a clear intention to provide to the Plan Agent broad powers**

22   **and authority appropriate for it to effectuate transactions to generate value for the benefit of**

23   **creditors.**

24       2.    **The Plan Expressly Authorizes the Plan Agent to Effectuate Stock**

25   **Transfer Transactions.**  Pursuant to the Plan, the Plan Agent is provided with broad

26   discretion to effectuate stock transfer transactions for the benefit of the Debtor's creditors.

27   In this regard, the Plan provides, in part, as follows:

28

1          (a)      <u>Section 5.3.1.5 of the Plan</u>.  Section 5.3.1.5 of the Plan provides that

2 each holder of an Allowed General Unsecured Claim will receive a "Distribution of

3 . . . the net proceeds realized from the **disposition of such Post-Effective Date**

4 **Stock"** (emphasis added).

5          (b)      <u>Section 6.18.1 of the Plan</u>.  Section 6.18.1 of the Plan provides, in

6 part, that the Plan will permit any **"acquisition [of Post-Effective Date Stock] . . .**

7 **that would benefit the holders of Allowed General Unsecured Claims, as**

8 **holders of Post-Effective Stock in the Reorganized Debtor"** (emphasis added).

9 Section 6.18.1 provides further that the Plan Agent is authorized to investigate

10 whether a stock transaction **"is viable, and should be pursued for the benefit of**

11 **holders of Allowed General Unsecured Claims."**

12       In addition, the approved Disclosure Statement accompanying the Plan

13 acknowledges the potential value of a stock transaction for the benefit of creditors:  such a

14 transaction "could produce substantial value for the benefit of Class 3 Creditors"

15 (paragraph XII(F)(1)(j), footnote 29 of the Disclosure Statement); if such a transaction is

16 effectuated, "recoveries by Class 3 Creditors may be favorably affected" (paragraph

17 XII(F)(2)(b)(iii) of the Disclosure Statement); and such a transaction "potentially may have

18 substantial value for Class 3 Creditors" (paragraph XII(G)(1)(c) of the Disclosure

19 Statement).[8]

---

20 [8]    The capital stock of the Debtor was listed on the NASDAQ Capital Market, but was thereafter delisted for failure to meet
certain listing standards.  As noted above, the Confirmation Order was entered by the Court on September 1, 2010.  On

21 November 2, 2011, in connection with an SEC administrative proceeding, the securities of the Debtor were formally de-registered.
Specifically, the SEC's November 2, 2011 order provides that the registration of each class of the Debtor's securities registered

22 under the federal securities laws was thereby revoked.
    Under Sections 2.1.89 and 5.3.1.5 of the Plan, the Plan Agent is authorized to issue Post-Effective Date Stock of the
Reorganized Debtor.  In connection with the proposed stock sale pursuant to the Agreement, the Plan Agent will issue the Post-

23 Effective Date Stock for sale to the Buyer.
    As demonstrated hereinabove, the provisions of the Plan, and, in particular Sections 5.3.1.5 and 6.18 of the Plan, evidence a

24 <u>clear intention</u> to provide to the Plan Agent broad discretion to effectuate transactions, including stock sales, for the benefit of
creditors.  Section 6.18 of the Plan, however, refers specifically to the Plan Agent's effectuation of a "Merger Transaction" for the

25 benefit of creditors.  Section 6.18.1 refers to a Merger Transaction as follows:
        Although, as of the Effective Date, the Reorganized Debtor will have no significant operations, the

26         Reorganized Debtor may possess substantial net operating losses for tax purposes, and, as a publicly-traded
        company, will possess a shareholder base, which may make it an attractive acquisition or merger candidate,
        including, without limitation, to an operating, privately-held corporation seeking to become a publicly-held

27         company (<u>e.g.</u>, through a "reverse merger" transaction).  This Plan will permit any such acquisition, merger,
        transaction, or other business combination, including, without limitation, a stock exchange, that would

28         benefit the holders of Allowed General Unsecured Claims, as holders of Post-Effective Date Stock in the
        Reorganized Debtor, by allowing them potentially to have an interest in a viable, operating business
        enterprise (any such transaction is referred to herein as a "Merger Transaction").

Thus, the Plan clearly authorizes the Plan Agent to pursue a stock transaction, as is provided for by the Agreement, for the benefit of holders of Allowed General Unsecured Claims, and provides to the Plan Agent broad discretion in order to effectuate a stock transaction. By the Confirmation Order, the Court has authorized the Plan Agent to exercise the rights, powers and duties provided to it by the Plan, including the right to pursue, if appropriate, stock transactions for the benefit of holders of Allowed General Unsecured Claims. See, paragraphs 7, 8 and 12 of the Confirmation Order (Exhibit "3" to the Agreement, which is appended as Exhibit "A" to the Feferman Declaration). Therefore, this Court can, and should, approve the Agreement and authorize the Plan Agent to perform its obligations thereunder.

**B. THIS COURT SHOULD ENTER AN ORDER APPROVING THE AGREEMENT IN ORDER TO IMPLEMENT THE PROVISIONS OF THE PLAN.**

Section 105(a) of the Bankruptcy Code provides, in pertinent part, as follows:

---

The reference in the Plan to a Merger Transaction refers, then, to a transaction to effectuate a merger, business combination or other comparable transaction to take advantage of what were then the publicly-traded shares of stock in the Debtor.

The proposed stock sale pursuant to the Agreement does not qualify as a "Merger Transaction" under Section 6.18.1 of the Plan. Pursuant to Section 5.6 of the Plan, the pre-Effective Date Stock in the Debtor was cancelled. Moreover, the Debtor is no longer a "publicly-traded company," as contemplated by Section 6.18 (in light of the de-registration of the Debtor's securities). Moreover, the proposed stock sale transaction pursuant to the Agreement is not a "business combination" that would benefit the holders of Allowed General Unsecured Claims, as holders of the Post-Effective Date Stock in the Reorganized Debtor, by allowing them potentially to have an interest in a viable, operating business enterprise, as contemplated in Section 6.18. Instead, the proposed stock sale will operate as a simple "cash out" sale of an asset (i.e., the shares of Post-Effective Date Stock).

Since the proposed stock sale transaction does not qualify as a "Merger Transaction," the "Restrictions on Effectuation of a Merger Transaction," as set forth in Section 6.18.7 of the Plan, do not apply to this transaction. In any event, even if the proposed stock sale were a Merger Transaction (and it is not), the shares still could be issued pursuant to the Plan in satisfaction of Section 6.18.7.1 of the Plan because the issuance of the shares is in compliance with section 1145 of the Bankruptcy Code and/or is exempt from the registration requirements of the Securities Act (including under Section 4(1) thereof, which provides an applicable statutory exemption for cash-for-stock mergers). In addition, even if the proposed stock sale were a Merger Transaction (and it is not), the transaction still could be consummated because the Debtor now has no reporting obligations under Sections 13(a) or 15(d) of the Exchange Act. The provisions of Section 6.18.7 were designed to address concerns of the SEC -- such as the issuance of non-exempt, unregistered shares, or the sale of a public "shell" that is not current on its reporting obligations -- that have no relation or application in the current context of the proposed stock sale.

In short, the Agreement provides for a simple, outright sale of non-public securities that are exempt from registration and that do not trade on any public market -- in a private transaction between two private (non-public) entities. There is no attempt to obtain or trade any public securities, only an attempt by the Buyer to acquire certain assets from the Debtor in exchange for cash. Moreover -- and perhaps most importantly -- the Buyer has provided a clear representation and warranty, in Section 7.9 of the Agreement, that it will not seek to become a publicly-held company (e.g., through a "reverse merger" transaction) by virtue of the proposed stock sale. The proposed transaction thus does not raise any concern that any of the provisions of Section 6.18.7 of the Plan were designed to address. The proposed stock sale is in the best interests of the holders of Allowed General Unsecured Claims, is contemplated and authorized by the Plan which evidences a clear intention to promote transactions, including stock transactions, that create value for the benefit of creditors, and should be approved by the Court.

For the reasons set forth hereinabove, the Plan Agent believes that the proposed stock sale transaction is not a "Merger Transaction" for the purpose of Section 6.18 of the Plan. If this Court nevertheless finds that the proposed transaction is in fact a Merger Transaction, this Court should (i) extend the Merger Consummation Date under Section 6.18.2, and (ii) approve the proposed transaction pursuant to Section 6.18 of the Plan as being in the best interests of creditors.

1    The court may issue any order, process, or judgment that is necessary or
     appropriate to carry out the provisions of this title.

2    11 U.S.C. § 105.

3       Section 1142 of the Bankruptcy Code provides, in pertinent part, as follows:

4       (a) ... the debtor and any entity organized or to be organized for the purpose of
            carrying out the plan shall carry out the plan and comply with any orders of

5           the Court.

6       (b) The court may direct the debtor ... to perform any other act . . . that is
            necessary for the consummation of the plan.

7    11 U.S.C. § 1142.

8       See also, In re Lacy, 2006 WL 29150 (B.A.P. 10th Cir. 2006) ("Under § 1142(a), the

9    debtor shall carry out the plan and shall comply with any orders of the court, including a

10   chapter 11 confirmation order.  The bankruptcy court can enforce this duty under §§ 105(a) and

11   1142, which allow it to take any action or make any determination necessary or appropriate to

12   enforce or implement a court order, such as its confirmation order, to prevent an abuse of process,

13   or to direct the debtor and any other necessary party to perform any act that is necessary for the

14   consummation of the plan. Orders made pursuant to these powers are within the bankruptcy

15   court's jurisdiction under 28 U.S.C. §§ 157 and 1334(b).") (internal footnotes and marks omitted);

16   In re Coral Air, Inc., 40 B.R. 979, 982 (D.V.I.1984) (sections 105(a) and 1142(b) of the Code

17   allow the court to issue such post-confirmation orders as are necessary to implement the terms of

18   a plan); In re Mortgages Ltd., 2:08-BK-07465-RJH, 2013 WL 1003450 (Bankr. D. Ariz. Mar. 12,

19   2013) (referencing post-confirmation sale motion brought "pursuant to the Plan's provision for

20   bankruptcy court approval of a post-confirmation sale")

21      In this case, as demonstrated hereinabove, the Plan provides to the Plan Agent broad

22   discretion to effectuate transactions, including stock transactions, if advisable to obtain value for

23   the benefit of the Debtor's creditors.  See also, paragraph 20 of the Confirmation Order

24   ("pursuant to sections 105 and 1142 of the Bankruptcy Code, the Debtor and the Reorganized

25   Debtor are authorized and empowered to execute such documents and to take such actions as may

26   be necessary or appropriate to effectuate the terms and conditions of the Fourth Amended Plan").

27   Moreover, the Plan provides for the Court's retention of jurisdiction to hear and consider post-

28   confirmation sale transactions:

-20-

1.        **Section 6.15 of the Plan.**  Pursuant to Section 6.15 of the Plan, the Plan Agent is authorized "to seek at any time after the Effective Date orders of the Bankruptcy Court approving actions to be taken consistent with this Plan as may be necessary or desirable to effectuate the provisions of this Plan."

2.        **Section 13.10 of the Plan.**  Pursuant to Section 13.10.2 of the Plan, this Court retains jurisdiction to enter "such orders as may be appropriate to . . . implement or consummate the provisions of this Plan" and, pursuant to Section 13.10.16 of the Plan, this Court retains jurisdiction to hear and determine any "matter deemed relevant to the consummation of the Plan and the administration of the Case."

3.        **Paragraph 19 of the Confirmation Order.**  Paragraph 19 of the Confirmation Order provides that this Court will retain jurisdiction over the case "in order to ensure that the purposes and intent of the Fourth Amended Plan are carried out" and that the Court "shall retain jurisdiction of the Case for the purposes set forth in Section 13.10 of the Fourth Amended Plan."

In addition, good cause exists for the Court to authorize the sale of the Post-Effective Date Stock free and clear of Liens.

First, the Plan authorizes sales free and clear of Liens under section 363(f) of the Bankruptcy Code.  See, Section 6.13 of the Plan.  Moreover, the Plan provides for a transfer of Post-Effective Date Stock free and clear of Liens.  Section 5.3.1.5 of the Plan provides that each Class 3 creditor is allocated under the Plan its pro rata number of shares of the Post-Effective Date Stock, with such shares to be held in trust by the Plan Agent, in contemplation of a disposition of the Post-Effective Date Stock for the benefit of Class 3 creditors.  Section 11.4 of the Plan provides that "all property distributed under [the] Plan" -- such as the Post-Effective Date Stock -- "shall be distributed free and clear of all Liens."  Therefore, the Plan authorizes the Plan Agent to distribute the Post-Effective Date Stock free and clear of Liens, and, accordingly, this Court may enter an order authorizing the Plan Agent, in furtherance of the Plan, to sell to the Buyer the Post-Effective Date Stock free and clear of Liens and to distribute the proceeds therefrom to Class 3 creditors in lieu of the Post-Effective Date Stock itself.

<u>Second</u>, the Post-Effective Date Stock is issued pursuant to the Plan, and, as set forth by the Feferman Declaration, is <u>not</u> subject to any Liens.  The Post-Effective Date Stock may be sold free and clear of any alleged Lien, then, pursuant to section 363(f)(4) of the Bankruptcy Code.

<u>Third</u>, even if the Post-Effective Date Stock were encumbered by a Lien (and it is not), such Lien will attach to the proceeds of the sale of the Post-Effective Date Stock (<u>i.e.</u>, $500,000 in gross proceeds).  There is absolutely <u>no</u> basis for determining that the amount of any such Lien is greater than $500,000.  Accordingly, the Post-Effective Date Stock may be sold free and clear of Liens pursuant to section 363(f)(3) of the Bankruptcy Code.

Based upon the foregoing, this Court clearly has the power to enter an order approving the Agreement and authorizing the Plan Agent to perform its obligations under the Agreement.  The entry of such an order is a condition to the Closing of the proposed Transaction.  As set forth by the Feferman Declaration, the proposed Transaction reflects the product of extensive efforts by the Plan Agent, over a considerable period of time, to obtain for the Debtor's creditors value from the disposition of the remaining assets of the Debtor.  Consummation of the Transaction will generate approximately $442,500 in net proceeds to be paid to the Debtor's creditors, thereby increasing significantly the recovery by creditors in this case.[9]  The Plan Agent believes that approval of the proposed Transaction is unquestionably in the best interests of the Debtor's creditors.  Therefore, this Court can, and should, enter an order granting the relief requested by the Plan Agent pursuant to the Motion.

## C.    <u>THIS COURT SHOULD AFFORD DEFERENCE TO THE PLAN AGENT'S BUSINESS JUDGMENT REGARDING THE PROPOSED TRANSACTION.</u>

This Court should afford deference to the business judgment exercised by the Plan Agent in entering into the proposed Transaction.

### 1.    <u>A Debtor's Exercise of Reasonable Business Judgment with Respect to a Sale of its Assets is Entitled to Deference From a Bankruptcy Court.</u>  A debtor may

---

[9]    The Plan Agent has retained special counsel and intermediaries to assist him to market the remaining assets of the Debtor and/or the Post-Effective Date Stock and is obligated to pay to them an aggregate 11.5% fee in connection with the proposed Transaction.

1   sell, out of the ordinary course of the debtor's business, property of the debtor if the sale

2   transaction is within the reasonable business judgment of the debtor.[10]  See, In re Borders

3   Group, Inc., 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011) ("In approving a transaction

4   conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised

5   sound business judgment."); In re Buffalo Coal Co., 2006 WL 3359585 (Bankr. N.D.W.

6   Va. 2006) ("A debtor's decision to sell property outside the ordinary course of business

7   under § 363(b) is reviewed by the court for compliance with the business judgment rule");

8   In re Lahijani, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005) ("the position of the trustee is

9   afforded deference, particularly where business judgment is entailed in the analysis"); In re

10  Azabu Buildings Co. Ltd., 2007 WL 1964306 (Bankr. D. Haw. 2007).  Bankruptcy courts

11  generally do not interfere with a debtor's exercise of its business judgment.  See, In re Air

12  Vectors Assocs., 53 B.R. 668, 686-687 (Bankr. S.D.N.Y. 1985) (citing B. Weintraub & A.

13  Resnick, Bankruptcy Law Manual ¶ 8.11[1] at 8-23 (1980) ("[A] chapter 11 debtor should

14  be given every opportunity afforded it under the bankruptcy laws to take advantage of the

15  'optimum environment for rehabilitation' without unnecessary interruption of its

16  business.")); In re Consolidated Auto Recyclers, Inc., 123 B.R. 130, 140 (Bankr. D. Me.

17  1991) ("So long as a trustee conducts the affairs of the estate by exercising his business

18  judgment in good faith, upon a reasonable basis, and within the scope of his authority

19  under the Code, he may proceed without interference."); Bennett v. Williams, 892 F.2d

20  822, 824 (9th Cir. 1989) (deference to business management decisions of bankruptcy

21  trustee); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) ("In

22  evaluating whether a sound business purpose justifies the use, sale or lease of property

23  under section 363(b), courts consider a variety of factors, which essentially represent a

24  'business judgment test.'"); In re Cadkey Corp., 317 B.R. 19, 22-23 (D. Mass. 2004) (a

25  debtor's business decision should be approved by the court "unless it is shown to be so

---

[10]    Pursuant to the Plan, the Plan Agent is granted the right to seek orders of this Court approving actions to be taken consistent with the Plan or desirable to effectuate the Plan, including orders authorizing sales free and clear of Liens pursuant to the provisions of section 363(f) of the Bankruptcy Code.  See, Sections 6.13 and 6.15 of the Plan.  Accordingly, the Plan Agent believes that a consideration of the business judgment exercised by the Plan Agent in connection with its entering into the proposed Transaction, and citations to case authority under section 363 of the Bankruptcy Code applicable to the determination of the Plan Agent in such regard, are relevant to the Court's evaluation of the merits of this Motion.

-23-

1    manifestly unreasonable that it could not be based upon sound business judgment, but only

2    on bad faith, or whim or caprice."); In re Castre, Inc., 312 B.R. 426, 430 (Bankr. D. Colo.

3    2004) ("A trustee or DIP is responsible for administering the bankruptcy estate and his, her

4    or management's judgment on the sale of estate assets and the procedure for sale is entitled

5    to respect and deference from the Court, as long as the burden of giving sound business

6    reasons is met."); In re Curlew Valley Assocs., 14 B.R. 506, 513-514 (Bankr. D. Utah

7    1981) ("the court will not entertain objections to a trustee's conduct of the estate where that

8    conduct involves a business judgment made in good faith, upon a reasonable basis, and

9    within the scope of his authority under the Code."); Frostbaum v. Ochs, 277 B.R. 470, 475

10    (E.D.N.Y. 2002) ("So long as this decision was not made arbitrarily, or in bad faith, it was

11    appropriate for the Bankruptcy Court to accept this decision for the benefit of the estate").

12          Thus, the Plan Agent's exercise of its business judgment in connection with

13    entering into the proposed Transaction is entitled to be afforded deference by this Court.

14          **2.     The Debtor Has Exercised Reasonable Business Judgment With**

15    **Respect to the Proposed Transaction.**    In this case, this Court can have confidence that

16    the business judgment of the Plan Agent in entering into the proposed Transaction is

17    reasonable, and this Court accordingly may defer to such business judgment, based, in part,

18    upon the following.

19          (a)    Extensive Marketing.  Commencing shortly after the appointment of

20          the Plan Agent after the Effective Date of the Plan, the Plan Agent began the

21          process of evaluating the Debtor's remaining assets and the prospects for realizing

22          value from the disposition of such assets for the benefit of creditors.  The Plan

23          Agent has spent a considerable amount of time and effort, over an extended period

24          of time, attempting to obtain value for the Debtor's remaining assets.  In this

25          regard, the Plan Agent has investigated the value of the Debtor's remaining assets,

26          and, specifically, the intellectual property rights and other intangible assets of the

27          Debtor, and has consulted with experts in that regard in order to facilitate the

28          marketing of such assets.  Moreover, the Plan Agent has retained experts to assist

1    the Plan Agent with respect to the marketing of the remaining assets of the

2    Debtor.[11]

3    The efforts made by the Plan Agent to market the Debtor's remaining assets

4    have been designed to attract a broad base of likely candidates to acquire such

5    assets. These efforts undertaken by the Plan Agent help to ensure that the sale

6    process in this case has received as much exposure as possible under the

7    circumstances, and, accordingly, that the sale price and other terms for the sale of

8    the Post-Effective Date Stock pursuant to the Agreement are favorable for the

9    Debtor's creditors.

10    (b)    Consultation with the Post-Effective Date Committee.  In

11    accordance with the provisions of the Plan, the Plan Agent has consulted with, and

12    has obtained the approval of, the Post-Effective Date Committee for the proposed

13    sale of the Post-Effective Date Stock pursuant to the Agreement.

14    (c)    Notice of the Proposed Sale.  Pursuant to the Plan, the Plan Agent is

15    not required to provide notice of any proposed sale of assets of the Debtor, nor to

16    obtain from this Court an order approving such a transaction.  See, Section 6.13 of

17    the Plan.  Moreover, pursuant to the Plan, the Plan Agent is required generally to

18    give notice of any proceedings only to a limited number of creditors and parties-in-

19    interest -- the United States Trustee, the Post-Effective Date Committee, the

20    Reorganized Debtor, Canopy and any creditor that files after the Effective Date a

21    request for notice of any proceedings in the case.[12]  Nevertheless, by the Motion,

22    the Plan Agent has requested that the Court approve the Motion and has given

23    notice of the Motion to all of the creditors in this case, in order to provide greater

24    exposure of the proposed sale of the Post-Effective Date Stock.

25

26    ---

[11]    In addition, the Plan Agent has explored extensively the possibility of effectuating a Merger Transaction, as contemplated by
27    the Plan, for the benefit of the Debtor's creditors.  The Plan Agent estimates that it has had direct communications with not less
than 75 entities with respect to a possible Merger Transaction (and, through intermediaries, with substantially more prospects), and
28    has pursued diligently all viable expressions of interest received by it in that regard.  To date, the Plan Agent has not been able to
obtain a viable agreement for a Merger Transaction.
[12]    No creditor or party-in-interest has filed any such request for post-Effective Date notices.

Based upon the foregoing, the Plan Agent believes, and hereby respectfully submits, that the Court should defer to the business judgment exercised by the Plan Agent with respect to the sale of the Post-Effective Date Stock pursuant to the Agreement.

**3.    Fairness Of Sale Price.**  The Ninth Circuit Court of Appeals has held that an arm's-length sale price, as between a willing buyer and a willing seller, is conclusive as to the issue of fair market value.  In re Two S Corp., 875 F.2d 240 (9th Cir. 1989).  In Two S Corp, the Ninth Circuit held that the bankruptcy court need not consider appraisals or other methods of valuation of the property, since "[b]y definition, when there has been a fair sale the purchase price reflects the fair market value of the asset."  Id. at 244 (citing Black's Law Dictionary 536 (5th ed. 1979) (defining "fair market value" as the "amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.")).[13]

In other cases where authority to sell assets has been sought, efforts, such as those made in this case by the Plan Agent, to ensure that the sale price is fair have encouraged courts to authorize the sale.  In re Del. & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991) (fair and reasonable price for the sale of assets is evidenced by solicitation of bids, negotiations with prospective bidders, and testimony that proposed offer is best available); In re Oneida Lake Dev., Inc., 114 B.R. 352, 356 (Bankr. N.D.N.Y. 1990) (assets sold at best offer received through solicitation efforts); see also, In re Anchor Exploration Co., 30 B.R. 802, 808-09 (Bankr. N.D. Okla. 1983) (the court reversed a lower court decision authorizing a sale partly because the trustee had not attempted to solicit other offers).

In this case, the extensive marketing of the remaining assets of the Debtor and the Post-Effective Date Stock, the fairness of the sale process in this case, and the lack of any compulsion for the Plan Agent to sell the Post-Effective Date Stock, provide the best

---

[13]    In addition, the testimony of an owner as to value of his/her property is admissible.  See, LaCombe v. A-T-O, Inc., 679 F.2d 431 (5th Cir. 1982); Ruud v. U. S., 256 F.2d 460 (9th Cir. 1958) cert. denied 79 S.Ct. 28, 358 U.S. 817, 3 L.Ed.2d 59.  This same principle applies "even when the owner is a corporation and the valuation testimony comes from a designated corporate officer." See, Russell, Bankruptcy Evidence Manual, § 701.2 (1998) (quoting United States v. 10,031.98 Acres of Land, 850 F.2d 634 (10th Cir.1988)); see also, S. Cent. Livestock Dealers, Inc. v. Sec. State Bank of Hedley, Tex., 614 F.2d 1056, 1061-1062 (5th Cir.1980) (admitting testimony of financial officer with respect to value of business).  By the Feferman Declaration, the Plan Agent attests to the fairness of the Purchase Price.

1    assurance possible under the circumstances of this case that the Plan Agent is obtaining a

2    fair price for the sale of the Post-Effective Date Stock.  The Plan Agent has spent a

3    considerable amount of time and effort attempting to sell the remaining assets of the

4    Debtor and the Post-Effective Date Stock.  Notwithstanding the efforts made by the Plan

5    Agent, the Plan Agent has received only one viable offer for any of the remaining assets of

6    the Debtor or the Post-Effective Date Stock -- the offer for the Post-Effective Date Stock

7    made by the Buyer as reflected by the Agreement.  The terms of the Agreement are the

8    product of extensive bargaining between the Plan Agent and the Buyer and both parties

9    provided significant concessions and accommodations in order to achieve an agreement.

10    The Plan Agent believes strongly that the terms of the Agreement are fair, and represent

11    the best, and currently only, terms available for the sale of remaining assets of the Debtor

12    or the Post-Effective Date Stock.  The sale of the Post-Effective Date Stock will generate

13    approximately $442,500 in net proceeds for the benefit of the holders of Allowed General

14    Unsecured Claims, and will increase significantly the recovery by them under the Plan.

15    Based thereon, the Plan Agent believes, and hereby respectfully represents, that the

16    proposed sale of the Post-Effective Date Stock pursuant to the terms and conditions of the

17    Agreement unquestionably is in the best interests of the Debtor's creditors.

18        In light of the foregoing, this Court should find and determine that the sale price for the

19    Post-Effective Date Stock accepted by the Plan Agent represents a fair recovery for the Debtor's

20    creditors from the sale of the Post-Effective Date Stock, and thus a reasonable exercise of the Plan

21    Agent's business judgment.  Consequently, this Court can, and should, approve the Agreement

22    and authorize the Plan Agent to sell to the Buyer, free and clear of Liens, the Post-Effective Date

23    Stock pursuant to the terms and conditions of the Agreement.

24                                **III.**

25                **THE COURT HAS THE DISCRETION TO AND SHOULD WAIVE**

26    **THE FOURTEEN-DAY  PERIOD FOR THE EFFECTIVENESS OF THE SALE ORDER**

27        Rule 6004(h) of the Bankruptcy Rules provides as follows:

28

1

An order authorizing the use, sale, or lease of property other than cash collateral
is stayed until the expiration of 14 days after entry of the order, *unless the court
orders otherwise.*

2

3

Fed. R. Bankr. P. 6004(h)(emphasis added).

4

The legislative history of Rule 6004(h) provides as follows:

5

The court may, in its discretion, order that Rule 6004(g) [now Rule 6004(h)] is
not applicable so that the property may be used, sold, or leased immediately in
accordance with the order entered by the court.  Alternatively, the court may
order that the stay under Rule 6004(g) is for a fixed period less than 10 [now 14]
days.

6

7

8

As set forth more fully above, the circumstances of this case militate in favor of allowing

9

the proposed Transaction to close as soon as possible.  The Buyer desires to close the Transaction

10

as promptly as possible.  The $500,000 in proceeds that the Plan Agent will obtain from the sale of

11

the Post-Effective Date Stock will enhance significantly the recovery by holders of Allowed

12

General Unsecured Claims under the Plan.  A prompt closing of the proposed Transaction, then,

13

will facilitate the Plan Agent's efforts to wind up this case and to make distributions to creditors.

14

Accordingly, the Plan Agent hereby requests that the Court order that the sale of the Post-Effective

15

Date Stock may be effectuated immediately upon entry of the Sale Order.

16

**IV.**

17

**CONCLUSION**

18

For the reasons and based upon the authorities cited above, the Plan Agent hereby

19

respectfully submits that good cause exists for this Court to grant all relief requested by the Plan

20

Agent pursuant to the Motion.

21

DATED: June 14, 2013

**WINTHROP COUCHOT
PROFESSIONAL CORPORATION**

22

23

By: */s/ Robert E. Opera*

24

Robert E. Opera
Richard H. Golubow
Jeannie Kim
Counsel for the Plan Agent Appointed
Under Joint Fourth Amended Chapter 11 Plan

25

26

27

28

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

# DECLARATION OF RICHARD J. FEFERMAN

I, Richard J. Feferman, declare and state as follows:

1.    I have personal knowledge of the facts stated herein and, if called upon as a witness, I would and could competently testify to these facts.

2.    This declaration is offered in support of the Motion for Approval of Sale, Pursuant to Provisions of Confirmed Plan, of Stock in the Debtor ("Motion").[14]

3.    Prior to the confirmation of the Plan, I (doing business as Corporate Recovery Associates) served as the financial consultant to the Committee in this case.  Pursuant to the Plan, I (again doing business as Corporate Recovery Associates) initially was appointed as the Plan Agent under the Plan.  I thereafter resigned as the Plan Agent, and, in accordance with the provisions of the Plan, Corporate Recovery Associates, LLC was appointed as, and currently serves as, the Plan Agent under the Plan.  I am the principal of Corporate Recovery Associates, LLC.  As a result of my having served as the financial consultant to the Committee and as the Plan Agent or as a principal of the Plan Agent, I have acquired substantial knowledge of virtually all aspects of the Debtor's case and the Debtor's financial affairs.  Specifically, I have substantial knowledge of the Debtor's current assets and the efforts made to market such assets for the benefit of the Debtor's creditors.

4.    As set forth in the Motion and for the reasons set forth below, I believe that it is in the best interests of the Debtor's creditors for this Court to enter an order granting the Motion.  My belief is based, in part, upon the facts set forth herein.

5.    On October 15, 2007 ("Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is a Delaware corporation.  The Debtor's stock was listed on the NASDAQ Capital Market but thereafter was delisted from the NASDAQ Capital Market for failure to meet certain listing standards.

6.    The Debtor was in the business of providing end-to-end information infrastructure solutions and strategic technology services, and was a re-seller and service provider of EMC

---

[14] Except as otherwise set forth herein, the definitions of the capitalized terms set forth herein are as set forth in the Motion.

1   Corporation Automated Network Storage Systems and software pursuant to a re-seller agreement

2   with EMC Corporation.

3        7.      As of the Petition Date, the Debtor ceased all business operations.  During this

4   case, the Debtor has attempted to maximize the value of its bankruptcy estate by collecting its

5   accounts receivable, selling, assigning or otherwise transferring its assets and properties, and by

6   prosecuting causes of action, including actions seeking recoveries and avoidance of transfers

7   pursuant to the provisions of sections 547 and 548 of the Bankruptcy Code.  During this case, the

8   Debtor entered into, and consummated, a number of transactions to sell, assign or otherwise

9   transfer assets and properties of its bankruptcy estate.

10       8.      On or about August 5, 2010, the Debtor and the Committee filed jointly the Plan

11  for the resolution of the claims asserted against the Debtor's bankruptcy estate.  The Plan

12  provides for a comprehensive debt restructuring of the Debtor in accordance with the terms and

13  conditions of the Plan.

14       9.      On September 1, 2010, the Court entered an order confirming the Plan.

15       10.     In accordance with the provisions of Sections 2.1.56 and 6.3 of the Plan, the

16  Effective Date of the Plan was September 27, 2010.

17       11.     As of the Effective Date of the Plan, the Committee was disbanded and was

18  replaced by the Post-Effective Date Committee.  Pursuant to the Plan, the Post-Effective Date

19  Committee is granted the power, and assigned the duty, to supervise the Plan Agent's

20  performance of its responsibilities under the Plan.  The members of the Post-Effective Date

21  Committee are:  Compnology, Inc.; CCS, Inc.; and The Receivable Management Services

22  Corporation, as agent for FedEx Custom Critical.

23       12.     Pursuant to the Plan, the Plan Agent has, among others, the following rights,

24  powers and duties:

25              a.      The Plan Agent, under the supervision of the Post-Effective Date

26              Committee, may administer, manage, transfer, assign and otherwise dispose of any all

27              of the Plan Assets and take all acts appropriate to effectuate the same, free of any

28              restrictions imposed by the Bankruptcy Code or by the Bankruptcy Rules.

-30-

b.      The Plan Agent, under the supervision of the Post-Effective Date Committee, is authorized to take all acts appropriate to implement the provisions of the Plan.

c.      The Plan Agent is appointed as the representative of the estate, and, as such, is vested with the authority and power to take, among others, the following acts on behalf of the Debtor:  manage, administer and dispose of Plan Assets for the benefit of holders of Allowed Claims; make all distributions provided for by the Plan; and such other acts as may be appropriate to administer, wind down, and close this case.

13.      Pursuant to the Plan, on the Effective Date of the Plan, the assets of the Debtor vested in the Reorganized Debtor, to be administered by the Plan Agent for the benefit of holders of Allowed Claims.

14.      Pursuant to the Plan, the Plan Agent is authorized to sell or exchange the Post-Effective Date Stock in the Debtor (i.e., all of the stock in the Reorganized Debtor to be issued by the Plan Agent under the Plan).  Pursuant to the Plan, the Plan Agent, under the supervision of the Post-Effective Date Committee, is authorized to determine whether a merger, stock exchange or comparable transaction (referred to in the Plan as a "Merger Transaction") is viable and whether a Merger Transaction should be effectuated for the benefit of the holders of Allowed General Unsecured Claims.

15.      Section 6.18.2 of the Plan provides that a Merger Transaction must be completed by the second-year anniversary of the Effective Date of the Plan (i.e., by September 27, 2012) ("Merger Consummation Date"), but authorizes the Plan Agent to request from the Court an extension of the Merger Consummation Date for a period not to exceed one additional year.[15]

16.      The Debtor's current assets consist primarily of the following:

a.      Cash.  As of May 1, 2013, the Debtor had approximately $800,000 in cash.

b.      Intellectual Property.  The Debtor retains certain intellectual property rights, including patent rights.  For the most part, such intellectual property rights are

---

[15]    The Plan contains no limitation as to when any such request for an extension of the Merger Consummation Date must be made by the Plan Agent.  The one-year extension period has not yet expired.

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

1    non-exclusive licenses of relatively older technology that the Debtor was not able to sell

2    or liquidate during the case.

3            c.    <u>Intangible Assets</u>.  Every machine that is on a TCP/IP network (a local

4    network or the internet) has a unique Internet Protocol version address.  Internet

5    Protocol version 4 ("IPv4") is the fourth version in the development of the Internet

6    Protocol.  IPv4 numbers have been given out or allocated by Internet registries (under

7    contracts with the United States Government) to organizations that need such numbers

8    to connect networks, devices and applications to the Internet.  As numbers were

9    assigned to users, the number of unassigned numbers decreased.  It is my understanding

10    that more than 99% of the IPv4 numbers have been allocated, and, accordingly, that the

11    supply of IPv4 numbers has effectively dried up (referred to as "IPv4 exhaustion").

12    Based upon my investigation, I believe that, in or about November 1990, the

13    organization authorized at the time by the United States Government to allocate IPv4

14    numbers gave to the Debtor the block of IPv4 numbers described more fully in

15    Exhibit "4" to the Agreement, and that the Debtor still holds this IPv4 number block.

16            d.    <u>Avoidance Claims</u>.  Numerous avoidance actions and other actions have

17    been filed in order to obtain recoveries for the Debtor's creditors.  I believe that all or

18    virtually all of the claims and causes of action of the estate have been asserted and have

19    been resolved by orders of the Court.

20            17.    By the Debtor's sale and assignment of assets of the Debtor's estate and collection

21    of the Debtor's accounts receivable, the Debtor was able to generate cash sufficient to pay in full

22    all secured claims against the Debtor.  I believe that all priority claims have been paid in full, and

23    that the only remaining pre-petition claims against the Debtor are the claims of the holders of

24    Allowed General Unsecured Claims.  Each holder of an Allowed General Unsecured Claim is

25    entitled to receive under the Plan, in full satisfaction and discharge of its Allowed General

26    Unsecured Claim, pro rata distributions of the cash on deposit in the Plan Fund.  Interim

27    distributions have been made to holders of Allowed General Unsecured Claims.

28

18.     Canopy Group, Inc. ("Canopy") asserts against the Debtor a claim (Class 4 under the Plan) in the amount of $260,000.  I dispute Canopy's claim.  A settlement was recently reached with Canopy by which Canopy has agreed to accept the amount of $150,000 as and for payment in full of its claim.

19.     In addition to the obligations owed under the Plan, obligations have been incurred post-confirmation in connection with the administration of the Plan, including obligations to professionals employed by the Plan Agent.  The Debtor may owe a relatively insignificant amount of corporate license and tax obligations associated with maintaining the Debtor's corporate existence.  I believe that the Debtor is current in paying its obligations to the United States Trustee.

20.     I anticipate that, if the Motion is approved by the Court, the Plan Agent will make as promptly as practicable final distributions on account of Allowed General Unsecured Claims and seek from the Court a Final Decree closing the case.

21.     From and after the Effective Date of the Plan, I have acted diligently to market the remaining assets of the Debtor in order to generate recoveries therefrom for the benefit of the Debtor's creditors.  I have investigated thoroughly the value of the Debtor's remaining assets, and I have consulted with experts in that regard.  Moreover, I have retained experts to assist me to market and to sell the Debtor's remaining assets.

22.     While I have obtained from time to time expressions of interest for the acquisition of assets of the Debtor or the stock in the Debtor, I have not received any viable offer for the acquisition of any of the assets of the Debtor or for the stock in the Debtor, except for the offer from the Buyer reflected by the Agreement.

23.     As set forth hereinabove, subject to the approval of the Court, the Plan Agent and the Buyer have entered into the Agreement pursuant to which the Plan Agent agrees to sell to the Buyer, and the Buyer agrees to purchase from the Plan Agent, the Post-Effective Date Stock.  A true and complete copy of the Agreement is attached hereto as Exhibit "A" and is incorporated herein by this reference.

24.    Material terms of the Agreement are described in the Motion.  In my view, the most significant terms of the Agreement include the following:[16]

a.    Sale of Post-Effective Date Stock (Section 1.1. of the Agreement). Subject to the terms and conditions of the Agreement, and the approval of this Court, the Plan Agent has agreed to sell to the Buyer, free and clear of Liens, and the Buyer has agreed to purchase from the Plan Agent, the Post-Effective Date Stock.

b.    Excluded Assets (Section 1.2 of the Agreement).  Prior to the Closing of the Transaction, the Plan Agent will transfer to a trust to be established for the benefit of the Debtor's creditors ("Trust"), and will not sell to the Buyer, the Debtor's right, title and interest in and to all of the Debtor's assets and properties, except only as provided expressly to the contrary in the Agreement ("Excluded Assets").  The Excluded Assets include the following:

i.    The Debtor's cash;

ii.    Any refunds, deposits, rebates and comparable assets of the Debtor;

iii.    Any and all claims and causes of action of the Debtor; and

iv.    Any furniture, fixtures, equipment, inventory and any other tangible personal property assets of the Debtor.

c.    Purchase Price (Section 1.3 of the Plan).  The Buyer has agreed to pay to the Plan Agent $500,000 cash in order to acquire the Post-Effective Date Stock in the Debtor, and has agreed to pay certain taxes and costs, if any, associated with the Closing of the Transaction.  The Buyer has provided to the Plan Agent's counsel a deposit for the entire $500,000 Purchase Price.

d.    Retained Assets (Section 1.5 of the Agreement).  The Debtor will retain, and not will not transfer to the Plan Agent, and, accordingly, the Buyer will, as a

---

[16]    The description of provisions of the Agreement contained herein is only a summary of such provisions and is not intended to be a complete statement of all material provisions of the Agreement.  In the event of any inconsistency between the provisions of this summary and the provisions of the Agreement, the provisions of the Agreement will control.

MAINDOCS-#188379-v7-MTI-MtnAuthSellPursPlanStockInDebtor.doc

consequence of its acquisition of the Post-Effective Date Stock, gain effective control of the following assets and properties of the Debtor ("Retained Assets"):

      i.     All intellectual property rights and interests of the Debtor, including any patents, trademarks and other general intangibles of a comparable nature that may be owned by the Debtor.

      ii.     The Debtor's IPv4 interests, as described in Exhibit "4" to the Agreement.

    e.    <u>Excluded Liabilities (Article III of the Agreement)</u>.  The Buyer will have no responsibility of any nature whatsoever for any liabilities, debts or obligations of the Debtor arising before the Closing, other than as provided expressly to the contrary in the Agreement.

    f.    <u>Covenants of the Plan Agent (Article IV of the Agreement)</u>.  Pursuant to the Agreement, the Plan Agent covenants and agrees, in part, as follows:

      i.     The Plan Agent will use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to consummate the Transaction.

      ii.     The Plan Agent is required to cause the Debtor to pay in full by the Closing Date, or to establish by the Closing Date with the Plan Agent reasonable reserves for the prompt payment in full of, all of the Debtor's obligations to creditors under the Plan which arose on or before the Effective Date of the Plan and all obligations which arose from the Effective Date of the Plan to the date of execution of the Agreement or which may arise from the date of execution of the Agreement through the Closing Date.

    g.    <u>Plan Agent's Representations and Warranties (Article VI of the Agreement)</u>.  Pursuant to the Agreement, the Plan Agent provides, in part, the following representations and warranties to the Buyer:

i.    Subject to the Court's approval of the Agreement, the Plan Agent has all requisite power and authority to enter into the Agreement and to carry out all of its obligations under the Agreement.

ii.    Except as expressly provided in the Agreement, the Plan Agent makes no representation or warranty to the Buyer, and disclaims any representation or warranty, with respect to the Debtor, the Post-Effective Date Stock, the Retained Assets or any other matter, including, without limitation, any representation or warranty as to the value, merchantability, use or fitness for a particular purpose of the Retained Assets.  Subject to the terms of the Agreement, the Plan Agent is selling to the Buyer the Post-Effective Date Stock on an "as is," "where is" and "with all faults" basis.

h.    <u>Survival of Representations, Warranties and Covenants/Limitation of Liability (Sections 6.3 and 6.4 of the Agreement)</u>.  The representations, warranties, covenants, obligations and agreements of the Plan Agent pursuant to the Agreement will survive any Closing of the Transaction for a period of only 180 days after the Closing ("Buyer Claims Survival Deadline"), after which time the representations, warranties, covenants, obligations and agreements of the Plan Agent will automatically terminate.

Neither the Plan Agent, the Debtor, the Trust, nor I nor any of our respective directors, officers, employees, shareholders or affiliates will have any personal liability of any nature whatsoever for any breach of any representation, warranty, covenant, obligation or agreement of the Plan Agent pursuant to the Agreement.  The Buyer's sole remedies for any breach of any representation, warranty, covenant, obligation or agreement of the Plan Agent pursuant to the Agreement are as follows:

i.    The Buyer may terminate the Agreement.  Upon any such termination of the Agreement, the Buyer will have no recourse against the Plan Agent, the Debtor, me or any of our respective directors, officers, employees, shareholders or affiliates.

ii.      If the Buyer closes the Transaction, the Buyer may assert, by the

Buyer Claims Survival Deadline (i.e., within 180 days after the Closing) a claim

for a credit or an offset against the Purchase Price, in an amount not to exceed

$100,000 ("Purchase Price Adjustment Claim").  The Plan Agent is required to

deposit into an escrow account or other segregated account ("Segregated

Account") the sum of $100,000 from the Purchase Price ("Purchase Price

Reserve").  In the event that the Buyer fails to assert by the Buyer Claims

Survival Deadline a Purchase Price Adjustment Claim, the Plan Agent will have

the right to disburse from the Segregated Account the Purchase Price Reserve as

the Plan Agent deems appropriate, and the Buyer will have no claim of any

nature whatsoever against the Plan Agent or against the Purchase Price Reserve.

On the other hand, in the event that the Buyer asserts by the Buyer Claims

Survival Deadline a Purchase Price Adjustment Claim, the Plan Agent will not

disburse from the Segregated Account any amount of the Purchase Price

Reserve.  In the event that the Plan Agent and the Buyer are unable to resolve

any Purchase Price Adjustment Claim, the Purchase Price Adjustment Claim

will be resolved by this Court.  Any Purchase Price Adjustment Claim is non-

recourse as to the Plan Agent, the Debtor, me and our respective directors,

officers, employees, shareholders and affiliates.

i.      <u>Closing of the Transaction (Article VIII of the Agreement)</u>.  The Closing

of the Transaction will be held within three business days after the satisfaction of the

conditions to the Closing of the Transaction set forth in Sections 10.1 and 10.2 of the

Agreement.  The most significant condition to the Closing of the Transaction is that the

Court enter an order approving the Agreement on terms acceptable to the Buyer and to

the Plan Agent.

25.      As noted above, the Buyer has required, as a condition to closing the Transaction,

that this Court approve the Agreement and authorize the Plan Agent to perform its obligations

under the Agreement.  Therefore, the Plan Agent must obtain from this Court approval of the

1   proposed Transaction in order to close the Transaction.  Moreover, I believe that, under the

2   circumstances of this case, it is prudent for creditors to obtain notice of the proposed Transaction

3   and for this Court to consider the merits, and to give its approval, of the proposed Transaction.

4        26.    On the Effective Date of the Plan, all (pre-confirmation equity) Interests in the

5   Debtor were cancelled.  However, pursuant to the Plan, each holder of an Allowed General

6   Unsecured Claim was allocated its pro rata number of shares of Post-Effective Date Stock, to be

7   held in trust for such creditor by the Plan Agent.  The Plan authorizes the Plan Agent to transfer

8   Post-Effective Date Stock if advisable to obtain a recovery for holders of Allowed General

9   Unsecured Claims under the Plan.

10        27.    Pursuant to the Plan, the Plan Agent is provided with broad discretion to sell assets

11   for the benefit of the Debtor's creditors in furtherance of the administration of the Plan and the

12   wind-up of the financial affairs of the Debtor.

13        28.    Pursuant to the Plan, the Plan Agent is provided with broad discretion to effectuate

14   stock transfer transactions for the benefit of the Debtor's creditors.

15        29.    Exercising the broad discretion granted to the Plan Agent by the Plan to effectuate

16   transactions, including stock transactions, in furtherance of the interests of creditors, I have

17   determined that the terms of the proposed stock sale transaction reflected by the Agreement are

18   fair and should be pursued for the benefit of holders of Allowed General Unsecured Claims.

19        30.    My determination that the Agreement should be pursued for the benefit of

20   creditors is based, in part, upon the following.

21           a.    <u>Extensive Marketing</u>.  Commencing shortly after my appointment as the

22          Plan Agent after the Effective Date of the Plan, I began the process of evaluating the

23          Debtor's remaining assets and the prospects for realizing value from the disposition of

24          such assets for the benefit of creditors.  I have spent a considerable amount of time and

25          effort, over an extended period of time, attempting to obtain value for the Debtor's

26          remaining assets.  In this regard, I have investigated the value of the Debtor's remaining

27          assets, and, specifically, the intellectual property rights and other intangible assets of the

28          Debtor, and I have consulted with experts in that regard in order to facilitate the marketing

1    of such assets.  Moreover, I have retained experts to assist me with respect to the

2    marketing of the remaining assets of the Debtor.

3    In addition, I have explored extensively the possibility of effectuating a Merger

4    Transaction, as contemplated by the Plan, for the benefit of the Debtor's creditors.  I

5    estimate that I personally have had communications with not less than 75 entities with

6    respect to a possible Merger Transaction (and, through intermediaries, with substantially

7    more entities), and I have pursued diligently all viable expressions of interest received by

8    me in that regard.  To date, I have not been able to obtain a viable agreement for a Merger

9    Transaction.

10    The efforts made by me to market the Debtor's remaining assets have been

11    designed to attract a broad base of likely candidates to acquire such assets. In my opinion,

12    the sale process in this case has received proper exposure under the circumstances.

13    b.    Consultation with the Post-Effective Date Committee.  In accordance with

14    the provisions of the Plan, I have consulted with, and have obtained the approval of, the

15    Post-Effective Date Committee regarding the proposed sale of the Post-Effective Date

16    Stock pursuant to the Agreement.

17    c.    Notice of the Proposed Sale.  Notice of the Motion has been given to all of

18    the creditors in this case, in order to provide greater exposure of the proposed sale of the

19    Post-Effective Date Stock.

20    31.    I believe that the extensive marketing of the remaining assets of the Debtor and the

21    Post-Effective Date Stock, the fairness of the sale process in this case, and the lack of any

22    compulsion for the Plan Agent to sell the Post-Effective Date Stock, provide the best assurance

23    possible under the circumstances of this case that the Plan Agent is obtaining a fair price for the

24    sale of the Post-Effective Date Stock.  I have spent a considerable amount of time and effort

25    attempting to sell the remaining assets of the Debtor and the Post-Effective Date Stock.

26    Notwithstanding my considerable efforts, only one viable offer has been received for any of the

27    remaining assets of the Debtor or the Post-Effective Date Stock -- the offer for the Post-Effective

28    Date Stock made by the Buyer as reflected by the Agreement.  The terms of the Agreement are

the product of extensive bargaining between the Plan Agent and the Buyer and both parties provided significant concessions and accommodations in order to achieve an agreement.  I believe that the terms of the Agreement are fair, and represent the best, and currently only, terms available for the sale of remaining assets of the Debtor or the Post-Effective Date Stock.  The sale of the Post-Effective Date Stock will generate approximately $442,500 in net proceeds for the benefit of the holders of Allowed General Unsecured Claims, and will increase significantly the recovery by them under the Plan.[17]  Based on the foregoing, it is my opinion that the proposed sale of the Post-Effective Date Stock pursuant to the terms and conditions of the Agreement unquestionably is in the best interests of the Debtor's creditors.

32.    In my opinion, the Purchase Price is not less than the aggregate value of the Retained Assets of which the Buyer will gain control as a consequence of its purchase of the Post-Effective Date Stock.  The primary Retained Assets are as follows.

a.    <u>Intellectual Property Rights</u>.  During the case, the Debtor's management engaged in an extensive effort to sell the Debtor's assets and properties, including the Debtor's intellectual property rights.  Based upon discussions that I have had with members of the Debtor's senior management, it is my understanding that the Debtor contacted a number of entities regarding a possible sale of its intellectual property rights, but was unable to sell such assets.

After my appointment as Plan Agent under the Plan, I investigated the Debtor's remaining intellectual property rights and the value thereof.  It appears to me that the Debtor's remaining intellectual property rights consist primarily of non-exclusive licenses with respect to certain patents.  The licenses generally contain very material restrictions on the Debtor's right to assign its interests under the licenses.  Certain of the underlying patents appear to have expired.  Based upon my investigation of the value of the licenses and my communications with the Debtor's management and with technology experts, I was not able to determine a clear path to monetize efficiently or effectively the licenses.  I

---

[17]    The Plan Agent has retained special counsel and intermediaries to assist him to market the remaining assets of the Debtor and/or the Post-Effective Date Stock, and the Plan Agent is obligated to pay to them an aggregate 11.5% fee for their services.

1    conferred with the Post-Effective Date Committee, and we concluded that, given the

2    uncertainty regarding the value of the Debtor's remaining intellectual property rights, and

3    the potential hurdles with respect to realizing value for the Debtor's intellectual property

4    rights, it would not be a prudent use of resources to devote any significant amount of

5    money to marketing or otherwise seeking to sell or dispose of the Debtor's remaining

6    intellectual property rights.

7        b.    IPv4 Assets.  In early 2012, I determined that the Debtor had an interest in

8    a block of approximately 65,536 IPv4 numbers.  IPv4 numbers are unique codes that

9    allow devices, such as cloud servers, to be found on the Internet.  As noted above, every

10    machine that is on a TCP/IP network has a unique IPv4 address.  As addresses were

11    assigned to users, the number of unassigned addresses decreased, and, as stated above, it

12    is my understanding that IPv4 address exhaustion effectively occurred in or about

13    February 2011.

14        During the first half of 2012, I identified and contacted intermediaries in the

15    business of selling these types of assets.  I retained the law firm of Levine, Blaszak, Block

16    & Boothby, LLP and IPv4 Market Group as my intermediaries to assist in the sale of the

17    IPv4 numbers.  Based upon my investigation, it is my belief that both of these firms are

18    highly qualified and knowledgeable in the marketing of IPv4 numbers.  With the

19    assistance of these intermediaries, the IPv4 numbers have been marketed to over 1,500

20    prospective buyers, of which there has been personal communication with over

21    100 prospects.

22    Pursuant to the Agreement, the Buyer has agreed to pay a purchase price of $500,000 for

23    the Debtor's Post-Effective Date Stock.  In contrast, the next best offer that I was able to obtain

24    was for $360,448 for the IPv4 numbers only.  That offer contained material closing contingencies

25    which may not have been able to have been met.  Thus, I determined that the offer made by the

26    Buyer, as reflected in the Agreement, providing for almost $140,000 in greater consideration and

27    no meaningful closing contingencies other than the need to obtain Court approval, is a transaction

28    that is more favorable for the Debtor's creditors.

33.    By the Motion, the Plan Agent requests that the Court authorize the sale of the Post-Effective Date Stock free and clear of Liens. I believe that this is a reasonable request. The Post-Effective Date Stock is not subject to any Liens. Moreover, even if the Post-Effective Date Stock were encumbered by a Lien (and it is not), such Lien will attach to the proceeds of the sale of the Post-Effective Date Stock (i.e., $500,000 in gross proceeds). There is absolutely no basis for believing that the amount of any such Lien is greater than $500,000.

34.    The Buyer desires to close the Transaction as promptly as follows. The approximately $442,500 in net proceeds that the Plan Agent will obtain from the sale of the Post-Effective Date Stock will enhance significantly the recovery by holders of Allowed General Unsecured Claims under the Plan. A prompt closing of the proposed Transaction, then, will facilitate the Plan Agent's efforts to wind up this case and to make distributions to creditors. Accordingly, by the Motion, the Plan Agent requests that the Court order that the sale of the Post-Effective Date Stock may be effectuated immediately upon entry of the Sale Order.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of June 2013 at San Diego, California.

Richard J. Feferman

-42-

# EXHIBIT A

## STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement ("**Agreement**") is made, executed and entered into as of May 9, 2013 ("**Execution Date**") by and between Corporate Recovery Associates, LLC, in its capacity as Plan Agent (as defined in paragraph J below) ("**Seller**"), and Fiber International, LLC ("**Buyer**"), with reference to the following facts (Buyer and Seller are referred to herein, together, as the "**Parties**").

## RECITALS

A.      On October 15, 2007 (the "**Petition Date**"), a voluntary petition for relief under Chapter 11 of the Bankruptcy Code was filed by MTI Technology Corporation (as reorganized pursuant to the confirmed Plan referenced in Recital H hereof, "**Debtor**"), as Case No. 8:07-13347-ES ("**Bankruptcy Case**"), in the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "**Bankruptcy Court**").

B.      The Debtor is a Delaware corporation.  The Debtor's capital stock was listed on the NASDAQ Capital Market, but thereafter was delisted from the NASDAQ Capital Market for failure to meet certain listing standards.

C.      The Debtor was in the business of providing end-to-end information infrastructure solutions and strategic technology services, and was a re-seller and service provider of EMC Corporation Automated Networked Storage systems and software pursuant to a re-seller agreement with EMC Corporation.

D.      As of the Petition Date, the Debtor ceased all business operations.  During the Bankruptcy Case, the Debtor has attempted to maximize the value of its bankruptcy estate by collecting its accounts receivable, selling, assigning or otherwise transferring its assets and properties, and by prosecuting causes of action, including actions seeking recoveries and avoidance of transfers pursuant to the provisions of sections 547 and 548 of the Bankruptcy

Code and other applicable law ("**Avoidance Actions**").  During the Bankruptcy Case, the Debtor entered into, among others, the following transactions to sell, assign or otherwise transfer assets and properties of its bankruptcy estate:

1.      On or about October 22, 2007, the Debtor filed in the Bankruptcy Court a motion requesting, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, an order authorizing the Debtor to sell and to assign the Debtor's interests in certain European subsidiaries of the Debtor.  The Bankruptcy Court thereafter entered an order granting such motion, and, on or about November 20, 2007, the Debtor's interests in such European subsidiaries were sold.

2.      On or about December 13, 2007, the Debtor filed in the Bankruptcy Court a motion requesting that the Bankruptcy Court approve the Debtor's sale to National Customer Engineering, Inc. of certain assets of the Debtor, including assets associated with the Debtor's "Legacy Hardware" (essentially, spare parts and testing equipment). Such motion was approved by an order of the Bankruptcy Court entered on or about January 3, 2008.

3.      On or about December 28, 2007, the Debtor filed in the Bankruptcy Court an application requesting authority for the Debtor to employ CMA Business Credit Services as an auctioneer to conduct an auction of excess personal property of the Debtor (e.g., office equipment, computers, printers, servers and office furniture).  On or about January 16, 2008, the Bankruptcy Court entered an order approving such application. The auction of such personal property was conducted on or about January 26, 2008.

4.      The Debtor filed in the Bankruptcy Court a motion requesting authority for the Debtor to sell and to assign to The Collective Group assets associated with the

Debtor's "Collective" business division.  Such motion was approved by order of the

Bankruptcy Court entered on or about May 15, 2008.

E.       The Debtor has filed in the Bankruptcy Court a number of Avoidance Actions. All

of the Avoidance Actions have been resolved, or are expected to be resolved by or soon after the

Closing (as such term is defined in Section 8.1 hereof).

F.       The Debtor has filed in the Bankruptcy Court a number of objections to disputed

claims asserted against the Debtor.  All of such objections have been resolved, or are expected to

be resolved by or soon after the Closing.

G.       As of the date of this Agreement, virtually all of the Debtor's assets and

properties have been sold or otherwise transferred, and the Debtor's bankruptcy estate converted

to cash.  A schedule of the Debtor's remaining assets and properties is attached hereto as

Exhibit "1" and is incorporated herein by this reference.

H.       On or about August 5, 2010, the Debtor and the Official Committee of Unsecured

Creditors appointed in the Debtor's Bankruptcy Case ("**Committee**") filed jointly in the

Bankruptcy Court that Joint Fourth Amended Chapter 11 Plan ("**Plan**") for the resolution of the

claims asserted against the Debtor's bankruptcy estate. The Plan provides for a comprehensive

debt restructuring of the Debtor in accordance with the terms and conditions of the Plan.  A true

and complete copy of the Plan is attached hereto as Exhibit "2" and is incorporated herein by this

reference.[1]

I.       On or about September 1, 2010, the Bankruptcy Court entered an order

confirming the Plan ("**Confirmation Order**").  A true and complete copy of the Confirmation

Order is attached hereto as Exhibit "3" and is incorporated herein by this reference.

---

[1] Unless otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the
Plan.

J.        Pursuant to the provisions of Section 6.6.1 of the Plan, a Plan Agent ("**Plan Agent**") is appointed under the Plan to administer the Plan Assets in accordance with the terms of the Plan and to make distributions in accordance with the terms of the Plan.

K.        Pursuant to the provisions of Sections 2.1.89 and 5.3.1.5 of the Plan, each holder of an Allowed General Unsecured Claim was allocated under the Plan its Pro Rata number of shares of Post-Effective Date Stock in the Debtor (as reorganized by the Plan), with such Post-Effective Date Stock to be held in trust for such Creditor by the Plan Agent.  Pursuant to the provisions of Section 6.18 of the Plan, the Plan Agent is authorized to pursue a merger transaction or other business combination including, without limitation, a stock exchange, that would benefit the holders of Allowed General Unsecured Claims, as holders of the Post-Effective Date Stock.

L.        Richard Feferman dba Corporate Recovery Associates ("**Feferman**") was appointed initially as the Plan Agent under the Plan.  Feferman has resigned as the Plan Agent, and, in accordance with the provisions of the Plan, Seller has been appointed as, and serves as, the Plan Agent under the Plan.

M.        In accordance with the provisions of the Plan, the Plan Agent has determined, in the exercise of its business judgment, that, subject to the approval of the Bankruptcy Court, good cause exists to sell, assign and to transfer to the Buyer all of the Post-Effective Date Stock.

N.        Subject to the approval of the Bankruptcy Court, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of Seller's right, title and interest in and to the Post-Effective Date Stock, in accordance with the terms and conditions hereof ("**Transaction**"). The Transaction is subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE**, based upon the foregoing Recitals, and in consideration of the mutual promises, covenants and agreements contained in this Agreement, and for other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the
Parties, and subject to the terms and conditions of this Agreement, the Parties, intending to be
legally bound, hereby agree as follows:

## AGREEMENT

## ARTICLE I.

## PURCHASE AND SALE OF POST-EFFECTIVE DATE STOCK

1.1    **Post-Effective Date Stock.**  Subject to the terms and conditions of this
Agreement, including, without limitation, approval of the Bankruptcy Court, Seller hereby
agrees to sell, transfer, assign, convey and deliver to Buyer, free and clear of pledges, security
interests, liens, claims, encumbrances, and interests (collectively, "**Liens**"), and Buyer agrees to
purchase, assume and accept from Seller, all of Seller's right, title and interest in and to the Post-
Effective Date Stock.

1.2    **Excluded Assets.**  Notwithstanding anything to the contrary contained in
Section 1.1 hereof or elsewhere in this Agreement, Buyer acknowledges and agrees that, except
only as provided expressly to the contrary in Section 1.5 hereof, Seller shall have the right, and
intends, prior to or concurrently with the Closing of the Transaction (as such term is defined in
Section 8.1 hereof), to cause the Debtor to transfer and deliver to Seller, to be held in trust by
Seller, as trustee of the MTI Liquidating Trust ("**Trust**") (a trust in the process of being formed
for the benefit of the Debtor's creditors), the Debtor's right, title, and interest in and to each of
the Debtor's assets and properties ("**Excluded Assets**").  The Excluded Assets shall include, but
shall not be limited to, the following:

1.2.1    **Cash.**  All cash, cash equivalents, investments, accounts and notes
receivable, and funds of any nature payable to the Debtor.

**1.2.2** __Refunds and Deposits.__ All deposits, including, without limitation, utility deposits and leasehold deposits, rights to refunds, including, without limitation, insurance refunds, tax refunds and assessment refunds, unused retainer payments, rebates, returns and pre-paid expenses and all similar assets or properties of the Debtor, attributable to or based upon the period through the Closing Date, and any claims for such deposits, refunds, retainer payments, rebates, returns, pre-paid expenses or similar payments.

**1.2.3** __Bank Accounts.__ All bank accounts and investment accounts maintained by or on behalf of the Debtor.

**1.2.4** __Insurance.__ All insurance policies of the Debtor and all rights, claims, refunds, adjustments, recoveries, payments from and/or proceeds of insurance policies.

**1.2.5** __Claims and Causes of Action.__ All claims and causes of action of the Debtor, whether or not such claims or causes of action are the subject of a lawsuit, action, adversary proceeding or other proceeding pending as of the Closing Date, including, without limitation, all preference, fraudulent transfer, or other avoidance claims and causes of action of the Debtor.

**1.2.6** __Indemnity, Contribution, Set-Off, Recoupment and Other Claims Regarding Excluded Assets.__ All claims, credits, refunds, abatements, allocations, claims for relief, causes of action, rights of recovery, rights of set-off, rights of indemnity, rights of contribution, rights of recoupment, counter-claims, cross-claims and defenses of the Debtor, to the extent related to any Excluded Asset or attributable to any period prior to the Closing Date, provided that the Debtor shall retain any of the foregoing to the extent that it relates to a Retained Asset.

    1.2.7    **Tangible Assets.**  All furniture, fixtures, equipment, inventory and other tangible personal property assets of the Debtor.

    1.2.8    **Contracts.**  All unexpired leases and contracts of the Debtor.

    1.2.9    **All Other Personal Property.**  Except only as provided expressly to the contrary in Section 1.5 hereof, all other personal property or assets of the Debtor.

    1.2.10    **Rights of Seller Under This Agreement.**  All rights of Seller under this Agreement or any agreement entered into in connection with this Agreement or the Transaction contemplated hereby.

Buyer shall acquire absolutely no interest in or benefit from any Excluded Assets, all of which shall constitute, as of the Closing Date, the sole property of Seller.

    1.3    **Purchase Price**.  The purchase price for the Post-Effective Date Stock ("**Purchase Price**") shall be as follows:

    1.3.1    **Cash**.  Buyer shall pay to Seller $500,000 cash.

    1.3.2    **Sales Taxes.**  Buyer shall pay any and all sales or transfer taxes that may be assessed solely on account of the transfer to Buyer of the Post-Effective Date Stock pursuant to this Agreement ("**Sales Taxes**") as and when such Sales Taxes become due. Seller shall give to Buyer a good faith estimate of the amount of any Sales Taxes prior to the Closing of the Transaction.

    1.3.3    **Assumed Liabilities.**  Buyer shall pay and satisfy the Assumed Liabilities, as defined in and as set forth in Article II of this Agreement, as and when the Assumed Liabilities become due.  For avoidance of doubt, no Post-Effective Date Plan Expense shall constitute an Assumed Liability and Seller shall be solely responsible for the payment and satisfaction of all Post-Effective Date Plan Expenses.

**1.4**    **Payment of Purchase Price**.  In addition to Buyer's assumption of the Assumed Liabilities as set forth by Article II hereof and Buyer's payment of any Sales Taxes pursuant to the provisions of Section 1.3.2, the Purchase Price shall be paid as follows:

**1.4.1**    **Purchase Price Deposit.**  Buyer has delivered to Seller's counsel, Winthrop Couchot Professional Corporation ("**Winthrop Couchot**"), the amount of the Purchase Price provided by Section 1.3.1 hereof (the "**Deposit**").  Winthrop Couchot shall maintain the Deposit in a trust account and shall not distribute such funds, except only as provided by the terms of this Agreement or pursuant to an order of the Bankruptcy Court.

**1.4.2**    **Application of Deposit to Purchase Price**.  At the Closing, the amount of the Deposit shall be credited toward the Purchase Price at the Closing.

**1.5**    **Retained Assets**.  Notwithstanding anything to the contrary contained in Section 1.2 of this Agreement or elsewhere in this Agreement, as of the Closing, the Debtor shall retain, and shall not transfer or deliver to Seller, the following assets and properties of the Debtor which shall remain as assets of the Debtor upon the Closing of the Transaction ("**Retained Assets**"):

**1.5.1**    **Intellectual Property.**  All remaining intellectual property rights and interests of the Debtor.  For the purpose of this Section 1.5.1, the term "intellectual property" shall include, but shall not be limited to, the following:  all (i) inventions, discoveries, industrial designs, business methods, patents and patent applications, including continuations, reissues, extensions and renewals with respect to the foregoing; (ii) trademarks, service marks, certification marks, collective marks, trade names, business names, assumed names, d/b/a's, fictitious names, brand names, trade dress, logos, symbols, Internet domain names and corporate names, and general intangibles of a

like nature and other indicia of origin or quality, whether registered, unregistered or arising by law, and all applications, registrations, and renewals for any of the foregoing, together with the goodwill associated with and symbolized by each of the foregoing; (iii) published and unpublished works of authorship in any medium, whether copyrightable or not (including databases and other compilations of information, computer software, source code, object code, algorithms, and other similar materials and Internet website content), copyrights and registrations and applications therefor, and all issuances, renewals, extensions, restorations and reversions thereof; and (iv) confidential and proprietary information, trade secrets, and know-how, including methods, processes, business plans, schematics, concepts, software and databases (including source code, object code and algorithms), formulae, drawings, prototypes, models, designs, devices, technology, research and development and customer information and lists.

      1.5.2   **Intangible Assets**.  The intangible assets of the Debtor identified in Exhibit "4" attached hereto and incorporated herein by this reference.

      1.5.3   **Governmental Permits and Licenses.**  All governmental permits and governmental licenses, rights, variances, waivers, consents, authorizations, approvals, contracts or agreements held by the Debtor.

      1.5.4   **Financial Books and Records.**  Copies of all financial books and records currently maintained by the Debtor, as requested by Buyer; provided, however, that all costs associated with the photocopying of such documents shall be borne solely by Buyer.

      1.5.5   **Organizational Documents.**  Copies of all minute books, seals, stock books, charter documents and other books and records currently maintained by the Debtor pertaining to the existence, organization or governance of the Debtor, as requested

by Buyer; provided, however, that all costs associated with the photocopying of such documents and the obtaining of such documents from the State of Delaware shall be borne solely by Buyer.

### 1.5.6 Indemnity, Contribution, Set-Off Recoupment and Other Claims Regarding Retained Assets.

All claims, credits, refunds, abatements, allocations, claims for relief, causes of action, rights of recovery, rights of set-off, rights of indemnity, rights of contribution,  rights of recoupment, counter-claims, cross-claims and defenses of the Debtor, to the extent related to any Retained Asset.

**1.6    Closing Costs.**  Seller shall pay any and all escrow fees and costs and any and all other costs associated with the Closing of the Transaction.

### ARTICLE II.

### ASSUMPTION OF LIABILITIES

Buyer shall assume and pay, perform and discharge, as and when due, only the following liabilities and obligations of the Debtor (liabilities described in Sections 2.1 and 2.2 collectively referred to as "**Assumed Liabilities**").

**2.1    Liabilities on Account of Retained Assets.**  All liabilities and obligations of the Debtor  arising after the Closing Date on account of the Retained Assets.  Except as specified in Exhibit "5," Seller has no knowledge, based upon the financial affairs of the Debtor after the appointment of the Plan Agent, of any liabilities or obligations of the Debtor that will arise after the Closing Date on account of the Retained Assets.

**2.2    Corporate Fees and Taxes.**  All liabilities and obligations of the Debtor  arising after the Closing Date, for any and all of the following:  taxes assessed by the federal government or by any state, municipal or other governmental unit (as such term is defined by section 101(27) of the Bankruptcy Code) (collectively, "**Governmental Units**"); any license fee

or other corporate charge or fee assessed against the Debtor by any Governmental Unit; and any and all other costs, fees, and charges of any nature whatsoever on account of the corporate existence of the Debtor after the Closing Date or Buyer's ownership of the Post-Effective Date Stock. Except as specified in Exhibit "5," Seller has no knowledge, based upon the financial affairs of the Debtor after the appointment of the Plan Agent, of any liabilities or obligations of the Debtor that will arise after the Closing Date otherwise within the scope of this Section 2.2. Seller shall provide to Buyer, prior to or concurrently with the Closing, copies of any tax notices and invoices for other fees assessed against the Debtor by any Governmental Unit which were received by the Debtor, or which may be received by the Debtor, within the twelve-month period prior to the Closing.

## ARTICLE III.

## EXCLUDED LIABILITIES

Buyer shall have no responsibility of any nature whatsoever for any liabilities, debts or obligations of the Debtor, whether accrued, absolute, contingent or otherwise, arising before the Closing, other than for the Assumed Liabilities. Other than the Assumed Liabilities, Buyer shall have no obligation to assume, pay or perform, nor shall Buyer have any obligation to defend, indemnify or hold harmless Seller from or against, any liabilities of the Debtor of any nature or description arising before the Closing, including, without limitation, any of the following liabilities of the Debtor:

3.1     **Post-Effective Date Plan Expenses.** Any liability for any Post-Effective Date Plan Expense, whenever arising or incurred.

3.2     **Governmental Liabilities**. Liabilities of the Debtor to any Governmental Unit, for unpaid taxes or assessments of any type or description, or penalties or interest, arising by reason of the ownership, use and/or operation of the Debtor's assets or properties prior and up to

the Closing, or arising on account of income of the Debtor. Without limiting the generality of the foregoing, prior to or concurrently with the Closing, Seller shall provide to Buyer proof that any pre-Closing tax claim of the State of Delaware shall have been paid in full by the Debtor.

**3.3    Business Liabilities**. Liabilities of the Debtor incurred or arising out of events occurring at or prior to the Closing, including but not limited to, liabilities to the Debtor's past or current Creditors, lienholders, customers, suppliers, employees, independent contractors, employee benefit plans as defined in the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and trustees of ERISA plans.

**3.4    Litigation**. Liabilities of the Debtor resulting from any litigation pending prior to the Closing or relating to occurrences or events occurring at or before the Closing, including, without limitation, any pending or threatened litigation for unpaid liabilities of the Debtor or regarding the Debtor's employment practices. Seller shall provide to Buyer, prior to the Closing, notice of any pre-Closing litigation that could have any material effect on the Debtor, the Post-Effective Date Stock or Buyer.

## ARTICLE IV.

## COVENANTS OF SELLER

Seller hereby covenants and agrees that it will act as follows:

**4.1    Seller's Reasonable Efforts to Consummate Agreement.** From the Execution Date until the Closing, subject to the terms and conditions of this Agreement, Seller shall use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to consummate and to make effective the Transaction.

**4.2    Preservation of Retained Assets**. From the Execution Date until the Closing, Seller shall cause the Debtor to use commercially reasonable efforts to not cause any damage to, or diminution in any value of, the Retained Assets. From the Execution Date until the Closing,

Seller shall cause the Debtor not to make any sale or other voluntary transfer of the Retained Assets.

**4.3**    **Access to Information**.  From the Execution Date until the Closing, Seller shall cause the Debtor to afford to representatives of Buyer reasonable access to the Debtor's financial and corporate books and records, upon written prior notice and appointment, for the purpose of facilitating Buyer's examination of the Retained Assets.

**4.4**    **Stock Sale Motion**.  Within fifteen (15) business days after the Execution Date, Seller shall file in the Bankruptcy Court a motion ("**Stock Sale Motion**") pursuant to which Seller shall request that the Bankruptcy Court enter an order, in a form mutually acceptable to Seller and Buyer, approving Seller's sale and assignment to Buyer of the Post-Effective Date Stock in accordance with the terms of this Agreement ("**Sale Order**").  The Sale Order shall provide that the Post-Effective Date Stock shall be transferred to Buyer free and clear of all Liens and expressly provide that the Debtor shall have no liability with respect to any Post-Effective Date Plan Expense.

**4.5**    **Satisfaction of Debtor's Obligations Under the Plan**.  Except only for the Assumed Liabilities, Seller shall cause the Debtor to pay in full by the Closing Date, or to establish by the Closing Date with Seller reasonable reserves for the prompt payment in full of, all of the Debtor's obligations to Creditors under the Plan which arose on or before the Effective Date of the Plan.

**4.6**    **Post-Effective Date Obligations of the Debtor**.  Except only for the Assumed Liabilities, Seller shall cause the Debtor to pay in full by the Closing Date, or to establish by the Closing Date with Seller reasonable reserves for the prompt payment in full of, all obligations of the Debtor known to the Debtor or reasonably ascertainable by the Debtor which arose from the

Effective Date of the Plan to the Execution Date of this Agreement or which may arise from the Execution Date of this Agreement through the Closing Date.

**4.7**    **Consents of Seller**.  Seller shall use commercially reasonable efforts to obtain, or cause to be obtained, all appropriate releases, consents, waivers and approvals as may be advisable to consummate and to make effective the Transaction.

**4.8**    **Seller Confidentiality.**  Seller shall comply fully and completely with the terms and conditions of that Mutual Confidentiality and Non-Disclosure Agreement, dated October 25, 2012 (**"Non-Disclosure Agreement"**), entered into by and among the Debtor, Feferman, IPv4 Market Group, LLC and Buyer.

## ARTICLE V.

## COVENANTS OF BUYER

Buyer hereby covenants and agrees that it will act as follows:

**5.1**    **Buyer's Reasonable Efforts to Consummate Agreement**.  From the Execution Date until the Closing, subject to the terms and conditions of this Agreement, Buyer shall use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to consummate and to make effective the Transaction.

**5.2**    **Consents of Buyer**.  Buyer shall use commercially reasonable efforts to obtain, or cause to be obtained, all appropriate releases, consents, waivers and approvals as may be advisable to consummate and to make effective the Transaction.

**5.3**    **Buyer Confidentiality.**  Buyer shall comply fully and completely with the terms and conditions of the Non-Disclosure Agreement.

## ARTICLE VI.

## SELLER'S REPRESENTATIONS AND WARRANTIES

6.1    **Representations and Warranties.**  Seller represents and warrants to Buyer that:

6.1.1    **Organization**.  The Debtor is a corporation duly organized, and, as of the

Closing Date, shall be validly existing and in good standing under the laws of the State of

Delaware.

6.1.2    **Power and Authority**.  Subject to the approval of the Bankruptcy Court,

Seller has all requisite power and authority to enter into this Agreement and to carry out

all of its obligations under this Agreement.  The individual who shall execute this

Agreement on behalf of Seller shall have been duly authorized to do so by all requisite

action on the part of Seller.  Subject to the approval of the Bankruptcy Code, this

Agreement is a valid and binding obligation of Seller and is enforceable against Seller, in

accordance with the terms of this Agreement.

6.1.3    **No Conflicts**.  Neither the execution nor the performance of this

Agreement by Seller will conflict materially with or result in any material violation of or

constitute any material default under (i) any material arrangement, agreement, mortgage,

indenture, license, permit, lease or other instrument to which Seller is a party or by which

Seller is bound; (ii) any statute, law, rule or regulation of any Governmental Unit; or (iii)

any material stipulation, judgment, writ, injunction, decree or order of any court or other

governmental authority relating to Seller.

6.1.4    **No Brokers or Finders**.  Except only for Seller's broker (Levine,

Blaszak, & Block, LLP), and a third party broker who has procured Buyer (IPv4 Market

Group, LLC), whose fees will be paid from proceeds obtained by Seller from the

Transaction, no person or entity has, or as a result of the Transaction will have, as a result

of any commitment of Seller, any right, interest or valid claim against Seller or the

Debtor for any commission, fee or other compensation as a broker or finder or for acting

in any similar capacity.

    **6.1.5**   **Pending Actions**.  To the best of Seller's knowledge, there are no actions,

suits, arbitrations or other legal, administrative or governmental proceedings pending or

threatened against or affecting Seller which might reasonably be expected to affect

Seller's ability to consummate this Agreement, and Seller is not aware of any

circumstances which might result in any such action, suit, arbitration or other proceeding.

    **6.1.6**   **Consents.**  Except for the entry of the Sale Order, the approval of the

Post-Effective Date Committee and as otherwise provided by this Agreement, no consent,

approval, authorization, permit, order, filing, registration or qualification of or with any

court, governmental authority or third person is required to be obtained by Seller in

connection with the execution and delivery by Seller of this Agreement or the

consummation by Seller of the Transaction.

    **6.1.7**   **No Prior Disposition or Encumbrance of the Retained Assets**.  Except

as disclosed in Exhibit "6" hereto, to the knowledge of Seller, since the appointment of

the Plan Agent, neither the Debtor nor the Plan Agent has made any disposition of or

otherwise encumbered any of the Retained Assets.

**6.2**   **No Other Representations**.  Except as expressly provided in this Agreement,

Seller makes no representation or warranty, expressed or implied, to Buyer and hereby disclaims

any representation or warranty, express or implied, with respect to the Debtor, the Post-Effective

Date Stock, the Retained Assets, or any other matter, including, without limitation, any

representation or warranty as to the value, merchantability, use or fitness for a particular purpose

of the Retained Assets.  Subject to the terms of this Agreement, Seller hereby is selling to Buyer the Post-Effective Date Stock on an "AS IS," "WHERE IS" and "WITH ALL FAULTS" basis.

**6.3** **Survival**.  The representations, warranties, covenants, agreements, promises, commitments and obligations of Seller hereunder shall survive any Closing of the Transaction for a period of only one hundred eighty (180) days after the Closing ("Buyer Claims Survival Deadline"), after which time the representations, warranties, covenants, agreements, promises, commitments and obligations of Seller hereunder shall automatically terminate, cease to be of any force or effect and shall not be enforceable against Seller.

**6.4** **Limitation of Seller's Liability**.  Neither Seller nor the Debtor, the Trust, Feferman or any of their respective directors, officers, employees, shareholders, trustees, agents, representatives, attorneys, accountants or affiliates shall have any personal liability of any nature whatsoever for any breach of any representation, warranty, covenant, agreement, promise, commitment or obligation of Seller hereunder.  Notwithstanding anything to the contrary contained in this Agreement, Buyer's sole remedies for any breach of any representation, warranty, covenant, agreement, promise, commitment or obligation of Seller hereunder shall be as follows:

**6.4.1** **Termination/No Recourse.**  Buyer may terminate this Agreement pursuant to the provisions of Section 11.1.1 hereof.  Upon any such termination of this Agreement, Buyer shall have no recourse, and shall be deemed to have waived any claim on account of any such breach by Seller, against Seller, the Debtor, Feferman or any of their respective directors, officers, employees, shareholders, agents, representatives, attorneys, accountants or affiliates.

**6.4.2** **Purchase Price Adjustment Claim.**  If Buyer closes the Transaction, Buyer may assert, by the Buyer Claims Survival Deadline, a claim for a credit or offset

against the Purchase Price, in an amount not to exceed $100,000 ("Purchase Price Adjustment Claim").  On or as soon as practicable after the Closing Date, Seller shall deposit into an escrow account or other segregated account reasonably acceptable to Buyer ("Segregated Account"), from which no disbursement shall be made except as permitted herein, the sum of $100,000 from the Purchase Price ("Purchase Price Reserve").  In the event that Buyer fails to assert by the Buyer Claims Survival Deadline a Purchase Price Adjustment Claim, Seller shall have the right to disburse from the Segregated Account the Purchase Price Reserve as it deems appropriate, and Buyer shall have no claim of any nature whatsoever against Seller or against the Purchase Price Reserve.  In the event that Buyer asserts by the Buyer Claims Survival Deadline a Purchase Price Adjustment Claim, Seller shall continue to maintain the Purchase Price Reserve in the Segregated Account, and shall not disburse from the Segregated Account any amount of the Purchase Price Reserve, without the written consent of Buyer or an order of the Bankruptcy Court authorizing a disbursement of the Purchase Price Reserve. Buyer and Seller shall use their respective reasonable efforts to resolve any Purchase Price Adjustment Claim.  In the event that they are unable to resolve any Purchase Price Adjustment Claim, the Purchase Price Adjustment Claim shall be resolved by the Bankruptcy Court in accordance with the provisions of Section 14.6 hereof.  In any dispute between Seller and Buyer with respect to the merits of any Purchase Price Adjustment Claim, Buyer shall have the burden of demonstrating the validity of such Purchase Price Adjustment Claim.  Any Purchase Price Adjustment Claim shall be nonrecourse as to Seller,  the Debtor, Feferman and their respective directors, officers, employees, shareholders, agents, representatives, attorneys, accountants and affiliates, and shall be payable solely from the Purchase Price Reserve.

# ARTICLE VII.

## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants that:

**7.1** **Organization**. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California.

**7.2** **Power and Authority**. Buyer has all requisite power and authority to enter into this Agreement and to carry out all of its obligations under this Agreement. The individual who shall execute and deliver this Agreement on behalf of Buyer shall have been duly authorized to do so by all requisite action on the part of Buyer. This Agreement is a valid and binding obligation of Buyer and is enforceable against Buyer, in accordance with the terms of this Agreement.

**7.3** **No Conflicts.** Neither the execution nor the performance of this Agreement by Buyer will conflict materially with or result in any material violation of or constitute a material default under: (i) Buyer's organizational documents; (ii) any material arrangement, agreement, mortgage, indenture, license, permit, lease or other instrument to which Buyer is a party or by which Buyer is bound; (iii) any statute, law, rule or regulation of any Governmental Unit; or (iv) any material stipulation, judgment, writ, injunction, decree or order of any court or other governmental authority relating to Buyer.

**7.4** **No Brokers or Finders**. No person or entity has, or as a result of the Transaction will have, as a result of any commitment of Buyer, any right, interest or valid claim against Seller or the Debtor for any commission, fee or other compensation as a broker, finder or attorney or for acting in any similar capacity.

**7.5** **Pending Actions**. To the best of Buyer's knowledge, there are no actions, suits, arbitrations or other legal, administrative or governmental proceedings pending or threatened

against or affecting Buyer which might reasonably be expected to affect Buyer's ability to consummate this Agreement, and Buyer is not aware of any circumstances which might result in any such action, suit, arbitration or other proceeding.

      **7.6**    **Consents**.  Except for the entry of the Sale Order, no consent, approval, authorization, permit, order, filing, registration or qualification of or with any court, Governmental Unit or third person is required to be obtained by Buyer in connection with the execution and delivery by Buyer of this Agreement or the consummation by Buyer of the Transaction.

      **7.7**    **Buyer's Investigation**.  Buyer has made such investigation as it has deemed appropriate in connection with the decision to enter into this Agreement.  Buyer has had the opportunity to examine the Retained Assets and the Debtor's corporate and financial books and records, including, without limitation, with respect to the Retained Assets.  Buyer is relying on the results of such investigation and the advice of its own advisors and has not relied upon any statement or representation made by the Debtor or by Seller or by any respective director, officer, employee, agent, representative, attorney, accountant, or affiliate of the Debtor or of Seller, other than the covenants, representations and warranties of Seller set forth in this Agreement.

      **7.8**    **Buyer's Financial Condition.**  As of the Closing Date and immediately after consummating the Transaction contemplated by this Agreement, Buyer will not (i) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the fair value of its assets will be less than the amount required to pay its probable liabilities as they become due and payable), (ii) have unreasonably small capital with which to engage in its business, or (iii) have incurred or planned to incur debts beyond its ability to repay such debts as they mature.

**7.9**     <u>No Reverse Merger Transaction</u>.  Buyer acknowledges and agrees that neither Buyer, nor any affiliate of Buyer, will, by virtue of the transfer to Buyer of the Post-Effective Date Stock, seek to become a publicly-held company (e.g., through a "reverse merger" transaction).

**ARTICLE VIII.**

**<u>CLOSING OF THE TRANSACTION</u>**

**8.1**     <u>The Closing</u>.  The closing of the Transaction contemplated by this Agreement ("Closing") shall be held within three (3) business days after the satisfaction of all conditions set forth in Sections 10.1 and 10.2 hereof, or on such other date as Buyer and Seller mutually agree in writing ("Closing Date").  The Closing shall take place at the law office of Winthrop Couchot, or at such other location as Buyer and Seller mutually agree in writing.

**8.2**     <u>Seller's Obligations at Closing</u>.  At the Closing, Seller shall take the following acts:

     **8.2.1**     <u>Transfer of the Post-Effective Date Stock</u>.  Seller shall cause to be transferred to Buyer the Post-Effective Date Stock.

     **8.2.2**     <u>Closing Documents from Seller</u>.  Seller shall execute and deliver to Buyer such transfer documents as may be reasonably requested by Buyer in connection with the transfer to Buyer of the Post-Effective Date Stock.

**8.3**     <u>Buyer's Obligations at Closing</u>.  At the Closing, Buyer shall take the following acts:

     **8.3.1**     <u>Payment of Purchase Price</u>.  Buyer shall provide to Winthrop Couchot absolute and unconditional written authorization to release to Seller the Deposit, as and for payment of the Purchase Price.  Except only as provided expressly to the contrary in

Section 6.4 hereof, Seller shall retain the Purchase Price free and clear of any claims or interests of Buyer.

**8.3.2**   **Closing Documents from Buyer.**   Buyer shall execute and deliver to Seller the following documents: (i) copies, certified by the appropriate governmental official of the state in which Buyer is organized, of Buyer's organizational documents, and all amendments thereto; (ii) a certificate, satisfactory to Seller, relating to Buyer's having taken all acts under its organizational documents appropriate for authorizing the Transaction; and (iii) such other documents as may be reasonably requested by Seller in connection with the consummation of the Transaction.

**8.4**   **Effectiveness of Agreement.**   This Agreement, and all of the terms and conditions hereof, shall be effective and binding upon the Parties upon the satisfaction or waiver of the conditions set forth in Sections 10.1 and 10.2 hereof; provided, however, that the following provisions of this Agreement shall be effective upon the Execution Date: Article III; Article IV; Article V; Article VI; Article VII; Article X; Article XI; and Article XV.

## ARTICLE IX.

## DELIVERY AND CONDITION OF THE POST-EFFECTIVE

## DATE STOCK AND THE RETAINED ASSETS

**9.1**   **Transfer of Post-Effective Date Stock.**   Immediately upon the Closing, Seller shall transfer to Buyer all of Seller's rights, title and interests, in, as well as possession, custody and control of, the Post-Effective Date Stock. Seller shall not be liable or responsible for any liabilities or obligations of any kind or nature whatsoever arising out of, under, or related to the Post-Effective Date Stock, or the Debtor, from and after the Closing.

**9.2**   **As Is, Where Is.**   Subject to the terms of this Agreement, Buyer acknowledges and agrees that it is purchasing, and shall take possession of, the Post-Effective Date Stock, and

-22-

the Retained Assets, in their "AS IS, WHERE IS" and "WITH ALL FAULTS" condition and

that Buyer has previously been given the opportunity to conduct, and has conducted, such

investigations and inspections of the Post-Effective Date Stock and the Retained Assets as Buyer

has deemed necessary or appropriate for the purposes of this Agreement.

     **9.3**    <u>**No Warranties Regarding Post-Effective Date Stock or Retained Assets**</u>.
**EXCEPT AS PROVIDED EXPRESSLY IN THIS AGREEMENT, SELLER MAKES NO
REPRESENTATIONS, STATEMENTS OR WARRANTIES, EXPRESS OR IMPLIED,
OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE POST-EFFECTIVE
DATE STOCK ON THE RETAINED ASSETS, INCLUDING, WITHOUT LIMITATION,
ANY WARRANTIES REGARDING THE CONDITION OR QUALITY OF THE POST-
EFFECTIVE DATE STOCK OR THE OWNERSHIP, CONDITION OR QUALITY OF
ANY OF THE RETAINED ASSETS, OR CONCERNING THE PAST, PRESENT OR
FUTURE VALUE OR USE OF THE RETAINED ASSETS, AND ANY AND ALL
IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE ARE DISCLAIMED HEREBY BY SELLER.**

**ARTICLE X.**

<u>**CONDITIONS PRECEDENT TO CLOSING**</u>

     **10.1**    <u>**Conditions on Behalf of Buyer**</u>.  The obligation of Buyer to proceed with the

Closing of this Agreement is subject to the satisfaction of all of the conditions set forth in this

Section 10.1.

     **10.1.1**    <u>**Transfer of Post-Effective Date Stock.**</u>  In accordance with the

provisions of the Sale Order, the Post-Effective Date Stock shall be transferred to Buyer

at the Closing free and clear of all Liens and all claims and liability with respect to any

Post-Effective Date Plan Expense.

**10.1.2      No Proceedings Adverse to Buyer.**  On the Closing Date, no suit, action or other proceeding, including any governmental action, shall be pending before any court, Governmental Unit or regulatory authority which seeks to restrain or to prohibit the consummation of the Transaction, or to obtain from Buyer damages or other material relief in connection with this Agreement or the consummation of the Transaction.

**10.1.3      Seller's Covenants, Agreements and Conditions.**  Seller shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions that it is required by this Agreement to perform, satisfy or comply with, before or at the Closing.

**10.1.4      Seller's Representations and Warranties.**  All representations and warranties made by Seller pursuant to this Agreement shall be true in all material respects as of the Closing Date as though such representations and warranties were made on and as of that date.

**10.1.5      Seller's Authorization.**  The execution and delivery of this Agreement by Seller, and the performance of Seller's covenants and obligations under this Agreement, shall have been duly authorized by all necessary action by Seller.

**10.1.6      Seller's Documents.**  The form and substance of all documents delivered to Buyer under this Agreement shall be acceptable to Buyer, which acceptance shall not be unreasonably withheld by Buyer.

**10.1.7      Sale Order Acceptable to Buyer.**  The Bankruptcy Court shall have entered the Sale Order on terms acceptable to Buyer, which acceptance shall not be unreasonably withheld by Buyer, and no appeal of the Sale Order shall have been filed timely pursuant to the Federal Rules of Bankruptcy Procedures ("**Appeal**"), or if an

Appeal shall have been filed timely, no stay of the execution of the Sale Order ("**Stay**")

is issued pending the resolution of the Appeal.  Absent a Stay, the lack of any pending

Appeal of the Sale Order shall not be a condition of the Closing, provided that the

Bankruptcy Court makes a finding that Buyer is a buyer in good faith within the meaning

of section 363(m) of the Bankruptcy Code and expressly provides that the Buyer shall not

be liable for any Post-Effective Date Plan Expense.

**10.2** **Conditions on Behalf of Seller**.  The obligation of Seller to proceed with the

Closing of this Agreement is subject to the satisfaction of all of the conditions set forth in this

Section 10.2.

**10.2.1** **No Proceedings Adverse to Seller.**  On the Closing Date, no suit, action

or other proceeding, including any governmental action, shall be pending before any

court, Governmental Unit or regulatory authority which seeks to restrain or to prohibit the

consummation of the Transaction, or to obtain from Seller damages or other material

relief in connection with this Agreement or the consummation of the Transaction.

**10.2.2** **Buyer's Covenants, Agreements and Conditions.**  Buyer shall have

performed, satisfied and complied in all material respects with all covenants, agreements

and conditions that it is required by this Agreement to perform, satisfy or comply with,

before or at the Closing, including, without limitation, payment of the Purchase Price.

**10.2.3** **Buyer's Representations and Warranties.**  All representations and

warranties made by Buyer pursuant to this Agreement shall be true in all material

respects as of the Closing Date as though such representations and warranties were made

on and as of that date.

**10.2.4** **Buyer's Authorization.**  The execution and delivery of this Agreement

by Buyer, and the performance of Buyer's covenants and obligations under this

Agreement, shall have been duly authorized by all necessary action by Buyer, and Seller

shall have received copies of all resolutions pertaining to that authorization.

    **10.2.5**   **Buyer's Documents.** The form and substance of all documents

delivered to Seller under this Agreement shall be acceptable to Seller, which acceptance

shall not be unreasonably withheld by Seller.

    **10.2.6**   **Sale Order Acceptable to Seller.** The Bankruptcy Court shall have

entered the Sale Order on terms acceptable to Seller, which acceptance shall not be

unreasonably withheld by Seller, and no Appeal shall have been filed timely, or if an

Appeal shall have been filed timely, no Stay is issued pending the resolution of the

Appeal. Absent a Stay, the lack of any pending Appeal of the Sale Order shall not be a

condition to the Closing.

  **10.3**   **Waiver of Conditions.** Any or all of the foregoing conditions may be waived in

whole or in part by a prior writing executed by the Party on whose behalf such condition is

included herein.

**ARTICLE XI.**

**TERMINATION OF THIS AGREEMENT**

  **11.1**   **Termination.** This Agreement may be terminated at any time prior to the

Closing as follows:

    **11.1.1**   **Breach by Seller.** By Buyer, at its option, if there is a material breach

by Seller of any representation or warranty of Seller set forth herein or any covenant or

agreement to be complied with or performed by Seller pursuant to the terms of this

Agreement, or a failure by Seller to satisfy a condition set forth in Section 10.1 hereof

(and such condition is not waived in writing by Buyer), or the occurrence of any event

which results or would result in the failure of a condition set forth in Section 10.1 hereof.

-26-

**11.1.2   Breach by Buyer.**  By Seller, at its option, if there is a material breach by Buyer of any representation or warranty of Buyer set forth herein or of any covenant or agreement to be complied with or performed by Buyer pursuant to the terms of this Agreement, or a failure by Buyer to satisfy a condition set forth in Section 10.2 hereof (and such condition is not waived in writing by Seller), or the occurrence of any event which results or would result in the failure of a condition set forth in Section 10.2 hereof.

**11.1.3   Mutual Consent.**  By mutual written consent of Buyer and Seller.

**11.1.4   Order Restraining Consummation of Transaction.**  By either Buyer or Seller, if a court of competent jurisdiction or Governmental Unit shall have issued a non-appealable final order, decree or ruling or taken any other action, in each case having the effect of permanently restraining, enjoining or otherwise prohibiting the consummation of the Transaction, except, if the Party relying on such order, decree or ruling or other action has not complied with its obligations with respect thereto under this Agreement.

**11.1.5   Deadline for Closing.**  By either Buyer or Seller, if the Closing shall not have occurred by July 31, 2013 (provided that the right to terminate this Agreement under this Section 11.1.5 shall not be available to the Party seeking to terminate this Agreement if any failure by such Party to fulfill any obligation of such Party under this Agreement is the cause of or results in the failure of the Closing to occur on or before such date).

**11.2   Effect of Termination.**  In the event of any termination of this Agreement as permitted by Section 11.1 hereof, this Agreement shall forthwith become void and no Party shall have any liability or further obligation to the other Party under or by reason of this Agreement or the Transaction contemplated hereby, except for any breach of this Agreement occurring prior to

or as a result of a termination of this Agreement, and except for the following: (i) each Party shall redeliver to the other Party all documents, work papers, and other materials of the other Party relating to the Transaction contemplated hereby, whether obtained by such Party before or after the Execution Date; and (ii) in the event that this Agreement is terminated by Buyer through no fault of Buyer, Seller shall, within seven (7) business days after such termination of this Agreement, return to Buyer the amount of the Deposit. Except only as provided expressly to the contrary in Section 6.4.1 hereof, any termination of this Agreement shall not relieve any defaulting or breaching Party from any liability to the other Party as a result of such breach or default under this Agreement. In the event of any termination of this Agreement by Seller, Seller shall reserve all rights and remedies available under applicable law to Seller as a consequence of any breach or default by Buyer under this Agreement; without limiting the generality of the foregoing, in the event of any breach or default by Buyer of any of its agreements, commitments, representations, warranties, covenants or obligations hereunder, Seller shall have the absolute right to retain the full amount of the Deposit and to pursue against Buyer all rights and remedies of Seller.

     **11.3**   <u>Extension; Waiver</u>. At any time prior to the Closing Date, Buyer or Seller may (i) extend the time for the performance for its behalf of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties given for its behalf herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions contained for its behalf herein. Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party.

     **11.4**   <u>Notice of Termination</u>. Any Party terminating this Agreement pursuant to Section 11.1 hereof shall give immediate written notice of such termination to the other Party at

the addresses to which notices must be provided pursuant to Section 14.13 hereof, specifying in

the notice the provision of this Agreement pursuant to which the termination is made.

## ARTICLE XII.

## SELLER'S OBLIGATIONS AFTER CLOSING

**12.1** **Proration**. Seller shall pay timely, from and after the Closing Date, Debtor's

portion, prorated as of the Closing Date, of any state and local taxes and fees assessed against the

Retained Assets, and all other costs, charges and expenses affecting the Debtor, the Retained

Assets or the Post-Effective Date Stock arising before the Closing.

**12.2** **Seller's Further Assurances**. After the Closing, Seller shall cooperate fully with

Buyer in the performance of this Agreement, and shall execute such additional agreements,

documents or instruments as may be reasonably appropriate to carry out the intent of the Parties

with respect to this Agreement; provided, however, that Seller shall have no further obligations

hereunder to Buyer after one hundred eighty (180) days after the Closing.

## ARTICLE XIII.

## BUYER'S OBLIGATIONS AFTER CLOSING

**13.1** **Proration**. Buyer shall pay timely, from and after the Closing Date, all Assumed

Liabilities and Buyer's portion, prorated as of the Closing Date, of any state and local taxes and

fees assessed against the Retained Assets, and all other costs, charges and expenses affecting the

Debtor, the Retained Assets or the Post-Effective Date Stock arising from and after the Closing.

**13.2** **Buyer's Indemnity**. Buyer shall indemnify and hold harmless the Debtor, Seller

and their respective officers, directors, shareholders, employees, principals, agents, attorneys and

representatives against, and in respect of, any and all claims, losses, expenses, costs, obligations,

and liabilities (including, without limitation, any interest, penalties, charges, legal fees and costs

and accountants' fees and costs) (collectively, **"Losses"**) incurred by any of them in connection

with and in defending against any such Losses by reason of any of the following:  (i) Buyer's breach, after the Closing Date, of any of its agreements, commitments, representations, warranties,  covenants or obligations in this Agreement; (ii) the ownership and operation of the Debtor or any of the Retained Assets at any time after the Closing; (iii) any obligations or liabilities of Buyer incurred or arising out of, or in connection with, any act or omission by Buyer occurring at any time before or after the Execution Date of this Agreement; and (iv) the Assumed Liabilities.  Buyer's obligations under this Section 13.2 shall survive until the Buyer Claims Survival Deadline, after which time all such obligations shall automatically terminate and shall not be enforceable against Buyer.

      **13.3**    **Buyer's Further Assurances**.  After the Closing, Buyer shall cooperate fully with Seller in the performance of this Agreement, and shall execute such additional agreements, documents or instruments as may be reasonably appropriate to carry out the intent of the Parties with respect to this Agreement.

**ARTICLE XIV.**

**MISCELLANEOUS**

      **14.1**    **Modification**.  This Agreement may not be modified or amended, except by an instrument in writing signed by both of the Parties.

      **14.2**    **Waiver**.  Acceptance by a Party of any performance less than required hereunder shall not be deemed to be a waiver of the rights of such Party to enforce all of the terms and conditions hereof.  No waiver of any such right hereunder shall be binding unless reduced to writing and signed by the Party to be charged therewith.

      **14.3**    **Counterparts; Facsimile or Electronic Signature**.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures appeared on the same instrument, and all signed counterparts shall be deemed to be an original.  Facsimile or

electronic transmission of any signed original document, and retransmission of any signed

facsimile or electronic transmission, shall be the same as delivery of an original.

     **14.4**     **Authorized Execution**.  Each individual executing this Agreement on behalf of

a Party represents and warrants that (i) it is authorized to execute this Agreement for such Party,

and (ii) such Party shall be bound in all respects hereby.

     **14.5**     **Attorneys' Fees and Costs**.  Each Party shall bear its own attorneys' fees and

costs arising from or related to the negotiation and execution of this Agreement.  In the event of

any action or proceeding to enforce, modify, interpret, construe, invalidate, rescind, or set aside

any term or provision of this Agreement, however, the prevailing Party shall be entitled to an

award of its costs and expenses, including reasonable attorneys' fees and costs, incurred as a

result of such claim, action, or lawsuit, including any appeals resulting therefrom.

     **14.6**     **Governing Law; Choice of Forum**.  This Agreement shall be construed and

enforced according to the laws of the State of Delaware without reference to conflicts of law

principles.  Any action or proceeding brought to enforce, modify, interpret, construe, invalidate,

rescind or set aside any of the terms or provisions of this Agreement, or with respect to any

dispute pertaining to or arising from the Sale Motion, the Stock Sale Order, the conduct of Seller,

the conduct of the Post-Effective Date Committee, Feferman, the Trust or the conduct of the

Debtor, may be brought only in the Bankruptcy Court (subject only to the right of appeal).  Each

of the Parties hereby consents to the exclusive jurisdiction of the Bankruptcy Court to enforce

the provisions of this Agreement and for all such matters, and hereby waives any objection that it

may have to such jurisdiction.  Notwithstanding the foregoing, in the event that the Bankruptcy

Case should be closed or dismissed, and the Bankruptcy Court declines to reopen the Bankruptcy

Case upon any request of a Party, any action or proceeding to enforce, modify, interpret,

construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement shall be brought only in the state or federal courts of California sitting in Orange County, California.

    **14.7**    <u>**Severability**</u>.  If any part of this Agreement shall be determined to be illegal, invalid or unenforceable, that part shall be severed from the Agreement and the remaining parts shall be valid and enforceable, so long as the remaining parts continue to fulfill the original intent of the Parties.

    **14.8**    <u>**Free and Voluntary Act**</u>.  The Parties hereby acknowledge and agree that they have carefully read this Agreement, know the contents thereof, have discussed them with legal counsel or have decided not to consult with legal counsel, and sign this Agreement of their own free and voluntary act with the intent to be legally bound thereby.

    **14.9**    <u>**No Construction against any Party; Headings for Convenience Only**</u>.  The Parties have cooperated in the drafting and preparation of this Agreement.  In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against either Party.  All headings in this Agreement are inserted for convenience of reference only, and shall not affect the construction or interpretation hereof.

    **14.10**    <u>**Reliance on Representations**</u>.  Each Party specifically acknowledges that it has not relied on any statement, representation, or promise of the other Party, or of any of its agents, employees, attorneys, or representatives, in executing this Agreement, except only as expressly set forth herein.

    **14.11**    <u>**Entire Agreement**</u>.  This Agreement constitutes the entire agreement of the Parties with respect to the matters set forth herein, and supersedes any and all prior agreements or understandings, written or oral, between them relating to the subject matter of this Agreement. No promises or agreements shall be binding upon the Parties with respect to this subject matter

unless contained in this Agreement or separately agreed to in writing and signed by an authorized representative of each Party.

    **14.12**   **Bankruptcy Court Approval**.  Each Party shall take any and all acts, and execute any and all further documents, that may be reasonably necessary or appropriate to obtain Bankruptcy Court approval of this Agreement.

    **14.13**   **Notices**.  All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be delivered by facsimile, e-mail transmission, or in person, or mailed by first class registered or certified mail, as follows:

| | |
|---|---|
| If Directed to Seller: | Richard Feferman<br>Corporate Recovery Associates, LLC<br>3830 Valley Centre Drive, Suite 705-152<br>San Diego, CA 92130<br>Tel.:  (858) 792-7473<br>Fax:  (858) 430-2454<br>Email:  richard.feferman@gmail.com |
| With a Copy to: | Winthrop Couchot Professional Corporation<br>660 Newport Center Drive #400<br>Newport Beach, CA 92660<br>Attn: Robert E. Opera, Esq.<br>Tel.: (949) 720-4130<br>Fax: (949) 720-4111<br>Email: ropera@winthropcouchot.com |
| If Directed to Buyer: | Bob Evans<br>Fiber International, LLC<br>2635 Park Blvd.<br>Palo Alto, CA  94306<br>Tel.: (650) 330-0428<br>Fax: (650) 330-1744<br>Email: bob@fiberinternational.com |
| With a copy to: | Gus Sanchez<br>Fiber International, LLC<br>2635 Park Blvd.<br>Palo Alto, CA  94306<br>Tel.: (650) 330-0428<br>Fax: (650) 330-1744<br>Email: gus@fiberinternational.com |

If delivered by facsimile, by e–mail transmission, or personally, the date on which the notice, request, demand or other communication is delivered, and a copy thereof is sent by first class mail, postage prepaid, addressed to the addresses required by this Section 14.13, shall be the date on which such delivery is made. If such notice, request, demand or other communication is delivered solely by mail as aforesaid, the date on which such notice, request, demand or other communication is received shall be the date of delivery. Any Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party. Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

14.14    **Interpretation.** Wherever in this Agreement the context so requires, reference to the neuter, masculine or feminine shall be deemed to include each of the others, and reference to either the singular or the plural shall be deemed to include the other.

14.15    **Further Assurances.** Except as set forth expressly to the contrary in this Agreement, each Party, at the request of the other Party, shall execute and deliver to the requesting Party all such further documents, and shall take such further acts, as may be reasonably necessary or appropriate in order to confirm or carry out the provisions of this Agreement.

14.16    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties.

14.17    **Time of Essence.** Time is of the essence in the performance of the Parties' respective obligations under this Agreement.

14.18    **Parties in Interest.** Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and any of their respective successors and assigns, nor is anything in this

Agreement intended to relieve or discharge the obligation of any third persons to a Party, nor shall any provision hereof give any third persons any right of subrogation or action over against a Party.

**14.19     Schedules and Exhibits.** All exhibits are a part of this Agreement as if fully set forth herein.  All references to sections, articles and exhibits shall be deemed references to such parts of this Agreement, unless the context shall otherwise require.  Disclosure of any fact or item in any exhibit hereto referenced by a particular section in this Agreement shall, should the existence of the fact or item of its contents be relevant to any other section, be deemed to be disclosed with respect to that other section whether or not an explicit cross-reference thereto appears.  Any reference in this Agreement to an exhibit or to another document means such exhibit or other document as it has been, or may be, amended, modified, restated or supplemented as of the Closing, and any such exhibit or other document shall be deemed to be included in this Agreement regardless of when it is prepared or attached hereto.

**14.20     Solicitation.** Buyer hereby acknowledges and agrees that Seller and its representatives, consistent with Seller's duties in the Bankruptcy Case, shall have the right to enter into, solicit, initiate or continue any discussions or negotiations with, and/or encourage or respond to any inquiries or proposals by, or participate in any negotiations with or provide any information to, or otherwise cooperate in any manner with, any person or entity other than Buyer and its representatives concerning any sale of the Post-Effective Date Stock, any sale of all or

any portion of the Retained Assets, or any Merger Transaction or any other transaction involving the Debtor, the Post-Effective Date Stock or the Retained Assets.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date and year first above written.

SELLER:                                          BUYER:

CORPORATE RECOVERY ASSOCIATES, LLC      FIBER INTERNATIONAL, LLC

By: Richard J. Feferman                        By: Robert Evans
Its: Managing Member                           Its: Founder / CEO

# EXHIBIT 1

## DEBTOR'S REMAINING ASSETS

### (Paragraph G)

1)   Cash   $834,085.34

2)   Possible claims against third parties, including, without limitation, claims of the type

described in Section 1.2.5 hereof

3)   The IP address block 144.86.0.0 – 144.86.255.255, CIDR 144.86.0.0/16 provided to MTI

Technologies (MTITEC) on November 20, 1990.  This information is published in the

publicly accessible American Registry of Internet Numbers commonly known as ARIN.

4)   Possible interests in intellectual property

5)   Assets that are not listed above and that are unknown to the Plan Agent

**EXHIBIT 2**

**PLAN**

**(Paragraph H)**

Scott C. Clarkson, Esq. (CA Bar No. 143271)
Eve A. Marsella, Esq. (CA Bar No. 165797)
Clarkson, Gore & Marsella, APLC
3424 Carson Street, Suite 350
Torrance, California 90503
Telephone: 310/542-0111
Facsimile: 310/214-7254
Email: sclarkson@lawcgm.com

Attorneys for Debtor and Debtor-in-Possession
MTI Technology Corporation

Robert E. Opera, Esq. (CA Bar No. 101182)
Winthrop Couchot Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Telephone: 949/720-4100
Facsimile: 949/720-4111
Email: ropera@winthropcouchot.com

Attorneys for the Official Committee
of Unsecured Creditors

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>MTI TECHNOLOGY CORPORATION, a<br>Delaware corporation,<br><br>                    Debtor | Case No.: 8:07-13347-ES<br><br>Chapter 11<br><br>**DEBTOR'S AND COMMITTEE'S JOINT<br>FOURTH AMENDED CHAPTER 11 PLAN**<br><br>Date:         August 26, 2010<br>Time:        10:30 a.m.<br>Location:   Courtroom 5A<br><br>Judge:       The Honorable Erithe A. Smith |

*Left margin vertical text:* CLARKSON, GORE & MARSELLA, APLC — ATTORNEYS AT LAW — TORRANCE, CALIFORNIA

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................2

II.   DEFINITIONS AND RULES OF CONSTRUCTION ........................3
      2.1    Defined Terms .......................................................................3
      2.2    Rules of Interpretation .........................................................17
      2.3    Exhibits ................................................................................18

III.  UNCLASSIFIED CLAIMS................................................................18
      3.1    Allowed Administrative Claims ............................................18
             3.1.1    Payment ...................................................................19
             3.1.2    Administrative Claims Bar Date ...............................19
             3.1.3    Deadline for Objections............................................19
             3.1.4    United States Trustee Fees .....................................20
             3.1.5    Pre-Effective Date Professional Fee Claims ...........20
      3.2    Allowed Priority Tax Claims ................................................20

IV.   CLASSIFICATION OF CLAIMS AND INTERESTS .......................21
      4.1    Overview ..............................................................................21
      4.2    Designation of Classes .......................................................21
             4.2.1    Allowed Claims........................................................21
             4.2.2    Interests...................................................................22
      4.3    Summary of Classification ...................................................22

V.    TREATMENT OF CLASSES UNDER THIS PLAN .......................23
      5.1    Class 1 -- Any Allowed Secured Claims ...............................23
             5.1.1    Treatment of Allowed Secured Claims.....................23
      5.2    Class 2 -- Allowed Priority Non-Tax Claims .........................24
             5.2.1    Treatment of Allowed Non-Tax Priority Claims........23
      5.3    Class 3 -- Allowed General Unsecured Claims .....................24
             5.3.1    Treatment of Allowed General Unsecured Claims .....24
      5.4    Class 4 -- Canopy Claim .....................................................27
             5.4.1    Treatment of Canopy Claim .....................................27
      5.5    Class 5 -- Allowed Subordinated Claims ..............................27
             5.5.1    Treatment of Allowed Subordinated Claims.............27
      5.6    Class 6 -- Allowed Interests ................................................29
             5.6.1    Treatment of Allowed Interests

VI.   PLAN IMPLEMENTATION ...............................................................30
      6.1    Overview ..............................................................................30
      6.2    Condition Precedent to Plan Confirmation ............................30
      6.3    Conditions Precedent to the Effectiveness of the Plan .........31
      6.4    Implementation of Plan ........................................................32
      6.5    Corporate Action..................................................................32

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

i

MTI Plan v.3.0

Case 8:07-bk-13347-ES   Doc 1265   Filed 08/05/10   Entered 08/05/10 16:40:42   Desc
Main Document   Page 3 of 47

## TABLE OF CONTENTS

### (Continued)

|  |  |  | **Page** |
|---|---|---|---|
| 6.6 | Plan Agent/Vesting of Assets | | 32 |
| | 6.6.1 | Employment of Plan Agent | 32 |
| | 6.6.2 | Transfer of Assets | 32 |
| | 6.6.3 | Disposition of Plan Assets | 33 |
| 6.7 | Termination of Debtor's Officers, Directors, Employees and Professionals | | 33 |
| 6.8 | Plan Fund Proceeds/Plan Administration | | 33 |
| | 6.8.1 | Distribution of Plan Fund Proceeds | 33 |
| | 6.8.2 | Plan Agent's Implementation of Plan | 33 |
| | 6.8.3 | Representative of the Estate | 34 |
| | 6.8.4 | Plan Agent Disclosure | 34 |
| | 6.8.5 | No Liability of Post-Effective Date Committee, the Plan Agent or the Reorganized Debtor | 34 |
| | 6.8.6 | Funding of Post-Effective Date Plan Expenses | 35 |
| 6.9 | Termination of the Committee and Appointment of the Post-Effective Date Committee | | 35 |
| | 6.9.1 | Replacement of Committee | 35 |
| | 6.9.2 | Members of Post-Effective Date Committee | 36 |
| | 6.9.3 | Duties of Members of Post-Effective Date Committee | 36 |
| 6.10 | The Reorganized Debtors | | 36 |
| | 6.10.1 | Corporate Powers | 36 |
| | 6.10.2 | Board of Directors | 37 |
| | 6.10.3 | Officer of Reorganized Debtor | 37 |
| | 6.10.4 | Effectuation of Merger Transaction | 37 |
| 6.11 | Causes of Action | | 38 |
| 6.12 | Post-Effective Date Professional Fees | | 38 |
| 6.13 | Approval for Disposition of Plan Assets | | 39 |
| 6.14 | Compromise of Controversies | | 39 |
| 6.15 | Bankruptcy Court Approval Relative to Post-Confirmation Matters | | 39 |
| 6.16 | Plan Agent Certification | | 39 |
| 6.17 | Final Decree | | 40 |
| 6.18 | Merger Transaction | | 40 |
| | 6.18.1 | Background | 40 |
| | 6.18.2 | Merger Consummation Date | 40 |
| | 6.18.3 | Cancellation of Post-Effective Date Stock and Wind-Up of Reorganized Debtor | 41 |
| | 6.18.4 | Terms of any Merger Transaction | 41 |
| | 6.18.5 | Valuation of Post-Effective Date Stock | 42 |
| | 6.18.6 | Election Not to Receive Post-Effective Date Stock | 42 |

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

ii

MTI Plan v.3.0

## TABLE OF CONTENTS

### (Continued)

| | | Page |
|---|---|---|
| VII. | DISTRIBUTIONS | 43 |
| | 7.1 Designation and Role of the Disbursing Agent | 42 |
| | 7.1.1 Plan Agent to Serve as Disbursing Agent | 42 |
| | 7.1.2 No Bond | 43 |
| | 7.1.3 Payment of Fees and Expenses of Disbursing Agent | 43 |
| | 7.1.4 Employment of Agents | 43 |
| | 7.2 Distribution of Property Under this Plan | 43 |
| | 7.2.1 Cash Distributions | 43 |
| | 7.2.2 Setoffs and Recoupment | 43 |
| | 7.2.3 No De Minimis Distributions | 44 |
| | 7.2.4 Timeliness of Distributions | 44 |
| | 7.2.5 Limitation on Liability | 44 |
| | 7.2.6 Delivery of Distributions | 44 |
| | 7.2.7 Undeliverable Distributions | 45 |
| | 7.2.8 Disposition of Unclaimed Property | 45 |
| | 7.2.9 Approval for Schedule of Proposed Distributions | 46 |
| | 7.2.10 Compliance with Tax Requirements | 46 |
| | 7.2.11 Further Assurances Regarding Distributions | 46 |
| | 7.2.12 Creditor's Payment of Obligations or Turn Over of Property to the Plan Agent | 46 |
| VIII. | OBJECTIONS TO DISPUTED CLAIMS | 48 |
| | 8.1 Exclusive Right to Object to Claims | 47 |
| | 8.2 Claims Objection Deadline | 47 |
| | 8.3 Investigation Regarding Disputed Claims | 47 |
| | 8.4 Treatment of Disputed Claims | 48 |
| | 8.4.1 No Distribution Pending Allowance | 48 |
| | 8.4.2 Distribution After Allowance | 48 |
| | 8.4.3 Reserve for Disputed Claims | 48 |
| | 8.4.4 No Distribution Until Allowance of Disputed Claims | 49 |
| | 8.5 Bar Date for Filing Avoidance Action Payment Claims | 49 |
| IX. | LITIGATION | 50 |
| | 9.1 Plan Agent's Authorization to Assert Causes of Action | 49 |
| | 9.2 Plan Agent's Evaluation of Causes of Action | 50 |
| | 9.3 Retention of Professionals | 50 |
| | 9.4 Preservation of Causes of Action | 50 |
| | 9.5 Subordination of Claims | 51 |
| X. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 52 |
| | 10.1 Executory Contracts and Unexpired Leases Being Assumed | 51 |
| | 10.2 Executory Contracts and Unexpired Leases Being Rejected | 52 |

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

iii

MTI Plan v.3.0

### TABLE OF CONTENTS

### (Continued)

Page

| | | | |
|---|---|---|---|
| | 10.3 | Retention of Property Rights | 53 |
| | 10.4 | Bar Date for Rejection Claims | 53 |
| | 10.5 | Cure Claims Schedule | 53 |
| XI. | | EFFECT OF CONFIRMATION OF THIS PLAN | 55 |
| | 11.1 | Discharge | 54 |
| | 11.2 | Injunction | 54 |
| | 11.3 | Release | 55 |
| | 11.4 | Distribution of Property Free and Clear of Liens, Claims, and Interests | 56 |
| | 11.5 | Binding Effect of Plan | 56 |
| XII. | | LIMITATION OF LIABILITY | 57 |
| | 12.1 | No Liability for Solicitation or Participation | 56 |
| | 12.2 | Good Faith | 56 |
| | 12.3 | Limitation of Liability Regarding Plan Confirmation | 56 |
| XIII. | | OTHER PLAN PROVISIONS | 58 |
| | 13.1 | Exemption from Stamp, Transfer and Other Taxes | 57 |
| | 13.2 | Books and Records | 57 |
| | 13.3 | Post-Effective Date Quarterly Fees | 57 |
| | 13.4 | Post-Effective Date Status Report | 57 |
| | 13.5 | Effectiveness of Court Orders | 58 |
| | 13.6 | No Admissions | 58 |
| | 13.7 | Revocation of the Plan | 58 |
| | 13.8 | Severability of Plan Provisions | 58 |
| | 13.9 | Governing Law | 59 |
| | 13.10 | Retention of Jurisdiction | 59 |
| | 13.11 | Successors and Assigns | 61 |
| | 13.12 | Business Day | 61 |
| | 13.13 | No Waiver | 61 |
| | 13.14 | Post-Effective Date Notice | 62 |
| | 13.15 | Modification of the Plan | 62 |
| | 13.16 | Nonconsensual Confirmation | 62 |
| | 13.17 | Other Documents and Actions | 62 |
| | 13.18 | Notices | 63 |
| | 13.19 | Inconsistencies | 63 |
| | 13.20 | Changes in Rates Subject to Regulatory Commission Approval | 63 |
| | 13.21 | Modification/Superseding of Loan and Security Agreements | 63 |
| | 13.22 | Implementation of Section 1142 of the Bankruptcy Code | 63 |
| XIV. | | RECOMMENDATION AND CONCLUSION | 65 |

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

iv

1    MTI Technology Corporation and the Official Committee of Unsecured Creditors hereby

2    propose jointly this Joint Fourth Amended Chapter 11 Plan and request confirmation hereof

3    pursuant to section 1129 of the Bankruptcy Code.

## I.

## INTRODUCTION

6    This Plan is proposed jointly by the Debtor and by the Committee for the resolution of the

7    Claims against the Estate.[1]  This Plan provides for a comprehensive debt restructuring of the

8    Debtor.  Pursuant to this Plan, the Allowed Claims of Creditors will be paid in accordance with the

9    terms and conditions of this Plan and otherwise will be discharged.

10    Sent to you in the same envelope as this Plan is the Debtor's Disclosure Statement.  The

11    Disclosure Statement has been approved by the Bankruptcy Court, and is being provided along

12    with this Plan in order to help you to understand this Plan and to evaluate the merits of this Plan.

13    The Disclosure Statement discusses, among other things, the Debtor's business, the results of the

14    Debtor's operations, the Debtor's assets and liabilities and the material terms of this Plan.

15    Creditors are encouraged to read the Disclosure Statement.

16    The objective of this Plan is to liquidate the Debtor's Assets for the benefit of Creditors and

17    make Distributions to the holders of Allowed Claims.  By this Plan, the Reorganized Debtor will

18    continue in existence as appropriate to effectuate a Merger Transaction prior to the Merger

19    Consummation Date, with any value obtained from any such Merger Transaction distributed to

20    holders of Allowed General Unsecured Claims in accordance with the terms and conditions of this

21    Plan.

22    This Plan divides Creditors and Interest Holders into Classes based upon their respective

23    legal rights and interests, and provides for the satisfaction of Allowed Claims in accordance with

24    the terms and conditions of this Plan.  Interest Holders will not receive or retain any value on

25    account of their Interests, except as provided expressly to the contrary in Section 5.6 hereof.

26

27    _____

[1] The definitions of the capitalized terms contained herein are set forth in Article II of this Plan.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

2

MTI Plan v3.0

UNLESS SPECIFICALLY SET FORTH IN THIS PLAN TO THE CONTRARY, THE INFORMATION CONTAINED OR REFERRED TO IN THIS PLAN HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT.  RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE DEBTOR.  ALTHOUGH THE PLAN PROPONENTS BELIEVE THAT EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT HEREIN ACCURATE FINANCIAL INFORMATION, THE RECORDS KEPT BY THE DEBTOR ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY.  NEITHER THE PLAN PROPONENTS NOR ANY OF THE PROFESSIONALS EMPLOYED BY THE PLAN PROPONENTS HAS INDEPENDENTLY VERIFIED THE INFORMATION CONTAINED HEREIN, AND NONE OF THEM MAKES ANY REPRESENTATION OR WARRANTY WITH RESPECT TO THE ACCURACY OF SUCH INFORMATION.

ANY CREDITOR ENTITLED TO VOTE ON THIS PLAN IS URGED TO REVIEW CAREFULLY THIS PLAN PRIOR TO VOTING ON THIS PLAN, AND MAY DESIRE TO CONSULT WITH ITS OWN LEGAL COUNSEL PRIOR TO VOTING ON THIS PLAN IN ORDER TO ENSURE A COMPLETE UNDERSTANDING OF THE TERMS OF THIS PLAN.

II.

## DEFINITIONS AND RULES OF CONSTRUCTION

2.1    **Defined Terms**.  The following terms (which appear in this Plan as capitalized terms), when used in this Plan, have the meanings set forth below.

2.1.1    "**Administrative Claim**" means a Claim for costs or expenses that are allowable under sections 503(b) or 507(b) of the Bankruptcy Code or 28 U.S.C. § 1930. These costs or expenses may include: (a) actual, necessary costs and expenses of preserving the Estate after the Petition Date; (b) Ordinary Course Administrative Claims; (c) Pre-Effective Date Professional Fee Claims; (d) Administrative Tax Claims; and (e) United States Trustee Fees.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

3

MAINDOCS-#149105-v3-MTI_4th_Amended_Ch_11_Plan.DOC

Exhibit A, page 87

**2.1.2** "**Administrative Claims Bar Date**" has the meaning set forth in Section 3.1.2 of this Plan.

**2.1.3** "**Administrative Claims Objection Deadline**" has the meaning set forth in Section 3.1.3 of this Plan.

**2.1.4** "**Administrative Tax Claim**" means a Tax Claim, other than a Secured Claim, that a governmental unit asserts against the Debtor for any tax period that, in whole or in part, falls within the period commencing on the Petition Date and ending on the Effective Date.

**2.1.5** "**Allowed Administrative Claim**" means an Administrative Claim that is allowed as set forth in Section 3.1 hereof or otherwise by a Final Order.

**2.1.6** "**Allowed Avoidance Action Payment Claim**" means an Allowed Claim based upon or arising from an entity's payment to the Debtor or Reorganized Debtor of a claim asserted against the entity pursuant to an Avoidance Action. Any Allowed Avoidance Action Payment Claim shall be treated hereunder as a Class 3 Claim.

**2.1.7** "**Allowed Claim**" means a Claim (a) that is listed in the Bankruptcy Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, unliquidated or unknown as to amount and as to which no timely objection has been filed; or (b) with respect to which a Proof of Claim has been filed by the Bar Date, and as to which no objection is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or by order of the Bankruptcy Court, or as to which any such objection has been determined by a Final Order. The amount of an Allowed Claim shall be as follows: (i) if the Creditor did not file a Proof of Claim with the Bankruptcy Court on or before the Bar Date, the amount of the Creditor's Claim as listed in the Bankruptcy Schedules as neither disputed, contingent, unliquidated or unknown; or (ii) if the Creditor filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, (1) the amount stated in such Proof of Claim if no objection to such Proof of Claim is filed within the time period fixed by the Bankruptcy Code, the Bankruptcy Rules, this Plan or by order of the Bankruptcy Court, or (2) the amount thereof fixed by a Final Order of the Bankruptcy Court

MTI Plan v3.0

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1 if an objection to such Proof of Claim is filed within the time period fixed by the

2 Bankruptcy Code, the Bankruptcy Rules, this Plan or by order of the Bankruptcy Court.

3 Any Claim that is not filed by the Bar Date and that is listed in the Bankruptcy Schedules as

4 disputed, unliquidated, contingent or unknown, or that is not allowed under the terms of this

5 Plan, shall be disallowed, and no Distribution shall be made on account of such Claim.  No

6 default interest or late charges or comparable fees, charges or penalties shall be included as

7 part of an Allowed Claim.

8   **2.1.8** **"Allowed Class '\*\*' Claim"** means an Allowed Claim classified in the

9 specified Class.

10   **2.1.9** **"Allowed Deficiency Claim"** means that portion of an Allowed Claim

11 that is in excess of the value of any Collateral which is security for the repayment of such

12 Claim, calculated in accordance with the provisions of section 506 of the Bankruptcy Code.

13   **2.1.10** **"Allowed General Unsecured Claim"** means an unsecured Allowed

14 Claim against the Debtor, however arising, not entitled to priority under section 507(a) of

15 the Bankruptcy Code, including, without limitation, an Allowed Deficiency Claim, an

16 Allowed Rejection Claim or an Allowed Avoidance Action Payment Claim.

17   **2.1.11** **"Allowed Interest"** means an Interest to the extent, and only to the extent,

18 of the amount of such Interest allowed by this Plan or by Final Order of the Bankruptcy

19 Court.

20   **2.1.12** **"Allowed Penalty Claims"** means a Penalty Claim that is allowed by a

21 Final Order.  Any Allowed Penalty Claim shall be treated hereunder as an Allowed Class 5

22 Claim.

23   **2.1.13** **"Allowed Priority Non-Tax Claim"** means an unsecured Allowed Claim

24 entitled to priority pursuant to sections 507(a)(4), 507(a)(5), or 507(a)(7) of the Bankruptcy

25 Code.

26   **2.1.14** **"Allowed Priority Tax Claim"** means an Allowed Claim entitled to

27 priority under section 507(a)(8) of the Bankruptcy Code.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEY AT LAW
TORRANCE, CALIFORNIA

5

1       **2.1.15** "**Allowed Rejection Claim**" means any Allowed General Unsecured

2 Claim based upon or arising from the rejection of an executory contract or unexpired lease

3 pursuant to a Final Order of the Bankruptcy Court or pursuant to this Plan. Any Allowed

4 Rejection Claim shall be treated hereunder as a Class 3 Claim.

5       **2.1.16** "**Allowed Secured Claim**" means an Allowed Claim secured by a valid

6 and unavoidable Lien against property in which the Estate has an interest, or which is

7 subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value,

8 determined in accordance with section 506(a) of the Bankruptcy Code, of the interest of the

9 holder of such Allowed Claim in the Estate's interest in such property, or to the extent of

10 the amount subject to any setoff, as the case may be. Unpaid principal and any accrued

11 interest allowable under section 506 of the Bankruptcy Code with respect to an Allowed

12 Secured Claim shall be computed as of the Effective Date, and the Allowed Secured Claim

13 shall thereafter bear interest as provided in this Plan.

14       **2.1.17** "**Allowed Subordinated Claim**" means any Allowed Claim that is

15 subordinated to Allowed Class 3 Claims to the extent provided by the Bankruptcy Code or a

16 Final Order.

17       **2.1.18** "**Assets**" means all assets and properties of the Debtor's Estate including

18 "property of the estate" as described in section 541 of the Bankruptcy Code.

19       **2.1.19** "**Avoidance Action**" means an adversary proceeding, lawsuit or other

20 action or proceeding filed pursuant to sections 502(d), 506, 510, 542, 543, 544, 545, 547,

21 548, 549, 550, 551, 552 or 553 of the Bankruptcy Code, an adversary proceeding, lawsuit or

22 other action or proceeding based on applicable non-bankruptcy law that may be

23 incorporated or brought under the foregoing sections of the Bankruptcy Code, an adversary

24 proceeding, lawsuit or other action or proceeding arising under, or relating to, any similar

25 state law or federal law, and any other similar action or proceeding filed to recover property

26 for or on behalf of the Estate, or to avoid a Lien or transfer, whether or not such adversary

27 proceeding, lawsuit, action or proceeding is initiated on or before the Effective Date.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

6

MTI Plan v3.0

1    2.1.20    "**Avoidance Action Payment Claim**" means a Claim based upon or

2    arising from an entity's payment to the Debtor or Reorganized Debtor of a claim asserted

3    against the entity pursuant to an Avoidance Action.

4    2.1.21    "**Bankruptcy Code**" means the United States Bankruptcy Code, as set

5    forth in 11 U.S.C. §§ 101-1532, as now in effect and as may be hereafter amended.

6    2.1.22    "**Bankruptcy Court**" means the United States Bankruptcy Court for the

7    Central District of California, Santa Ana Division.

8    2.1.23    "**Bankruptcy Rules**" means, collectively, the Federal Bankruptcy Rules

9    and the Local Bankruptcy Rules.

10    2.1.24    "**Bankruptcy Schedules**" means the Schedules of Assets and Liabilities

11    and Statement of Financial Affairs filed by the Debtor in the Case, as they may have been

12    amended and as they may be amended hereafter from time to time.

13    2.1.25    "**Bar Date**" means the last date for Creditors and Interest Holders whose

14    Claims or Interests, respectively, are not scheduled, or whose Claims or Interests are

15    scheduled in the Bankruptcy Schedules as disputed, contingent, unliquidated or unknown as

16    to amount, to file Proofs of Claim or Interests, as set forth in an order of the Bankruptcy

17    Court entered on April 7, 2008.

18    2.1.26    "**Business Day**" means any day other than a Saturday, Sunday or a legal

19    holiday (as defined in Rule 9006(a) of the Federal Bankruptcy Rules).

20    2.1.27    "**Canopy**" means Canopy Group, Inc.

21    2.1.28    "**Canopy Claim**" means the Allowed Claim of Canopy.

22    2.1.29    "**Case**" means the case under Chapter 11 of the Bankruptcy Code

23    commenced by the Debtor on the Petition Date and bearing Case Number 8:07-13347-ES.

24    2.1.30    "**Case Closing Date**" means the date on which the Bankruptcy Court

25    enters a Final Decree closing the Case, in accordance with section 350 of the Bankruptcy

26    Code.

27    2.1.31    "**Cash**" means cash or cash equivalents including, but not limited to, bank

28    deposits, checks or other similar forms of payment or exchange.

CLARKSON, GORE & MARSELLA, APLC<br>ATTORNEYS AT LAW<br>TORRANCE, CALIFORNIA

7

1     **2.1.32**     **"Causes of Action"** means any and all claims, demands, rights, actions,

2 causes of action and suits of the Debtor or the Estate, of any kind or character whatsoever,

3 known or unknown, suspected or unsuspected, whether arising prior to, on or after the

4 Petition Date, in contract or in tort, at law or in equity or under any other theory of law, that

5 the Debtor or the Debtor's Estate has or asserts, or may have or assert, against third parties,

6 whether or not brought as of the Effective Date, and which have not been settled or

7 otherwise resolved by Final Order as of the Effective Date, including but not limited to

8 (a) rights of setoff, counterclaim or recoupment, (b) claims on contracts or for breaches of

9 duties imposed by law, (c) rights to object to Claims or Interests, (d) such claims and

10 defenses as fraud, mistake, duress or usury, (e) Avoidance Actions, (f) claims for tax

11 refunds, (g) claims to recover accounts receivable, and (h) any other claims which may be

12 asserted against third parties.

13     **2.1.33**     **"Claim"** means a "claim" against the Debtor, as such term is defined in

14 section 101(5) of the Bankruptcy Code.

15     **2.1.34**     **"Claims Objection Deadline"** means the latest of the following dates:

16 (a) the one hundred eightieth (180th) day after the Effective Date; (b) with respect to a

17 specific Claim, the ninetieth (90th) day after a Proof of Claim with respect to such Claim is

18 filed by a Creditor; (c) with respect to a Claim that is not listed in the Bankruptcy

19 Schedules, the ninetieth (90th) day after the Plan Agent learns of the existence of such

20 Claim; or (d) such greater period of limitation as may be fixed or extended by the

21 Bankruptcy Court or by agreement between the Plan Agent and the Creditor.

22     **2.1.35**     **"Class"** means a group of Claims or Interests as classified in Article IV of

23 this Plan.

24     **2.1.36**     **"Collateral"** means any property or interest in property of the Estate

25 subject to a Lien of a Secured Creditor that is not subject to avoidance under the Bankruptcy

26 Code or otherwise invalid under the Bankruptcy Code or applicable federal or state law.

27     **2.1.37**     **"Committee"** means the Official Committee of Unsecured Creditors

28 appointed in the Case by the United States Trustee.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

8

MTI Plan v3.0

MAINDOCS-#149105-v3-MTI_4th_Amended_Ch_11_Plan.DOC

1    **2.1.38**    "**Confirmation**" means the entry of the Confirmation Order by the

2    Bankruptcy Court.

3    **2.1.39**    "**Confirmation Date**" means the date on which the Bankruptcy Court

4    enters the Confirmation Order on its docket.

5    **2.1.40**    "**Confirmation Hearing**" means the hearing before the Bankruptcy Court

6    to consider the confirmation of this Plan pursuant to section 1128(a) of the Bankruptcy

7    Code, as such hearing may be continued from time to time.

8    **2.1.41**    "**Confirmation Hearing Date**" means the first date on which the

9    Bankruptcy Court holds the Confirmation Hearing.

10    **2.1.42**    "**Confirmation Order**" means the order of the Bankruptcy Court

11    confirming this Plan under section 1129 of the Bankruptcy Code.

12    **2.1.43**    "**Creditor**" means the holder of a Claim against the Debtor.

13    **2.1.44**    "**Cure Claims**" has the meaning set forth in Section 10.5 of this Plan.

14    **2.1.45**    "**Cure Claims Schedule**" has the meaning set forth in Section 10.5 of this

15    Plan.

16    **2.1.46**    "**Debtor**" means MTI Technology Corporation, the debtor and debtor-in-

17    possession in the Case.  For the purpose of this Plan, references to the "Debtor" shall

18    include the Reorganized Debtor.

19    **2.1.47**    "**Deficiency Claim**" means that portion of a Claim that is in excess of the

20    value of the Collateral which is security for the repayment of such Claim, calculated in

21    accordance with the provisions of section 506 of the Bankruptcy Code.

22    **2.1.48**    "**De Minimis Distribution**" has the meaning set forth in Section 7.2.3 of

23    this Plan.

24    **2.1.49**    "**Disbursing Agent**" means the entity charged with making Distributions

25    under this Plan.  The Plan Agent shall serve as Disbursing Agent under this Plan.

26    **2.1.50**    "**Disclosure Statement**" means the Joint Third Amended Disclosure

27    Statement relating to this Plan, including, without limitation, all exhibits and schedules

28    thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

9

Exhibit A, page 93
MAINDOCS-#149105-v3-MTI_..ird_Amended_Ch_11_P/Plan.DOC

1  Code, as may be amended, modified or supplemented from time to time in accordance with

2  the provisions of the Bankruptcy Code and Bankruptcy Rules.

3  **2.1.51**    "**Disclosure Statement Order**" means the Final Order entered by the

4  Bankruptcy Court approving the Disclosure Statement.

5  **2.1.52**    "**Disputed Claim**" means any Claim as to which: (a) a Proof of Claim

6  has been filed and the dollar amount of such Claim is not specified in a fixed amount; (b) a

7  Proof of Claim has been filed, to the extent to which the stated amount of such Claim

8  exceeds the amount of such Claim listed in the Bankruptcy Schedules; (c) a Proof of Claim

9  has been filed and such Claim is not listed in the Bankruptcy Schedules; (d) a Proof of

10  Claim has been filed, or is deemed filed under Rule 3003(b)(1) of the Federal Bankruptcy

11  Rules, and is listed in the Bankruptcy Schedules as contingent, disputed, liquidated, or

12  unknown as to amount; or (e) an objection, or request for estimation, has been filed by the

13  Claims Objection Deadline and such objection or request for estimation has neither been

14  withdrawn nor been denied by a Final Order.

15  **2.1.53**    "**Disputed Claims Reserve**" has the meaning set forth in Section 8.4.3 of

16  this Plan.

17  **2.1.54**    "**Distribution**" means any transfer under the Plan of Cash, or other

18  property or instruments, to the holder of an Allowed Claim.

19  **2.1.55**    "**Distribution Schedule**" has the meaning set forth in Section 7.2.9 of this

20  Plan.

21  **2.1.56**    "**Effective Date**" means the eleventh (11th) day following the waiver or

22  satisfaction of the conditions set forth in Section 6.3 of this Plan.

23  **2.1.57**    "**Estate**" means the estate created in the Case under section 541 of the

24  Bankruptcy Code.

25  **2.1.58**    "**Expenses**" has the meaning set forth in Section 2.1.88 of this Plan.

26  **2.1.59**    "**Federal Bankruptcy Rules**" means the Federal Rules of Bankruptcy

27  Procedure, as now in effect and as may be hereafter amended.

28  **2.1.60**    "**Final Decree**" has the meaning set forth in Section 6.17 of this Plan.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

10

MTl Plan v3.0

MAINDOCS-#149105-v3-MTl_4th_Amended_CB_()_Plan.DOC

Exhibit A, page 94

1        **2.1.61**    "**Final Order**" means an order or judgment of the Bankruptcy Court or

2    other applicable court, as entered on the applicable docket, that has not been reversed,

3    stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or

4    move for reargument or rehearing has expired and as to which no appeal, petition for

5    certiorari, or other proceedings for reargument or to obtain a rehearing shall then be pending

6    or as to which any right to appeal, petition for certiorari, reargue, or obtain a rehearing shall

7    have been waived in writing in form and substance satisfactory to the Plan Proponents prior

8    to the Effective Date, or to the Plan Agent after the Effective Date, as applicable, or, in the

9    event that an appeal, writ of certiorari, or proceeding for reargument or rehearing of such

10   order or judgment has been sought, such order or judgment shall have been affirmed by the

11   highest court to which such order or judgment was appealed, or certiorari has been denied,

12   or from which reargument or rehearing was sought, and the time to take any further appeal,

13   petition for certiorari or move for reargument or rehearing shall have expired.

14       **2.1.62**    "**General Unsecured Claim**" means any Claim that is not an

15   Administrative Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim,

16   the Canopy Claim or a Subordinated Claim, including, without limitation, a Rejection

17   Claim, a Deficiency Claim or an Avoidance Action Payment Claim.

18       **2.1.63**    "**Initial Distribution Date**" has the meaning set forth in Section 7.2.8 of

19   this Plan.

20       **2.1.64**    "**Interest**" means an "equity security" in the Debtor, as such term is

21   defined in section 101(16) of the Bankruptcy Code, no matter how held, including, without

22   limitation, issued and outstanding shares of MTI Stock, and all rights and interests arising

23   thereunder, and all rights to acquire equity securities in the Debtor, including, without

24   limitation, pursuant to options, warrants, employee plans, or similar agreements, contracts

25   or instruments, provided that such rights are exercised on or prior to the Effective Date.

26       **2.1.65**    "**Interest Holder**" means a holder of an Interest.

27       **2.1.66**    "**Internal Revenue Code**" means the Internal Revenue Code of 1986,

28   now in effect and as may be hereafter amended.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

11

MTI Plan v3.0

1       **2.1.67**    "**Late-Filed Claim**" means any General Unsecured Claim described in

2    sections 726(a)(2)(C) or 726(a)(3) of the Bankruptcy Code.

3       **2.1.68**    "**Lien**" means any lien, security interest, mortgage, deed of trust,

4    encumbrance, pledge or other charge against Assets of the Debtor.

5       **2.1.69**    "**Loan Documents**" has the meaning set forth in Section 13.21 of this

6    Plan.

7       **2.1.70**    "**Local Bankruptcy Rules**" means the Local Bankruptcy Rules applicable

8    to cases pending before the Bankruptcy Court, as now in effect and as may be hereafter

9    amended.

10       **2.1.71**    "**Merger Consummation Date**" has the meaning set forth in

11    Section 6.18.2 of this Plan.

12       **2.1.72**    "**Merger Transaction**" has the meaning set forth in Section 6.18.1 of this

13    Plan.

14       **2.1.73**    "**MTI Stock**" means the issued and outstanding shares of common stock

15    and preferred stock of the Debtor as of the Effective Date.

16       **2.1.74**    "**Ordinary Course Administrative Claim**" means an Administrative

17    Claim allowable under section 503(b) of the Bankruptcy Code, that is incurred in the

18    ordinary course of the Debtor's operations or the Case, or the payment of which is provided

19    for by an order of the Bankruptcy Court, exclusive of any Pre-Effective Date Professional

20    Fee Claims, Administrative Tax Claims and United States Trustee Fees.

21       **2.1.75**    "**Penalty Claim**" means any Claim for any fine, penalty, or forfeiture, or

22    for multiple, exemplary, or punitive damages, arising before the Petition Date, to the extent

23    that such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary

24    loss suffered by the holder of such Claim, as set forth in section 726(a)(4) of the Bankruptcy

25    Code.

26       **2.1.76**    "**Petition Date**" means October 15, 2007, the date on which the Debtor

27    filed its voluntary petition commencing the Case.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

12

**2.1.77** "**Plan**" means this Joint Fourth Amended Chapter 11 Plan, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in its present form or as it may be altered, amended, or modified from time to time.

**2.1.78** "**Plan Agent**" means the entity appointed by this Plan to administer this Plan and to make the Distributions provided by this Plan, in accordance with the provisions of Section 6.6.1 of this Plan.

**2.1.79** "**Plan Agent Certification**" has the meaning set forth in Section 6.16 of this Plan.

**2.1.80** "**Plan Agent Disclosure**" has the meaning set forth in Section 6.8.4 of this Plan.

**2.1.81** "**Plan Assets**" means the Assets, which shall be transferred on the Effective Date of this Plan to the Reorganized Debtor, to be administered by the Plan Agent, free and clear of any Liens that otherwise might have existed in favor of any Secured Creditor.

**2.1.82** "**Plan Fund**" means a segregated, interest-bearing account established at a financial institution which is an authorized depository under United States Trustee Guidelines, into which the Plan Agent will deposit all Cash of the Estate as of the Effective Date, less the Cash used to make, or reserve for the making of, the Distributions required to be made on or about the Effective Date, and all Cash received by the Reorganized Debtor after the Effective Date. The Plan Fund Proceeds shall be made available for making Distributions to the following Creditors: the holders of Allowed General Unsecured Claims; Canopy on account of any Canopy Claim; any Allowed Subordinated Claims; and for paying the Post-Effective Date Plan Expenses.

**2.1.83** "**Plan Fund Proceeds**" means the Cash available in the Plan Fund for making Distributions on account of Allowed General Unsecured Claims, the Canopy Claim, and any Allowed Subordinated Claims and for paying the Post-Effective Date Plan Expenses.

13

MTI Plan v3.0

1     **2.1.84**    **"Plan Proponents"** means, together, the Debtor and the Committee, the
2  proponents of this Plan.

3     **2.1.85**    **"Post-Effective Date Committee"** means the Committee, as it shall be
4  reconstituted and function after the Effective Date, pursuant to the provisions of this Plan.

5     **2.1.86**    **"Post-Effective Date Committee Disclosure"** has the meaning set forth
6  in Section 6.9.1 of this Plan.

7     **2.1.87**    **"Post-Effective Date Notice Parties"** has the meaning set forth in
8  Section 6.16 of this Plan.

9     **2.1.88**    **"Post-Effective Date Plan Expenses"** means all voluntary and
10  involuntary costs, expenses, charges, obligations, or liabilities of any kind or nature,
11  whether matured, unmatured, non-contingent, contingent, liquidated, or unliquidated
12  (collectively, "Expenses") incurred after the Effective Date related to the implementation of
13  this Plan, including, but not limited to: (a) the Expenses associated with administering this
14  Plan, including any taxes assessed against the Assets; (b) all United States Trustee Fees;
15  (c) the Expenses associated with making the Distributions required by this Plan; (d) any
16  Expenses associated with preparing and filing tax returns and paying taxes; (e) any
17  reasonable Expenses incurred by a member of the Post-Effective Date Committee, but
18  excluding the attorneys' fees or other professional fees, if any, incurred by it, except for any
19  such fees to which it is entitled by indemnification; (f) the Expenses of independent
20  contractors and Professionals providing services to the Plan Agent or the Post-Effective
21  Date Committee; (g) the Expenses associated with the Plan Agent's indemnity obligations,
22  the purchase of errors and omissions insurance and/or other forms of indemnification; and
23  (h) the fees of the Plan Agent, and the reimbursement of expenses, to which the Plan Agent
24  is entitled under this Plan.

25     **2.1.89**    **"Post-Effective Date Stock"** means any shares of common stock in the
26  Reorganized Debtor issued on account of the holders of Allowed General Unsecured
27  Claims, pursuant to section 1145 of the Bankruptcy Code, in accordance with the provisions
28  of Sections 5.3.1.5 and 6.18 of this Plan.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Plan v3.0

**2.1.90** "__Postpetition Interest__" means any interest accrual on any Allowed Claim from and after the Petition Date, in accordance with the provisions of Sections 5.3.1.3 and 5.5.1.3 of this Plan. Any Postpetition Interest shall accrue at the federal judgment rate, as set forth in 28 U.S.C. § 1961(a), in effect as of the Petition Date.

**2.1.91** "__Pre-Effective Date Professional__" means a person employed in the Case prior to the Effective Date pursuant to an order of the Bankruptcy Court in accordance with sections 327 or 1103 of the Bankruptcy Code.

**2.1.92** "__Pre-Effective Date Professional Fee Claim__" means:

(a)    A Claim of a Pre-Effective Date Professional under sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for compensation for services rendered or expenses incurred prior to the Effective Date on behalf of the Estate; or

(b)    A Claim, arising prior to the Effective Date, either under section 503(b)(4) of the Bankruptcy Code or under section 503(b)(3)(D) of the Bankruptcy Code.

**2.1.93** "__Priority Non-Tax Claim__" means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

**2.1.94** "__Priority Tax Claim__" means a Claim entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**2.1.95** "__Professional__" means any attorney, accountant, appraiser, auctioneer, broker, financial consultant, expert or other professional person.

**2.1.96** "__Proof of Claim__" means a statement under oath filed in the Case by a Creditor in which the Creditor sets forth the amount claimed to be owed to it and detail sufficient to identify the basis for the Claim, in accordance with Rule 3001 of the Federal Bankruptcy Rules.

**2.1.97** "__Pro Rata__" means proportionately so that the ratio of (a) the amount of consideration distributed on account of an Allowed Claim to (b) the amount of the Allowed Claim is the same as the ratio of (x) the amount of consideration available for distribution

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

15

MTI Plan v3.0

on account of all Claims in the Class in which that Allowed Claim is included to (y) the amount of all Claims in that Class.

The Pro Rata formula is illustrated as follows:

| (a) | Amount of consideration distributed to a holder of an Allowed Claim | (x) | Total consideration available for distribution to holders of Claims of that Class |
|---|---|---|---|
| | = | | |
| (b) | Amount of such Allowed Claim | (y) | Amount of all Allowed Claims in that Class |

For the purpose of the application of this definition, in calculating the Distributions to be made under this Plan, the Plan Agent, as Disbursing Agent under this Plan, shall establish Reserves, on account of Disputed Claims, in accordance with the provisions of Section 8.4.3 of this Plan.

2.1.98    "**Rejection Claim**" means any General Unsecured Claim based upon or arising from the rejection of an executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court or pursuant to this Plan.

2.1.99    "**Reorganized Debtor**" means the Debtor, as its financial affairs are reorganized from and after the Effective Date. For the purpose of this Plan, a reference to the "Reorganized Debtor" shall include the Debtor.

2.1.100    "**Representatives**" has the meaning set forth in Section 6.8.5 of this Plan.

2.1.101    "**Reserves**" means, collectively, the Disputed Claims Reserve, the Unclaimed Property Reserve, and other reserves that the Plan Agent, as Disbursing Agent under this Plan, is required to establish pursuant to this Plan.

2.1.102    "**Secured Claim**" means a Claim that is secured by a Lien against property in which the Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code. A Claim is a Secured Claim only to the extent of the value, as determined under section 506(a) of the Bankruptcy Code, of the Secured Creditor's interest in the Collateral securing the Claim or to the extent of the amount subject to setoff, whichever is applicable.

2.1.103    "**Secured Creditor**" means the holder of a Secured Claim.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

16

MTI Plan v3.0

**2.1.104** "Stock Termination Approval" has the meaning set forth in Section 6.18.3 of this Plan.

**2.1.105** "Subordinated Claim" means any Claim that is subordinated to Allowed Class 3 Claims to the extent provided by the Bankruptcy Code or a Final Order.

**2.1.106** "Tax" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest, penalties or additions attributable to, or imposed on or with respect to, such assessments.

**2.1.107** "Tax Claim" means any Claim, pre-petition or post-petition, relating to a Tax.

**2.1.108** "Unclaimed Property" has the meaning set forth in Section 7.2.7 of this Plan.

**2.1.109** "Unclaimed Property Reserve" has the meaning set forth in Section 7.2.7 of this Plan.

**2.1.110** "United States Trustee" means the Office of the United States Trustee for the Central District of California.

**2.1.111** "United States Trustee Fees" means all fees and charges assessed against the Debtor or the Reorganized Debtor by the United States Trustee and due pursuant to section 1930 of title 28 of the United States Code.

**2.2    Rules of Interpretation.** For the purpose of this Plan, unless otherwise provided in this Plan, (a) the rules of construction set forth in section 102 of the Bankruptcy Code apply to this Plan; (b) Rule 9006(a) of the Federal Bankruptcy Rules applies when computing any time period under this Plan; (c) a term that is used in this Plan and that is not defined in this Plan has the meaning attributed to that term, if any, in the Bankruptcy Code or in the Bankruptcy Rules; (d) the definition given to any term or provision in this Plan supersedes any different meaning that may be given to that term or provision in the Disclosure Statement; (e) whenever it is appropriate from the

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

17

1  context, each term, whether stated in the singular or the plural, includes both the singular and the

2  plural; (f) each pronoun stated in the masculine, feminine or neuter includes each of the masculine,

3  feminine and neuter; (g) any reference to an exhibit, schedule, instrument or other document means

4  such exhibit, schedule, instrument or other document as it has been, or may be, amended, modified,

5  restated or supplemented as of the Confirmation Date, and any such exhibit, schedule, instrument or

6  other document shall be deemed to be included in this Plan, regardless of when it is filed; (h) the

7  phrases "under this Plan," "hereof," "hereto," "hereunder," and similar words or phrases, refer to

8  this Plan in its entirety rather than to only a portion of this Plan; (i) unless otherwise indicated, all

9  references in this Plan to sections, articles or exhibits are references to sections, articles or exhibits

10  in this Plan; (j) section captions and headings are used for convenience only and do not affect the

11  meaning of this Plan; and (k) any reference to the holder of a Claim or Interest includes that entity's

12  successor and assigns.

13    **2.3    Exhibits.**  All exhibits to this Plan are incorporated into and are a part of this Plan as

14  if set forth in full herein.

15                                **III.**

16                    **UNCLASSIFIED CLAIMS**

17    As required by the Bankruptcy Code, this Plan places Claims and Interests into various

18  Classes according to their respective legal rights and interests, including their respective rights to

19  priority. However, in accordance with the provisions of section 1123(a)(1) of the Bankruptcy Code,

20  Administrative Claims and Priority Tax Claims are deemed "unclassified." These Claims are not

21  considered impaired under section 1124 of the Bankruptcy Code, and the holders of these Claims

22  do not vote on this Plan, because these Claims are automatically entitled to specific treatment

23  provided for them in the Bankruptcy Code. Accordingly, the Plan Proponents have not placed

24  Administrative Claims and Priority Tax Claims in a Class. The treatment of these unclassified

25  Claims is as provided below.

26    **3.1    Allowed Administrative Claims.**  Administrative Claims generally are Claims for

27  the expenses of administering the Debtor's Case that are allowed under section 503(b) of the

28  Bankruptcy Code. Administrative Claims also include Claims provided for by section 503(b)(9) of

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

                                    18

MTI Plan v3.0

the Bankruptcy Code. The Bankruptcy Code requires that all Administrative Claims be paid on the

Effective Date of this Plan, unless a particular Creditor agrees to a different treatment of its Claim.

The treatment of Administrative Claims under this Plan is as described below.

      **3.1.1    Payment.** Except to the extent that the holder of an Allowed Administrative

Claim agrees to a less favorable treatment of its Allowed Administrative Claim, and, subject

to the Administrative Claims Bar Date set forth in Section 3.1.2 hereof, each holder of an

Allowed Administrative Claim shall receive, in full satisfaction, discharge, exchange and

release of its Allowed Administrative Claim, Cash in an amount equal to such Allowed

Administrative Claim, on the latest of (i) the Effective Date, (ii) the fifteenth (15th) Business

Day after the date upon which such Administrative Claim becomes an Allowed

Administrative Claim, or (iii) the date upon which such Allowed Administrative Claim

becomes due according to its terms; provided, however, that an Ordinary Course

Administrative Claim shall be paid in full in accordance with the terms and conditions of the

agreements giving rise to such Ordinary Course Administrative Claim.

      **3.1.2    Administrative Claims Bar Date.** Except for Pre-Effective Date

Professional Fee Claims, United States Trustee Fees and Ordinary Course Administrative

Claims, and, except as set forth in section 503(b)(1)(D) of the Bankruptcy Code, all requests

for payment of Administrative Claims shall be filed with the Bankruptcy Court and served no

later than thirty (30) days after the Effective Date (the "Administrative Claims Bar Date").

Any holder of an Administrative Claim that is required to file a request for payment of its

Administrative Claim by the Administrative Claims Bar Date and that does not file by the

Administrative Claims Bar Date such a request for payment of its Administrative Claim shall

be forever barred from asserting such Administrative Claim against the Debtor, the

Reorganized Debtor, the Estate or any of the property or assets of the Debtor or the

Reorganized Debtor.

      **3.1.3    Deadline for Objections.** All objections to allowance of Administrative

Claims that are subject to the Administrative Claims Bar Date must be filed by the Plan

Agent no later than forty-five (45) days after the Administrative Claims Bar Date (the

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

19

1  "Administrative Claims Objection Deadline"). The Administrative Claims Objection

2  Deadline may be extended for a one-time thirty (30) day period by the Plan Agent by filing a

3  notice of the extended Administrative Claims Objection Deadline with the Bankruptcy

4  Court. Thereafter, the Administrative Claims Objection Deadline may be further extended

5  only by an order of the Bankruptcy Court. If the Plan Agent fails to file, by the

6  Administrative Claims Objection Deadline, an objection to an Administrative Claim that

7  must be filed, and is filed, by the Administrative Claims Bar Date, such Administrative

8  Claim shall be deemed allowed as of the Administrative Claims Objection Deadline.

9      **3.1.4**   **United States Trustee Fees.** United States Trustee Fees shall be paid prior to

10  the Effective Date by the Debtor, and, after the Effective Date by the Plan Agent from the

11  Plan Fund, in each case, when due in accordance with applicable law until the entry of a

12  Final Decree.

13      **3.1.5**   **Pre-Effective Date Professional Fee Claims.** Each Pre-Effective Date

14  Professional seeking from the Bankruptcy Court an award with respect to a Pre-Effective

15  Date Professional Fee Claim shall file its final application for allowance of compensation for

16  services rendered and reimbursement of expenses incurred through the Effective Date by no

17  later than the forty-fifth (45th) day after the Effective Date or such later date as may be fixed

18  by the Bankruptcy Court. Such Pre-Effective Date Professional shall receive, in full

19  satisfaction, discharge, exchange and release of its Pre-Effective Date Professional Fee

20  Claim, Cash in such amounts as are allowed by the Bankruptcy Court. All objections to

21  allowance of Pre-Effective Date Professional Fee Claims must be filed and served timely in

22  accordance with the requirements of the Bankruptcy Rules.

23      **3.2**   **Allowed Priority Tax Claims.** Except to the extent that a holder of an Allowed

24  Priority Tax Claim agrees to a less favorable treatment of its Allowed Priority Tax Claim, each

25  holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, discharge, exchange and

26  release of its Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax

27  Claim, on the later of (i) the Effective Date or (ii) the fifteenth (15th) Business Day after such

28  Priority Tax Claim becomes an Allowed Priority Tax Claim.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

20

MTI Plan v3.0

**IV.**

**CLASSIFICATION OF CLAIMS AND INTERESTS**

**4.1** **Overview.** As required by the Bankruptcy Code, this Plan places Claims and Interests into Classes according to their respective legal rights and interests, including their respective rights to priority. In Section 4.2 hereof, the Plan Proponents list each Class of Claims and Interests established under this Plan and state whether each Class is impaired or is unimpaired by this Plan. A Class is "unimpaired" by this Plan if this Plan leaves unaltered the legal, equitable and contractual rights to which the holders of Claims or Interests in the Class are entitled, as provided in section 1124 of the Bankruptcy Code. Article V of this Plan sets forth the treatment that each Class will receive under this Plan.

Pursuant to this Plan, a Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in another Class or Classes to the extent that any remainder of the Claim qualifies within the description of such other Class or Classes. A Claim is classified in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied prior to the Effective Date.

**4.2** **Designation of Classes.** This Plan designates the following Classes of Claims and Interests:

**4.2.1** **Allowed Claims.**

4.2.1.1    Class 1: Any Allowed Secured Claims. This Class is unimpaired by this Plan.

4.2.1.2    Class 2: Allowed Priority Non-Tax Claims. This Class is unimpaired by this Plan.

4.2.1.3    Class 3: Allowed General Unsecured Claims. This Class is impaired by this Plan.

4.2.1.4    Class 4: The Canopy Claim. This Class is unimpaired by this Plan.

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

21

MTI Plan v3.0

1        4.2.1.5    Class 5: Any Allowed Subordinated Claims. This Class is

2    impaired by this Plan.

3    **4.2.2    Interests.**

4        4.2.2.1    Class 6: Interests of the Interest Holders. This Class is impaired

5    by this Plan.

6    **4.3    Summary of Classification.** The following table summarizes the Classes of Claims

7    and Interests established by this Plan:

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Class 1 | Allowed Secured Claims | Unimpaired | Deemed to Accept Plan |
| Class 2 | Allowed Priority Non-Tax Claims | Unimpaired | Deemed to Accept Plan |
| Class 3 | Allowed General Unsecured Claims | Impaired | Entitled to Vote on Plan |
| Class 4 | Canopy Claim | Unimpaired | Deemed to Accept Plan |
| Class 5 | Allowed Subordinated Claims | Impaired | Entitled to Vote on Plan |
| Class 6 | Interests | Impaired | Deemed to Reject the Plan |

    As set forth above, Classes 1, 2 and 4 are unimpaired by this Plan; holders of Claims in these Classes are conclusively presumed to have accepted this Plan and, hence, are not entitled to vote with respect to this Plan. Classes 3 and 5 are impaired by this Plan, and holders of Claims in these Classes are entitled to vote to accept or reject this Plan. Interests in Class 6 are impaired; the Plan Proponents believe that it is very likely that Interest Holders will not receive or retain under this Plan any value on account of their Interests, and, hence, Interest Holders are deemed to reject this Plan in accordance with section 1126(g) of the Bankruptcy Code.

    The treatment of Claims and Interests under this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights that each Creditor or Interest Holder may have in or against the Debtor or its property. This treatment supersedes and replaces any agreements or rights which those entities have in or against the Debtor or its property. **NO DISTRIBUTIONS SHALL**

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Plan v3.0

MAINDOCS-#149105-v3-M11_4th_Amended_CH_11_Plan.DOC

1  BE MADE, AND NO RIGHTS SHALL BE RETAINED, ON ACCOUNT OF ANY CLAIM

2  THAT IS NOT AN ALLOWED CLAIM.

3  **V.**

4  **TREATMENT OF CLASSES UNDER THIS PLAN**

5  The following sets forth the treatment of Classes established by this Plan.

6  **5.1    Class 1 -- Any Allowed Secured Claims.**  Class 1 consists of any Allowed Secured

7  Claims.  Class 1 is unimpaired by this Plan.  In the event that there is more than one holder of an

8  Allowed Class 1 Claim, the Allowed Secured Claim of each such Secured Creditor shall be deemed

9  to be classified in a separate sub-class of Class 1, and each such sub-class of Class 1 shall be

10  deemed to be a separate Class under this Plan.

11  **5.1.1    Treatment of Allowed Secured Claims.**  Within fifteen (15) Business Days

12  after the Effective Date, each Secured Creditor holding an Allowed Class 1 Claim shall

13  receive, at the election of the Plan Agent, made in the exercise of its sole and absolute

14  discretion, one of the following treatments in full satisfaction, discharge, exchange and

15  release of the Allowed Class 1 Claim:

16  **5.1.1.1    Option 1.**  The holder of the Allowed Class 1 Claim shall receive a

17  return of the Collateral in which that Secured Creditor has a security interest.

18  Unless a Secured Creditor holding an Allowed Deficiency Claim should make an

19  election under section 1111(b) of the Bankruptcy Code, its Allowed Deficiency

20  Claim shall be treated hereunder as a Class 3 Allowed General Unsecured Claim.

21  **5.1.1.2    Option 2.**  The holder of the Allowed Class 1 Claim shall receive

22  any proceeds actually received by the Debtor or Reorganized Debtor (as applicable)

23  from the sale or other disposition of the Collateral in which that Secured Creditor

24  has a security interest.  Unless a Secured Creditor holding an Allowed Deficiency

25  Claim should make an election under section 1111(b) of the Bankruptcy Code, its

26  Allowed Deficiency Claim shall be treated hereunder as a Class 3 Allowed General

27  Unsecured Claim

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

23

MTI Plan v3.0

MAINDOCS-#149105-v3-M11_4th_Amended_CH_11_Plan.DOC

   5.1.1.3 <u>Option 3</u>.  The holder of the Allowed Class 1 Claim shall receive Cash in the full amount of that Secured Creditor's Allowed Class 1 Claim.

   5.1.1.4 <u>Option 4</u>.  The holder of the Allowed Class 1 Claim shall receive such other Distributions or treatment as is necessary to leave the rights of that Secured Creditor unimpaired under the Bankruptcy Code.

  The Plan Agent shall have until the <u>later</u> of the tenth (10th) Business Day before the Confirmation Hearing Date, or the tenth (10th) Business Day after the date on which a Class 1 Claim because an Allowed Secured Claim, to elect which treatment set forth under this Section 5.1.1 to provide to the Secured Creditor holding such Allowed Class 1 Claim.

  **5.2** **Class 2 -- Allowed Priority Non-Tax Claims.**  Class 2 consists of all Allowed Priority Non-Tax Claims.  Class 2 is not impaired by this Plan.

   **5.2.1** **Treatment of Allowed Non-Tax Priority Claims.**  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment of its Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction, discharge, exchange and release of its Allowed Priority Non-Tax Claim, Cash in the full amount of the Allowed Priority Non-Tax Claim on the later of (i) the Effective Date, and (ii) the fifteenth (15th) Business Day after such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

  **5.3** **Class 3 -- Allowed General Unsecured Claims.**  Class 3 consists of all Allowed General Unsecured Claims.  Class 3 is impaired by this Plan.

   **5.3.1** **Treatment of Allowed General Unsecured Claims.**  The treatment of Allowed Class 3 Claims is as follows:

   5.3.1.1 Subject to the provisions of Sections 5.3.1.3, 5.3.1.4, 5.3.1.5 and 5.3.1.6 of this Plan, except to the extent that the holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed General Unsecured Claim, the holder of an Allowed General Unsecured Claim shall receive, in full and complete satisfaction, discharge, exchange and release of its Allowed

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

24

1  General Unsecured Claim, Pro Rata Distributions of the Plan Fund Proceeds

2  available for distribution to holders of Allowed Class 3 Claims.

3       5.3.1.2    The Plan Agent shall make Distributions to the holders of Allowed

4  Class 3 Claims from the Plan Fund Proceeds.  All holders of Allowed Class 3

5  Claims shall receive an initial Distribution of their Pro Rata share of the Plan Fund

6  Proceeds within 180 days following the Effective Date, or on such later date as the

7  Plan Agent determines to be practicable, in the exercise of its sole and absolute

8  discretion, and shall receive thereafter during the Case Distributions of their Pro

9  Rata share of Plan Fund Proceeds on each 180th-day anniversary of the Effective

10  Date, or on such later date as the Plan Agent determines to be practicable in the

11  exercise of its sole and absolute discretion.  Holders of Allowed Class 3 Claims

12  shall receive any final Distribution of their Pro Rata share of Plan Fund Proceeds

13  within ten (10) days after the filing of the Plan Agent Certification, or as soon

14  thereafter as is practicable.  Upon payment of the amount owed to the holder of any

15  Allowed Class 3 Claim under this Plan, such Allowed Class 3 Claim shall be

16  deemed to be fully and completely satisfied, discharge and released.

17       5.3.1.3    In accordance with section 726(a)(5) of the Bankruptcy Code, an

18  Allowed General Unsecured Claim shall not include Postpetition Interest on account

19  of such Allowed General Unsecured Claim, except to the extent that all of the

20  following are satisfied and paid in full:  (a) all Allowed Administrative Claims;

21  (b) all Allowed Priority Tax Claims; (c) all Allowed Priority Non-Tax Claims;

22  (d) all Allowed Secured Claims (subject to the elections provided pursuant to

23  Section 5.1.1 hereof); (e) all Allowed General Unsecured Claims; (f) the Canopy

24  Claim; (g) all Late-Filed Claims; (h) all Post-Effective Date Plan Expenses; and

25  (i) all Allowed Penalty Claims.  Any Postpetition Interest that may be payable on an

26  Allowed General Unsecured Claim shall be calculated from the Petition Date

27  through the date on which such Allowed General Unsecured Claim is paid in full.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

25

MTI Plan v3.0

MAINDOCS-#149105-v3-M11_4th_Amended_Ch_11_Plan.DOC

1    5.3.1.4    Notwithstanding any other provision to the contrary contained in

2    this Plan, no Cash Distribution shall be made on account of any Allowed General

3    Unsecured Claim until each of the following occurs:  (a) all Allowed Administrative

4    Claims are paid; (b) all Allowed Priority Tax Claims are paid; (c) all Allowed

5    Priority Non-Tax Claims are paid; (d) all Allowed Secured Claims are paid (subject

6    to the elections provided pursuant to Section 5.1.1 hereof); (e) the Disputed Claims

7    Reserve is adequately funded for the Claims referenced in subsections (a)

8    through (d) of this Section 5.3.1.4; and (f) all outstanding Post-Effective Date Plan

9    Expenses have been paid in full and an adequate Reserve is established by the Plan

10    Agent providing for full payment of the estimated amount of all Post-Effective Date

11    Plan Expenses through the Case Closing Date, in an amount to be determined by the

12    Plan Agent in the exercise of its sole and absolute discretion.

13    5.3.1.5    Each holder of an Allowed General Unsecured Claim shall be

14    allocated its Pro Rata number of shares of Post-Effective Date Stock, to be held in

15    trust for such Creditor by the Plan Agent in contemplation of a potential Merger

16    Transaction.  Subject to the provisions of Section 6.18 hereof, each holder of an

17    Allowed General Unsecured Claim shall receive a Distribution of any Post-Effective

18    Date Stock, or the net proceeds realized from the disposition of such Post-Effective

19    Date Stock, in connection with any Merger Transaction; provided, however, that the

20    holder of an Allowed General Unsecured Claim shall have the right to elect not to

21    receive any Distribution of Post-Effective Date Stock, in accordance with the

22    provisions of Section 6.18.6 hereof.

23    5.3.1.6    Notwithstanding anything to the contrary contained in

24    Section 5.3.1, no holder of an Allowed General Unsecured Claim shall be entitled to

25    receive more than 100% of the amount of its Allowed General Unsecured Claim,

26    plus any Postpetition Interest thereon payable pursuant to Section 5.3.1.3 hereof.

27    For the purpose of this Section 5.3.1.6, the value of any Distribution of Post-

28

MTI Plan v3.0

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1    Effective Date Stock shall be determined pursuant to the provisions of

2    Section 6.18.5 hereof.

3        **5.4**    **Class 4 -- Canopy Claim.**  Class 4 consists of the Canopy Claim.  The Canopy

4    Claim is unimpaired under this Plan.

5            **5.4.1**    **Treatment of Canopy Claim.**  Canopy shall be paid, without alteration or

6    modification, any and all amounts to which Canopy is entitled pursuant to paragraphs 2

7    and 3 of that Settlement Agreement and Mutual Release of Claims ("Canopy Agreement"),

8    approved by an order of the Bankruptcy Court entered on November 13, 2008, a true and

9    complete copy of which is attached hereto as Exhibit "1."

10        **5.5**    **Class 5 -- Allowed Subordinated Claims.**  Class 5 consists of all Allowed

11    Subordinated Claims.  Class 5 is impaired by this Plan.

12            **5.5.1**    **Treatment of Allowed Subordinated Claims.**  The treatment of any

13    Allowed Class 5 Claim is as follows:

14                5.5.1.1    Subject to the provisions of Sections 5.5.1.3, 5.5.1.4, 5.5.1.5

15    and 5.5.1.6 of this Plan, except to the extent that the holder of any Allowed

16    Subordinated Claim agrees to a less favorable treatment of its Allowed Subordinated

17    Claim, in the event that all Allowed General Unsecured Claims are paid in full as set

18    forth in Section 5.3.1 of this Plan, the holder of an Allowed Subordinated Claim

19    shall receive, in full and complete satisfaction, discharge, exchange and release of

20    its Allowed Subordinated Claim, solely from the Plan Fund Proceeds, a Pro Rata

21    Distribution of any remaining Plan Fund Proceeds.

22                5.5.1.2    The Plan Agent shall make Distributions to the holders of

23    Allowed Class 5 Claims, from any Plan Fund Proceeds available for distribution to

24    holders of Allowed Class 5 Claims.  All holders of Allowed Class 5 Claims shall

25    receive an initial Distribution of their Pro Rata share of any Plan Fund Proceeds

26    available for distribution to holders of Allowed Class 5 Claims on such date as the

27    Plan Agent determines to be practicable, in the exercise of its sole and absolute

28    discretion, and thereafter shall receive Distributions of any such Plan Fund Proceeds

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Plan v3.0

1    as the Plan Agent determines to be practicable, in the exercise of its sole and

2    absolute discretion.  Holders of Allowed Class 5 Claims shall receive any final

3    Distribution of any Plan Fund Proceeds available for distribution to holders of

4    Allowed Class 5 Claims within ten (10) days after the filing of the Plan Agent

5    Certification, or as soon thereafter as is practicable.  Upon payment of the amount, if

6    any, owed to each holder of an Allowed Class 5 Claim under this Plan, such

7    Allowed Class 5 Claim shall be deemed to be fully and completely satisfied,

8    discharged and released.

9        5.5.1.3    In accordance with section 726(a)(5) of the Bankruptcy Code, an

10   Allowed Subordinated Claim shall not include Postpetition Interest on account of

11   such Allowed Subordinated Claim, except to the extent that all of the following are

12   satisfied and paid in full:  (a) all Allowed Administrative Claims; (b) all Allowed

13   Priority Tax Claims; (c) all Allowed Priority Non-Tax Claims; (d) all Allowed

14   Secured Claims (subject to the elections provided pursuant to Section 5.1.1 hereof);

15   (e) all Allowed General Unsecured Claims; (f) the Canopy Claim; (g) all Late-Filed

16   Claims; (h) all Post-Effective Date Plan Expenses; (i) all Allowed Penalty Claims;

17   and (j) all Allowed Subordinated Claims in accordance with the terms thereof.  Any

18   Postpetition Interest that may be payable on an Allowed Subordinated Claim shall

19   be calculated from the Petition Date through the date on which such Allowed

20   Subordinated Claim is paid in full.

21       5.5.1.4    Notwithstanding any other provision to the contrary contained in

22   this Plan, no Distribution shall be made on account of any Allowed Subordinated

23   Claim until each of the following occurs:  (a) all Allowed Administrative Claims are

24   paid; (b) all Allowed Priority Tax Claims are paid; (c) all Allowed Priority Non-Tax

25   Claims are paid; (d) all Allowed Secured Claims are paid (subject to the elections

26   provided pursuant to Section 5.1.1 hereof); (c) all Allowed General Unsecured

27   Claims are paid; (f) the Disputed Claims Reserve is adequately funded for the

28   Claims referenced in subsections (a) through (e) of this Section 5.5.1.4; and (g) all

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Plan v3.0                                        Exhibit A, page 112

MAINDOCS-#149105-v3-MTI_4th_Amended_CH_11_Plan.DOC

1  outstanding Post-Effective Date Plan Expenses have been paid in full and an

2  adequate Reserve is established by the Plan Agent providing for full payment of the

3  estimated amount of all Post-Effective Date Plan Expenses through the Case

4  Closing Date, in an amount to be determined by the Plan Agent in the exercise of its

5  sole and absolute discretion.

6        5.5.1.5    No Post-Effective Date Stock, or other equity security interest in

7  the Reorganized Debtor, shall be issued on account of an Allowed Subordinated

8  Claim.

9        5.5.1.6    Notwithstanding anything to the contrary contained in

10  Section 5.5.1, no holder of an Allowed Subordinated Claim shall be entitled to

11  receive more than 100% of the amount of its Allowed Subordinated Claim, plus any

12  Postpetition Interest thereon payable pursuant to Section 5.5.1.3 hereof.

13     **5.6**   **Class 6 -- Allowed Interests.**  Class 6 consists of all Allowed Interests.  Class 6 is

14  impaired under this Plan.

15      **5.6.1**   **Treatment of Allowed Interests.**  The treatment of Allowed Interests under

16  this Plan is as follows:

17        5.6.1.1    On the Effective Date of this Plan, all Interests shall be cancelled,

18  and Interest Holders shall receive no Post-Effective Date Stock or any other Interest

19  of any nature whatsoever in the Reorganized Debtor.  Interest Holders shall not

20  receive any Distributions on account of their Interests; provided, however, that, in

21  the event that each Allowed Claim, plus any Postpetition Interest to which the

22  holder thereof is entitled, is paid in full, each holder of an Allowed Interest shall

23  receive, in full and complete satisfaction, discharge, exchange and release of such

24  Allowed Interest, Pro Rata Distributions of any Plan Fund Proceeds remaining in

25  the Plan Fund, payable as soon as practicable as the Plan Agent determines in the

26  exercise of its sole and absolute discretion.

27        5.6.1.2    It is expected that Class 6 Interest Holders will receive no

28  Distributions under this Plan.  Accordingly, for the purpose of this Plan, Interest

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

29

MTI Plan v3.0

MAINDOCS-#149105-v3-MTI_-III_Amended_Ch_11_Plan.DOC

1    Holders are deemed not to have accepted this Plan, and are not entitled to vote with

2    respect to this Plan, as provided by section 1126(g) of the Bankruptcy Code.

3         5.6.1.3    For the purpose only of determining any Distributions to which

4    Interest Holders may be entitled under Section 5.6.1.1 hereof, each beneficial owner

5    or holder of record of MTI Stock as of the Effective Date shall be deemed to have

6    an Allowed Interest for the number of shares of MTI Stock held by it as of the

7    Effective Date, and need not file a proof of its Interest with respect thereto.  In the

8    event that any entity that is neither the record holder of MTI Stock as of the

9    Effective Date nor the beneficial owner of MTI Stock as of the Effective Date files a

10    proof of right to record status pursuant to Rule 3003(d) of the Federal Bankruptcy

11    Rules, such proof of right shall be disallowed automatically and without any need

12    for the Debtor, the Reorganized Debtor, the Plan Agent, or any other party-in-

13    interest to object thereto or otherwise take any act with respect thereto.

## VI.

## PLAN IMPLEMENTATION

16    **6.1**    **Overview.**  This Plan provides that, from and after the Effective Date, the Debtor's

17    Assets, including, without limitation, any Causes of Action, shall be liquidated and the Plan Fund

18    Proceeds distributed to the holders of Allowed Claims in accordance with the provisions of this

19    Plan.  The Plan Agent shall be responsible for maintaining the Plan Assets, liquidating the Plan

20    Assets, prosecuting or settling Causes of Action, and making Distributions in payment of Allowed

21    Claims in accordance with the provisions of this Plan.  In addition, the Plan Agent shall be

22    responsible for evaluating the viability of, and, if appropriate, pursuing a Merger Transaction, in

23    order to enhance the value of the Post-Effective Date Stock issued on account of Allowed General

24    Unsecured Claims, for the benefit of the holders of Allowed General Unsecured Claims.

25    **6.2**    **Condition Precedent to Plan Confirmation.**  The only condition precedent to the

26    confirmation of this Plan is that the Bankruptcy Court shall have entered the Confirmation Order on

27    terms and conditions satisfactory to the Plan Proponents.

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

30

MAINDOCS-#149105-v3-M11_4th_Amended_Ch_11_Plan_(A.A.)

1    **6.3    <u>Conditions Precedent to the Effectiveness of the Plan</u>.** The following are the

2    conditions precedent to the effectiveness of this Plan and the occurrence of the Effective Date:

3    (a) the Confirmation Order shall have become a Final Order; (b) any documents, instruments and

4    agreements, in form and substance satisfactory to the Plan Proponents, provided for by, or

5    appropriate to implement, this Plan shall have been executed and delivered by the parties thereto;

6    (c) the Plan Proponents shall have received all authorizations, consents, rulings, opinions or other

7    documents that are determined by the Plan Proponents, in the exercise of their sole and absolute

8    discretion, to be appropriate to implement this Plan; and (d) the Plan Proponents shall have

9    determined, in the exercise of their sole and absolute discretion, that sufficient Cash exists to pay, or

10    to establish a Reserve for the payment of, all Administrative Claims, Priority Tax Claims, Priority

11    Non-Tax Claims and Secured Claims (subject to the election of the options provided by

12    Section 5.1.1 hereof), and to otherwise fund the obligations provided for by this Plan and to pay the

13    expenses associated with the implementation of this Plan.

14    The Plan Proponents may, in the exercise of their sole and absolute discretion, waive any of

15    the conditions to the effectiveness of this Plan and to the occurrence of the Effective Date set forth

16    hereinabove, without the need for any prior notice or hearing with respect thereto. Without limiting

17    the generality of the foregoing, in the event that an appeal, petition for certiorari or motion for

18    reargument or rehearing or comparable post-confirmation relief is filed with respect to the

19    Confirmation Order, and no stay of the effectiveness of the Confirmation Order is obtained, the

20    Plan Proponents may elect, in the exercise of their sole and absolute discretion, to waive the

21    condition set forth in Section 6.3(a) hereof, and to proceed with the Effective Date of this Plan and

22    to commence to consummate this Plan, by filing and serving notice of such election upon the

23    United States Trustee and the party seeking such post-confirmation relief.

24    The failure of any condition set forth in this Section 6.3 to be satisfied constitutes good and

25    sufficient cause for the Plan Proponents to have this Plan not become effective regardless of the

26    circumstances giving rise to the failure of such condition to be satisfied (including, without

27    limitation, any act or failure to act by the Plan Proponents).

28

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

31

MTI Plan v3.0

1    **6.4    Implementation of Plan.**  On or soon as practicable after the Effective Date, the

2    following shall occur with respect to the implementation of this Plan:  (a) all acts, documents and

3    agreements appropriate to implement this Plan shall be effected or executed; (b) the Plan Agent, as

4    Disbursing Agent under this Plan, shall make all Distributions required to be made on or about the

5    Effective Date of this Plan; and (c) the Plan Agent, as Disbursing Agent under this Plan, shall fund

6    the Reserves required to be funded on or about the Effective Date of this Plan.

7    **6.5    Corporate Action.**  Upon the Effective Date, all transactions and matters provided

8    for under this Plan shall be deemed to have been authorized and approved by the Debtor without

9    any requirement of further action by the Debtor, the Debtor's Interest Holders, or by the Debtor's

10    board of directors.

11    **6.6    Plan Agent/Vesting of Assets.**  In accordance with the provisions of Section 6.6.1

12    hereof, on the Effective Date, a Plan Agent shall be appointed who shall have the rights, powers and

13    duties provided for by this Plan and the Confirmation Order.  In accordance with the provisions of

14    Section 6.6.2 hereof, on the Effective Date, and subject to Canopy's rights under the Canopy

15    Agreement, the Assets shall be transferred to and vest in, the Reorganized Debtor, to be

16    administered by the Plan Agent.

17    **6.6.1    Employment of Plan Agent.**  On the Effective Date, a Plan Agent shall be

18    appointed to administer the Plan Assets in accordance with the terms of this Plan and to

19    make Distributions in accordance with the terms of this Plan.  The Plan Agent shall have the

20    rights, powers and duties provided for by this Plan and the Confirmation Order.

21    **6.6.2    Transfer of Assets.**  On the Effective Date, pursuant to sections 1123, 1141

22    and 1146(a) of the Bankruptcy Code, the Debtor and its Estate are authorized to, and shall,

23    transfer, grant, assign, convey, set over, and deliver to the Reorganized Debtor, to be

24    administered by the Plan Agent for the benefit of the holders of Allowed Claims and

25    Interest Holders to the extent that Interest Holders are entitled to receive Distributions under

26    Section 5.6.1.1 hereof, all of the Debtor's and the Estate's right, title and interest in and to

27    the Assets, including Causes of Action, free and clear of all Liens, Claims, and Interests of

28    any kind, except as provided expressly to the contrary in this Plan.  All Creditors and other

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

32

MTI Plan v3.0

parties-in-interest shall cooperate with the Debtor and the Plan Agent by executing any documents, and by taking any acts, appropriate to implement the transfers of the Assets to the Reorganized Debtor.  From and after the Effective Date, the transfer of the Assets from the Estate to the Reorganized Debtor, and the vesting of the Assets in the Reorganized Debtor, shall be deemed to be final and irrevocable.

      **6.6.3   Disposition of Plan Assets.**  The Plan Agent, under the supervision of the Post-Effective Date Committee, may administer, manage, use, convey, transfer, encumber, assign and otherwise dispose of any and all of the Plan Assets and take all acts appropriate to effectuate the same, free of any restrictions imposed by the Bankruptcy Code or by the Bankruptcy Rules.

      **6.7   Termination of Debtor's Officers, Directors, Employees and Professionals.** Except as otherwise provided by this Plan or as otherwise retained by the Plan Agent, the Debtor's officers, directors, employees and Professionals shall be terminated and relieved of any responsibilities to the Debtor or to the Reorganized Debtor as of the Effective Date.

      **6.8   Plan Fund Proceeds/Plan Administration.**

      **6.8.1   Distributions of Plan Fund Proceeds.**  Distributions of Plan Fund Proceeds shall be made solely to the holders of Allowed General Unsecured Claims, to Canopy on account of any Canopy Claim and, in accordance with the provisions of Sections 5.5.1.1 and 5.6.1.1 hereof, in the unlikely event that Allowed General Unsecured Claims are paid in full, holders of Allowed Subordinated Claims, and, if Allowed Subordinated Claims are paid in full, Interest Holders.  The holders of Allowed General Unsecured Claims shall receive Distributions from the Plan Fund solely as provided for by this Plan and Canopy shall receive on account of the Canopy Claim Distributions from the Plan Fund solely as provided for by this Plan and the terms of the Canopy Agreement.

      **6.8.2   Plan Agent's Implementation of Plan.**  Subject to Canopy's rights under the Canopy Agreement, the Plan Agent, under the supervision of the Post-Effective Date Committee, shall be authorized to, and shall, take all acts appropriate to implement the provisions of this Plan as are contemplated to be taken by the Plan Agent under this Plan,

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

1    including, without limitation, making Distributions to holders of Allowed Claims, objecting

2    to Disputed Claims, prosecuting or settling the Causes of Action and, if the Plan Agent

3    deems appropriate, effectuating a Merger Transaction.

4        **6.8.3    Representative of the Estate.**  The Plan Agent, under the supervision of the

5    Post-Effective Date Committee, shall be, and hereby is, appointed as the representative of

6    the Estate pursuant to sections 1123(a)(5), 1123(a)(7) and 1123(b)(3)(B) of the Bankruptcy

7    Code and, as such, shall be vested with the authority and power, subject to the provisions of

8    this Plan, to take, among others, the following acts on behalf of the Reorganized Debtor:

9    (a) manage, administer and dispose of Plan Assets for the benefit of holders of Allowed

10    Claims; (b) file, litigate, prosecute, settle, adjust, retain, enforce, collect and abandon all

11    Causes of Action in the name of, and for the benefit of, the Estate; (c) make all Distributions

12    provided for by this Plan; and (d) such  other acts as may be appropriate to administer,

13    wind-down, and close the Case.  As the representative of the Estate, the Plan Agent, under

14    the supervision of the Post-Effective Date Committee, shall succeed to all of the rights and

15    powers of the Debtor and the Estate with respect to all Causes of Action, and shall be

16    substituted for, and shall replace, the Debtor, the Estate and the Committee, as applicable, as

17    the party-in-interest in all such litigation pending as of the Effective Date.

18        **6.8.4    Plan Agent Disclosure.**  On or before the thirtieth (30th) day prior to the

19    Confirmation Hearing Date, the Plan Proponents shall file with the Bankruptcy Court a

20    pleading disclosing the identity of the Plan Agent, its credentials, and any and all relevant

21    information regarding the retention of the Plan Agent, including, without limitation, any and

22    all affiliations, connections and actual or potential conflicts of interest that the Plan Agent

23    may have in the Case ("Plan Agent Disclosure").  A copy of the Plan Agent's engagement

24    agreement shall be attached to the Plan Agent Disclosure.

25        **6.8.5    No Liability of Post-Effective Date Committee, the Plan Agent or the**

26    **Reorganized Debtor.**  To the maximum extent permitted by law, the Post-Effective Date

27    Committee, the Plan Agent and the Reorganized Debtor, and their respective employees,

28    officers, directors, shareholders, agents, members, representatives, and Professionals

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

34

MTI Plan v3.0

Exhibit A, page 118
MAINDOCS-#149105-v3-MTI_4th_Amended_Ch_11_Plan.DOC

1  (collectively, "Representatives") shall not have or incur liability to any Creditor, Interest

2  Holder, party-in-interest or to any other entity for an act taken or omission made in good

3  faith in connection with or related to the administration of the Plan Assets, the

4  implementation of this Plan and the making of Distributions under this Plan. The Post-

5  Effective Date Committee, the Plan Agent, the Reorganized Debtor and the Representatives

6  shall in all respects be entitled to reasonably rely on the advice of counsel with respect to

7  their respective duties and responsibilities under this Plan. Entry of the Confirmation Order

8  shall constitute a judicial determination that the exculpation provisions contained in this

9  Section 6.8.5 are necessary to, inter alia, facilitate Confirmation and to minimize potential

10  claims arising after the Effective Date for indemnity, reimbursement or contribution from

11  the Plan Assets. The approval of this Plan by the Confirmation Order shall constitute a res

12  judicata determination of the matters included in the exculpation provisions of this Plan.

13  Notwithstanding the foregoing, nothing in this Section 6.8.5 shall absolve the Post-Effective

14  Date Committee, the Plan Agent or the Reorganized Debtor of any potential liability that

15  any of them respectively may have to any Creditor (which liability shall be several and not

16  joint) on account of any acts or omissions by it constituting willful misconduct or gross

17  negligence.

18      **6.8.6**    **Funding of Post-Effective Date Plan Expenses.** All Post-Effective Date

19  Plan Expenses shall be expenses of the Reorganized Debtor. Except as may be provided

20  expressly to the contrary in the Plan Agent Disclosure, the Plan Agent shall have no

21  personal liability for any Post-Effective Date Plan Expenses. The Plan Agent shall disburse

22  Plan Fund Proceeds from the Plan Fund for the purpose of funding the Post-Effective Date

23  Plan Expenses.

24      **6.9**    **Termination of the Committee and Appointment of the Post-Effective Date**

25  **Committee.**

26      **6.9.1**    **Replacement of the Committee.** As of the Effective Date, the Committee

27  shall terminate and disband, and the Committee shall be released from and discharged of all

28  further authority, duties, responsibilities and obligations related to the Case. As of the

35

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

MTI Plan v3.0

1    Effective Date, the Committee shall be replaced by the Post-Effective Date Committee,

2    which shall be comprised of members of the Committee.  The Post-Effective Date

3    Committee shall have the right to supervise the Plan Agent and shall have the other powers,

4    rights, responsibilities and functions identified in this Plan and in a disclosure document to

5    be filed in the Bankruptcy Court on or before the thirtieth (30th) day prior to the

6    Confirmation Hearing Date ("Post-Effective Date Committee Disclosure").

7         6.9.2    **Members of Post-Effective Date Committee.**  In the event of the death or

8    resignation of any member of the Post-Effective Date Committee, the remaining members

9    of the Post-Effective Date Committee shall have the right to designate a successor member

10   from among the holders of Allowed General Unsecured Claims.  If a Post-Effective Date

11   Committee member assigns its Claim in full, or releases the Debtor from payment of the

12   balance of such member's Claim, such act shall constitute a resignation from the Post-

13   Effective Date Committee.  Until a vacancy on the Post-Effective Date Committee is filled,

14   the Post-Effective Date Committee shall function in its reduced number.  Upon the Case

15   Closing Date, the Post-Effective Date Committee shall be dissolved and the members

16   thereof shall be released and discharged of and from all further authority, duties,

17   responsibilities and obligations related to and arising from their service as Post-Effective

18   Date Committee members.

19        6.9.3    **Duties of Members of Post-Effective Date Committee.**  The members of

20   the Post-Effective Date Committee shall undertake their duties as specified in this Plan and

21   in the Post-Effective Date Committee Disclosure.  In serving as a member of the Post-

22   Effective Date Committee, such member shall not assume, or be deemed to have assumed,

23   any liability to Creditors, the Debtor, or any other parties-in-interest in the Case and shall

24   not be liable for any acts or omissions while acting in that capacity, except for acts or

25   omissions constituting willful misconduct or gross negligence.

26   **6.10    The Reorganized Debtor.**

27        6.10.1    **Corporate Powers.**  The Debtor, as the Reorganized Debtor, shall continue

28   to exist after the Effective Date of this Plan.  The Reorganized Debtor shall have all of the

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

36

MTI Plan v3.0

1   powers and rights of a corporation under the laws of the State of Delaware, and, except as set

2   forth in this Plan expressly to the contrary, shall continue to have all corporate powers and

3   rights accorded to it under its Articles of Incorporation, Bylaws and other corporate

4   governance agreements.

5       **6.10.2   Board of Directors.**  On the Effective Date, the members of the Board of

6   Directors of the Reorganized Debtor shall be the following persons:  the Plan Agent; Scott

7   Poteracki; and another individual to be named by the Post-Effective Date Committee.  The

8   Reorganized Debtor shall maintain customary directors and officers insurance coverage

9   through the Case Closing Date, or as otherwise determined by the Plan Agent.  The members

10  of the Board of Directors shall be entitled to payment of compensation, for serving on the

11  Reorganized Debtor's Board of Directors, in the amount of $1,250.00 per calendar quarter,

12  or as otherwise determined reasonably by the Plan Agent in the exercise of its sole and

13  absolute discretion; provided, however, that such compensation paid to the Plan Agent for

14  serving on the Reorganized Debtor's Board of Directors shall be applied against the

15  compensation payable to the Plan Agent pursuant to this Plan and as set forth in the Plan

16  Agent Disclosure.

17      **6.10.3   Officer of Reorganized Debtor.**  As of the Effective Date, the Plan Agent

18  shall serve as the Chief Executive Officer of the Reorganized Debtor.  The Board of

19  Directors of the Reorganized Debtor may appoint other officers as appropriate to aid in the

20  implementation of this Plan.  The Plan Agent shall be authorized to take any act, and to

21  execute any documents, necessary to preserve the corporate existence of the Reorganized

22  Debtor, with no additional authorization required for the Plan Agent to do so.

23      **6.10.4   Effectuation of Merger Transaction.**  The Reorganized Debtor shall

24  continue in existence after the Effective Date, as appropriate to effectuate a Merger

25  Transaction.  In accordance with the provisions of Section 6.18 hereof, the Plan Agent, under

26  the supervision of the Post-Effective Date Committee, shall determine whether a Merger

27  Transaction is viable, whether a Merger Transaction should be effectuated for the benefit of

28  holders of Allowed General Unsecured Claims and the terms thereof, and/or whether to

CLARKSON, GORE & MARSELLA, APLC
ATTORNEYS AT LAW
TORRANCE, CALIFORNIA

37